D1MLCIB1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          11-CR-424 (NRB)

5    GULAY CIBIK, REFAEL BRODJIK,
     a/k/a "Rafi," NATHAN SCHWARTZ,
6    HAROLD TISCHLER, a/k/a
     "Hershy,",
7
                   Defendants.            Jury Trial
8
     ------------------------------x
9
                                          New York, N.Y.
10                                        January 22, 2013
                                          9:16 a.m.
11

12   Before:

13                   HON. NAOMI REICE BUCHWALD,

14                                        District Judge

15                        APPEARANCES

16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
19        Assistant United States Attorneys
     MICHAEL DINET, Paralegal Specialist
20

21   DONALDSON CHILLIEST LLP
          Attorneys for Defendant Gulay Cibik
22   BY:  XAVIER R. DONALDSON, ESQ.

23   LAWRENCE D. GERZOG, ESQ.
     JEREMY L. GUTMAN, ESQ.
24        Attorneys for Defendant Refeal Brodjik

25

D1MLCIB1

                              APPEARANCES
                              (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:   PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:   DEIDRE GORDON, Special Agent, Homeland Security
                RYAN GIBBS, Special Agent, U.S. Dept. of Labor

```
 1              (Trial resumed)

 2              (Jury not present)

 3              THE COURT:  All right.  This looks a little empty.

 4    Where are the bodies?

 5              MR. GUTMAN:  Mr. Brill was right next to me in line

 6    until we got split up at Worth Street, so I think he's right on

 7    his way.

 8              THE COURT:  Guys, how do we get started at nine?  All

 9    the jurors were here and the lawyers aren't here.  Apparently

10    there's a missing client as well.

11              MR. GUTMAN:  Your Honor, the lines on both entrances.

12              THE COURT:  And every experienced lawyer knows that on

13    Monday morning when there's a jury call that the lines are

14    going to be long.  And what is the answer?  Get here early.

15              MR. GUTMAN:  I understand, your Honor.

16              THE COURT:  I catch a train 40 minutes earlier when

17    I'm on trial so that I can be here without question.  I don't

18    think it's wrong to expect the same thing of counsel.

19              MR. GUTMAN:  I understand.

20              THE COURT:  Particularly because we ask the jurors who

21    are not being significantly paid to be here.

22              MR. BRILL:  That being said, your Honor, I don't know

23    where Mr. Schwartz is.  Never mind.

24              MR. DONALDSON:  I just went downstairs to look for

25    her.  I had my office call her.  I just went downstairs as
```

D1MLCIB1

1  well.

2          THE COURT:  We asked the guards to check if there was

3  anybody for the Buchwald trial.

4          MR. DONALDSON:  I went down as well.  I didn't.

5          THE COURT:  You didn't see her?

6          MR. DONALDSON:  Actually.

7          THE COURT:  I thought she was here, no?

8          MR. DONALDSON:  I didn't go to the other side.  I just

9  went down to try to call her.  I can go check the other side.

10          THE COURT:  We can call also, anybody for the Buchwald

11  trial.

12          (Pause)

13          THE COURT:  There's Ms. Cibik.  All right.  Does that

14  mean we now have all counsel and all defendants?

15          MR. BRILL:  I'll go get Mr. Schwartz.

16          Mr. Schwartz was actually here long before I was,

17  Judge.

18          THE COURT:  We understood that.

19          MR. BRILL:  Okay.

20          (Pause)

21          THE COURT:  Can the government have its witness in the

22  box, please.

23          MS. ECHENBERG:  There was one evidentiary issue we

24  wanted to raise, but we can do it at the break, your Honor.

25          THE COURT:  We've been here for the last ten minutes.

D1MLCIB1

                    MS. ECHENBERG:  I apologize.  We just thought because
there was a defendant missing it wasn't appropriate.

                    MR. PASTORE:  Also, I noticed Mr. Donaldson wasn't in
the room.

                    THE COURT:  I think we could have gotten him.

                    MR. PASTORE:  Very briefly, your Honor, there are
several issues, but I think this is the only one that needs to
be addressed before witness testifies.

                    Later today we expect that David Grynsztajn will
testify as a cooperating witness.  There are three types of
documents that the government is going to seek to admit through
Mr. Grynsztajn.  And based on prior objections by defense
counsel, we anticipate that there may be some objections.  We
wanted to flesh them out now rather than at the side bar.

                    The three types of documents that Mr. Grynsztajn is
going to be talking about are, first of all, client files from
the law firm.  The second type of documents are going to be
files that were prepared by the law firm and submitted to
immigration authorities.  They're going to be out of the A file
documents.  And the third type of documents are going to be
correspondence from immigration that was received by the law
firm.

                    With respect to each of those types of documents,
Mr. Grynsztajn is going to be able to testify that he saw each
of those types of documents in connection with his employment

D1MLCIB1

at the law firm, that he's familiar with these types of

documents because of his employment at the law firm, and,

indeed, in several although not all instances, his handwriting

will appear on the document or he will recognize.

THE COURT:  Just wait.  Hold them back.  Sorry.

MR. PASTORE:  He will recognize the document either

because it has his handwriting on it, he's familiar with the

client, or he's generally familiar that these were the types of

documents that were prepared by the law firm.  And in some

instances he will not be able to definitively say who at the

law firm authored the document, but we don't believe that's

necessary for its admissibility pursuant to Rule 901, as well

as under case law in the Second Circuit including United States

v. Maldonado Rivera, which is at 922 F.2d 934.  It's a Second

Circuit case from 1990, and it holds that the author of a

document need not definitively be established as long as

there's some basis in fact by the witness that the document is

what it purports to be under Rule 901.

So what I'm concerned and the objections that we've

previously heard are suggest that the defendant, I'm sorry, the

witness must have personally prepared the document or

personally authored it for it to be admissible.  That, of

course, is not the law and that's what we are concerned the

objections made are founded on.

THE COURT:  First, why don't we know if we have an

D1MLCIB1

1    issue here.  Do we have an issue?

2            MR. GERZOG:  Only with respect, it seems to me, to,

3    and I don't know if this applies to Mr. Brodjik at all, but if

4    he can identify that the document definitely came from the

5    David law firm and that it is a client file from the David law

6    firm, then I would imagine it would be admissible whether he

7    can say that he wrote it or not, or whether he can say whoever

8    wrote it, whether or not he can identify the author or not.  If

9    all he can say is it looks like the kind of work we did, then I

10   wouldn't think it would come in.  I don't know exactly what

11   he's going to say.

12           MR. PASTORE:  And, your Honor, that's precisely not

13   the law and precisely why I wanted to raise it.  Rule 901 only

14   requires a basis in fact.  The indicia on the document will

15   include the names of the people who prepared it, for example,

16   Earl David's name or other attorneys.

17           THE COURT:  That would meet his standard.  He didn't

18   say that the witness had to personally have prepared it.  He

19   just needs, as I understand it, the position of Mr. Gerzog was

20   if the witness can identify it as a David law firm document by

21   a variety of, variety of possibilities:  It's the type of

22   folder.  I remember the name of that client.

23           MR. GERZOG:  Exactly.

24           THE COURT:  That's our typeface.  That's signed by

25   somebody who worked there.  I recognize the handwriting.  A

1    whole bunch of things.

2              MR. DONALDSON:  May I just say one thing on behalf of

3    Ms. Cibik.  I would agree with the prosecutor's statement of

4    the law.  But what I would have a concern with is, and I'll

5    object now and then talk about it afterwards, but if the

6    witness is going to -- testimony is going to be speculative in

7    nature that this might be something that we did or this

8    probably is something that we did, and then the prosecutor gets

9    up on summation and says this is clearly a document that they

10   did, that would be a little bit of a difference.

11             So that would be my concern.  I don't want to say this

12   might be, based upon my experience, this might be what we did,

13   looks like what we did, and the prosecutor in summation says

14   this is what was produced at the firm based on X, Y, Z

15   testimony.  Those are two different facts so that would be my

16   concern.

17             My concern is solely what will happen based upon the

18   speculative or probable nature of the evidence and then

19   conclusory statement by the prosecutor.  So if that's going to

20   happen, I would object.  If not, I have no objection.

21             THE COURT:  Let's go back a step.  Where did you get

22   the documents?

23             MR. PASTORE:  We got the documents from two sources:

24   One is going to be the A files, and the second is going to be

25   the law firm client files that were seized from various

D1MLCIB1

1    locations, two locations where the law firm was operating, one

2    location where an employee of the law firm had stored the

3    documents on behalf of the law firm, essentially, so.

4            THE COURT:  So isn't that a rather relevant fact to

5    their authenticity?

6            MR. GUTMAN:  Your Honor, this is actually sort of an

7    academic point.  I don't think this is going to come up.  I

8    mean there are two theoretical objections:  one is authenticity

9    and one is hearsay.  If there were a document that says

10   defendant X did something and that's been offered for its

11   truth, it's possible if it's not a properly -- if there's not a

12   proper foundation for it as a business record, then it doesn't

13   come in as hearsay.

14           Again, I don't anticipate that based upon what we

15   think is coming into evidence, but I didn't want to sound as if

16   we're waiving potential hearsay objections if there are such

17   objections.

18           MR. PASTORE:  Your Honor, as to that, it's not just

19   the business record exception.  These are statements in

20   furtherance of conspiracy by coconspirators and that's exactly

21   what Maldonado Rivera stands for.  It doesn't matter who

22   authored the document.  And when I say who, I mean the person's

23   actual identity.  All that matters is that it's a statement in

24   furtherance of the conspiracy.  Each of these documents that

25   went to immigration is a statement in furtherance of the

D1MLCIB1

1    conspiracy.  It's the actus reus, which makes it also

2    admissible.  It is the crime.

3            To the extent that the documents are from immigration,

4    they're not at this time being offered for the truth.  There is

5    no truth or statement that they're being offered for at this

6    time, but instead merely to show why Mr. Grynsztajn and the

7    other coconspirators took certain actions, and let me be more

8    specific.

9            The documents we anticipate going through with

10   Mr. Grynsztajn will be requests for additional evidence, and so

11   then after that you see documents that have later dates that

12   are obviously responding to that request for more evidence.

13   And in terms of the factual statements, they'll be admitted for

14   the truth through Special Agent Deidre Gordon when she

15   testifies, and then they will be used as business records for

16   whatever truth is contained in them.

17           THE COURT:  I was doing fine until the last argument.

18           MR. GERZOG:  It just seems to me, Judge, we need to

19   wait and see what the documents are.

20           THE COURT:  Frankly, from the discussion, this doesn't

21   seem this is really an issue.

22           MR. PASTORE:  I hope not.  Again, I wanted to

23   anticipate in particular what Mr. Donaldson was saying.

24           THE COURT:  I don't think your witness is speculating.

25   There's a difference between saying in effect this is a

D1MLCIB1

1    business record which I personally did not author and

2    speculating as to what it is.  It's not the same thing.

3            (Continued on next page)

D1MLCIB1

 1          (Jury present)

 2          THE COURT:  Good morning, ladies and gentlemen.  I'm

 3   sorry about the late beginning.  All I can say is I was not

 4   responsible.  And I think the people that were won't do it

 5   again.  So, thank you for being on time, and I hope you had a

 6   nice weekend.

 7          THE DEPUTY CLERK:  Mr. Mirandona, I just remind you

 8   you are under oath.

 9          THE WITNESS:  Yes.

10          THE COURT:  Mr. Pastore.

11          MR. PASTORE:  Thank you, your Honor.

12    JOHN MIRANDONA, resumed.

13       called as a witness by the Government,

14       having previously been duly sworn, testified as follows:

15   DIRECT EXAMINATION (cont'd)

16   BY MR. PASTORE:

17   Q.  Good morning, Agent Mirandona.

18   A.  Good morning.

19   Q.  When we were -- when you were last testifying, we were

20   focused on Government's 3608, and I just ask if that could be

21   brought up on our screens so we can talk about it.

22          And in particular I want to focus on paragraph 11,

23   which I believe we did not previously read, and that would be

24   on page 2, please.

25          Could you just read paragraph 11 for the jury?

1  A.  "I refuse to get into a lengthy email argument

2  correspondence with you.  You win.  I will deposit the money

3  you think I stole from you into your account as soon as I can.

4  Enjoy it and spend it wisely."

5  Q.  Okay.  And if we can go back up to paragraph 9.  And if you

6  could just take a look at that paragraph and please read it for

7  us.

8  A.  "One more thing which I personally don't need an answer

9  for, but look at yourself in the mirror and answer yourself.

10  The $10,000 you took from Gulay and got me involved.  You cried

11  to her that you were in the streets and took advantage of her

12  feeling for you and asked me to back up your story.  Not only

13  that, but before she left the country, you once again tried to

14  get more money from her.  Your justification to me was she

15  doesn't need it.  Did she not work hard for that money?

16  Eighteen hours a day at two jobs?  When you come to give me

17  musser, make sure your own hands are clean."

18  Q.  If we could go back to page 1 to the middle of the page

19  where in bold there's an email address, just a little bit

20  higher than that, please.  Okay.

21       So based on this, what email address is this

22  particular email that you were just reading from?

23  A.  ARYE1998@yahoo.com.

24  Q.  Now I want to focus your attention on Government

25  Exhibit 3611, okay.  First, if you look at the very top of the

1    page, can you tell us where it says subject, from, date, to,

2    and CC, just go through each of those fields and tell us what

3    it means.

4    A.   Subject is forwarded message Gulay.

5    Q.   What tells you it's a forwarded message?

6    A.   The FWD before the subject, before the word Gulay.

7    Q.   And continuing on with the next field?

8    A.   The from field is EarlSDavid@yahoo.com.

9    Q.   And the to field?

10   A.   Sammy110wall@aol.com.

11   Q.   And the CC field?

12   A.   Leoontherun@aol.com.

13   Q.   So taken together, what does this mean?

14   A.   That EarlSDavid@yahoo.com forwarded a message to

15   Sammy110wall@aol.com and Leoontherun@aol.com.

16   Q.   Can you tell -- does the original message appear anywhere

17   in Government's 3611?

18   A.   I believe it's to the lower part of the page.

19   Q.   Okay.  And can you tell us where on the lower part of the

20   page you can tell that the original message is?

21   A.   Well, it says note forwarded message attached, and it has

22   the header information from the forwarded message and the body

23   of the forwarded message is below.

24   Q.   So the original message, can you tell who or what email

25   address that was from?

1   A.  From EarlSDavid@yahoo.com to ARYE1998@yahoo.com.

2   Q.  And what's the subject?

3   A.  Gulay.

4   Q.  Let's read the body of this email, please.

5   A.  "What right do you have to say anything about this lady?

6   She made 100,000 off me.  Moreover, what right did you have to

7   get 5,000 from her?

8           "Gulay told me that your wife was busy licking her ass

9   to get that money and after that she never picked up the phone

10  for Gulay anymore.  So you are talking to me about being a

11  user?  Look at your own actions before you accuse others.

12  Gulay said that you and your wife took her for a ride.  Those

13  are her words.  She even told me she has your checks to deposit

14  and wants to put in right away.  You are asking me to look in

15  the mirror.  What about yourself?

16          "Why do you keep diverting from the fact you did

17  something wrong, but you are too proud and arrogant to admit

18  that you deceived me with those checks.  Just admit and move on

19  with your life.  Stop bringing up other issues that have

20  nothing to do with it.  I have never tried to pick a fight with

21  you or anyone.  About Canada, excuse me, but I was born there.

22  How can this be your idea?"

23  Q.  Do you have any idea what the reference to Canada is?

24  A.  No.

25  Q.  If we could go now to Government's 3609.  Starting at the

D1MLCIB1                        Mirandona - direct

1    top of the page, looking at the header information where it

2    says subject, FWD digital copier system, and then it's got

3    FEVZIOGLU/FUAT, what does this indicate to you?

4    A.  A forwarded message that the original subject was digital

5    copier system with those words after it.

6    Q.  And who's the email from?

7    A.  From the -- this email that you're showing is from

8    EarlSDavid@yahoo.com.

9    Q.  And who is it to?

10   A.  Sammy110wall@aol.com.

11   Q.  Does the original message that was forwarded appear

12   anywhere in this government exhibit?

13   A.  I would have to see the whole thing to refresh.

14   Q.  Okay.  If we can scroll down a little bit.

15   A.  Yes.

16   Q.  Okay.  Tell us where?

17   A.  Where it starts, Dear Earl.

18   Q.  That's the original message?

19   A.  Can I see the whole thing?  It appears so.

20   Q.  Okay.  And who is the original message from?

21   A.  Can you scroll up.  Okay.  It is to Earl S. David from

22   Gulay C-I-B-I-K or GCIBIK@yahoo.com.

23   Q.  Do you see the email address within the carets?

24   A.  Yes.

25   Q.  And then there's a name to the left?

D1MLCIB1                        Mirandona - direct

1   A.  Yes.

2   Q.  Why would there be a name to the left?

3   A.  If it was saved, if it was known to the email address in

4   the address book.

5   Q.  Okay.  And what does this -- what does the body of the

6   original email say?

7   A.  "Dear Earl, please ask Sam about his substitution of

8   beneficiary 2001 case.  Beneficiary FEVZIOGLU/FUAT."

9   Q.  And then is it signed?

10  A.  "Thanks, Gulay."

11  Q.  Let's go now to Government's 3610.  Okay.  With respect to

12  this email, can you tell us who the email is from?

13  A.  From GCIBIK@yahoo.com.

14  Q.  And from looking at this email, does it appear to be a

15  forwarded email or is this the original email?

16  A.  This appears to be a composed email, not a forwarded email.

17  Q.  And who is the email sent to?

18  A.  EarlSDavid@yahoo.com.

19  Q.  Is anyone copied on the email?

20  A.  Sammy110wall@aol.com.

21  Q.  If you could go ahead and read for us what appears in the

22  body of the email.

23  A.  "Dear Earl, this is my last memorandum to you.  Where is

24  Mr. Vego, Mr. Cohen.  Think about why suddenly they disappeared

25  from their market.  If I'm trying to tell you don't do business

1    with certain people or in certain condation, I don't want you
2    have bad time for your future which already you had more than
3    enough.  I am so sick and tired to repeat same advice last four
4    years.  If you want to continued to listen to other's evil and
5    mental sick money animal people, as always, told you go ahead.
6    That's your life, your future.  You can do whatever you want to
7    do.  Good luck and happy healthy safety life.  Sincerely yours,
8    Gulay."
9    Q.  Now let's take a look at government's 3612.  Looking at the
10   subject line, what if anything does that tell you about this
11   email?
12   A.  It appears to be a forwarded email.
13   Q.  And what does the subject line indicate?
14   A.  That the original email subject title was case status
15   A-06220-47556, Harold Tischler.
16   Q.  And in the from field?
17   A.  HarrytheMN.
18   Q.  I notice that that does not have a sort of @something.com
19   after it.  Do you know why it would not have an @something.com
20   after it?
21   A.  Generally when an email is sent within AOL, if it
22   recognizes the name, it just drops the @aol.com.
23   Q.  And who is this email to or what account is this email to?
24   A.  Sammy110wall.
25   Q.  Is there anything about this email -- and you know what,

D1MLCIB1                      Mirandona - direct

1    I'm going to approach and hand you a physical copy of 3612.

2                Looking at the entirety of this email, is there

3    anything that tells you whether in fact the email was sent

4    through the AOL system?

5    A.  Well, it has the return path @aol.com.

6    Q.  And can you tell us where?  Just direct us to where in this

7    email the return path is if we can zoom out.

8    A.  If you scroll up.  Where it says received from

9    RLYXN06.MX.AOL.com and it has the IP address and AOL mail,

10   Wednesday, 30 of August, 2006.

11   Q.  And what is all that, RLYXN06.MX.AOL.com?

12   A.  It's just generic address for mailboxes, mail protocol

13   transfer.

14   Q.  And is mail protocol generally the way that email gets

15   routed around the internet?

16   A.  Yes.

17   Q.  And with respect to the body of this email, let's take a

18   look at it.  What is the body, if you can just read the body of

19   the email for us.

20   A.  "Thank you for your phone call to the national processing

21   center concerning your case filed under the PERM program.  Case

22   A-06220-47556, Fix Anything Construction and Plumbing, Inc., is

23   still in process and official notification will be forthcoming.

24   Applications are processed in the order they are received.

25   However, because each application is unique, processing times

1    may vary depending on specific circumstances of the case.  We

2    apologize for the delay.

3         "If the case was mailed in, then the employer and

4    representative must await correspondence from this office.  If

5    the case was filed online, status of the case may be checked

6    online by following the directions below.

7         "To check the status of your case filed online, go to

8    the my applications tab, then the search cases tab.  You can

9    enter your case number and see the current status.  You can

10   also search by partial number.  For more details, see page 40

11   of the user guide by clicking the online help link at the top

12   of the PERM webpage".

13   Q.  Now I want to focus on Government Exhibit 3613 and 3614.

14   Let's start with 3613.

15        Looking at the header information, what if anything

16   can you tell us about whether this was an original email or

17   forwarded email?

18   A.  It appears to be a composed email.

19   Q.  I'm sorry?

20   A.  A composed email, not a forwarded email.

21   Q.  And who or what account is this email from?

22   A.  Sammy110wall.

23   Q.  And who is it to?

24   A.  Nathan@Monseyframing.com.

25   Q.  And the message body?

D1MLCIB1                    Mirandona - direct

1    A.  Name is Lidia Chalen.

2    Q.  Does that name mean anything to you?

3    A.  No.

4    Q.  I'm going to hand you 3613.  I'm going to hand you what has

5    already been admitted as Government's 3613, and I'll ask you to

6    turn to the second page.  And if it's possible to bring it up.

7    I don't know if we have it.

8              Okay.  Remind us what the second page is of this

9    exhibit?

10   A.  It's the file properties of the email.

11   Q.  Okay.  So can you take us through looking at the file path

12   where on the computer this email is recovered from?

13   A.  It's from the main partition, documents and settings, all

14   users, application data, AOL, America Online 9.0, backup,

15   Sammy110wall, Sammy110wall, mail, mail you've sent, message

16   0002.

17   Q.  So if we drill down all the way to the bottom message 0002,

18   the next level up where it says mail you've sent, what if

19   anything does that indicate?

20   A.  It's from the sent folder.

21   Q.  So based on that, do I understand correctly that this

22   particular email was in Sammy110wall's sent folder?

23   A.  Yes.

24   Q.  Now let's go to 3614, please.  Who is this or what is this

25   email from?

D1MLCIB1                          Mirandona – direct

1    A.  This email is from Sammy110wall to

2    Nathan@Monseyframing.com.

3    Q.  And, again, can you tell from looking at this whether it's

4    an original message or a forwarded message?

5    A.  It appears to be a composed message.

6    Q.  And what does the message body say?

7    A.  "Cook any Levy's Kosher Garden Corporation.  Care of, c/o,

8    Shlomo, Levy, 106 Route 59, Monsey, New York 10952."

9             MR. PASTORE:  Your Honor, may I have a moment?

10            THE WITNESS:  Excuse me?

11            MR. PASTORE:  Your Honor, no further questions at this

12   time.

13            THE COURT:  Is there any cross?

14            MR. DONALDSON:  Yes.

15            THE COURT:  Mr. Donaldson.

16   CROSS-EXAMINATION

17   BY MR. DONALDSON:

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  How was your weekend?

21   A.  All right.

22   Q.  How are you pronouncing your name so I don't mess it up?

23   A.  Mirandona.

24   Q.  Mirandona.  Good morning again.

25   A.  Good morning.

1    Q.  Is it Agent Mirandona?

2    A.  Yes, sir.

3    Q.  Agent.  Now, how many emails, if you know, approximately

4    you say you examined or analyzed related to this case?

5    A.  Actually examined the content of the emails?

6    Q.  Yes.

7    A.  Very few.

8    Q.  How many emails did you actually review, not the content,

9    but just review related to this case?

10   A.  Maybe 50.

11   Q.  Fifty?

12   A.  If that, yeah.

13   Q.  During your review, did you come across any emails between

14   Gulay Cibik and Salamon or that Salamon email?

15   A.  I didn't specifically check who or where.

16   Q.  Could you tell based upon your experience and analysis what

17   computer sent what email?

18          MR. PASTORE:  Sorry, objection.  Vague.  I'm just not

19   sure what email we're talking about.

20          MR. DONALDSON:  Any email.

21          THE COURT:  Broadly speaking.

22   A.  In general, yes.

23   Q.  You could.  So if you looked at 3610, Government

24   Exhibit 3610, you would be able to tell what computer sent that

25   particular email?

D1MLCIB1                         Mirandona - cross

1    A.  I would have to refresh.

2    Q.  But you could do that?

3    A.  With -- at face value, I would have to examine it.

4         MR. DONALDSON:  Nothing further.

5    CROSS-EXAMINATION

6    BY MR. GERZOG:

7    Q.  Good morning, Agent Mirandona.

8    A.  Good morning, sir.

9    Q.  The emails we've been talking about in your testimony came

10   off the so-called F1 computer; is that right?

11   A.  Yes, sir.

12   Q.  And did you conduct similar searches or analysis with

13   respect to the other computers in the locations you found?

14   A.  I searched all of the computers for email.

15   Q.  And you duplicated their hard drive the same way you

16   duplicated the hard drive of computer F1?

17   A.  Yes.

18   Q.  And you took those emails back to your office or to some

19   government location and took the emails off them?

20   A.  I made forensic images of all the computers and from those

21   forensic images, using my equipment, I was able to locate,

22   identify, locate, and extract emails from all of the images.

23   Q.  Did you look for anything else, for example, lists of files

24   or payments made or anything of that nature?

25   A.  No.

D1MLCIB1                          Mirandona - cross

1    Q.  Did you not do that because you didn't think it was

2    important or because no assistant U.S. attorney asked you to?

3    A.  Neither the assistant nor the case agent asked me.  I was

4    specifically instructed to look for email and produce the email

5    that I found on the computers and that's what I did.

6    Q.  Okay.  Now, if you had had an email address such as we've

7    been talking about, Sammy110wall@aol.com, you could have issued

8    a subpoena to AOL to give you all the emails that had been sent

9    and received on that account, correct?

10          MR. PASTORE:  Objection.

11          THE COURT:  Sustained.

12          MR. GERZOG:  Sustained?

13          THE COURT:  Yeah.

14          MR. GERZOG:  All right.

15   Q.  You could have -- you're familiar with subpoenas, are you

16   not?

17   A.  Currently my position is a forensic examiner.

18          THE COURT:  Not solving the problem.

19   Q.  Is it possible to -- you're familiar as a forensic examiner

20   of emails and as someone who works with email accounts that

21   email information can be subpoenaed from AOL, Yahoo, those

22   types of companies?

23   A.  Sir, as a special agent investigating, I am familiar with

24   the subpoena process.  Currently in this case, I serve as the

25   forensic examiner.  It is not my position to subpoena.

D1MLCIB1                        Mirandona - cross

1   Q.  Right.  That's why Judge Buchwald sustained my objection --

2   A.  Yes, sir.

3   Q.  -- because I asked if you subpoenaed something.

4   A.  Yes, sir.

5   Q.  I'm guessing that's why she sustained the objection.

6   A.  As a criminal investigator, I am familiar with the subpoena

7   process.

8   Q.  Right.  And you are also familiar that AOL, Yahoo, gmail,

9   those companies will respond to a subpoena by providing you

10  with emails sent and received on a particular account?

11              MR. PASTORE:  Objection.

12              THE COURT:  Sustained.

13  Q.  Will provide, maybe not to you, but will provide to the

14  government?

15              MR. PASTORE:  Objection.

16              THE COURT:  Sustained.

17  Q.  If the government had wanted to find out who signed up for

18  the Sammy110wall@aol.com email address, that information could

19  have been obtained from AOL; is that correct?

20  A.  You'd be better off asking AOL.  I don't know what AOL can

21  or cannot or would have or would not have provided.

22  Q.  As a government forensic examiner you're not familiar, you

23  don't know whether AOL would provide that?

24  A.  Sir, in the course of my duties generally, if you provide a

25  subpoena to any entity for information that they possess, they

D1MLCIB1                        Mirandona – cross

1    will return information.  I'm not familiar with the policies of
2    each individual company nor am I familiar with exactly how long
3    they retain email.  You would be better served asking someone
4    who is current.
5    Q.  I'm not asking you about the email now.  I'm asking you
6    about who signed up for that address, what person signed up for
7    that address.
8            MR. PASTORE:  Objection.
9            THE COURT:  I think he's told you that he can't
10   respond on behalf of AOL in terms of whether they still have
11   the information, what their reaction would be.  He's not
12   denying that it's possible to subpoena.
13   Q.  Have you in any case ever had AOL provide such information
14   to the investigators?
15   A.  I'm sorry, can you clarify what case?
16           MR. PASTORE:  Objection.
17           THE COURT:  Sustained.
18   Q.  Any case.
19           THE COURT:  Sustained.
20               (Continued on next page)
21
22
23
24
25

D1m1cib2                    Mirandona - cross

1    BY MR. GERZOG:

2    Q.   There are a number of different ways to obtain the

3    information you obtained; correct?

4            MR. PASTORE:  Objection.

5            THE COURT:  Yes, it's just a little confusing.

6    Q.   Searching the computer isn't the only way to obtain the

7    information; correct?

8    A.   In the course of my duties, I search the computer for the

9    information.  If there are other ways to find the same data

10   such as subpoena to the company, then you would need to

11   subpoena the company and find out what data.  I cannot say what

12   data they have or don't have.

13   Q.   Well, in fact, if you knew sammy110wall's passwords, you

14   could use any of the computers in the courtroom to sign into

15   his account and look up whatever is there; correct?

16           MR. PASTORE:  Objection.  Relevance and speculation,

17   your Honor.

18           THE COURT:  Sustained.

19   Q.   You talked about a specific computer; right?

20   A.   Yes.

21   Q.   You can access an e-mail account from any -- pretty much

22   any computer.  You can access an AOL e-mail account, let's say,

23   from pretty much any computer anywhere; is that true?

24   A.   No, that's not true.

25   Q.   Okay.  If you have the user name and a password, is it not

D1m1cib2                      Mirandona - cross

1    possible to sign in from my computer, from his computer, from a

2    computer you might have at home, to that account?

3    A.  Are they connected to the internet?

4    Q.  Assuming they are, of course.

5    A.  Then it would be possible to sign on if you possess one's

6    user name and password.

7    Q.  Right.  And so there isn't -- the fact that these e-mails

8    were found on F1 just means that someone who was using F1

9    either read or sent or received that e-mail, correct, on that

10   computer?

11   A.  These e-mails are found on the hard drive of the computer,

12   not on the internet.  If you say -- if one -- if a person signs

13   on to AOL from another computer on the internet, it will save

14   the mail differently than if you have AOL installed, and in

15   this case, this is not someone accessing www.aol.com, this is

16   somebody who had AOL 9.0 and 9.1 installed on their computer,

17   because prior to high-speed broadband, everybody got the AOL

18   disc in the mail and you installed AOL on your computer and

19   that's how you accessed it, and it created the hierarchy of

20   files that we see here and contained in these folders.  So I

21   would say that these e-mails -- it is possible to access AOL

22   from other computers but that these computers -- these e-mails

23   were found on this computer, which means that either they were

24   created on this computer or they were accessed on this

25   computer, leading them to be contained on the hard drive, not

D1m1cib2                          Mirandona - cross

1   simply in the cache or as a web --

2   Q.  Right.  So they were accessed on that computer; correct?

3              MR. PASTORE:  Objection.

4              THE COURT:  That's not a proper --

5              MR. GERZOG:  He just said that, Judge.

6              THE COURT:  That's only part of what he said.

7   Q.  Do you have any idea whether these -- whether these e-mails

8   were sent over telephone wires, modem, or broadband?

9   A.  I would have to do more in-depth analysis.

10  Q.  So the answer is no, you don't.

11  A.  No, I don't.

12  Q.  So when you just said all that, what you said, you don't

13  even know if these were sent -- these could have been sent by

14  broadband; correct?

15  A.  I'm not familiar with how they accessed the internet.  I

16  would have to do more investigation.

17  Q.  But they could have -- for all you know, they could have

18  been done by broadband; right?

19  A.  I don't know what the service was at that office at that

20  time.

21  Q.  Right.  So you don't know.  They could have been or they

22  might not have been --

23  A.  That's correct.

24  Q.  They might have been or they might not have been; correct?

25  A.  That is correct.

D1m1cib2                         Mirandona - cross

1  Q.  Okay.  So if you sign in to an AOL account on the

2  broadband, you are going to get whatever information is on that

3  AOL account, correct, e-mail and so forth?  Has nothing to do

4  with -- in the old days -- if I still had an AOL account, I

5  could access my AOL account from this computer, from the

6  computer I have at home, from the computer in Judge Buchwald's

7  chambers; correct?

8           MR. PASTORE:  Objection.

9           THE COURT:  I don't think that's accurate.

10           MR. GERZOG:  Could we find out from the --

11           THE COURT:  Okay.

12  A.  If you access the e-mail -- if you access e-mail from

13  another computer, it will not be on the hard drive of the

14  computer in question unless the person signs in and accesses

15  the e-mail and does something.  All these e-mails were found on

16  the hard drive.  They were not found in the history of -- the

17  internet history, so either they were sent from this computer

18  or this computer was accessing the AOL servers on the account.

19  Q.  Well, doesn't every computer that signs in to AOL access

20  the AOL servers?

21  A.  But not every computer has the e-mail on the computer

22  itself.

23  Q.  What do you mean by that?

24  A.  If you access AOL from another computer that you don't have

25  AOL installed on, it will not save it on the hard drive the way

D1m1cib2                          Mirandona - cross

1    that these are saved.

2    Q.  If I was to -- if I knew sammy110wall's password and I

3    signed in to his account and I saw an e-mail and then I hit

4    save, what would happen?

5                MR. PASTORE:  Objection.  Relevance.

6                THE COURT:  No.  I know what he's driving for.  Let

7    him ask it.

8    A.  You would have to decide how to save it, but you would not

9    have it saved in the hierarchical structure that you have on a

10   computer that has AOL installed on it.  You would have to save

11   it as an HTML file possibly.  You would not have the structure

12   with all the mailboxes and organized the way --

13   Q.  Well, it's not uncommon for a computer to have AOL

14   installed on it, is it?  Lots of -- millions of computers have

15   AOL installed on them, do they not?

16               MR. PASTORE:  Objection, your Honor.

17   A.  I'm not familiar with millions of computers.

18               MR. PASTORE:  Relevance.

19   Q.  You're a forensic expert and you don't know that millions

20   of computers have AOL on it?

21               MR. PASTORE:  Objection, relevance to the search done

22   on this computer.

23               THE COURT:  I think he's talking about the computer

24   that he's extracted these e-mails from.

25               MR. GERZOG:  Yes, ma'am.

D1m1cib2                          Mirandona - cross

Q.  But is it not true that you're aware, as a forensics

expert, that millions of computers have -- or many, many, many,

many computers -- I don't know exactly the number, but a very

large number of computers have AOL installed on them?

             MR. PASTORE:  Objection, relevance.

             THE COURT:  You can answer.

A.  I thought you were making a distinction to being able to

sign on from any computer on the internet, going directly to

AOL, that is, a distinction between going to any computer and

signing on to the internet, from a computer that has AOL

installed on it.  If another computer had AOL installed on it

and you access this account, you would create the same folder

structure on that computer as well.

Q.  Exactly.  Exactly.  So --

             THE COURT:  Wait a second.  Would you create this

folder structure on both computers or on only the one that you

access the account in?

             THE WITNESS:  If you install AOL on another computer,

you will create the same folder structure and have e-mail, the

user account names and etc.  If you have seven different people

using AOL, it's going to create a folder for each user name, on

each computer, and then it will hold the folders, and then

those folders will hold the e-mails, but if you access it from

going to www -- excuse me -- www.aol.com, you will not create

that folder structure on the hard drive than if you save it --

D1m1cib2                      Mirandona - cross

Q.  I understand what you're saying.  There's two ways to

access AOL.  One is to type in www.aol.com, and that means you

don't have the AOL software installed on your computer, but yet

you can have access to AOL --

A.  Yes.

Q.  -- or you can have the AOL software installed on your

computer, in which case it will save material if you are merely

reviewing it, you don't have to have sent it or retrieved it;

correct?

A.  I don't understand your question.

Q.  All right.  If you have the AOL software installed on your

computer -- if I have the AOL software installed on my computer

and I look up sammy, and I look in -- I click and my AOL

software pops up and I click in sammy110wall and his password

and I start looking around and I save things, it will save them

to that computer the same way it would save to this computer;

correct?

A.  Theoretically, that sounds correct.

Q.  Thank you.  Took us a long time to get there, but we got

there.

        Now I would like to show you what I believe has been

received in evidence as Government's Exhibit 3604.

        MR. GERZOG:  Could we bring that up on the screen.

Q.  Now this appears to be a message sent on the sammy110wall

account; correct?

D1m1cib2                          Mirandona - cross

1    A.  That is how it appears.

2    Q.  And it appears to have been sent to the

3    earlsdavid@yahoo.com e-mail address; correct?

4    A.  Yes.

5    Q.  Now you said that the reason sammy110wall, on a different

6    e-mail, didn't say @aol.com is because it was being sent to

7    another AOL address, and when one AOL address speaks to another

8    AOL address, they leave off the AOL, but here's an AOL address

9    speaking to a Yahoo address and yet there's no AOL address; is

10   that right?

11   A.  Generally if it is within AOL, not necessarily from one AOL

12   address to another, but generally, in that case, where I

13   brought that up, it was from one AOL address to another.

14   Q.  Right.

15   A.  But when AOL sees @aol.com, generally it sometimes will

16   just put the user name.  Same as when you sign in.  You don't

17   actually have to sign in with @aol.com.  You can sign in with

18   just your user name that is the user name within AOL.

19   Q.  So no matter who they're sending an e-mail to, AOL may

20   sometimes leave off the aol.com; is that what you're testifying

21   to now?

22   A.  I'm saying that in this case when you see sammy110wall from

23   within AOL, the reason you're not seeing aol.com is because

24   sammy110wall is the user -- is the user name.

25   Q.  I don't understand.  It says sammy110wall, it's going to a

D1m1cib2                          Mirandona – cross

1    Yahoo address; correct?

2    A.  Yes.

3    Q.  The fact that aol.com doesn't appear does not necessarily

4    mean that the recipient is another AOL account; correct?

5    A.  I'm not familiar exactly how the program works.

6    Q.  Well, in fact this is a Yahoo account; right?

7    A.  The addressee is a Yahoo account, but this e-mail was

8    extracted from an AOL account, from an AOL account it was sent,

9    and sammy110wall is recognized --

10   Q.  I understand that.

11   A.  -- by the account.

12   Q.  But you testified previously that the reason aol.com didn't

13   appear was because it was from one AOL account to another.

14   That isn't necessarily the only -- the only reason.  For some

15   reason it doesn't appear here either, and it's being sent to a

16   Yahoo account; correct?

17   A.  When I was questioned about the previous government

18   exhibit, I stated that that one was from one AOL account to

19   another.  I don't recall if I said every single time.  I do

20   know that when an e-mail account is sent from within the AOL

21   account, it will not always put it there if AOL recognizes the

22   account as the user name.

23   Q.  And you know also that it would sometimes not put it there

24   when it's being sent to a Yahoo account, such as in this case?

25   A.  As in this case, that is correct.

D1m1cib2                          Mirandona - cross

1    Q.   Okay.  Now you can't tell from any of these e-mails who the

2    actual sender or the actual recipient is, can you?

3    A.   Are you asking me if I was -- if I have an ability to tell

4    who was physically sitting behind the computer at the time on

5    February 22nd, 2006?  Are you asking me if I know who was

6    sitting in the seat?

7    Q.   That's what I'm asking you.

8    A.   No, sir, I do not.

9    Q.   So it could have been me, for all you know.

10   A.   Hypothetically, it could have been you, sir.

11   Q.   And I'd ask you to read what the message -- withdrawn.

12            This is what you referred to as an original e-mail, is

13   it not?  In other words, it's not -- it's an e-mail composed by

14   someone using the sammy110 account and sending it to the

15   earlsdavid account, but we don't know who was using the

16   sammy110 account on that date at the time this was sent;

17   correct?

18   A.   I'm sorry, sir.  Are you asking my opinion on who I think

19   was sending the e-mail?

20   Q.   I certainly am not asking you to speculate about anything.

21   I'm asking you that this message -- what we know from this

22   paper is that we can tell that someone, some unknown person,

23   using the sammy110wall account, sent a message to the

24   earlsdavid account, but we can't tell who sent that message,

25   can we, from this piece of paper?

D1m1cib2                       Mirandona - cross

1    A.  From the information in front of me, I can tell you that

2    this is a record of an e-mail that was sent from

3    sammy110wall@aol.com account to earlsdavid@yahoo.com account on

4    February 22nd, and there is information.  I cannot tell you

5    anything about who sent the e-mail.

6    Q.  Right.  That's all I asked.  We don't know who -- we have

7    no idea who sent the e-mail; correct?

8    A.  That is correct.

9    Q.  Okay.  Now would you read the e-mail, please, subtext --

10   the message, rather.

11   A.  "I wonder & wonder who helped rafi with the letter.  He

12   can't even spell his own name.  Also he writes you left cause

13   of me to Canada.  Well it's alli they put an arab name on

14   m---cy not me."

15   Q.  Now it's clear from that message that whoever it is that

16   sent the message doesn't have a very good opinion of Rafi's

17   ability to write; correct?

18           MR. PASTORE:  Objection.

19   Q.  He says Rafi can't even spell his own name; correct?

20   A.  It says --

21           MR. PASTORE:  Wait a minute.

22           THE COURT:  It speaks for itself.  The witness can't

23   testify about what that means.

24   Q.  All right.  It says that the writer wonders who helped Rafi

25   with the letter; correct?

D1m1cib2                          Mirandona - cross

1    A.   That is what it says.

2    Q.   And it also says he can't even spell his own name.  And

3    that's a clear reference to Rafi; correct?

4              THE COURT:  Sustained.  The jury can read that the

5    same way the witness can, and make --

6              MR. GERZOG:  Well, the government's been reading

7    e-mails into the record right and left.

8              THE COURT:  But they've just been reading it.  He's

9    not been asked to interpret it.

10   Q.   Now are you familiar with -- there's a type of -- there's

11   something called an address or something.  I'm not that

12   familiar with it, but each computer has a unique address; is

13   that right?

14   A.   You might be referring to an internet protocol address, an

15   IP address?

16   Q.   I might be.  I don't know.  I'm asking you.

17   A.   Generally there is a unique IP address assigned to every

18   computer so that they can access the internet.

19   Q.   And is there a way to find out which -- whether a message

20   was sent from a particular IP address?

21   A.   Yes.

22   Q.   Has that been done in this case?

23   A.   I -- on this particular message, I don't see any connected

24   to it in the header information.  That may or may not be

25   attainable through further investigation.

D1m1cib2                          Mirandona - cross

1   Q.  Have you obtained, in connection to any of these e-mails,

2   that IP address?

3   A.  No.

4   Q.  If you had, you would have been able to tell which computer

5   was the originator of the message; correct?

6   A.  Not necessarily.

7   Q.  No?  Why is that?

8   A.  If the information is not available, I would not be able to

9   tell.

10  Q.  If you had obtained it.

11  A.  I'm sorry.  If I had obtained the information?

12  Q.  The IP address connected with the e-mail, you would have

13  been able to tell which computer was the generator of that

14  e-mail; correct?

15  A.  I can't say what I would have been able to do.

16  Q.  Isn't that the point of the IP address?

17  A.  In general, one would be able to, but in every case it's

18  not exactly the same.

19  Q.  But in general, one would be able to; correct?

20  A.  In general.

21  Q.  Now did you read the contents of the e-mail that was

22  found -- of the e-mails that were found -- excuse me -- during

23  the search?

24  A.  No.

25  Q.  Only the ones that you were asked to read by the

D1m1cib2                         Mirandona - cross

1    government.

2    A.  Yes.

3    Q.  So you would be unaware, for example, that some of the

4    e-mails refer to various books.

5             MR. PASTORE:  Objection.  It calls for speculation.

6             MR. GERZOG:  No, I asked him -- I said he would be

7    unaware.

8             THE COURT:  Yes.  You can answer.

9    A.  I'm sorry.  Can you repeat the question?

10   Q.  Sure.  You would be unaware that some of the e-mails, in a

11   message, discuss various books; correct?

12   A.  Books?

13   Q.  Books.

14   A.  I have no knowledge of what you're speaking.

15   Q.  Right.  Did anyone, to your knowledge, read all the e-mails

16   that were seized?

17   A.  I do not know.

18   Q.  So the e-mails that are government exhibits are e-mails

19   that the government prosecutors asked you to focus on; is that

20   correct?

21   A.  Yes, sir.

22   Q.  Now, Agent, you work for the government; correct?

23   A.  Excuse me, sir?

24   Q.  You work for the United States government --

25   A.  Yes, I do.

D1m1cib2                          Mirandona - cross

1    Q.  -- correct?  Have you ever testified on behalf of the

2    defense in a case?

3    A.  No.

4    Q.  How many locations did you participate in the search of

5    computers -- withdrawn.  That's an awkwardly worded question.

6            How many locations did you search for computer hard

7    drives?

8    A.  Locations?  Do you mean addresses?

9    Q.  That's what I mean.

10   A.  One.

11   Q.  Just the one where this computer was found?

12   A.  Yes.

13   Q.  Do you recall now how many computers were found there?

14   A.  I do not recall the exact number.

15   Q.  And what was the address again?

16   A.  I believe it was 125 Maiden Lane.

17   Q.  Okay.  And other than the fact that there were desks and

18   offices and computers, do you know anything about those

19   offices?

20   A.  No.

21   Q.  Were you asked to search -- or rather were you asked to

22   analyze any other computers in connection with this case?

23   A.  I do not recall.  I would have to be refreshed.

24   Q.  You don't know one way or the other?

25   A.  I would have to refresh exactly which computers came from

D1m1cib2                        Mirandona - cross

the address.  I know there were other search -- there were

other search locations.

Q.  And you don't -- but you don't remember whether you were

asked to analyze any computers that may have been found at

that -- at those locations.

A.  I would have to refresh from my -- my investigation -- my

own --

Q.  And that's because the search occurred years ago and you

couldn't -- and you don't remember; right?

A.  I would have to refresh myself, sir.

Q.  And that's because the searches were conducted years ago

and you don't remember; right?  That's why you would have to

refresh yourself.  As you sit here now, you simply don't

remember; correct?

A.  That is correct.

Q.  And with respect to the government exhibits that were

introduced, if the government hadn't directed your attention to

those specific exhibits, you wouldn't have remembered those

exhibits particularly either; correct?

A.  Can you reword the question?  I don't understand.

Q.  With respect to the government exhibit e-mails that have

been introduced --

A.  Yes.

Q.  -- if you hadn't been directed towards those e-mails by the

government, you wouldn't remember anything about those e-mails

1   either; correct?

2   A.  I hadn't previously reviewed those e-mails.

3   Q.  So you knew nothing about them until the government said,

4   would you look at this set -- this particular set of e-mails;

5   right?

6   A.  I examined the computers, multiple computers, and recovered

7   tens of thousands of e-mails.  I did not personally review

8   those e-mails.  I provided them for review by the prosecution

9   team.

10  Q.  Right.  So you didn't personally look at a single one of

11  the files; correct?

12  A.  I can't say a single one.  I may have inadvertently seen

13  them, but I did not analyze them.

14  Q.  But you certainly wouldn't remember what it was about six

15  or seven years later, whatever it is; right?

16  A.  I believe this one -- I -- I believe this search was 2009.

17  Q.  All right.  Four years ago.  You wouldn't remember what it

18  was about; right?

19  A.  Had I reviewed it, I might.  Had I actually analyzed it.

20  Q.  But you can't tell the jury today that you do in fact

21  remember what any of them are about, right, except the ones

22  that you especially reviewed?

23  A.  I can speculate and give you an answer, but --

24  Q.  I don't want you to speculate.

25  A.  I need to refresh myself to give you an exact answer that

D1m1cib2                          Mirandona - cross

1    you're requesting.

2    Q.  And the reason you need to refresh yourself is because you

3    don't remember; right?

4    A.  That is correct.

5             MR. GERZOG:  May I have a second, your Honor?

6             THE COURT:  Sure.

7             (Pause)

8             MR. GERZOG:  No other questions, your Honor.

9             MR. GREENFIELD:  I just have --

10            THE COURT:  Sure.

11   CROSS-EXAMINATION

12   BY MR. GREENFIELD:

13   Q.  Good morning, Agent.

14   A.  Good morning, sir.

15   Q.  I want to understand about forwarding e-mails.  If I -- if

16   someone forwards an e-mail to someone else, what does the

17   recipient get?  Does he get a chain of communications or does

18   he just get the one response?  Does that make -- is that clear?

19   A.  In most cases a forwarded e-mail, just as anybody familiar

20   with e-mail, when you open that forwarded e-mail, generally the

21   subject has that FWD to let you know that it's a forwarded

22   e-mail, and if you go into the header information, the

23   metadata, you can find it.  In some cases it's hidden on some

24   e-mails, you would actually have to go dig for it, but in most

25   cases that information is there.  It is contained in the

D1m1cib2                         Mirandona - cross

1    e-mail.

2    Q.  So for example, I have one son who lives in San Francisco

3    and another one lives in Portland, Maine.  If I send an e-mail

4    to my son in Portland, Maine, "When are you coming to New

5    York?" and he writes back to me, "In two weeks," and I forward

6    that e-mail to my son in Maine, what will my son in Maine see

7    on what I forwarded to him?  Will he see my question --

8    question to my son in San Francisco?

9    A.  In general, yes.

10   Q.  Well, should he -- is it fair to expect that he will or

11   sometimes he won't?

12   A.  It's fair to expect that he will unless you somehow

13   manipulate the e-mail.

14   Q.  I would have to do something.

15   A.  You would most -- you would have to manipulate it.

16   Q.  But absent that, one would expect that the forwarded e-mail

17   would contain everything in that chain of communications.

18   A.  In general, my experience with e-mail is that the previous

19   chain is contained.

20   Q.  And --

21          MR. GREENFIELD:  No further questions.  Thank you.

22          THE COURT:  Mr. Brill, anything?

23          MR. BRILL:  I was waiting for Mr. Greenfield to get

24   back into his seat.

25          THE COURT:  Okay, sure.

D1m1cib2                        Mirandona - cross

1    CROSS-EXAMINATION

2    BY MR. BRILL:

3    Q.  Good morning, Agent Mirandona.

4    A.  How are you, sir.

5    Q.  My name is Peter Brill for Nathan Schwartz.

6            MR. BRILL:  That being said, could we take a look,

7    please, at Exhibit 3613, page 1.

8    Q.  The sammy110wall account, was that contained on a single

9    computer that you searched or more than one computer that you

10   searched?

11   A.  I believe it was the F1 computer.

12   Q.  Oh, so in reviewing the other computers that you searched

13   in that office, you didn't determine that the AOL software

14   containing folders related to sammy110wall were on any of those

15   other computers?

16   A.  I did not specifically -- I would have to go back and

17   verify whether or not it was.

18   Q.  Okay.  So testifying on your knowledge right now, you don't

19   know.

20   A.  That is correct.

21   Q.  Take a look at -- so you have no idea who Lidia Chalen or

22   Lidia Chalen is; right?

23   A.  I have no idea.

24   Q.  That name didn't come up in any other part of your search;

25   right?

D1m1cib2                        Mirandona - cross

1    A.  I would have to physically search for that name.

2    Q.  Sure.  Does the sammy110wall account contain any

3    identifying information as to who that account belongs to,

4    specifically?

5    A.  I did not look for any specific information such as

6    subpoena type information of who is registered to the account.

7    Q.  I'm not talking about subpoena information.  You said the

8    AOL software was installed on this computer; correct?

9    A.  Yes.

10   Q.  And based upon your general familiarity with AOL software,

11   a user generally would put in specific identifying information

12   along with their account name; correct?

13   A.  They would sign in, and upon signing in with your user name

14   and password, it would create the folder substructure.

15   Q.  Sure.  In initially installing AOL software on the

16   computer, however, there is additional identifying information

17   that the user has the option of inputting, if you're aware?

18   A.  I'm not familiar with exactly what happens when you

19   install.  If maybe one person installs it and then other people

20   can just sign in, I'm not familiar.

21   Q.  Oh.  So it's fair to say that anyone who signs in, that is,

22   each individual account that signs into the AOL software on a

23   computer, there would be folders created on that computer for

24   each individual user; right?

25   A.  That is correct.

1    Q.  Which user account folders were created on this computer?

2    A.  I -- I would have to refresh back to my --

3    Q.  At least sammy110wall; correct?

4    A.  Yes.

5    Q.  And we know that by -- well, one second.  We'll get there.

6           Nathan@monseyframing, do you know anything about that

7    e-mail address?

8    A.  I do not.

9           MR. BRILL:  If we look at the second page, please.

10   Q.  So this is how we know that there's a sammy110wall folder

11   created on this computer; right?

12   A.  Yes.

13   Q.  And the path here is actually a path on the hard disk of

14   the computer indicating that sammy110wall had set up an account

15   on America Online; right?

16   A.  Yes.

17   Q.  Now is there anything in the information that you have

18   reviewed concerning this exhibit, the 3613, that would say that

19   the message was actually sent?  And let me make this a little

20   bit clearer.  The message resides as message 0002 in the Mail

21   You've Sent folder; right?

22   A.  That is correct.

23   Q.  Is there anything to indicate in any of this information

24   that that message was in fact actually ever sent from this

25   computer or from any other computer?

1   A.  There is no proof that the message was actually sent.

2   Q.  And in fact, this Mail You've Sent file, there's -- the

3   folder all the way along at the end of this path is not write

4   protected; correct?

5   A.  Excuse me?

6   Q.  It's not a write-protected folder; is that correct?

7   A.  I believe that is correct.

8   Q.  That means an individual can go into Mail You've Sent and

9   delete messages; right?

10  A.  That is correct.

11  Q.  It also means that an individual could go into the Mail

12  You've Sent folder and insert messages; right?

13  A.  That is correct.

14  Q.  And you, in examining this folder, did not take the details

15  of each file from the hard drive; right?  That is, when the

16  file was created, when it was manipulated, you've seen that

17  before; right?

18  A.  Yes.

19  Q.  Okay.  And you don't have that information; right?

20  A.  That information was not on this file itself.  It just had

21  the information from the To and the e-mail date.

22  Q.  But this is actual files that reside on this hard drive;

23  right?

24  A.  Yes.

25  Q.  So if I were to actually go into the File Explorer on the

1    computer and look at the details of this file, that is, message

2    0002, it would tell me when that message was placed on the hard

3    drive; right?

4    A.  Yes.

5    Q.  It would also tell me the last time that that message was

6    accessed prior to your examining it; right?

7    A.  Yes.

8    Q.  You don't have that information.

9    A.  I -- I do not have that information.

10   Q.  Are you -- one of the ways you would be able to determine

11   if this message actually had been sent is if you examine the

12   computer on the other end or the user account on the other end,

13   that is, the nathan@monseyframing account; correct?

14   A.  That is correct.

15   Q.  Are you aware of -- or let me put it this way.  Did you

16   personally gain access to the nathan@monseyframing account?

17   A.  No.

18   Q.  Are you aware of anyone else having gained access for this

19   purpose to the nathan@monseyframing account?

20   A.  I have no knowledge further than the To field of these

21   e-mails --

22   Q.  Okay.

23   A.  -- of that account.

24   Q.  All right.  And again, so you're not aware of any sort of

25   search warrant being executed to get the information from the

D1m1cib2                         Mirandona – cross

1   nathan@monseyframing account.

2   A.  I am not.

3   Q.  And of course even if the message had been received at the

4   nathan@monseyframing account, you'd have no information to

5   determine whether the message had been in fact opened or read

6   by the recipient; right?

7   A.  Generally that information would be provided by the sender

8   requesting read receipt, delivery confirmation.

9   Q.  Sure.  So you have an option, even on AOL, to request a

10  return receipt; correct?

11  A.  In general, yes.

12  Q.  All right.  And is there any information that you recovered

13  with regard to this e-mail that a return receipt was requested

14  or received?

15  A.  I did not see any return receipts on anything.

16          MR. BRILL:  Okay.  Can we look at 3614.

17  Q.  Again, this was found in the same folder; correct?

18  A.  I don't have the properties for 3614.

19  Q.  Did you obtain the properties for 3614?

20  A.  I believe so.  I just don't have a hard copy.

21  Q.  Okay.  Do you have something with you that would help

22  refresh your recollection, or does the government perhaps have

23  something?

24  A.  I believe so.

25  Q.  Let's take a look at page 2 of Exhibit 3614.  And let us

D1m1cib2                      Mirandona - cross

1    know if that refreshes your recollection.  And we can see it up

2    on the screen as well.

3    A.  Yes.

4    Q.  All right.  So this in fact was not found in the same file,

5    not in the same mail file; right?

6    A.  It was the same user account but a different folder.

7    Q.  Okay.  And this was found in the account "newmail"; right?

8    A.  It appears that it was found in the directory in "newmail."

9    Q.  All right.  And based upon your understanding of the AOL

10   software, what is the "newmail" folder?

11   A.  I -- I don't know if it was a user-created folder or if it

12   was a system-created folder.  I would assume each folder is

13   self-explanatory, the name of the folder.

14   Q.  Self-explanatory meaning the meaning should be

15   self-explanatory from the word "newmail"?

16   A.  Yes.  I don't know if it was an AOL-created folder or if it

17   was a user-created folder.

18   Q.  Okay.  So can we assume that "newmail" was for incoming

19   mail?  Is that what you mean?

20   A.  I have no knowledge of --

21   Q.  So it's not necessarily self-explanatory if we can't figure

22   it out.

23   A.  Well, in general, folder names are made to be

24   self-explanatory.  I don't know who created it, why, if it was

25   created by the system or how it got in that folder.

D1m1cib2                         Mirandona - cross

1    Q.  All right.  So as we sit here today -- I can't figure it

2    out, so let me ask you.  As you sit here today, can you tell me

3    what the purpose of the "newmail" folder is?

4    A.  I can only tell you where I found the e-mail.

5    Q.  On the computer.

6    A.  On the computer.

7    Q.  Okay.  Given that this message -- if we go back to the

8    first page of this, given that this e-mail was not in fact

9    found in the Sent Mail folder, do you have any basis to believe

10   that this message was in factually sent?

11   A.  My basis to believe that this e-mail was sent is that there

12   is a From, a To, and a date, an exact date.

13   Q.  That could be a draft; right?

14   A.  Generally if it was a draft, it would be found in the draft

15   folder, so I wouldn't necessarily assume that it's a draft.

16   Q.  Okay.  But it's not in a random folder that we don't know

17   where it came from; right?

18   A.  It's found in a folder in the sammy110wall user.

19   Q.  Which would indicate that either the AOL software on its

20   own or a user placed it in that folder; right?

21   A.  That is correct.

22   Q.  Again, no return receipt or no indication other than name,

23   date, that this was in fact sent; right?

24   A.  That is correct.

25   Q.  And no information, based on what we've talked about

D1m1cib2                         Mirandona - cross

1    before, that you have right now that it was in fact received;

2    right?

3    A.  I have no knowledge of the nathan@monseyframing.com

4    account.

5    Q.  In your examination of the e-mails on this computer, did

6    you see any -- any replies to any of the e-mails that have the

7    address to nathan@monseyframing.com?

8    A.  I personally did not see any replies.

9    Q.  And did you see, other than replies, any other e-mails to

10   the e-mail address associated with sammy110wall from a user

11   name or the e-mail address nathan@monseyframing.com?

12   A.  Not to my knowledge.

13   Q.  In your background as a forensic examiner, are you familiar

14   with the term "spoofing" as it refers specifically to e-mails?

15   A.  I have a vague understanding.

16   Q.  And based upon what -- based upon your vague understanding,

17   can you briefly just explain what that means.

18   A.  It's the ability to send an e-mail and make it appear as if

19   it came from another account.

20   Q.  And is that technology widely available to the general

21   public?

22   A.  I wouldn't -- I don't know.  I've never used it.

23            MR. BRILL:  Okay.  Nothing further.

24            MR. PASTORE:  Redirect, your Honor?

25

D1m1cib2                          Mirandona - redirect

1    REDIRECT EXAMINATION

2    BY MR. PASTORE:

3    Q.  Agent Mirandona, you mentioned that you were a forensics

4    examiner and you also mentioned I think something called a case

5    agent.  Can you just tell the jury a little bit more about the

6    difference between a case agent and a forensics examiner.

7    A.  As a case agent, you investigate the -- in general, as a

8    case agent, you investigate criminal activity, and when you

9    come across a specialty that you need taken care of, you go to

10   each individual group.

11           In my case, I do computer forensics.  I no longer

12   carry criminal cases.  Having gone full-time as a computer

13   forensics examiner, it is my job to handle the forensics and no

14   longer do the activities that a case agent would do, such as

15   conducting search warrants.  Where I assist on the search

16   warrant, I physically did not organize it, and the case agent

17   handles the day-to-day case work, talking to witnesses,

18   preparing reports and all of the normal activities that one

19   would deal with as I focus solely on the computer forensics.

20   Q.  Okay.  So are you assigned to one case or many cases?

21   A.  I'm assigned many cases.

22   Q.  And with respect to each of those cases, are you sitting

23   there sort of looking for evidence, investigating, reading all

24   of the e-mails, or are you simply extracting e-mails as

25   requested?

D1m1cib2                    Mirandona - redirect

A.  I go in and find what the case agent wants me to find for

them and return it to them for their review, and I do

cursory -- I see things as I'm working, but I'm not -- it's not

my job to analyze the output data.

Q.  Okay.  So in this case tell us exactly what did you -- and

if you could take that hard drive out of the box if it's still

there.

        All right.  So how is this -- just remind us how this

was actually created.

A.  I brought this with me the day of the search warrant, and

this was connected to my equipment.  I took the hard drive out

of the suspect computer, connected it to my equipment, and made

a forensic image, which was captured on my hard drive, which I

initialed and dated, and then I took those images back to my

equipment and analyzed it and processed it, which goes in and

finds every single file and identifies each file and it indexes

every word in every file so that I can search for file types, I

can search for files that contain certain words, I can search

for different types.  It's ten different types of images --

JPEGs, TIFs, you can search for individual things, and there

are many different ways to search, and in this case I was

specifically asked to find e-mail and identify anything I can

identify as e-mail, extract it all, and provide it to the case

agent for review.

Q.  And then later on were you asked to conduct further

1    analysis of specific e-mails?

2    A.  Yes.

3    Q.  And for each of those specific e-mails, can you tell

4    physically where that actual e-mail was recovered from.

5    A.  From the hard drive of the image of the computer.

6    Q.  And which specific computer --

7             MR. PASTORE:  If we could bring up 3616.

8    Q.  Government's 3600 series, the e-mails you've been

9    discussing, where physically were each of those e-mails?

10   A.  In Room F, on the top right at Desk 1.

11            MR. PASTORE:  I'm sorry.  If we could bring up 3616,

12   please.

13   Q.  Okay.  So now that we have it displayed on our screens,

14   where physically are each of these e-mails located?

15   A.  On the hard drive of the computer in Room F on the top

16   right at Desk 1.

17   Q.  Okay.  So what does the fact that a physical copy of the

18   e-mail was found on the hard drive at Desk F1 tell you about

19   the e-mail, if anything?

20   A.  That that account was accessed from that desk.

21   Q.  And that the e-mail, in other words, physically resided on

22   that computer, if I understand that correctly?

23   A.  Yes.  Yes.  That it was -- that it was held physically on

24   that computer.

25   Q.  You were also asked about e-mail addresses being truncated.

D1m1cib2                    Mirandona - redirect

1   Do you remember that?

2   A.  Yes.

3   Q.  With respect to AOL, can you just explain what your

4   understanding is of how or when an e-mail address would be

5   truncated, in other words, where it would be missing @aol.com?

6   A.  If you're using AOL, generally, when AOL sees an AOL

7   account user name, it will truncate the @aol.com.  It isn't

8   necessarily because it was one AOL account to another.  It's

9   just that it's -- AOL recognizes @aol.com being its own user

10  name.

11              MR. PASTORE:  Okay.  So if we could bring up 3612.

12  And if we could take a look at the To/From here.

13  Q.  Could you tell us what we're dealing with here in terms of

14  the truncated addresses and the From and the To line, what that

15  indicates to you.

16  A.  It indicates to me, in my experience, that AOL recognized

17  harrythemn@aol.com and sammy110wall@aol.com and truncated the

18  @aol.com.

19              MR. PASTORE:  Okay.  And then with 3604, if we could

20  just bring that up.

21  Q.  What, if anything, does the From/To indicate here?

22  A.  That the From is sammy110wall@aol.com and the To is

23  earlsdavid@yahoo.com.

24  Q.  Okay.  So in other words, only the AOL address is truncated

25  in the e-mail; is that right?

D1m1cib2                         Mirandona - redirect

1    A.  That is correct.

2              MR. PASTORE:  So if we could bring up 3610.

3    Q.  I'm going to hand you a physical copy.

4              MR. PASTORE:  And if we go to the file properties on

5    page 2, please.

6    Q.  Can you tell what mailbox this e-mail was found in.

7    A.  Incoming/Saved Mail.

8              MR. PASTORE:  So if we go back to the first page.

9    Q.  So do I understand correctly that this e-mail from

10   gcibik@yahoo.com signed by Gulay was found in the incoming mail

11   folder on the F1 computer?

12   A.  Yes.

13   Q.  You were asked about IP addresses.  Do you remember that?

14   A.  Yes.

15   Q.  When were the e-mails in Government 3600 sent and received,

16   according to -- according to the dates on the e-mails?

17   A.  In general, anywhere between 2006, 2008.  There's a fairly

18   large span of time.

19   Q.  Do you know, based on your training and experience, whether

20   companies, internet service providers purge their data after a

21   certain amount of time?

22             MR. GERZOG:  Objection.

23             MR. DONALDSON:  Objection.

24             MR. GERZOG:  I asked the same question and it was

25   sustained.

1          MR. PASTORE:  Your Honor, respectfully, it's a

2     different question:  Do you know whether data providers, ISPs

3     generally purge their data?

4          MR. DONALDSON:  I'm objecting for a different reason,

5     but objection.

6          THE COURT:  Isn't there a difference between ISP --

7     oh, okay.  All right.  ISP stands for internet service provider

8     but -- I'll sustain the objection.

9     Q.  You also mentioned something called an IP address.  Do you

10    remember being asked about that?

11    A.  Yes.

12    Q.  Do you know what a proxy server is?

13    A.  Yes.

14    Q.  What's a proxy server?

15    A.  Proxy server lets you go into one -- it lets you access a

16    server so that it masks your IP address or, by proxy, gives you

17    another IP address.

18    Q.  And if -- how, if at all, would that affect whether you'd

19    be able to determine from which computer an IP address was

20    attached to?  Let me try that again.

21         MR. BRILL:  I would object.  There's no evidence in

22    this case that a proxy server was used.

23         MR. PASTORE:  Your Honor, the question came up about

24    spoofing and whether if you --

25         THE COURT:  Yes.  I mean, the defense, you opened the

1       door on this one.

2                   MR. BRILL:  Spoofing is much different than a proxy

3       server; completely different, actually.

4                   THE COURT:  But the whole point is, you introduced the

5       concept that perhaps these aren't what they appear to be, and

6       so I think the government can follow through on that.

7       BY MR. PASTORE:

8       Q.  So if someone was -- is an IP address typically assigned to

9       a particular computer or device that's connected to the

10      internet?

11      A.  Generally the IP address is connected to the account and

12      then on -- to the modem.  You have an external IP address, and

13      then internally, you have a router that assigns different IP

14      addresses to different computers internally, but you can tell

15      the -- generally, you can tell the external IP address.

16      Q.  But you wouldn't necessarily be able to tell the internal

17      IP address; is that right?

18      A.  You would have to analyze the router.

19      Q.  Okay.  So if you traced back any of the e-mails here and

20      determined what IP address they were sent from, would that

21      necessarily tell you what computer they were sent from?

22      A.  Not necessarily.

23      Q.  I want to look at Government's Exhibit 3612 again.  Do you

24      remember being asked in cross-examination, when a forwarded

25      e-mail comes to you, is there typically a chain attached to it?

D1m1cib2                        Mirandona - redirect

1    A.  Yes.

2    Q.  And you said generally.  What did you mean by generally?

3    Are there circumstances where a chain is not included?

4    A.  If the user manipulates the e-mail.  In some cases, some

5    programs, it won't let you.  I think on a BlackBerry, I don't

6    even -- on some devices you can and can't manipulate it, but I

7    know in other -- in other programs, if you forward a message,

8    you can delete the previous part --

9    Q.  Okay.  So you remember being asked --

10   A.  -- of the body.  You cannot delete the header information,

11   but you can delete the body information in some cases.

12   Q.  You can delete the body of the original message; is that

13   right?

14   A.  You can manipulate the data in a forwarded message.

15   Q.  So you remember on cross-examination you were asked:  If I

16   send a message to one of my children, say, "Are you coming home

17   for the holidays?" they forward it to another kid, they would

18   see both -- both of those e-mails?

19   A.  In general, if you simply forward the message, you will see

20   all of the previous transactions.

21   Q.  Okay.  Now if the second child said, "Yeah, unfortunately,

22   I feel obligated to come home," and then the -- when it was

23   forwarded back to the original sender, let's say, right,

24   someone deleted that comment because they didn't want dad's

25   feelings to get hurt, would that be possible, in your

D1m1cib2                          Mirandona - redirect

1   experience?

2   A.  Yes.

3         MR. GREENFIELD:  Objection to what's possible.

4   There's no evidence whatsoever that this witness has said any

5   of this was done or that it could have been done on whatever

6   computer was used, which I assume --

7         THE COURT:  It's just a follow-up question to

8   Mr. Brill's hypothetical.

9   Q.  So when you say manipulate, you mean change the body of the

10  e-mail, if I understand that correctly.

11  A.  Yes.

12        MR. PASTORE:  Your Honor, may I have a moment?

13        (Pause)

14        MR. PASTORE:  No further questions.  Thank you.

15        MR. DONALDSON:  I just have a few.

16  RECROSS EXAMINATION

17  BY MR. DONALDSON:

18  Q.  Agent, thank you for this lesson because I -- two questions

19  for you.  I'm a lawyer, so maybe three.

20        Even with the IP information, it's still possible that

21  you don't know what computer sent the actual e-mail?

22  A.  I can tell you what computer I found the e-mail on.

23  Q.  Right.

24  A.  That's the information I have.

25  Q.  But based upon what the prosecutor just said, even if you

D1m1cib2                          Mirandona - recross

1    had the IP information, you couldn't tell what computer sent

2    the e-mail; correct?

3    A.   Strictly speaking, with just the IP information, it would

4    come back to the account.  Further investigation would be

5    necessary to determine which computer --

6    Q.   Actually sent the information.

7    A.   Yes.

8    Q.   So then it's possible then that for --

9           MR. DONALDSON:  Could you put up 3610, please.

10   Q.   So for this particular e-mail, I believe you said you

11   looked into the inbox of this particular computer, F1, and

12   found that e-mail; correct?

13   A.   This e-mail was found in the Incoming/Saved Mail folder.

14   Q.   Right.  And you don't know what computer sent that e-mail:

15   A.   This e-mail was sent from gcibik@yahoo.com.  I have no

16   knowledge of that account or where that was sent.  I can only

17   tell you I found this e-mail and where I found it.

18           (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. DONALDSON:

2    Q.  And correct me if I'm wrong, did you say that you have no

3    proof that mail was actually sent, you said earlier?

4    A.  There's -- I can only tell you the information that I have.

5    I would need some form of a read receipt or to examine the

6    recipient's account to say whether or not they received it and

7    read it.

8            THE COURT:  There's a difference between sending and

9    receiving.  I think the question is are you saying that you

10   don't know if these were actually sent?

11   Q.  Yes.  That's -- what I believe I heard you say earlier from

12   I believe Mr. Brill's question was that you don't have any

13   actual proof that the mail was actually sent?

14   A.  Well, I have the email and from the way it appears, it

15   appears as if it was sent.  But what kind of proof are you

16   asking that it was actually sent?

17           MR. DONALDSON:  I don't.  I'm done.  Thank you.

18           MR. GERZOG:  May I, your Honor?

19           THE COURT:  Yes.

20   RECROSS EXAMINATION

21   BY MR. GERZOG:

22   Q.  Agent, when you examined the original hard drive, that

23   was -- or withdrawn.

24           Did you examine the original hard drive that was on

25   computer F1, physically examine it, look at it?

1   A.  I removed the hard drive from the computer and connected it

2   to my equipment.

3   Q.  Right.  Did you examine it, did you look at it?

4           THE COURT:  For what purpose?  Obviously he looked at

5   it.  He --

6           MR. GERZOG:  I'm about to get to that, Judge.

7   A.  I must have.

8   Q.  And hard drives have manufacture dates on them, correct?

9   A.  In general they do.

10  Q.  And do you recall what the manufacture date on this, on

11  F1's hard drive was?

12  A.  I do not recall.

13  Q.  Now, you say that the emails we've been discussing were

14  physically held on the F1 computer, correct?

15  A.  Yes.

16  Q.  It's also possible that they were physically held on

17  another computer, correct?

18  A.  That is possible.

19  Q.  And it's possible in fact that they were physically held on

20  it was on a hundred computers?

21  A.  I have no knowledge of how many computers.

22  Q.  I know you don't know whether they were or not, but it's

23  theoretically possible?

24  A.  Theoretically it is possible.

25          MR. GERZOG:  Nothing further.

D1MLCIB3                    Mirandona - recross

1           THE COURT:  Okay.  I think they're out of questions.

2     Thank you very much.

3           Actually, just answer one for me.

4           The IP address, how many digits are in that?

5           THE WITNESS:  Generally it's a series of four blocks,

6     and it's could be each block can be up to three digits.

7           THE COURT:  Okay.

8           THE WITNESS:  It's generally separated by periods,

9     four sections.

10          MR. PASTORE:  Your Honor, if I may ask.

11    REDIRECT EXAMINATION

12    BY MR. PASTORE:

13    Q.  When you refer to IP, are you familiar with IPV4 and IPV6?

14    A.  Yes.

15    Q.  What's the difference between IPV4 and IPV6?

16    A.  It's a protocol that uses because basically IPV4 -- this is

17    going deep, but IPV4 is your IP address.  It's your internet

18    protocol address.  And they're basically running out of

19    addresses because there's so many computers and devices, every

20    device, including mobile device, everything.  So they had to

21    come up with a new protocol to expand and they created IPV6,

22    though it is not highly in use right now, basically businesses

23    and...

24    Q.  So when you were discussing a series of digits separated by

25    periods, is that IPV4, IPV6?

D1MLCIB3                        Mirandona - redirect

1    A.  I was discussing IPV4.

2    Q.  Is IPV6 alphanumeric?

3    A.  I'm not that familiar with the actual structure of it as

4    it's not that...

5    RECROSS EXAMINATION

6    BY MR. GERZOG:

7    Q.  Agent, if you know, the IP addresses were created so that

8    information transmitted from one computer to another could be

9    tracked, correct?

10   A.  Yes.

11           MR. GERZOG:  Thank you.

12           THE COURT:  All right.  That is the end of our lesson

13   this morning.  Okay.  Very good.

14           THE WITNESS:  Thank you, your Honor.

15           (Witness excused)

16           MS. ECHENBERG:  United States calls Special Agent Mark

17   Cozine.

18    MARK COZINE,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. PASTORE:

23   Q.  Good morning, Agent Cozine.

24   A.  Good morning.

25   Q.  How are you currently employed?

D1MLCIB3                    Cozine – direct

1    A.  I'm a special agent employed by the U.S. Department of

2    Homeland Security Investigations.

3    Q.  And are you assigned to a particular unit or squad at this

4    time?

5    A.  Right now I'm assigned to the general investigative group

6    at JFK airport.

7    Q.  And what are your duties and responsibilities in that role?

8    A.  We investigate criminal and administrative violations of

9    the immigration customs laws of the United States.

10   Q.  Directing your attention to January 2009, were you employed

11   as a special agent at that time?

12   A.  Yes, I was.

13   Q.  And what squad or unit were you assigned to at that time?

14   A.  The document benefit fraud task force.

15   Q.  And what were your duties and responsibilities with the

16   benefits and fraud task force?

17   A.  We basically investigated or concentrated most of our cases

18   on investigations that related to either fraudulent documents

19   or immigration benefit fraud schemes.

20   Q.  Directing your attention in particular to January 15, 2009,

21   were you working that day?

22   A.  Yes, I was.

23   Q.  What were you doing that day?

24   A.  We executed a search warrant that day.

25   Q.  Do you remember where you executed the search warrant?

D1MLCIB3                            Cozine - direct

1    A.  125 Maiden Lane here in Manhattan.

2    Q.  How did you come to be involved in the execution of a

3    search warrant at 125 Maiden Lane here in Manhattan?

4    A.  It was an investigation being conducted by our squad, and I

5    was assigned the task of the team leader for that particular

6    search warrant location.

7    Q.  What does it mean to be a team leader for a search warrant?

8    A.  Basically just you coordinate the activities of the search

9    warrant, write the reports, make sure everything gets done as

10   properly as it can be.

11   Q.  Were any photographs taken on the day of the search?

12   A.  Yes.

13   Q.  I'm handing you what's been marked for identification as

14   Government's 3044 through 3050.  Can you please look at each of

15   them and tell us what they are?

16   A.  They're photographs of the hallway door or 3044 is the

17   hallway door of the location marked Suite 16B, David M.

18   Schlacter, Esquire, Vintage Partners.

19   Q.  I'm sorry to interrupt.  But, in general, what are 3044

20   through 3050?

21   A.  Photographs of the location that the search warrant was

22   executed at.

23   Q.  And do they fairly and accurately depict the location 125

24   Maiden Lane as it appeared on the day of the search?

25   A.  Yes, they do.

D1MLCIB3                          Cozine - direct

1           MR. PASTORE:  Government offers 3044 through 3050.

2           MR. GERZOG:  Without objection.

3           THE COURT:  Received.

4           (Government's Exhibits 3044 through 3050 received in

5      evidence)

6      Q.  So you were just describing Government's 3044, and if he

7      would could please publish that to the jury by displaying it on

8      the screen.

9           So, before you were mentioning a hallway door, Suite

10     16B, is this the photo you were describing?

11     A.  Yes, it is.

12     Q.  And on the door plaque, can you read for us what's there?

13     I don't know if you can see it on the overhead, I'm sorry, on

14     your screen.

15     A.  Suite 16B, David M. Schlacter, Esquire, Vintage Partners.

16     Q.  If we go to 3045, can you tell us what we're looking at

17     here?

18     A.  That would be the waiting room inside the office.

19     Q.  3046.

20     A.  One of the offices inside the location.

21     Q.  In the sort of bottom or mid-right part of this photograph,

22     do you see that red object and there's a purple object on top

23     of it?

24     A.  Yes.

25     Q.  What are those?

D1MLCIB3                        Cozine - direct

1    A.  Files.

2    Q.  And where did you find those files in the office?

3    A.  On top of the desk.

4    Q.  And going to 3047, can you tell us what we're looking at

5    here?

6    A.  Again, an office inside Suite 16B.

7    Q.  And, again, the yellow object on the right side of the

8    screen and then the blue objects to the left of the screen,

9    what were those?

10   A.  They would be case files.

11   Q.  And were case files found anywhere other than just on top

12   of the desks?

13   A.  Yes, in the filing cabinets.

14   Q.  If we go to 3048, can you tell us what this is?

15   A.  Another desk inside the office.

16   Q.  And 3049?

17   A.  Another desk inside the office.

18   Q.  And, finally, 3050?

19   A.  Credenza and printer inside one of the offices.

20   Q.  On the day of the search, did you seize any of the file

21   folders that you've identified in a couple of these

22   photographs?

23   A.  Yes.

24   Q.  What did you do with them after you seized them?

25   A.  They were all boxed up, sealed up at the location, and then

1    were taken by truck to our office at 601 West 26th Street and

2    then were logged into office.

3    Q.   They were logged into evidence?

4    A.   Yes.

5    Q.   And where were they stored once they're logged into

6    evidence?

7    A.   We had a locked secure room that they were signed into by

8    the supervisor.

9    Q.   Do you know whether some of the files are still in that

10   room?

11   A.   Yes, they are.

12   Q.   How do you know that?

13   A.   I've seen them in there recently.

14   Q.   With respect to the search location, did you also create a

15   sketch of the search location?

16   A.   Yes, I did.

17   Q.   If I can direct your attention now to 3616, if we could

18   please bring that up on the screen.

19        What is this?

20   A.   That is a copy of the sketch I made.

21   Q.   Okay.  You see down below where it says sketch by, is that

22   your name there?

23   A.   Yes, it is.

24   Q.   Prior to your testimony, if I could direct your attention

25   to the trial cart that's to the left of you, did you have an

1    opportunity to go through the files that are in that trial

2    cart?

3    A.  Yes, I have.

4    Q.  And what in general do they consist of?

5    A.  Files that have come out of the location at 125 Maiden

6    Lane.

7    Q.  Did you notice anything different about the files as

8    compared to the day that you seized them?

9    A.  They've been tabbed.  Some plastic protective sheets have

10   been added.  The government's exhibit stickers have been added

11   to some items.  There's cover sheets showing what particular

12   boxes they came out of.  But they're substantially the same.

13   Q.  I'm sorry, you said they're substantially the same as the

14   date of the search?

15   A.  Yes.

16        MR. PASTORE:  Your Honor, at this time the government

17   offers 3037, 3038, 3043, 3100 through 3116, 3118 through 3127,

18   3129 through 3133, 3135 through 3139, 3200 through 3219, 3224

19   through 3234, 3239 through 3241, 3243 through 3244 into

20   evidence.

21        MR. GERZOG:  Your Honor, subject to connection with

22   respect to my client, Mr. Brodjik.

23        THE COURT:  They're received.

24        (Government's Exhibits 3037, 3038, 3043, 3100 through

25   3116, 3118 through 3127, 3129 through 3133, 3135 through 3139,

D1MLCIB3                          Cozine - direct

3200 through 3219, 3224 through 3234, 3239 through 3241, 3243

through 3244 received in evidence)

          MR. PASTORE:  Thank you, your Honor.  No further

questions at this time.

          THE COURT:  Any cross?

          MR. DONALDSON:  I have no questions.

CROSS-EXAMINATION

BY MR. GERZOG:

Q.  Agent, you were the leader of the search team for 125

Maiden; is that correct?

A.  That is correct.

Q.  Did you seize every file that was at 125 Maiden?

A.  No, we did not.

Q.  So you made a judgment.  You looked at every file, I

assume.  Is that correct?

A.  Yes.  Not me personally, but an agent went through the

files.

Q.  You or one your fellow agents looked at every file?

A.  Correct.

Q.  And you or one of your fellow agents made an on-the-spot

judgment as to whether that file might be relevant to the

investigation, correct?

A.  Correct.

Q.  And you seized or you and your fellow agents seized what

you thought might be potentially relevant, correct?

D1MLCIB3                          Cozine - cross

1  A.  We seized what we thought was relevant and what was within

2  the scope of the warrant.

3  Q.  And it's possible that you left some files at the location

4  by mistake that might have been relevant or could have been

5  relevant?

6  A.  There were files left at the location.  I can't speak as to

7  what others did.  But if any files that I left behind I felt

8  were not relevant.

9  Q.  Okay.  But it's not -- is it possible that you simply made

10  a mistake and didn't understand what a file was and left it

11  behind because you thought it was not relevant?

12  A.  Anything is possible.  But in my opinion, the files I took

13  were relevant.  The files I left were not relevant.

14  Q.  How long had you been assigned to this investigation?

15  A.  I joined document benefit fraud task force in 2007, I

16  believe I was assigned to that squad.

17  Q.  So at the time of the search, you were on the squad about

18  two years, correct?

19  A.  Yes.

20  Q.  And you were not the case agent for this case, right?

21  A.  No, I was not.

22  Q.  So you had at best a sort of summary of what the case was

23  about or might be about, correct?

24  A.  That's fair to say.

25          MR. GERZOG:  Nothing further.

1          THE COURT:  I'm sorry, go ahead.

2     CROSS-EXAMINATION

3     BY MR. GREENFIELD:

4     Q.  In the course of the search of Maiden Lane, did you come

5     across the tenants of the lease for those premises?

6     A.  I don't recall.

7     Q.  Do you know whether someone else with you with the

8     execution of that search warrant seized the lease?

9     A.  Again, I don't recall.  I haven't gone through every single

10    box that was taken.

11    Q.  Do you know if there was a lease to those premises?

12    A.  I do not know.

13          MR. GREENFIELD:  No question.

14    REDIRECT EXAMINATION

15    BY MR. PASTORE:

16    Q.  Approximately how many boxes were seized at the search

17    location, if you remember?

18    A.  We took 190 boxes of documents from the location.

19    Q.  And prior to going into the search, did you review a

20    warrant or some sort of protocol for executing the search?

21    A.  Yes, we did.

22    Q.  And after you were involved in the search, were you

23    involved in the case in any other way?

24    A.  Yes.  We then went through the boxes that were seized and

25    indexed what was in the individual boxes.  And then several

D1MLCIB3                        Cozine - redirect

```
 1   years down the road, one of the targets of the investigation, I
 2   was there when the arrest warrant was executed for him.
 3   Q.  Who did you arrest?
 4   A.  Mr. Tischler.
 5   Q.  Do you remember his full name?
 6   A.  Harold, I believe.
 7           MR. PASTORE:  Okay.  Thank you.  Nothing further.
 8   RECROSS EXAMINATION
 9   BY MR. GERZOG:
10   Q.  When you inventoried the documents, you didn't inventory
11   them page by page, page 1 of 5 is blah blah blah, page 2 of
12   file two is.  You would say case file for Jim Jones, case file
13   for Bill Bradley, something like that, right?
14   A.  That's correct.
15           MR. GERZOG:  Thank you.
16   RECROSS EXAMINATION
17   BY MR. GREENFIELD:
18   Q.  Any connection whatsoever between the execution of the
19   search warrant that you came here to testify about and the fact
20   that some months later you happened to be assigned to placing
21   Mr. Tischler under arrest?
22   A.  Other than there was an arrest warrant, I was still
23   assigned to the squad, there was no connection between.
24   Q.  No relationship whatsoever --
25   A.  No.
```

D1MLCIB3                          Cozine – recross

1    Q.   -- between the search warrant that you were brought in to

2    testify to today and the fact that you happened to be still on

3    the case when the arrest of Mr. Tischler took place, right?

4    A.   That's correct.

5              MR. GREENFIELD:   Thank you.

6              THE COURT:   Thank you very much.  All right.  Why

7    don't we take our break.  And remember the cardinal rules of

8    don't talk about the case and keep an open mind.

9              (Witness excused)

10             (Continued on next page)

D1MLCIB3

1          (Jury not present)

2          THE COURT:  Is there anything we should be talking

3    about?

4          MR. DONALDSON:  No.

5          THE COURT:  Mr. Pastore.

6          MR. PASTORE:  Yes, your Honor, two issues.  The first

7    is we'll be submitting probably after the break for your

8    Honor's consideration a letter following up on our Friday

9    conversation about whether the door was opened to the admission

10   of Ms. Cibik's proffer statements.

11         And then second we do believe based on Mr. Donaldson's

12   opening statement regarding essentially following orders and

13   obedience, we're exploring whether a duress jury charge is

14   appropriate in light of that.  In particular, that duress, the

15   circumstances under which duress would be a defense and how

16   they in essence don't apply in this case in anticipation.

17         THE COURT:  Isn't that for the defendant to ask for?

18         MR. PASTORE:  No, your Honor.  The government believes

19   that it is, in other words, that the jury needs to be

20   instructed that duress is not a defense except in very

21   particular limited circumstances.  So we're looking at -- we

22   have some sample charges we're looking at.  We're planning to

23   provide the Court with that probably either later this evening

24   if that's okay or first thing tomorrow morning.

25         THE COURT:  I don't really care when you give it to

D1MLCIB3

1    me.  Today or tomorrow is fine.

2              MR. GERZOG:  May I simply ask the government through

3    you, your Honor, who the next couple of witnesses are going to

4    be?

5              THE COURT:  That is a piece of information you should

6    have had, but you can have it.

7              MR. GERZOG:  I assume it's Mr. Grynsztajn, one of

8    them, at least.

9              MR. PASTORE:  Your Honor, we did send an email.

10             THE COURT:  We're running out of witnesses on the

11   list.  I check them off.

12             MR. PASTORE:  I think we sent an email and also we

13   definitely mentioned it on Friday.  It's Eric Silverman, Lavale

14   Jackson, who are document custodians, David Grynsztajn, Sam

15   Salamon, Deidre Gordon.  That's what we anticipate the final

16   lineup is going to be.

17             MR. GERZOG:  We're clearly not going to get to all of

18   them today.  Does the government anticipate finishing the

19   direct of Mr. Grynsztajn today?

20             MR. PASTORE:  Probably not.  We anticipate it's about

21   three hours or so on direct.

22             MR. GERZOG:  Thank you, your Honor.

23             THE COURT:  Okay.

24             (Recess)

25             MR. PASTORE:  Your Honor, for the government's

D1MLCIB3

1    cooperating witnesses we intend to use, as long as it's okay

2    with the Court, a face board and we positioned it in the

3    courtroom.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1MLCIB3

1           (Jury present)

2           MR. PASTORE:  United States calls Lavale Jackson.

3     LAVALE JACKSON,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. PASTORE:

8    Q.  Mr. Jackson, how you are currently employed?

9    A.  Yes, I am.

10   Q.  How you are currently employed?

11   A.  I'm a special agent with the United States Department of

12   Labor, Office of Inspector General.

13   Q.  I'm sorry, did you say Office of the Inspector General?

14   A.  Correct.

15   Q.  How long have you held that position?

16   A.  Approximately eight years.

17   Q.  What are your duties and responsibilities as a special

18   agent with the Department of Labor, Office of the Inspector

19   General?

20   A.  To investigate fraud, waste, abuse, and corruption within

21   the Department of Labor programs.

22   Q.  Directing your attention to February 20, 2009, were you

23   working that day?

24   A.  Yes.

25   Q.  What were you assigned to do that day?

D1MLCIB3                        Jackson - direct

1   A.  I was the evidence custodian on a search warrant location.

2   Q.  When you say you were the evidence custodian, what do you

3   mean by that?

4   A.  I was tasked to maintain the chain of custody.

5   Q.  For what?

6   A.  For the evidence we confiscated from the location.

7   Q.  Do you remember what location you executed the search

8   warrant at?

9   A.  Yes.

10  Q.  What was the location?

11  A.  4524 Burlington Street, Flushing, New York.

12          MR. GERZOG:  May I have the address one more time?

13  A.  4524 Burlington Street, Flushing, New York.

14  Q.  In connection with the search, were any photographs taken?

15  A.  Yes.

16  Q.  You should have before you what's been identified as

17  Government's 3051, 3052, 3053, and 3054.  Do you recognize

18  those?

19  A.  Yes.

20  Q.  What are they?

21  A.  This is the search location as well as the boxes of

22  evidence that was confiscated.

23  Q.  And do they fairly and accurately depict the search

24  location, 4524 Burlington, as it appeared on that day as well

25  as the boxes as they appeared on that day?

D1MLCIB3                    Jackson - direct

1    A.  Yes.

2            MR. PASTORE:  Government offers 3051 through 3054.

3            MR. GERZOG:  No objection.

4            (Government's Exhibit 3051 through 3054 received in

5    evidence)

6            MR. PASTORE:  If we could publish Government's 3051.

7    Q.  And, Agent Jackson, if you can take a look at that and tell

8    us what we're looking at with respect to this document or

9    photograph, I should say.

10   A.  This is the search location, 4524 Burlington Street.

11   Q.  And if you go to 3052, please tell us what we're looking at

12   here.

13   A.  This is the walkway leading to the backyard of 4524

14   Burlington Street.

15   Q.  If you go to 3503.

16   A.  The backyard of 4524 Burlington Street.

17   Q.  I see there is a tarp in the photograph.  Can you tell us

18   what that is?

19   A.  The tarp was covering the boxes that was later on

20   confiscated.

21   Q.  And if you could look at 3054.

22   A.  These are the boxes of documents that was confiscated.

23   Q.  So the tarp has now been removed from this photograph; is

24   that right?

25   A.  Correct.

D1MLCIB3                        Jackson - direct

1  Q.  When you took the boxes, what did you do with them?

2  A.  We took them to the offices of Immigration and Customs

3  located on 26th Street in New York City.

4  Q.  If you work for DOL, why did you go to ICE, why did you go

5  to immigration?

6  A.  Because ICE was the lead agency on the case so the evidence

7  was basically transferred to go to that location to be stored.

8  Q.  And do you know where it was stored on that location?

9  A.  In the evidence room.

10  Q.  And do you know where these boxes are today?

11  A.  Yes.

12  Q.  Where are they?

13  A.  26th Street, New York City.

14  Q.  In that same?

15  A.  In that same evidence room, correct.

16  Q.  And did you personally look inside these boxes during the

17  search or have any further interaction with these boxes after

18  the search?

19  A.  I signed them off to a seizing agent -- I signed them off

20  to an ICE agent and that was it.

21  Q.  That was the end of your involvement?

22  A.  Correct.

23  Q.  In preparing to testify today, did you look at some -- did

24  you look at certain files that I showed you?

25  A.  Certain files?

D1MLCIB3                          Jackson – direct

1    Q.  File folders?

2    A.  Today?  Certain files?

3    Q.  Yes, certain file folders?

4    A.  Yes.

5    Q.  Were you able to determine whether they in fact came from

6    inside the boxes?

7    A.  No.

8    Q.  Why was that?

9    A.  I didn't go through.  I didn't review the documents in the

10   boxes.

11          MR. PASTORE:  Okay.  No further questions at this

12   time, your Honor.

13          MR. DONALDSON:  No questions.

14          MR. GERZOG:  No questions.

15          THE COURT:  Okay.  You set the record for shortest

16   witness.  Congratulations.

17          (Witness excused)

18          MR. PASTORE:  United States calls Eric Silverman.

19    ERIC SILVERMAN,

20       called as a witness by the Government,

21       having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. PASTORE:

24          MR. PASTORE:  Your Honor, may I inquire?

25          THE COURT:  Yes, please.

1    Q.  Mr. Silverman, how are you currently employed?

2    A.  I'm a special agent with U.S. Department of Homeland

3    Security Immigration and Customs Enforcement.

4    Q.  Are you assigned to a particular squad or unit?

5    A.  Right now I'm in the counterproliferation investigations

6    unit.

7    Q.  Did you say counterproliferation unit?

8    A.  Counterproliferation investigations.

9    Q.  What are your duties and responsibilities in that unit?

10   A.  I essentially investigate people trying to take and

11   illegally export any nuclear and military secrets or materials.

12   Q.  How long have you been assigned to that unit?

13   A.  Close to three years.

14   Q.  And prior to that, what unit were you assigned to?

15   A.  I was in the document benefit fraud, excuse me, document

16   benefit fraud task force.

17   Q.  What were your duties and responsibilities in that unit?

18   A.  We investigated anyone committing fraud against the United

19   States, and more particularly involving immigration fraud.

20   Q.  What unit were you assigned to on January 15, 2009?

21   A.  The document benefit fraud task force.

22   Q.  Were you at work that day?

23   A.  Yes.

24   Q.  What were you assigned to do on that day?

25   A.  I was a team leader for a search warrant.

D1MLCIB3                         Silverman - direct

1    Q.   And where was the search warrant executed?

2    A.   On Wall Street, 82 Wall Street.

3    Q.   Is that here in New York?

4    A.   Yes.

5    Q.   And as the team leader, what were your duties and

6    responsibilities in connection with the search?

7    A.   I was part of the search team and I labeled boxes and kept

8    inventory.

9    Q.   Do you have before you what's been marked for

10   identification as Government's 3055 through 3063?

11   A.   Yes.

12   Q.   Can you tell us in general what these exhibits are?

13   A.   These are pictures of the inside of the law firm or offices

14   that we searched that day.

15   Q.   When you say that day, are you referring to January 15,

16   2009?

17   A.   Yes.

18   Q.   And do they fairly and accurately depict the offices as

19   they appeared on the day of the search?

20   A.   Yes.

21            MR. PASTORE:  Government offers 3055 through 3063.

22            MR. DONALDSON:  No objection.

23            THE COURT:  Received.

24            (Government's Exhibits 3055 through 3063 received in

25   evidence)

D1MLCIB3                         Silverman - direct

1          MR. PASTORE:  If we can put up 3055, please.

2    Q.  Tell the jury what we're looking at here.

3    A.  This is the front door to those offices.

4    Q.  How do you recognize it as the front door to the offices?

5    A.  Well, to the right we can see the sign where it starts

6    saying law, law offices.  But 610 was the suite number of the

7    law firm.

8    Q.  And 3056.

9    A.  That was as you went through the door that you just saw,

10   there was a hallway that went left, right, and that was the

11   hallway and it had file cabinets against it.

12   Q.  Did you have occasion to look through the filing cabinets?

13   A.  Yes.

14   Q.  In general, what was contained in the filing cabinets?

15   A.  Attorney's files, different color files.

16   Q.  I'm sorry, they were different colors?

17   A.  Different color files.

18   Q.  And can you describe in general when you say different

19   color file, what is we're talking about?

20   A.  They were green, red -- I don't know if there were other

21   colors -- and manila legal-sized files.

22   Q.  And if we can go to Government 3057.  What are we looking

23   at here?

24   A.  Just more of the file cabinets that contained files that

25   were against the wall in the hallway.

D1MLCIB3                        Silverman - direct

1   Q.   Okay.  3058.  I want to direct your attention to that red

2   object and the green object in the foreground of the

3   photograph.  Do you see that?

4   A.   Yes.

5   Q.   What are those?

6   A.   Those are the color files that I was telling you about.

7   They were out in the hallway.

8   Q.   3059.  What are we looking at here, the purple objects?

9   A.   More of the same different colored files that I was talking

10  about.

11  Q.   How about 3060?

12  A.   The same thing.  You see the blue one on the chair and just

13  the yellow one up on the printer.

14  Q.   3061.

15  A.   You can see in the Redwelds, you can see the blue and green

16  ones sticking out.  And I think there was one on the bottom of

17  the screen against the black file cabinet.

18  Q.   How about 3062 and 3063, if you just want to flip through

19  them?

20  A.   All the same.  Different colored files, legal size like the

21  ones we were looking through.

22  Q.   What did you do with these files?

23  A.   Well, we would take the files.  We would flip through them

24  quickly to see if they were immigration related, I believe is

25  what we were looking for, labor related.  And if they were, we

D1MLCIB3                         Silverman - direct

1    would just put them in a box.

2    Q.  And what ultimately happened to the boxes that you put the

3    file folders into?

4    A.  The boxes were taped up and transported to our office.

5    Q.  Approximately how many boxes did you seize that day?

6    A.  125.

7    Q.  And when you say they were transported to your office, what

8    happened to them at your office?

9    A.  They were locked up in an evidence room.

10   Q.  Do you know where they are today?

11   A.  Yes, they're still in that evidence room.

12   Q.  And if you look to your left, there should be a Redweld on

13   the witness stand containing what's been marked for

14   identification as Government's 3036, 3065, 3128, 3134, 3140,

15   3222, and 3223.  Do you recognize each one of these?

16   A.  These are the files that we were looking through, the same

17   type of files that we were looking through.

18   Q.  When you reviewed them, did you review them prior to

19   testifying?

20   A.  Yes.

21   Q.  And did you notice anything different about them as

22   compared to the day of the search?

23   A.  No.

24   Q.  Is there -- are there any stickers on any of the folders?

25   A.  Government Exhibit stickers.  And then the front is the

D1MLCIB3                     Silverman – direct

1    sheets where it says removed from 80-82 Wall Street, box

2    No. 12.

3    Q.  Were those stickers and that sheet on the file folders on

4    the day of search?

5    A.  The government exhibit sticker?  No.

6    Q.  So other than the exhibit sticker and the sheet you just

7    mentioned, are these in the same or substantially the same as

8    when you saw them in 80-82 Wall?

9    A.  Yeah.  The sheets were added when we took them.

10          MR. PASTORE:  Government offers the exhibits that I

11   previously identified.

12          THE COURT:  Any objection?

13          MR. DONALDSON:  No objection.

14          THE COURT:  They're received.

15          (Government's Exhibits 3036, 3065, 3128, 3134, 3140,

16   3222, and 3223 received in evidence)

17   Q.  You said that at some point you went through these and

18   other files; is that right?

19   A.  Yes.

20   Q.  What was the purpose in doing that?

21   A.  We wanted to make sure that we weren't taking any unrelated

22   files that, you know, files unrelated to the alleged fraud or

23   immigration.

24   Q.  At some point did you also recreate, help out creating an

25   inventory of these various files?

 1  A.  Yes.

 2             MR. PASTORE:  No further questions.

 3             MR. GERZOG:  No questions.

 4             MR. DONALDSON:  No questions.

 5             THE COURT:  This might be -- do you think he's shorter

 6  than the last witness?  All right.  That was a short-lived

 7  prize because you now have the prize for the shortest witness.

 8  Congratulations.

 9             (Witness excused)

10             MR. PASTORE:  The United States calls David

11  Grynsztajn.

12             THE COURT:  He's not going to win the prize.

13   DAVID GRYNSZTAJN,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MR. PASTORE:

18             MR. PASTORE:  May I inquire, your Honor?

19             THE COURT:  Please.

20  Q.  Mr. Grynsztajn, how old are you?

21  A.  I'm 56.

22  Q.  Where were you born?

23  A.  Leningrad, Russia.

24  Q.  And, Mr. Grynsztajn, do you see the microphone that's in

25  front of you?

D1MLCIB3                          Grynsztajn - direct

1    A.  Yes.

2    Q.  I'll ask if you could pull it towards you and lean in a

3    little bit.

4            You said you were born in Russia?

5    A.  Yes.

6    Q.  After you were born in Russia, did you move somewhere else?

7    A.  Yeah, Poland.

8    Q.  And at some point did you come to the United States?

9    A.  Yes.

10   Q.  When was that?

11   A.  1969.

12   Q.  Approximately how old were you when you came to the United

13   States?

14   A.  Twelve and a half, 13.

15   Q.  How did you enter the United States?

16   A.  As a refugee status.

17   Q.  And what's your current immigration status?

18   A.  I'm a green card holder.

19   Q.  How did you get that green card?

20   A.  Through refugee status.

21   Q.  I want to focus your attention on 1999.  Where were you

22   living in 1999?

23   A.  I was living at a Bronx shelter.

24   Q.  And at some point --

25            MR. GERZOG:  Your Honor, I'm having a lot of trouble

1    hearing.

2            THE COURT:  You could just get a little closer to the

3    mike and try to speak up, please.

4    Q.  And at some point did you get a job in 1999?

5    A.  Yes.

6    Q.  Where did you get a job?

7    A.  With Mr. David.

8    Q.  What is Mr. David's full name?

9    A.  Earl David.

10   Q.  And who is Earl David?

11   A.  He is an attorney.

12   Q.  How did you known Earl David?

13   A.  We grew up together.

14   Q.  When you say that you grew up together, where did you grow

15   up together?

16   A.  In Brooklyn.

17   Q.  What job did Mr. David hire you to do?

18   A.  As a copy boy.

19   Q.  And what were your duties and responsibilities as a copy

20   boy?

21   A.  Making copies.

22   Q.  Where were you working?

23   A.  In New York.

24   Q.  Where specifically in New York?

25   A.  110 Wall Street.

D1MLCIB3                          Grynsztajn - direct

1   Q.  And when you say 110 Wall Street, can you describe for us

2   the office or offices that you worked at?

3   A.  First I worked on the 21st floor.

4   Q.  Twenty-first floor?

5   A.  Yes.

6   Q.  And did the law firm, Mr. David's law firm take up the

7   entire 21st floor?

8   A.  No.

9   Q.  Can you just give us a sense of the layout of the 21st

10  floor?

11  A.  Approximately about five, six rooms.

12  Q.  What room did you work in in 1999?

13  A.  1999, I work in the room next to Mr. David's.

14  Q.  At some point did your job duties change?

15  A.  Yes.

16  Q.  When was that?

17  A.  Sometime in 2000.

18  Q.  And how did your job duties change?

19  A.  I was asked to prepare immigration forms and labor forms.

20  Q.  I'm sorry, I'm still having a little difficulty hearing

21  you.

22          THE COURT:  You have to lean forward, not back.

23  A.  I was asked to prepare forms.

24  Q.  What kind of forms were you asked to prepare?

25  A.  Labor forms.

1   Q.  Any other types of forms?

2   A.  Immigration forms.

3   Q.  Who taught you how to prepare labor and immigration forms?

4   A.  Mr. David.

5   Q.  Why was it that in approximately 2000 you began preparing

6   labor and immigration forms?

7   A.  There was extension of immigration, the I-245 law.

8   Q.  Tell us in general what the I-245 law is in your

9   understanding?

10  A.  I-245 law allowed people that entered the country, people

11  that had expired visa, they overstayed here or people that

12  entered without visa, if they were physically present in the

13  United States before December 21, 2000, and file a case before

14  April 30, 2001, they be able to adjust.

15  Q.  And so how did that law affect you?  In other words, why

16  did that law mean that you had to start preparing petitions?

17  A.  Because the office was crazy busy.

18  Q.  When you say it was crazy busy, give us a sense of what the

19  office was like in the time frame about 2000, 2001.

20  A.  There was lines, people sleeping in the hallways, people

21  sleeping on the floor.  Some people waiting for a couple days

22  to see the attorney.

23  Q.  And with respect to the offices, you said at one point they

24  occupied the 21st floor at 110 Wall Street.  Did that ever

25  change?

D1MLCIB3                              Grynsztajn – direct

1   A.  Yes.

2   Q.  How did it change?

3   A.  We moved to another floor.

4   Q.  What floor did you move to?

5   A.  Sixteen.

6   Q.  Do you remember approximately when that happened?

7   A.  I believe around 2004.

8   Q.  What about the offices on the 21st floor, were they

9   abandoned?

10  A.  No.

11  Q.  So do I understand correctly that the law office had both

12  the 21st and the 16th floor?

13  A.  Correct.

14  Q.  And on the 16th floor, was that the entire floor or was

15  that just a suite of offices?

16  A.  A suite of offices.

17  Q.  And you were still working at the firm at that point?

18  A.  Yes.

19  Q.  Did you -- did you move to the 16th floor or did you stay

20  on the 21st?

21  A.  I moved to the 16th.

22  Q.  When you were on the 16th floor, describe where you worked

23  out of.

24  A.  I share room with two people.

25  Q.  What two people did you share a room with?

1    A.   Sam Salamon and Leo Teitelbaum.

2    Q.   Did you know Mr. Teitelbaum by any other names?

3    A.   Yeah, Lipa.

4    Q.   Lipa?

5    A.   Yes.

6    Q.   At some point did federal law enforcement authorities

7    approach you about your work at the law firm?

8    A.   Yes.

9    Q.   Do you remember approximately when that was?

10   A.   Sometime beginning of 2006.

11   Q.   And at some point were you charged with crimes in

12   connection with your work at the law firm?

13   A.   Yes.

14   Q.   What happened to your case?

15   A.   I pleaded guilty to three counts in June 2007.

16   Q.   And if you could just lean forward and bring the

17   microphone, I think we're having a little difficulty hearing

18   you still.

19        You said you pled to three counts; is that right?

20   A.   Yeah, pleaded guilty to three counts in June 2007.

21   Q.   What three counts did you plead guilty to in general?

22   A.   One count was filing false labor cases.  One count was

23   filing for false immigration cases.  And the third count was

24   conspiracy to bribe a federal official.

25   Q.   Okay.  Do I understand correctly that the first two counts

D1MLCIB3                        Grynsztajn - direct

1   related to your filling out of the labor and immigration forms
2   you were just describing a few minutes ago?
3   A.  Correct.
4   Q.  What's this third count about conspiring to bribe a federal
5   official?
6   A.  Some people that did not file a case on time -- the
7   deadline was April 30, 2001.  So when we needed the date, we
8   were able to get from the Department of Labor official.
9   Q.  When you say you were able to get a date from the
10  Department of Labor official, what do you mean by that?
11  A.  Through Mr. Teitelbaum we were able to.  He had a friend in
12  the Department of Labor in Pennsylvania, and we'd be able to.
13  Whatever date we needed, we were able to get it.
14  Q.  Did Mr. Teitelbaum ever discuss with you what that
15  Department of Labor employee was doing?
16  A.  Yes.
17  Q.  What did Mr. Teitelbaum tell you?
18  A.  He tell me he goes on the computer and switches the dates
19  on the cases.
20  Q.  Did you ever personally speak with this Department of Labor
21  employee?
22  A.  No.
23  Q.  So if you needed a date, what would you do?
24  A.  Speak to Mr. Teitelbaum.
25  Q.  And did you have to pay Mr. Teitelbaum in order to obtain

1    these dates?

2    A.   Yes.

3    Q.   Approximately, do you remember approximately how much you

4    had to pay him?

5    A.   He charge like a thousand dollars.

6    Q.   A thousand dollars per date or overall?

7    A.   Per each case.

8    Q.   For each case.  When you pled, you mentioned you pled

9    guilty in June 2007.  Was that pursuant to a cooperation

10   agreement with the government?

11   A.   Yes.

12   Q.   Under that agreement, what were your obligations?

13   A.   To cooperate with the government, to be available whenever

14   they need me, to file tax returns for the years I did not file,

15   not to commit any more crime, and to tell the truth.

16   Q.   Before you pled guilty, did you meet with the government

17   several times?

18   A.   Yes.

19   Q.   As you were meeting with the government, did you continue

20   for a time to work at the law firm?

21   A.   Can you repeat that question?

22   Q.   Sure.  Were you meeting with the government and at the same

23   time working at the law firm still for a time period?

24   A.   Yes.

25   Q.   And approximately when did you leave the law firm?

1   A.  I believe sometime in April, May 2006.

2   Q.  So it was prior to your guilty plea you left the law firm?

3   A.  Yes.

4   Q.  After you pled guilty in June 2007, did you commit

5   additional crimes?

6   A.  Yeah, I filed two more cases with the Department of Labor.

7   Q.  And did you tell the government about that?

8   A.  Yes.

9   Q.  When did you tell the government about that?

10  A.  In 2007.

11  Q.  And what's your understanding of how the government found

12  out about it other than you telling them?

13  A.  I told the government.

14  Q.  What if anything happened as a result of you telling the

15  government about these two additional cases?

16  A.  I pleaded guilty to that charge.

17  Q.  When did you plead guilty?

18  A.  January 2013.

19  Q.  If you told the government in 2007 about these additional

20  cases, do you have any idea why it took until 2013 for you to

21  plead guilty?

22  A.  I have no idea.

23  Q.  Was that because of anything you did?

24  A.  No, sir.

25  Q.  With respect to this guilty plea in January 2013, was that

1    also pursuant to a cooperation agreement?

2    A.   Yes.

3    Q.   And how do the terms of the new cooperation agreement

4    compare to the terms of the old cooperation agreement?

5    A.   I'm facing additional five years.

6    Q.   So what was the maximum sentence you faced under the

7    June 2007 plea agreement?

8    A.   Twenty years.

9    Q.   What is the maximum sentence you face now?

10   A.   Twenty-five.

11   Q.   If you do the things that you mentioned, show up when the

12   government asks you to, testify truthfully, don't commit any

13   crimes, and file amended tax returns, what if anything has the

14   government agreed to do for you?

15   A.   Just tell me they write a letter to the judge.

16   Q.   What's your understanding of what information will be

17   contained in that letter?

18   A.   Whatever I help, I spoke to the government many years, and

19   good things and bad things I did.

20   Q.   You said the good things and bad?

21   A.   The bad things I did.

22           THE COURT:   Could you please, please keep your voice

23   up.

24   Q.   And to whom is the government going to send that letter?

25   A.   To the sentencing judge.

D1MLCIB3                              Grynsztajn - direct

1    Q.  And what sentence are you hoping to get?

2    A.  I'm hoping for probation.

3    Q.  What's the maximum you could get?

4    A.  Twenty-five years.

5    Q.  What's your understanding of whether the government is

6    going to recommend a specific sentence for you?

7    A.  I understand government will not recommend anything.

8    Q.  Who ultimately decides what sentence you get?

9    A.  Judge.

10   Q.  Does the outcome of this trial in any way affect whether or

11   not you get that letter to the judge?

12   A.  No.

13   Q.  What does affect whether you get the letter to the judge?

14   A.  Need to speak the truth.

15   Q.  Are you hoping also to receive an immigration benefit from

16   the government?

17   A.  No.

18   Q.  Has the government agreed to do anything with respect to

19   the immigration authorities if you do the things that you

20   mentioned under your cooperation agreement?

21   A.  They promise to send the same letter to the immigration

22   judge they send to the judge here.

23   Q.  Does the United States Attorney's Office, as far as you're

24   aware, have power to grant you citizenship?

25   A.  No.

D1MLCIB3                        Grynsztajn - direct

1    Q.  What's your understanding of whether the United States

2    Attorney's Office is going to recommend that you get

3    citizenship?

4    A.  They're not going to recommend anything.

5    Q.  And if you could just speak into the microphone and maybe

6    pull it a little more up.

7            You mentioned something about taxes and having to file

8    taxes.  What's that about?

9    A.  A few years that I did not file taxes.

10   Q.  And were those the years that you were working at the law

11   firm?

12   A.  Yes.

13   Q.  After you left the law firm in approximately 2006, did you

14   have additional communications with employees of the law firm?

15   A.  Yes.

16   Q.  Do you remember who you communicated with?

17   A.  Sam Salamon, Earl David, Mayer Weber.

18   Q.  Who is Mayer Weber?

19   A.  Mayer Weber was one of the people that supplied sponsors.

20   Q.  When you say sponsor, what do you mean by that?

21   A.  Company that would offer employment to the alien.

22   Q.  And what's your understanding of whether the job offers

23   were in fact legitimate?

24   A.  My understanding they were not legit.

25   Q.  Do you know what sponsor or sponsors Mr. Weber provided?

D1MLCIB3                        Grynsztajn - direct

1   A.  I know there was a nursing home in Connecticut.

2   Q.  A nursing home in Connecticut?

3   A.  Yeah.  I believe it was Rose Bank, I'm not sure.

4   Q.  Pardon me?

5   A.  I think the name was Rose Bank.

6   Q.  Rose Beck?

7   A.  Rose Bank or Rose Beck, something like that.

8   Q.  Rose Bank?

9   A.  Yeah.

10  Q.  How did you have these communications with Sam Salamon,

11  Earl David, and Mayer Weber?

12  A.  Mostly through email.

13  Q.  Did you ever speak in any other way besides email or

14  communicate in any other way besides email?

15  A.  Once or twice on the phone.

16  Q.  What about in person?

17  A.  With Mr. Weber, yes.

18  Q.  How about with Mr. Salamon?

19  A.  Yes, him too.

20  Q.  Handing you what's been marked for identification as

21  Government's 601-5.  The typeface is small so why don't you

22  take a moment, look at it, and tell us if you recognize that

23  document.

24          Okay.  And it looks like you finished reading the

25  document.  Do you recognize it?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's email between me, Earl David, and Sam Salamon.

4   Q.  Did you say it's emails between you, Earl David, and Sam

5   Salamon?

6   A.  Yes.

7   Q.  And, again, I hate to keep saying it, if you could lean a

8   little bit into the microphone, I appreciate it.

9          How do you recognize this document as emails between

10  you, Earl David, and Sam Salamon?

11  A.  I seen it before.

12  Q.  And is it a true and accurate copy of the emails between

13  you, Earl David, and Sam Salamon?

14  A.  Yes.

15          MR. PASTORE:  Government offers 601-5.

16          MR. DONALDSON:  No objection.

17          MR. GERZOG:  Subject to connection with Mr. Brodjik.

18          THE COURT:  They're received.

19          (Government's Exhibit 601-5 received in evidence)

20          MR. PASTORE:  If we can bring up 601-5 on the screen,

21  please.  And if we could focus.

22  Q.  And, Mr. Grynsztajn, I don't know if it's easier for you to

23  look at your screen.  Does your screen have 601-5 on it as

24  well?

25  A.  Yeah.

1    Q.  If we could focus in where it says original message and

2    then it says from Earl David to David G.

3            First, do you recognize EarlSDavid@yahoo.com, do you

4    recognize that email address?

5    A.  Yes.

6    Q.  How do you recognize it?

7    A.  That was his email address.

8    Q.  And what about David G, David110wall@yahoo.com, do you

9    recognize the David110wall email address?

10   A.  Yes.

11   Q.  Whose email address was that?

12   A.  My email address.

13   Q.  Let's go through the original message.

14           It begins, "I don't know what you want from me.  I

15   helped you like no one else in the world.  You went from a

16   shelter to a home."

17           Let me stop there.  What's your understanding of the

18   reference to a shelter?

19   A.  Moved from shelter to my own house.

20   Q.  And when -- are you referring to when you were first

21   employed by Mr. David, what you were telling us earlier?

22   A.  Yes.

23   Q.  "You built a beautiful rich life and I was never jealous

24   whatever you had and have.  I never told you how to spend your

25   money and it's your decision to quit, so be responsible for

1     your decisions."

2              Let me ask you, what's your understanding of the

3     reference to quitting?

4     A.   Quitting, I left the office because basically I was pushed

5     out of the office.

6     Q.   And had you also been visited by agents of law enforcement

7     at the time that you left the office?

8     A.   Yes.

9     Q.   After you left the office and you communicated with Earl

10    David and Sam Salamon, did you ask them for anything?

11    A.   Yes.

12    Q.   What did you ask them for?

13    A.   I asked them for money.

14    Q.   Why did you ask them for money?

15    A.   For the referral for the clients, for the approvals that I

16    left, and the approvals that were taken from me.

17    Q.   So I'm going to break each of those down.

18              The files that you left.  So do I understand correctly

19    when you left the law office, you did not take your files with

20    you?

21    A.   No.

22              (Continued on next page)

23

24

25

1   BY MR. PASTORE:

2   Q.  And when you said referrals, what did you mean by that?

3   A.  The clients I referred.

4   Q.  You referred clients to the law firm?

5   A.  Yes.

6   Q.  Was that even after you left, you referred clients to the

7   law firm?

8   A.  Yes.

9   Q.  Approximately how many clients -- from the time you left

10  until the time you pled guilty, in June 2007, approximately how

11  many clients do you think you referred?

12  A.  Maybe ten.

13  Q.  Why did you refer clients to the law firm even after you

14  left?

15  A.  'Cause I was afraid, you know, that -- people got in touch

16  with me, they want me to do a case, I said go to them.  I was

17  afraid they were going to find out that I'm cooperating with

18  the government.

19  Q.  And in fact, after you pled guilty in June 2007, did you

20  ever make an additional referral to the law office?

21  A.  Yes.

22  Q.  Approximately how many additional referrals do you think

23  you made?

24  A.  I don't know.  Couple.

25  Q.  When was the last time that you referred someone to the law

D1m1cib4                        Grynsztajn - direct

1    office?

2    A.    '07.

3    Q.    Okay.  And finally, you said -- you said referrals, your

4    files, and then you mentioned things that were taken from you,

5    as one of the reasons you wanted to be paid.  What do you mean

6    by things taken from you?

7    A.    The approvals that would come again, for example, Turkish

8    clients, and Ms. Gulay would take the approvals away from me

9    and I never got paid for them.

10   Q.    When you said Ms. Gulay would take them away, what is

11   Ms. Gulay's full name?

12   A.    Gulay Cibik.

13   Q.    Do you think you would recognize Ms. Cibik if you saw her

14   again?

15   A.    Yes.

16   Q.    Please take a look around the courtroom and tell us if you

17   see her here today.

18   A.    Yes.

19   Q.    Can you please point out where she is in the courtroom and

20   identify an item of clothing that she is wearing.

21   A.    Right here (indicating), with a green top.

22        MR. PASTORE:  May the record reflect that the witness

23   has indicated the defendant Gulay Cibik.

24        THE COURT:  Okay.

25   Q.    Okay.  Let's return to the Earl David e-mail dated

D1m1cib4                        Grynsztajn – direct

1    May 5th, 2006.  It continues, "You're over 40 years of age.

2    Don't destroy families.  If you want to quit, good luck, but

3    don't take others down."

4            What's your -- what's your understanding of what that

5    is in reference to?

6    A.  They knew I was talking to the government, so they thought

7    maybe, you know --

8    Q.  Well, let me stop you.  Who knew you were talking to the

9    government?

10   A.  Mr. David knew.

11   Q.  How do you know that Mr. David knew you were talking to the

12   government?

13   A.  I told him that I was visited.

14   Q.  Okay.  Did you tell anyone else that you had been visited

15   by law enforcement?

16   A.  Yes.

17   Q.  Who else did you tell?

18   A.  Rafi Brodjik.

19   Q.  Okay.  Did you tell them before or after you asked them for

20   money?

21           MR. GERZOG:  Objection.  No evidence that he asked

22   Mr. Brodjik for money.

23   Q.  Did you ever ask Mr. Brodjik for money?

24   A.  For money?  No.

25   Q.  Okay.  With respect to the folks that you asked for money,

D1m1cib4                          Grynsztajn - direct

1    Mr. Salamon and -- who did you ask for money?

2    A.   From Mr. Salamon.

3    Q.   Okay.  And before you -- before you asked Mr. Salamon for

4    money, had you told people that you had been visited by federal

5    law enforcement?

6    A.   Yes.

7    Q.   Let's move up to the next e-mail.  Do you see where it says

8    "david grin wrote," then it's got a colon?  Do you see that in

9    bold in the middle of the page?

10   A.   Yes.

11   Q.   It says, "I am not looking to take anybody down.  That's

12   why I said let's settle peacefully."

13            So what is that a reference to?

14   A.   Simply, I don't want to fight with nobody.

15   Q.   Okay.  "You know why I quit.  I'm not going to repeat it in

16   the e-mail.  You people are still making money.  I made money

17   but you also made money from the same cases from my Polish

18   referrals, and how many Turkish approvals went to Gulay?"

19            Let me ask you first, Polish referrals, what do you

20   mean by that?

21   A.   I referred Polish clients.

22   Q.   Why is it that you referred Polish clients?

23   A.   Because I speak Polish.

24   Q.   So let me take a step back.  In general how were clients

25   assigned to different people at the law firm?

D1m1cib4                        Grynsztajn - direct

1   A.   Usually Polish clients would go to me, Turkish clients

2   would go to Gulay, people who spoke Spanish Hebrew would go to

3   Sam Salamon.

4   Q.   And why would the Turkish clients go to the defendant

5   Cibik, why would Polish clients go to you, why would Spanish

6   Hebrew clients go to Sam Salamon?

7   A.   I spoke Polish, Gulay spoke Turkish, Mr. Salamon spoke

8   Spanish and Hebrew.

9   Q.   And if you worked on a client's file -- well, let me ask

10  you this:  How were people compensated at the firm?  Was it a

11  flat salary or was it a per-client basis?

12  A.   Per client.

13  Q.   With respect to getting clients in general, how did the law

14  firm and how did you generally get clients?

15  A.   Usually by referrals.

16  Q.   Were there ever any advertisements taken out to attract

17  clients?

18  A.   Yes.

19  Q.   Did you ever take out any advertisements?

20  A.   I had it for a while, yes.

21  Q.   Tell us about that.

22  A.   I had it in the Polish newspapers.

23  Q.   When you say Polish, are you referring to Polish language

24  newspapers?

25  A.   Correct.

D1m1cib4                          Grynsztajn - direct

1    Q.  Are you aware whether other individuals in the law firm

2    also took out advertisements?

3    A.  Yes.

4    Q.  Who are you aware of taking out advertising?

5    A.  Ms. Cibik advertised in the Turkish newspapers, Sam -- Sam

6    advertised in the Spanish newspapers.

7    Q.  Let's move on to the next section of this e-mail.  It says,

8    "How many Turkish approvals went to Gulay?"  What did you mean

9    by that?  And again, if you could just lean a little bit into

10   the mic.

11   A.  In 2001 I had a lot of Turkish cases before Ms. --

12   Ms. Gulay started working there.  When the approvals came in

13   finally, she end up getting those approvals.

14   Q.  What do you mean she got the approvals?

15   A.  She just took them.  She said, "The Turkish clients are

16   mine."

17   Q.  How do you know that Ms. Cibik took Turkish clients of

18   yours?

19   A.  Because I knew the clients.  They were my clients.

20   Q.  And then what did you see the clients doing?

21   A.  Can you repeat that?

22   Q.  Sure.  You said that they were your clients initially?

23   A.  Yes.

24   Q.  So how do you know that Ms. Cibik ultimately took those

25   clients?

D1m1cib4                         Grynsztajn - direct

1    A.  Because I see that.  She continued doing the -- the next

2    step in the case.

3    Q.  Let's keep going with this e-mail.  "My family is down to

4    zero."  What did you mean by that?

5    A.  We're down to zero.  We had no money.

6    Q.  "I don't want to take down families, but you have to

7    understand I have my own 12 children to take care of.  If you

8    people are so religious, I'm not supposed to ask you for money,

9    you're supposed to offer it.  You helped me out before and you

10   think I don't appreciate it?  I do appreciate it.  We can

11   finish peacefully, and I'll leave, start a business, and that's

12   it."

13          When you're talking about people helping you out, what

14   do you mean by that?

15   A.  Mr. David would help me out.

16   Q.  Help you out in what way?

17   A.  He would give me his credit card to pay bills.

18   Q.  And did he ever give you cash as well?

19   A.  Yes.

20   Q.  Okay.  Let's go up to the top e-mail from Earl David to

21   david110wall.  Do you see the cc there, sammy110wall?  Do you

22   recognize that e-mail address?

23   A.  Yes.

24   Q.  How do you recognize it?

25   A.  That was Sam's e-mail.

D1m1cib4                        Grynsztajn – direct

1   Q.  Sam Salamon's e-mail?

2   A.  Yes.

3   Q.  Okay.  It says, "Sam says, once your threats and blackmail

4   stop, we will help you out as a fellow Yid."  What does Yid

5   mean?

6   A.  A Jew.

7   Q.  "No one will give in to threats.  He will also tell Gulay

8   to help you."

9           How much money were you looking for from Sam Salamon

10  and/or Earl David?

11  A.  $25,000.

12  Q.  And did you ever actually receive money from Sam Salamon or

13  Earl David?

14  A.  Yes.

15  Q.  Approximately how much money did you receive and from whom

16  did you receive it?

17  A.  I got like $1500 approximately from Mr. Salamon.

18  Q.  Tell us the circumstances under which you received that

19  money.

20  A.  I spoke to him and he told me to meet him and he gave me

21  the money.

22  Q.  Where did you meet to get this money from Mr. Salamon?

23  A.  Outside the office by a deli.

24  Q.  Outside the office by a deli?

25  A.  On Water Street, yeah.

D1m1cib4                        Grynsztajn - direct

1   Q.  Here in New York?

2   A.  Yes.

3   Q.  And after that time did you continue to communicate with

4   Mr. Salamon?

5   A.  Yes.

6   Q.  In what form did you communicate with him?

7   A.  E-mail.

8   Q.  When -- when is the last time that you physically saw

9   Mr. Salamon?

10  A.  At that meeting.

11  Q.  And when do you think that meeting was?  This e-mail is

12  from May 2006, so --

13  A.  2006.

14  Q.  So you think the last time you physically saw Mr. Salamon

15  was 2006?

16  A.  Yes.

17  Q.  Other than a brief -- well, were these e-mail exchanges

18  with Mr. Salamon after you received money from him, were they

19  lengthy, brief?  What were the nature of the e-mails?

20  A.  They were short.

21  Q.  And have you had any in-person, phone contact with him or

22  any lengthy conversations or e-mail exchanges with him since

23  2006?

24  A.  No.

25  Q.  I'm handing you now what's been marked for identification

D1m1cib4                          Grynsztajn - direct

1    as Government's 8, Government's 6, and Government's 9.  I'm

2    also going to hand you Government's 20.

3              Please tell us if you can recognize what Government's

4    20 is.

5    A.  Picture of Mayer Weber.

6    Q.  And does it fairly and accurately depict him as he -- as

7    you knew him?

8    A.  Yes.

9    Q.  Is there any differences in that picture and the way that

10   you knew him?

11   A.  Maybe the beard here is a little bit longer.

12   Q.  The beard there is a little bit longer?

13   A.  Yeah.

14             MR. PASTORE:  Okay.  Government offers 20.

15             MR. DONALDSON:  No objection.

16             MR. GERZOG:  No objection.

17             THE COURT:  Received.

18             (Government's Exhibit 20 received in evidence)

19   Q.  What was -- what was Mr. Weber's role at the law firm or in

20   connection with what you've been discussing?

21   A.  Providing sponsor.

22             MR. PASTORE:  Okay.  Your Honor, the government also

23   moves to admit 20A, which is just the nameplate that goes along

24   with the photo.

25             THE COURT:  Okay.

D1m1cib4                         Grynsztajn - direct

1          (Government's Exhibit 20A received in evidence)

2     Q.  Okay.  If you can take a look at Government's 6 and tell us

3     what we're looking at.

4     A.  Earl David.

5     Q.  Earl David?

6     A.  Yes.

7     Q.  And does it fairly and accurately depict Mr. David as he

8     appeared when you dealt with him at the law firm?

9     A.  Yes.

10          MR. PASTORE:  Government offers 6 as well as 6A, which

11     is an accompanying nameplate.

12          MR. DONALDSON:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibits 6 and 6A received in evidence)

15     Q.  And if you could go to the next government exhibit, let us

16     know what it is and what it is.

17     A.  Number 8, that's Sam Salamon.

18     Q.  Do you know if Mr. Salamon went by any other names?

19     A.  Shmuel.

20     Q.  Any other names, any other first names?

21     A.  Robert Salamon.

22     Q.  Does it fairly and accurately depict Sam Salamon, who was

23     also known as Robert, who was also known as Shmuel?

24     A.  Yes.

25     Q.  And what did he do at the firm?

D1m1cib4                        Grynsztajn – direct

1    A.  Was the provider of most of the sponsors.

2    Q.  Provided most of the sponsors?

3    A.  Yes.

4    Q.  Do you know whether he worked with Mr. Weber?

5    A.  Yes.

6    Q.  And did he work with Mr. Weber?

7    A.  I'd seen him many times with Mr. Weber.

8    Q.  Okay.  And finally, if you could --

9            MR. BRILL:  Your Honor, I'm going to object, but I'd

10   like to approach to state the objection, if possible.

11           THE COURT:  All right.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1m1cib4                          Grynsztajn – direct

1          (At the sidebar)

2          MR. BRILL:  The pictures in and of themselves are not

3     objectionable.  The fact that now the government is arranging

4     them in a pyramid -- which is the government's argument as to

5     what the layout of this firm was and the relationship between

6     the parties.  Obviously Mr. David is at the top, Mr. Salamon is

7     somewhere in the middle, and assumedly they're going to attempt

8     to then put the sponsor defendants towards the bottom and then

9     align the sponsors.  I don't know if they have a picture of Mr.

10    Schwartz or Mr. Tischler.

11         MR. PASTORE:  I do.  I can tell you we anticipated

12    potentially this objection.  That's why we're not going to use

13    face plates for the defendants.

14         MR. BRILL:  Well, again, but still, if we are to

15    equate Mr. Schwartz with Mr. Weber or Mr. Tischler, whomever

16    else is a sponsor defendant, I mean, the fact that they know,

17    even from openings -- the jury knows that Mr. Schwartz is a

18    sponsor defendant, Mr. Tischler is a sponsor defendant, and

19    knowing little to nothing about Mr. Weber and what his

20    involvement was, I think it's a false equivalent that makes our

21    clients, you know, look guilty by association.

22         THE COURT:  Overruled.

23         (Continued on next page)

24

25

1           (In open court)

2           MR. PASTORE:  Your Honor, I apologize.  I think I may

3    have failed to move -- failed to offer Government's 8 and

4    accompanying nameplate 8A.

5           THE COURT:  That's true.

6           MR. PASTORE:  And so I'll offer it now.

7           (Government's Exhibits 8 and 8A received in evidence)

8    BY MR. PASTORE:

9    Q.  And if you could identify the last government exhibit.

10   A.  Leo Teitelbaum.

11   Q.  And does it fairly and accurately depict Mr. Teitelbaum as

12   you dealt with him at the law firm?

13   A.  Yes.

14          MR. PASTORE:  Government offers 9.

15   Q.  What did Mr. Teitelbaum generally do at the law firm?

16   A.  Provided sponsors, wrote checks to immigration, cashed

17   checks, provided letters from Pennsylvania Department of Labor.

18          MR. BRILL:  I'm sorry.  I can't hear.

19          THE COURT:  You know, for whatever reason, it is

20   important that you speak up.

21   Q.  So if you could just tell us again, what were the things

22   that Mr. Teitelbaum did?  I think you mentioned something about

23   Philadelphia.  What was that about?

24   A.  He provided the dates from the Department of Labor,

25   Pennsylvania, he provided sponsors, job offer letters,

D1m1cib4                          Grynsztajn – direct

1    employment letters, cashed checks, wrote checks to immigration.

2              MR. PASTORE:  Okay.  And your Honor, government offers

3    9 and the accompanying Exhibit 9A, accompanying nameplate 9A.

4              THE COURT:  Received.  I'm just trying to see if we

5    can raise the volume on the microphone.

6              (Government's Exhibits 9 and 9A received in evidence)

7    Q.  Keep your voice up.  You earlier mentioned another name,

8    Refeal Brodjik.  Do you think you'd recognize Mr. Brodjik if

9    you saw him again?

10   A.  Yes.

11   Q.  Do you see him in the courtroom here today?

12   A.  Yes.

13   Q.  Please tell us where he is in the courtroom and identify an

14   item of clothing that he's wearing.

15   A.  Sitting the row back with the glasses and the yarmulke.

16             MR. GERZOG:  I acknowledge the ID, your Honor.

17   Q.  What was -- what did Mr. Brodjik do at the law firm?

18   A.  Mr. Brodjik job was to collect money from everybody and

19   transfer over to Mr. David when he left.

20   Q.  You said when Mr. David left.  What do you mean by that?

21   A.  At one point Mr. David was suspended.

22   Q.  Suspended from what?

23   A.  From practicing law.

24   Q.  And then what happened?

25   A.  He still continue filing cases, but then Mr. Brodjik was

D1m1cib4                          Grynsztajn - direct

1   the one that collecting money from everybody that work in the

2   office.

3   Q.   Do you know physically where Mr. David was located at the

4   time that you're referring to?

5   A.   Two locations.  First he started with 90 Washington Street

6   in New York.

7   Q.   Let me stop you there.  During what time period was

8   Mr. David at 90 Washington?

9   A.   During the time -- before he left to Canada.

10  Q.   Okay.  When did he leave for Canada?

11  A.   Probably around 2004.  Around 2004, 2005.

12  Q.   You believe that Mr. David left for Canada around 2005?

13  A.   I believe so.

14  Q.   Okay.  So he was at 90 Washington sometime prior to 2005;

15  is that right?

16  A.   Correct.

17  Q.   And do you remember approximately when he was suspended

18  from the practice of law?

19  A.   Approximately about that time.

20  Q.   So approximately 2005 we're talking about?

21  A.   2004, 2005, something, yeah.

22  Q.   How do you know that?  Did you ever discuss with

23  Mr. Brodjik what he was doing with the money that he collected?

24  A.   Yes.

25  Q.   What did Mr. Brodjik tell you he was doing with the money

1   he collected?

2   A.  He said whatever he collects from everybody, he is

3   deducting 20 percent for himself and the rest he deposits for

4   Mr. David.

5   Q.  Did you ever personally pay Mr. Brodjik money?

6   A.  Yes, sir.

7   Q.  How did you pay Mr. Brodjik money?

8   A.  I paid him cash.

9   Q.  Where were you when you paid the defendant cash?

10  A.  Usually in my office.

11  Q.  Approximately how often in a given week would you pay the

12  defendant cash?

13  A.  Basically almost every night.

14  Q.  Did you ever see the defendant collect money from any other

15  people?

16  A.  Yes.

17  Q.  Who did you see Mr. Brodjik collect money from?

18  A.  From Gulay, from Sam, from Mr. Teitelbaum.

19  Q.  Okay.  You said Gulay, Sam, and Mr. Teitelbaum?

20  A.  Yes.

21  Q.  All right.  Earlier you mentioned that you filed labor

22  applications and immigration applications.  Can you just take

23  us through, in general, how did the process work and what was

24  your role in the process.

25  A.  When a client came in, first we had to find out if they

D1m1cib4                         Grynsztajn - direct

1    have their own sponsor or if we have to provide them one.

2    Q.  Okay.  So when a client -- when you say client, who are you

3    referring to?  What were the typical clients like?

4    A.  Alien coming in looking for a green card.

5    Q.  Okay.  And when you say you had to determine whether they

6    had a sponsor or not, what do you mean by that?

7    A.  I would ask them, do you have somebody sponsor you or do

8    you need -- we should provide one company for you.

9    Q.  If the alien had a sponsor already, what would happen next?

10   A.  We start preparing the form.

11   Q.  And what if the alien needed a sponsor?

12   A.  Then we would provide one.

13   Q.  How would you provide a sponsor?

14   A.  Go to Mr. David and then he would get the sponsor from

15   Mr. Salamon.

16   Q.  Did you personally use the sponsors on applications that

17   you personally prepared?

18   A.  Yes.

19   Q.  Do you recall the names of any of the individuals who

20   provided sponsors?

21   A.  Yes.

22   Q.  Who were some of the people that provided sponsors?

23   A.  Sam Salamon, Mayer Weber, Abe Flam, Mr. Herbst.

24   Q.  Is there anyone else you can recall?

25   A.  Teitelbaum.

D1m1cib4                              Grynsztajn - direct

1    Q.  Okay.  You mentioned -- one of the names you mentioned was

2    Abe Flam.  Do you know what his full name was?

3    A.  Yes, Abraham Flam.

4    Q.  And do you know -- what do you know about Mr. Flam?

5    A.  He was the cousin of Mr. David.

6    Q.  And how do you know that?  Did you know that because

7    Mr. David told you that?

8    A.  Yes.

9    Q.  What else did Mr. David tell you about Abe Flam?

10   A.  That he used to have a vending truck and he used that name

11   for the -- to sponsor people.

12   Q.  Do you know whether at the time he was sponsoring people he

13   in fact had a vending truck?

14   A.  At that time, no.

15   Q.  And do you know whether Mr. Flam was paid for participating

16   or agreeing to sponsor people?

17   A.  Yes.

18   Q.  How do you know that Mr. Flam was paid for sponsoring

19   people?

20   A.  Mr. David paid him and I paid him too.

21   Q.  Why did you pay Mr. Flam?

22   A.  Because Mr. David told me, look, he has a lot of kids and

23   he's filling out the papers and signing forms, so take care of

24   him.

25   Q.  Do you remember any of the names of the companies

D1m1cib4                        Grynsztajn - direct

1   associated with Mr. Flam?

2   A.  My Favorite Bakery, Lakewood Bakery.  I know there was

3   more.  I --

4   Q.  But you can remember My Favorite Bakery and Lakewood Bakery

5   so far?

6   A.  Yes.  And Abe's Vending.

7   Q.  Abe's Vending?  Okay.

8   A.  I know there was a -- at least one more.

9   Q.  You believe there was at least one more Abe Flam company;

10  is that right?

11  A.  Yes.

12  Q.  Okay.  Mr. Herbst, do you remember Mr. Herbst's full name?

13  A.  Go by two names.  Andre and Erwin Herbst.

14  Q.  Okay.  And do you remember any of the companies that he

15  provided as sponsor?

16  A.  One of the companies was Hygia.

17  Q.  Hygia?

18  A.  Yes.

19  Q.  H-Y-G-I-A, is that it?

20  A.  Correct.

21  Q.  Do you remember any other companies that Mr. Herbst

22  provided?

23  A.  No.

24  Q.  Handing you what's been marked for identification as

25  Government's 4 and Government's 18.  First, if you could take a

D1m1cib4                        Grynsztajn – direct

1    look at Government's 4, can you let us know what that is.

2    A.  Mr. Flam.

3    Q.  And does it fairly and accurately depict Mr. Flam as you

4    saw him in the law offices?

5    A.  Yes.

6            MR. PASTORE:  Government offers 4, along with the

7    accompanying nameplate 4A.

8            MR. DONALDSON:  No objection.

9            MR. GERZOG:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibits 4 and 4A received in evidence)

12   Q.  And if you could just tell us the next government exhibit.

13   A.  Exhibit 18.

14   Q.  And what is Exhibit 18?

15   A.  Mr. Herbst.

16   Q.  Does it fairly and accurately depict Mr. Herbst as you saw

17   him in the -- or as you knew him during the time period you

18   were working in the law officed?

19   A.  Yes.

20           MR. PASTORE:  Government offers 18.

21           MR. DONALDSON:  No objection.

22           MR. GERZOG:  No objection.

23           (Government's Exhibit 18 received in evidence)

24   Q.  Did you ever see Mr. Salamon or Mr. Teitelbaum meeting with

25   any of the sponsors in the office?

D1m1cib4                         Grynsztajn - direct

1   A.  Yes.

2   Q.  Who do you remember Mr. Salamon -- well, let's start with

3   Mr. Salamon.  Who do you remember Mr. Salamon meeting with?

4   A.  Can you repeat that, please?

5   Q.  Sure.  What sponsors do you remember Mr. Salamon meeting

6   with?

7   A.  One of them was Mr. Tischler.

8   Q.  Okay.  Who is Mr. Tischler?

9   A.  Harold Tischler.

10  Q.  Do you think you would recognize Mr. Tischler if you saw

11  him again?

12  A.  Yes.

13  Q.  Please look around the courtroom and tell us if you see

14  Mr. Tischler here today.

15  A.  Sitting right there (indicating).

16  Q.  Can you identify an article of clothing that he's wearing.

17  A.  I can't see from here.  A white shirt.

18  Q.  And can you tell us what physically he's doing right now.

19  A.  Holding his hand like that (indicating).

20  Q.  You say he has his finger on his chin?

21  A.  Yes.

22          MR. PASTORE:  May the record reflect that the witness

23  has indicated the defendant Harold Tischler.

24          THE COURT:  Okay.

25  Q.  Okay.  When you saw Mr. Tischler meeting with Sam Salamon,

1   where were you?

2   A.  I was in the same office.

3   Q.  Approximately how many feet away were you?

4   A.  15, 20.

5   Q.  If you could lean into the microphone again.  I'm sorry.

6   A.  15, 20.

7   Q.  Okay.  You said you were approximately 15 to 20 feet away?

8   A.  Yes.

9   Q.  Did you ever hear Mr. Tischler talking to Mr. Salamon?

10  A.  Yes.

11  Q.  Were you in a position to hear what they were saying?

12  A.  Yes.

13  Q.  Tell us in general what you heard them saying on the

14  occasions that you saw Mr. Tischler meeting with Sam Salamon.

15  A.  Mr. Tischler was complaining that Mr. Salamon was putting

16  too many people in one company.

17  Q.  Did Mr. Tischler explain why he was upset that Sam Salamon

18  was putting too many people in one company?

19  A.  Because he came in with mail -- he brought the mail to

20  Mr. Salamon that he had received from either Department of

21  Labor or immigration.

22  Q.  And did he explain -- did you overhear why he was upset

23  that there were too many people being put into one company?

24  A.  One, that he didn't get paid for all of them.

25  Q.  And was there another reason?  You said one, he said he

D1m1cib4                        Grynsztajn - direct

1   wasn't getting paid for them.

2   A.   Yeah, too many -- I think he didn't get paid for all of

3   them, and putting too many people --

4           THE COURT:  You really have to slow down, you really

5   have to speak up.

6   Q.   So go ahead and start again, Mr. Grynsztajn.  You heard

7   Mr. Tischler complaining that he wasn't paid for all of the

8   applications.  What else did you hear Mr. Tischler say?

9   A.   That he wasn't getting paid enough for the applications.

10  Q.   Did you overhear how much Mr. Tischler wanted to get paid

11  for the applications?

12  A.   Yes.

13  Q.   How much did Mr. Tischler want to get paid for each of

14  those applications?

15  A.   Like a thousand dollars.

16  Q.   How did Mr. Salamon react when Mr. Tischler asked for

17  $1,000 per application?

18  A.   There was screaming back and forth at each other.  He said,

19  "I don't pay nobody a thousand dollars."

20  Q.   Who said, "I don't pay nobody a thousand dollars"?

21  A.   Mr. Salamon.

22  Q.   How did Mr. Tischler react?

23  A.   I'm not sure how the fight ended.

24  Q.   Pardon me?

25  A.   I'm not sure how the argument ended.

D1m1cib4                          Grynsztajn - direct

1   Q.  You're not sure how it ended?  And you said that you saw

2   Mr. Tischler with receipts in his hand; is that what you said?

3   A.  Yes.

4   Q.  What do you mean by receipts?

5   A.  He brought to Sam Salamon from either immigration or labor

6   department.

7   Q.  How can you tell that what Mr. Tischler was holding were

8   receipts from immigration or Department of Labor?

9   A.  That's what he was screaming "look how many cases you

10  filed."

11  Q.  Okay.  And in your experience in the law firm, had you ever

12  seen mailings from the Department of Labor and from the

13  immigration department?

14  A.  Yes.

15  Q.  And from where you were sitting, were you close enough to

16  actually see the receipts or are you basing --

17  A.  Yes.

18  Q.  Go ahead.

19  A.  Yes.

20  Q.  Okay.  So you could actually see what Mr. Tischler was

21  holding in his hand.

22  A.  Yes.

23  Q.  How big was this office?

24  A.  A small office.

25  Q.  Approximately how big?

1    A.   Maybe like this (indicating).

2    Q.   Okay.  So I believe the witness is basically drawing a line

3    with his finger in the air around the witness stand; is that

4    about right?

5    A.   Yes.

6    Q.   Over into the corner where the court reporter is sitting?

7    A.   Correct.

8    Q.   Is that approximately right?

9    A.   Yes.

10   Q.   Did each person have a desk in the office or how was it set

11   up?

12   A.   No, there were only two desks.  I had one and Sam Salamon

13   had one.

14   Q.   Okay.  And where did Mr. Teitelbaum work then if there was

15   no desk there?

16   A.   He worked basically -- he was writing everything on top of

17   the cabinets.

18   Q.   He would write on top of the cabinets?

19   A.   Yeah.

20   Q.   Now going back to the application process, you said if

21   someone didn't have a sponsor, you would provide one for them

22   by talking to various people in the law firm.

23   A.   Correct.

24   Q.   Did you charge the aliens money for the services you

25   provided?

1   A.  Yes.

2   Q.  How, if at all, would it affect the price if an alien

3   needed a sponsor as opposed to having their own?

4   A.  If we had to provide the sponsor, it would be like double

5   the price.

6   Q.  So how much would you typically charge an alien if they had

7   their own sponsor?

8   A.  $3,000.

9   Q.  And how much would you typically charge an alien if you

10  needed to provide a sponsor?

11  A.  5 or 6,000.

12  Q.  Why was it double the price if an alien needed a sponsor?

13  A.  One, we had to pay the sponsor.

14  Q.  You said you had to pay the sponsors?

15  A.  Correct.

16  Q.  And again, that was perfect.  If you can just keep leaning

17  into the microphone.

18          All right.  So with respect to the client interview

19  process, once you determined whether or not someone needed a

20  sponsor, what was the next thing that you would do?

21  A.  Start preparing forms.

22  Q.  What types of forms would you prepare?

23  A.  Labor forms.

24  Q.  Do you remember what the form was called?

25  A.  The ETA 750B.

D1m1cib4                          Grynsztajn - direct

1   Q.  ETA 750B?

2   A.  Yes.

3   Q.  Were there any other forms besides the 750B?

4   A.  There was also the ETA 750A.

5   Q.  Okay.  What was the difference between the 750A and the

6   750B?

7   A.  The 750A was for the company that was sponsoring the

8   person, and the B was for the alien.

9   Q.  At some point did the forms required by the Department of

10  Labor change?

11  A.  Yes.

12  Q.  Tell us about that.

13  A.  Everything became filed electronically.  It was called the

14  PERM system.

15  Q.  The PERM system?

16  A.  Yeah.

17  Q.  Approximately when did the PERM system come into play?

18  A.  I would say 2004.

19  Q.  Sometime in 2004?

20  A.  I believe so.

21  Q.  And what, if anything, did you do when the PERM process

22  came into play?

23  A.  I did not do PERM cases.

24  Q.  Why did you not do PERM cases?

25  A.  I did not know how to do them.

D1m1cib4                          Grynsztajn – direct

1   Q.  So if a client came to you during the time period when the

2   PERM was in process, what did you do?

3   A.  I would refer them to Mr. David or I'd refer them to

4   Ms. Gulay.

5   Q.  Why would you refer a client to Mr. David or Ms. Gulay?

6   A.  A lot of Turkish clients who came to me, so I would refer

7   them.  If it was a PERM case, I would refer them.

8   Q.  But why would you refer PERM cases to Ms. Gulay or

9   Mr. David?

10  A.  There was a problem with the Turkish people, with the

11  Polish people, they had cases waiting since 2001, and at one

12  time New York State Department of Motor Vehicles stopped

13  renewing the licenses unless these people had the work

14  authorization.

15  Q.  Okay.  So you're saying the New York State Department of

16  Motor Vehicles stopped issuing licenses unless someone had a

17  work authorization?

18  A.  Yeah, and a valid Social Security number.

19  Q.  And a Social Security number?

20  A.  Yes.

21  Q.  So how did that affect what happened with your clients?

22  A.  The PERM case, that would speed up the process a lot, and

23  there would be -- we would be able to get first the permission

24  to work and a Social Security card.

25  Q.  Did Ms. Cibik ever discuss with you filing PERMs for your

D1m1cib4                          Grynsztajn – direct

1    clients?

2    A.   Yes.

3    Q.   What did she tell you about that?

4    A.   How much to charge money for it.

5    Q.   So did Ms. Cibik know how to file PERM applications?

6    A.   Yes.

7    Q.   Do you know how Ms. Cibik learned to file PERM

8    applications?

9    A.   From Mr. David.

10   Q.   How do you know that Mr. David taught Ms. Cibik how to file

11   PERM applications?

12   A.   I seen him.

13   Q.   What do you mean you've seen him?

14   A.   I'd sit in the office when she sat next to him and he

15   taught her to do it.

16   Q.   So you saw Mr. David teaching Ms. Cibik how to file PERM

17   applications.

18   A.   Correct.

19   Q.   We'll return to the driver's license in a minute, but for

20   now I want to focus on ETA parts A and parts B.  Those were the

21   forms that you personally filled out; is that right?

22   A.   Correct.

23   Q.   After they were filled out, what was the next step in the

24   process?

25   A.   The next step, to get a sponsor.  You had to advertise the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1m1cib4                          Grynsztajn - direct

1   case in the newspaper.

2   Q.  What do you mean you had to advertise the case in the

3   newspaper?

4   A.  If a company was looking for a worker, that job should

5   be -- you had to advertise the case, because companies looking

6   for a worker, first they have to offer the job to somebody

7   American available for the job, not the immigrant.

8   Q.  So you had to establish, do I understand correctly again --

9   remember to lean into the microphone a little -- if the

10  employer was looking to hire an alien, they first had to

11  establish, you said, that there was no American worker

12  available for the job; is that right?

13  A.  Correct.

14  Q.  Who told you that that was a requirement?

15  A.  Mr. David.

16  Q.  And how did the advertising play a part in that, in that

17  process?

18  A.  You advertise in the newspaper, they looking for somebody,

19  then people -- see if anybody would respond to it.

20  Q.  And what, if anything, would you do with the advertisements

21  in connection with the Department of Labor application?

22  A.  Can you repeat, please?

23  Q.  Sure.  So what, if anything, would you do once the

24  advertisements ran in connection with the Department of Labor

25  applications?

D1m1cib4                         Grynsztajn - direct

1   A.   Well, you waited 30 days, after the advertising, and

2   Mr. David would write a letter to the Department of Labor that

3   we have advertised and there's no -- there was no -- nobody

4   responded, and he would send the case to the Department of

5   Labor.

6   Q.   Okay.  Did he include and did you include anything other

7   than the letter saying that you advertised?

8   A.   Yeah.  The tear sheet, the copies of the advertisement.

9   Q.   When there was an advertising, what address was listed as

10  the contact information for the employer?

11  A.   The address of the company that was sponsoring.

12  Q.   Whatever the sponsoring company was?

13  A.   That's correct.

14  Q.   Were there ever situations or circumstances in which the

15  address was not the employer's address?

16  A.   Yes.

17  Q.   What would happen then?

18  A.   Then the Department of Labor would order the company to

19  advertise again, and then all the résumés that people would

20  respond would go to Department of Labor.

21  Q.   So the Department of Labor would receive the résumés; is

22  that your understanding?

23  A.   Correct.

24  Q.   Did you ever see résumés submitted by job applicants in

25  response to these advertisements?

D1m1cib4                          Grynsztajn - direct

1    A.  Yes.

2    Q.  What happened to those résumés?

3    A.  Mr. David would respond to them, or some would go in the

4    garbage.

5    Q.  Some would go in the garbage?

6    A.  Yeah.

7    Q.  Do you know, to your knowledge, were any of these job

8    applicants actually interviewed?

9    A.  No.

10   Q.  Why not?

11   A.  Because they would tell everybody, the other sponsors, to

12   throw it in the garbage.

13   Q.  After the case was advertised and the tear sheets obtained,

14   what would be the next step in the process for the Department

15   of Labor application?

16   A.  Once the case got approved, then the next step would be to

17   file it with the immigration department.

18   Q.  How would you know that the Department of Labor had in fact

19   approved a case?

20   A.  Because they would send a letter.

21   Q.  During the time period for the ETA Forms 750A and B, the

22   ones that were not submitted online -- and I guess I should

23   ask, how were they submitted if not online, ETA Forms 750A and

24   B?  How did you actually submit them?

25   A.  By mail.

D1m1cib4                          Grynsztajn - direct

1   Q.  So what, if anything, was generated when an ETA Form 750A

2   and B case was approved?

3   A.  It would be what's called a labor certification.

4   Q.  Do you remember what color the labor certification was?

5   A.  It was white paper with a pink stamp.

6   Q.  A white paper with a colored stamp?

7   A.  Yes.

8   Q.  And with respect to the PERM process, what, if anything,

9   was generated when an application was approved?

10  A.  That they would send a copy -- they would send an original

11  to the office.

12  Q.  And what color was the original?

13  A.  Grayish light blue.

14  Q.  A grayish light blue?  And you personally saw these labor

15  approvals?

16  A.  Yes.

17  Q.  After you obtained the labor certification, tell us what

18  the next step in the process was.

19  A.  The next step would be to file I-140 petition.

20  Q.  What is an I-140 petition?

21  A.  It's a -- company sponsoring the alien, it's a form that

22  you file with the immigration department.

23  Q.  And did you personally fill out these I-140 petitions?

24  A.  I did many of them.

25          MR. DONALDSON:  I can't hear.

D1m1cib4                        Grynsztajn - direct

1    Q.   Please --

2    A.   Yes, I did.

3    Q.   That's perfect.  Okay.  So --

4           THE COURT:  Actually, before that he said, "I did many

5    of them."

6           MR. DONALDSON:  Okay.  Thank you.

7    Q.   So with respect to the I-140 in general, what information

8    was required for the I-140?

9    A.   Tax ID for the company, information on the alien, how much

10   the job would pay per hour.

11   Q.   Aside from the I-140, were you required to submit any

12   additional information and documents to immigration along with

13   the I-140?

14   A.   Yeah, the tax return for the company.

15   Q.   How would you obtain tax returns for these various sponsor

16   companies?

17   A.   Most of them from Mr. Vago.

18   Q.   Who is Mr. Vago?

19   A.   He's an accountant.

20   Q.   Who is his full name?

21   A.   David Vago.

22   Q.   Did you personally deal with Mr. Vago?

23   A.   Yes.

24   Q.   And did you personally obtain tax returns from Mr. Vago in

25   connection with some of the applications that he prepared?

D1m1cib4                          Grynsztajn - direct

1    A.  Yes.

2    Q.  Tell us how these tax returns were prepared.

3    A.  Mr. David would figure out the -- how many people the

4    company sponsor.

5    Q.  If you could just lean into the microphone again.

6    A.  Mr. David would figure out how many people the company

7    sponsor, how much was the salary, and the tax return would have

8    to show there's enough money over there to cover all the

9    workers that are being sponsored, in case they get approved.

10   Q.  So the information that Mr. David came up with, would

11   Mr. Vago ever get that information?

12   A.  Yes.

13   Q.  How would he get that information?

14   A.  Over the phone, it was faxed over.

15   Q.  And were the tax returns legitimate or not?

16   A.  No.

17   Q.  Was Mr. Vago paid to prepare these tax returns?

18   A.  Yes.

19   Q.  Did you personally pick up tax returns from Mr. Vago?

20   A.  Yes.

21   Q.  Did you ever see Mr. Vago in the office?

22   A.  Many times.

23   Q.  Many times?

24   A.  Yes.

25   Q.  What did you see Mr. Vago doing in the office?

D1m1cib4                      Grynsztajn - direct

1   A.   He would stand next to the copy machine and use the stamp

2   copy and stamp the taxes Copy, Copy, Copy (indicating).

3   Q.   Okay.  I see that you just made a sort of up-and-down

4   motion with your fist, your right fist; is that accurate?

5   A.   Yes.

6   Q.   And is that indicating a stamp that Mr. Vago would put on

7   the tax returns?

8   A.   Correct.

9   Q.   And do I understand that that stamp said Copy on it?

10  A.   Yes.

11  Q.   Were there other accountants who also prepared taxes in

12  connection with this -- with this scheme?

13  A.   Yes.

14  Q.   Who were they?

15  A.   There was one Angelica Yonayev, and Alex Lev or Levitt.

16  Q.   Alex Lev or Levitt and Angelica Yonayev?

17  A.   Yonayev, something like that.

18  Q.   How, if at all, did the tax returns they prepared differ

19  from the tax returns that Mr. Vago would prepare?

20  A.   Mr. Vago's tax returns would have no signature and there

21  were copies sent, and the other people's tax return would be

22  with the signature and sometimes stamped with the certified IRS

23  stamp.

24  Q.   Was there a reason that some of the tax returns --

25          MR. PASTORE:  I'm sorry.  You're still having --

1          THE COURT:  I really can't hear him, and I'm the

2     closest.

3          MR. PASTORE:  Sure.

4     Q.  So Mr. Grynsztajn, if you could just explain again the

5     differences between the tax returns prepared by Mr. Vago and

6     the tax returns prepared by the other two accountants that you

7     identified, and again, just keep leaning into the microphone.

8     A.  Mr. Vago's tax returns, there's no signature, just a stamp,

9     okay?  The other tax returns, they had signatures, and some of

10    them had stamp by IRS, certified tax return.

11    Q.  Why would some of the tax returns have been stamped

12    certified?  Was that significant to you in any way?

13    A.  Yes, because there came time when immigration asked us for

14    certified tax returns.

15    Q.  So if I understand correctly, there was a time when they

16    did not ask for certified tax returns.

17    A.  Correct.

18    Q.  To your knowledge did Mr. Vago ever provide tax returns

19    that had those certification stamps on them?

20    A.  No.

21    Q.  Aside from the tax returns, what, if anything, would have

22    to be provided with the I-140?

23    A.  Experience letter.

24    Q.  Can you tell us what an experience letter is.

25    A.  The client had to show his previous experience from their

D1m1cib4                         Grynsztajn - direct

1    country.

2    Q.   In your experience how were these experience letters

3    obtained?

4    A.   Some clients would provide, some were made up in the

5    office.

6    Q.   How do you know that sometimes the experience letters would

7    be made up in the office?

8    A.   I seen it.

9    Q.   Where -- describe what you saw.

10   A.   Some were made in the office by Mr. -- by Mr. David.

11   Q.   And what did you see?

12   A.   See him on the computer, you know, Polish client, looking

13   up a name for -- looking for a restaurant, a hotel, to make the

14   letter.

15   Q.   Okay.  When you say that he looked for a hotel, what are

16   you talking about?  Are you talking about searches on websites

17   or what?

18   A.   Yeah, the website, looking up names of the hotels.  If the

19   person was, let's say, from Warsaw, he would find out a hotel

20   in Warsaw.

21   Q.   And then he would make the experience letter from that?

22   A.   Correct.

23   Q.   Did you ever see anyone else at the law firm making up

24   these experience letters?

25   A.   Yes.

1    Q.  Who else did you see making up experience letters?

2    A.  Gulay Cibik, Aleksandra Urbanek.

3    Q.  Who is Aleksandra Urbanek?

4    A.  She sent Polish clients to me.

5    Q.  And aside from making up experience letters, what else did

6    she do, if anything, at the law firm?

7    A.  She was filing cases too.

8    Q.  Besides Ms. Cibik and Ms. Urbanek, did anyone else -- did

9    you see anyone else preparing experience letters at the law

10   firm?

11   A.  That's it.

12   Q.  Those are the two that you can remember?

13   A.  Yeah.

14   Q.  Handing you now what's been marked for identification as

15   Government's 30, Government's 12, and Government's 11, and if

16   we can start with Government's 11.

17   A.  Aleksandra Urbanek.

18   Q.  And is it a fair and accurate depiction of her as she

19   appeared when you knew her?

20   A.  Yes.

21           MR. PASTORE:  Government offers 11.

22           MR. GERZOG:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 11 received in evidence)

25   Q.  And you said that she was preparing applications at the law

D1m1cib4                         Grynsztajn - direct

1    firm?

2    A.  Yes.

3           MR. PASTORE:  We also move to admit 11A, the

4    accompanying nameplate.

5           (Government's Exhibit 11A received in evidence)

6    Q.  Okay.  And what exhibit are you looking at now,

7    Mr. Grynsztajn?

8    A.  30.

9    Q.  Okay.  And do you recognize that?

10   A.  Yes, that's Alex Lev or Alex Levitt.

11   Q.  Okay.  And what, if anything, did he do at the law firm?

12   A.  Certified tax return we would be able to get from him.

13   Q.  And is it a fair and accurate depiction of Mr. Lev or

14   Mr. Levitt as you knew him while you were working at the law

15   firm?

16   A.  Yes.

17          MR. PASTORE:  The government offers Government 30.

18   The government is not offering an accompanying nameplate.

19          (Government's Exhibit 30 received in evidence)

20   Q.  And finally, if you could take a look at 12, Government's

21   12, and tell us what that is.

22   A.  I have no idea.

23   Q.  Okay.  Thank you.

24          Okay.  With respect to the I-140, do you recognize --

25   I'm sorry.  Do you know whether any other information besides

D1m1cib4                        Grynsztajn - direct

1   an experience letter and fake taxes had to be -- had to be

2   submitted?

3   A.  You have to send in the immigration fee.

4   Q.  Were there other forms that could, from time to time, be

5   submitted along with the I-140?

6   A.  Yeah.  It was changed, that you were able to file together

7   that I-140 together with an I-485.

8   Q.  Did you say it was changed?

9   A.  Yeah, they changed the law, because people were waiting a

10  long time to get their I-140 approved, so this way they'll be

11  able to file it together.

12  Q.  So do I understand correctly at some point the I-140 was

13  filed separately from the 485?

14  A.  Correct.

15  Q.  Okay.  Did you ever personally prepare I-485s?

16  A.  Yes.

17  Q.  What information, if any, went along with the I-485?

18  A.  Information of the alien, family members, you have to send

19  photographs with it.

20  Q.  Were there any other forms that would be sent along with

21  the I-485?

22  A.  Yes.  I-765.

23  Q.  What is an I-765?

24  A.  Work authorization.

25  Q.  Okay.  What other forms might be sent with an I-485?

D1m1cib4                         Grynsztajn – direct

1    A.  G-325.

2    Q.  A G-325?

3    A.  Correct.

4    Q.  What was that?

5    A.  Biographical information.

6    Q.  Any other forms?

7    A.  Supplement 485A, that went along with the I-485.

8    Q.  Okay.  And typically, in your experience, when would the

9    485 Supplement A be filed?

10   A.  Could have been sent right away with I-485, but in this

11   office would always send later.

12   Q.  So you said it could have been sent but in your experience

13   you usually sent it later?

14   A.  Yes.

15   Q.  What, if anything, was required to be submitted along with

16   the Supplement A?

17   A.   Immigration would send a notice requesting additional

18   evidence.

19   Q.  Okay.  And were there any fees associated with the 485

20   Supplement A?

21   A.  Yes.

22   Q.  What fees were associated with it?

23   A.  A thousand dollars.

24   Q.  You said that immigration would sometimes ask for

25   additional information.  Typically how would those requests be

1    communicated to you and to the law office?

2    A.  Done by mail.

3    Q.  How do you know it was done by mail?

4    A.  Because I've seen the mail.

5    Q.  Was the mail always sent to the law firm?

6    A.  Repeat it?

7    Q.  Sure.  Was the mail always sent to the law firm?

8    A.  Usually would go to the law firm and the -- and the copy

9    would go to the alien home.

10   Q.  The law firm and the alien as well?

11   A.  Yes.

12   Q.  Would -- in your experience would immigration ever send

13   requests as well to the employer sponsoring the alien?

14           MR. GERZOG:  Object to the leading.

15           THE COURT:  Overruled.

16   Q.  In your experience would letters or communications that

17   would be sent to the employer or sponsor as well?

18   A.  On the I-140, not on the I-485.

19   Q.  So with respect to the I-140, your experience is that

20   sometimes the employer would receive mail as well.

21   A.  Usually each letter which is sent on the I-140, the copy

22   was sent to the sponsor.

23   Q.  What types of additional information would immigration ask

24   for?

25   A.  The I-140?

1    Q.   For the I-140 and the I-485.

2    A.   Sometimes they will ask for additional tax return, I-485

3    they would ask for medical.

4    Q.   Was that submitted on a particular type of form, the

5    medical?

6    A.   That would go to -- that would go together with the I-485A.

7    Q.   So medical exam, additional tax returns, anything else?

8    A.   Job offer letter.

9    Q.   What is a job offer letter?

10   A.   A copy of offering a job to the alien.

11   Q.   And typically when would that be required by immigration?

12   A.   Usually would go with the 485A.

13   Q.   And do you know whether or not interviews would be

14   conducted in connection with 485 applications?

15   A.   In some cases.

16   Q.   How do you know that in some cases interviews would be

17   conducted?

18   A.   Because we would get the letters in the office for people

19   to come to interview.

20   Q.   Once you got a letter that someone was going to be

21   interviewed in connection with a 485, what, if anything, would

22   you do?

23   A.   I would call the client.

24   Q.   And aside from calling the client, would you do anything

25   else?

D1m1cib4                          Grynsztajn – direct

1    A.  Yeah, I would speak to Mr. David.

2    Q.  Why would you speak to Mr. David?

3    A.  I said the person got an interview, we would arrange a

4    meeting with an attorney that would go to the interview, he

5    would sit down with them and -- to discuss everything.

6    Q.  And in general who was that attorney?

7    A.  One of them was Mr. Klug.

8    Q.  What was Mr. Klug's full name?

9    A.  David Klug.

10   Q.  Were there other attorneys that also accompanied your

11   clients to interviews?

12   A.  Yes.

13   Q.  Do you remember any of their names?

14   A.  Maritza Diaz, Jeffrey Lichnov (ph), Freddie Jacobs.

15   Q.  Freddie Jacobs, did you say?

16   A.  Yes.

17   Q.  Can you remember anyone else?

18   A.  No.

19   Q.  Okay.  Aside from -- aside from discussing with Mr. David

20   the need to get an attorney to meet with the client, did you

21   discuss anything else with Mr. David when you were notified

22   that an interview was coming up for a green card?

23   A.  Yes.  We discussed that there was a need for a letter, job

24   offer letter.

25   Q.  Okay.  And what would you and Mr. David do to get that job

D1m1cib4                          Grynsztajn – direct

1    letter?

2    A.  Mr. David would prepare -- Mr. David would prepare the

3    letter, offering the job to the alien, whatever company he told

4    about it, and would get in touch with the sponsor.

5             MR. DONALDSON:  Your Honor, I can't hear.

6    Q.  So Mr. David would prepare a letter, and then you said --

7    you sort of trailed off.  Mr. David would prepare a letter and

8    what?

9    A.  And he would call the sponsor or --

10   Q.  You would call the sponsor?

11   A.  Correct.

12   Q.  What else?

13   A.  Or you fax it over to the sponsor.

14   Q.  Were you ever present for any of these phone calls between

15   Mr. David and sponsors?

16   A.  Yes.

17   Q.  Do you remember which sponsor or sponsors Mr. David was

18   talking to?

19   A.  Mr. Flam.

20   Q.  How do you know that Mr. David was talking to Mr. Flam?

21   A.  Because he told me, "I'm going to call my cousin."

22   Q.  And did you overhear the conversation?

23   A.  Yes.

24   Q.  What language or languages were they speaking?

25   A.  Have Yiddish, half English.

D1m1cib4                              Grynsztajn - direct

1   Q.  Half Yiddish, half English?

2   A.  Yeah.

3   Q.  Okay.  Do you speak Yiddish?

4   A.  Yes.

5   Q.  What languages do you speak?  You mentioned so far Polish

6   and Yiddish.

7   A.  Yiddish, Polish, Russian, and English.

8   Q.  And you could overhear what Mr. David was saying in

9   Yiddish?

10  A.  Yes.

11  Q.  How is Mr. David's Yiddish?

12  A.  Not too good.

13  Q.  All right.  What types of things did you hear Mr. David

14  telling the sponsor Abe Flam?

15  A.  He was telling him that the -- this person is going for the

16  interview so in case the interviewer calls you, you tell them

17  exactly what the letter says.

18  Q.  Tell them exactly what the letter says?

19  A.  Yeah.

20  Q.  Okay.  And how were these letters prepared?

21  A.  On the computer.

22  Q.  Who did you see preparing these job offer letters?

23  A.  Mr. David.

24  Q.  Did you ever see anyone else preparing job offer letters?

25  A.  Gulay.

D1m1cib4                        Grynsztajn - direct

1    Q.   Just Gulay and Mr. David, that's what you remember

2    personally seeing?

3    A.   Yeah.  Yes.

4    Q.   Did the -- did the job offer letters, the company that the

5    job offer letter was by, was that always the same company as

6    the sponsor listed on the I-140?

7    A.   Not necessary.

8    Q.   Okay.  So who might be doing job offer letters or who might

9    be signing job offer letters if not a sponsor?

10   A.   Anybody could sign.

11   Q.   Anybody could sign.

12   A.   Could be any company.

13   Q.   Okay.  After the documents were all submitted to

14   immigration, what was the next step in the process?

15   A.   Either the people got their green card in the mail or they

16   were called for the interview.

17   Q.   And you said that you charged -- charged the clients money;

18   is that right?

19   A.   Correct.

20   Q.   Typically how did the clients pay you?

21   A.   Cash.

22   Q.   Did they ever pay you -- pay by any means other than cash?

23   A.   Sometimes by check.

24   Q.   Sometimes by check?

25   A.   Yes.

D1m1cib4                         Grynsztajn – direct

1    Q.  What would you do when you received a check from a client?

2    A.  I would give it to Mr. Teitelbaum.

3    Q.  Why would you give Mr. Teitelbaum the check?

4    A.  He was an accountant.  I give it to him.

5    Q.  And in general, how were these checks that your clients

6    would give you, how were they actually filled out?

7    A.  Sometimes the client would give me the book to fill it out.

8    Q.  Did the clients ever tell you why they were giving you the

9    book so you could fill it out instead of them?

10   A.  They were not familiar with the language.

11   Q.  I'm going to hand you what's been marked for identification

12   as Government 3032.

13            Let me retrieve –– what I had previously given was

14   copies, so I'm going to give the originals of 3032.

15            Okay.  Why don't you go ahead and look at Government's

16   3032.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Just take a moment to flip through Government 3032, and

2    once you've done that, just look up and let us know you've

3    completed looking through.

4              In general, what are Government's 3032?

5    A.  It's a check.

6    Q.  Are each of them checks?

7    A.  Yes.

8    Q.  And does each of those consist only of checks or is there

9    other information on there?

10   A.  There are names.

11   Q.  I'm sorry?

12   A.  Can you repeat the question?

13   Q.  Sure.  So Government's 3032, for example, go to 3032-8,

14   Mr. Grynsztajn.

15   A.  Yes.

16   Q.  Do you have 3032-8 in your hands?

17   A.  3032.

18   Q.  Why don't you go ahead and flip through the documents that

19   are in front of you until you get to 3032-8.

20             Okay.  So tell us what is 3032-8, literally, what are

21   you holding in your hand?

22   A.  It's a receipt.

23   Q.  What makes you say it's a receipt?

24   A.  This is the check that my clients wrote to Mr. Teitelbaum.

25   I give the check to him.  He charge me $330 to cash that check,

1   $700 for the sponsor, which left a balance of 4,470.  3,000

2   went to Mr. David, and the balance is 1470.  I signed I

3   received the balance of 1470 went to me.

4   Q.  Does your signature appear on that document?

5   A.  Yes.

6   Q.  Are there also photocopies of checks on that document?

7   A.  Yes.

8   Q.  And do you recognize the names in the checks?

9   A.  Yes, they were my clients.

10  Q.  And do you recognize that other than your handwriting, do

11  you recognize any other handwriting on that document?

12  A.  Yeah, Mr. Teitelbaum.

13  Q.  And have you had prior occasions to see Mr. Teitelbaum's

14  handwriting?

15  A.  Yes.

16  Q.  When did you see Mr. Teitelbaum's handwriting?

17  A.  On other receipts.

18  Q.  And does this look like, well, in fact does this look the

19  same or substantially the same as the receipt as you signed it

20  when Mr. Teitelbaum gave it to you?

21  A.  Yes.

22  Q.  And with respect to each of Government's 3032-2 through

23  3032-12, are each those receipts together with copies of

24  checks?

25  A.  Yes.

D1MLCIB5                          Grynsztajn – direct

1              MR. PASTORE:  Government offers 3032-2 through

2     3032-12.

3              MR. GERZOG:  No objection.

4              MR. DONALDSON:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibits 3032-2 through 3032-12 received

7     in evidence)

8              MR. PASTORE:  And if we could for the jury publish.

9     Let's start with 3032-8.

10    Q.   Okay, Mr. Grynsztajn.  First let's start with where does

11    your handwriting appear on this document?

12    A.   Where it says on the bottom BAL.

13    Q.   On the bottom.  So that mark there, that's your

14    handwriting, you recognize it as the letters BAL.  If we could

15    focus in.  Is that next to the numerals 1470?

16    A.   Correct.

17    Q.   If we could zoom in on the portion that we're discussing

18    here.  Okay.

19              So to the left of 1470, you recognize that handwriting

20    and you recognize it as saying BAL?

21    A.   Yes.

22    Q.   To the right of it, the numerals, what is that?

23    A.   That's my initial.

24    Q.   And if we could back out and see the whole document again,

25    please.

1              The two checks, let me focus on the $2,000 check.  Do

2     you recognize the name that appears as the drawee in the top

3     left corner?

4     A.  Yes.

5     Q.  Do you see where it says Arti Gandhi, do you recognize that

6     name?

7     A.  Yes.

8     Q.  How do you recognize that name?

9     A.  It was a client of mine.

10    Q.  Does your handwriting appear anywhere in this check?

11    A.  No.

12    Q.  Your handwriting doesn't appear anywhere on this check?

13    A.  No.

14    Q.  What is or who is YM Pollack?

15    A.  I believe I never met YM Pollack, but that's what

16    Mr. Teitelbaum told me to write the check to, Mr. YM Pollack.

17    Q.  Did Mr. Teitelbaum tell you anything else about YM Pollack?

18    A.  He told me he's building credit for him.

19    Q.  Mr. Teitelbaum told you he's building credit for YM

20    Pollack?

21    A.  Yes.

22    Q.  So after this check was written by the client, what would

23    be the next step what, would happen next?

24    A.  I would give it to Mr. Teitelbaum.

25    Q.  And Mr. Teitelbaum then would do what with it?

D1MLCIB5                          Grynsztajn – direct

1    A.  He would cash the check for me.

2    Q.  What would happen with the cash?

3    A.  He would give it to me.

4    Q.  If we can zoom out again to the entire document.

5             And you see the other check is for $3,500.  Do you

6    recognize the name in the top left of this check?

7    A.  Thomas Lechowski.

8    Q.  Do you recognize that name?

9    A.  Yes.

10   Q.  How do you recognize it?

11   A.  Client of mine.

12   Q.  And if we could again zoom out from this document and

13   focusing on the top.  If we could please rotate the document.

14            Okay.  What's actually written at the top where it

15   says David --

16   A.  Greenspan.

17   Q.  David Greenspan.  But your handwriting you're pretty sure

18   or confident is below it, right?

19   A.  Yes.

20   Q.  So $5,500, what does that represent?

21   A.  The total amount of two checks.

22   Q.  330, and then it says check cashing next to it.  What does

23   that represent?

24   A.  That's what Mr. Teitelbaum would charge me to cash the

25   check.

1    Q.  $700, and then it says sponsor.  What's your understanding

2    that means?

3    A.  Money to go to the sponsoring company.

4    Q.  And paid to David 3,000, what's your understanding of what

5    that means?

6    A.  David would be for Earl David.

7    Q.  This reference to David is not reference you, David

8    Grynsztajn, Greenspan, it's a reference to Earl David?

9    A.  Correct.

10   Q.  If we could go to 3032-2, please.  All right.  Again we see

11   David G and Earl.

12            Does your handwriting appear on this document?

13   A.  Yes.

14   Q.  Where does your handwriting appear?

15   A.  On the check.

16   Q.  Okay.  So focusing in on the check for a moment.  Where in

17   this check does your handwriting appear?

18   A.  Only the name Y. Pollack.

19   Q.  You handwrote that in?

20   A.  Yes.

21   Q.  Do you recognize either of the names on this check, Marissa

22   Vallangca?

23   A.  Yes.

24   Q.  And Vernon Vallangca?

25   A.  Yes.

1   Q.  What names do you recognize?

2   A.  Both.

3   Q.  Let's start with Marissa.  How do you recognize that name?

4   A.  Marissa was bringing me client.

5   Q.  And what about Vernon?

6   A.  Vernon had a case with me.

7   Q.  What if anything did Marissa receive for bringing you

8   clients?

9   A.  She received money.

10  Q.  Okay.  And in the memo line, what does it actually say in

11  the memo line there?  Can you make it out?

12  A.  I can't make it out.

13  Q.  Can't make it out?

14  A.  No.

15  Q.  Okay.  So does it mean anything to you?

16  A.  No.

17  Q.  Now let's zoom out on this.

18          And does your handwriting appear on the top of the

19  page as well?

20  A.  Yes.

21  Q.  Where?

22  A.  In the third part, the signature, the initial.

23  Q.  The initials underneath Earl?

24  A.  Yes.

25  Q.  If we could go to 3032-3.  Okay.

1          Please tell us first if you recognize the name on the

2     top left of the check?

3     A.   Yes.

4     Q.   What how do you recognize that?

5     A.   It's my client.

6     Q.   And does your handwriting appear anywhere in the check?

7     A.   Yes.

8     Q.   Where?

9     A.   Where it says 1,250 and 1,250 on the right side.

10    Q.   So you wrote out that check?

11    A.   Yes.

12    Q.   Did you sign it or did someone else sign it?

13    A.   No, somebody else.

14    Q.   And does your handwriting appear below, do you see where it

15    says Earl and then there's some script?

16    A.   Yes, my signature.

17    Q.   That's your signature?

18    A.   Long initial.

19    Q.   Your initial.  Let's go to 3032-4, please.

20         Do you recognize, starting at the top check, do you

21    recognize the name Mohan Singh?

22    A.   Yes.

23    Q.   How do you recognize it?

24    A.   My client.

25    Q.   And, again, does your handwriting appear in this check at

D1MLCIB5                          Grynsztajn - direct

1    all?

2    A.  Yeah, signature on the left.

3    Q.  Signature on the left?

4    A.  Yeah.

5    Q.  Does it appear in the check?

6    A.  On the check, no.

7    Q.  Just on the signature, correct?

8    A.  Correct.

9    Q.  And do you see the lower check there, do you see where it

10   says L. Teitelbaum?

11   A.  Yes.

12   Q.  Are you familiar with an L. Teitelbaum?

13   A.  That's Leo Teitelbaum.

14   Q.  And what about to the left where it says Ali Gomaa it looks

15   like?

16   A.  Yeah, that's what it says, Ali Gomaa.

17   Q.  Who is Ali Gomaa, if you know?

18   A.  He worked with the Arab clients in the office.

19   Q.  And what if anything did Mr. Gomaa do at the office?

20   A.  He would bring clients, file cases.

21   Q.  And you see where Abdul is crossed out right above it?

22   A.  Yes.

23   Q.  Did you know anyone who worked at the office by the name

24   Abdul?

25   A.  Yes, Abdul Basit.

D1MLCIB5                          Grynsztajn - direct

1    Q.  Who did Mr. Basit do?

2    A.  Also file cases.

3    Q.  And do you know where Mr. Basit lived?

4    A.  I believe somewhere in Queens or Long Island.

5    Q.  Queens or Long Island?

6    A.  Either Queens or Long Island, yeah.

7    Q.  Did there come a time when Mr. Basit took possession of

8    some of the law firm's files?

9    A.  Yes.

10   Q.  Tell us about that.

11   A.  Mr. David asked him to store some files so he moved the

12   files to his house.

13   Q.  Okay.  And you said his house was somewhere you believe in

14   Queens or Long Island?

15   A.  Yes.

16   Q.  If we can go now to 3032-5, please.

17            Okay.  Focusing your attention on the bottom check

18   where it says Arti Gandhi.  Is that the same client that we

19   were talking about before when we looked at Government's

20   3032-8?

21   A.  I had two cases.  There was a mother and her daughter.

22   They had separate cases.

23   Q.  Okay.  So Arti Gandhi, was that the mother or daughter or

24   can you remember?

25   A.  I don't remember.

D1MLCIB5                        Grynsztajn – direct

1    Q.  Don't remember which was which?

2    A.  No.

3    Q.  Does your handwriting appear anywhere in the check?

4    A.  Yes.

5    Q.  Where does it appear in the check?

6    A.  The whole check.  Only the signature is not mine.

7    Q.  Signature is not yours, but where it says Y Pollack and

8    1,500, that's yours?

9    A.  Yes.

10   Q.  If we could go to 3032-7, please.

11          Again, top corner, do you recognize these names?

12   A.  Yes.

13   Q.  How do you recognize them?

14   A.  They were my clients.

15   Q.  And does your handwriting appear anywhere in this check?

16   A.  Whole check besides the signature.

17   Q.  3032-10, please.

18          All right.  Same questions.  Top of the check,

19   left-hand side, do you recognize those names?

20   A.  No.

21   Q.  You don't recognize those names?

22   A.  No.

23   Q.  Does your handwriting appear in any of these checks or this

24   check?

25   A.  No.

D1MLCIB5                        Grynsztajn – direct

1   Q.  Okay.  Do you remember each and every client that you ever
2   helped at the firm?
3   A.  Most of them.
4   Q.  Okay.  Approximately how many clients did you assist during
5   the time that you worked at the firm?
6   A.  A few hundred.
7   Q.  Several hundred you said?
8   A.  Yes.
9   Q.  Okay.  If we could go to 3032-11, please.
10          Focusing on the top left, same question, do you
11  recognize that name?
12  A.  Yes.
13  Q.  How do you recognize it?
14  A.  A client of mine.
15  Q.  And does your handwriting appear anywhere in this check?
16  A.  No.
17  Q.  Okay.  And, finally, 3032-12.  Do you recognize that?
18  A.  Yes.
19  Q.  And in particular do you recognize the name in the top left
20  of the check?
21  A.  Yes.
22  Q.  How do you recognize it?
23  A.  A client of mine.
24  Q.  And is your handwriting anywhere in the check?
25  A.  No, only the check, the amount, but not the signature.

1    Q.  Sorry.  The check -- when you say the check, do you mean

2    where it says Y Pollack?

3    A.  Y Pollack and the $1,000 amount and the thousand dollars.

4    Q.  That's all your handwriting?

5    A.  Yes.

6    Q.  But not the signature?

7    A.  No.

8    Q.  Okay.  And then down below do you see the note, it says

9    David Greenstein towards rent?

10   A.  Yes.

11   Q.  What's your understanding of what that refers to?

12   A.  I was chipping in money for the rent for the office.

13   Q.  What office were you chipping in money for?

14   A.  The one on the 16th floor.

15   Q.  Handing you what's been marked for identification as

16   Government's 700.

17            And at this time I believe we have a stipulation

18   associated with 700.  While we're preparing the stipulation,

19   I'm going to go ahead and hand you Government's 13, 22, and 21.

20            First let's start with Government's 13.  Do you

21   recognize that?

22   A.  Yes.

23   Q.  What is it?

24   A.  Photograph of Abdul Basit.

25   Q.  Photograph of Abdul Basit.  Did he have another name?

1    A.  Abdul Basit Choudary.

2    Q.  Abdul Basit Choudary.  And does it fairly and accurately

3    depict Abdul Basit Choudary as he appeared during the time

4    period that you worked at the law firm?

5    A.  Yes.

6            MR. PASTORE:  Government offers 21 and associated name

7    plate 21A.

8            MR. GERZOG:  Without objection.

9            THE COURT:  Received.

10           (Government's Exhibits 21, 21A received in evidence)

11   Q.  Okay.  And if you could take a look, what's the next

12   Government Exhibit that you have in your hand?

13   A.  Thirteen.

14   Q.  Can you tell us what Government's 13 is?

15   A.  That's photograph of Maritza Diaz.

16   Q.  Does it fairly and accurately depict Ms. Diaz as you knew

17   her at the time you were working at the law firm?

18   A.  Yes.

19           MR. PASTORE:  Government offers 13 and associated name

20   plate 13A.

21           THE COURT:  Received.

22           (Government's Exhibits 13, 13A received in evidence)

23   Q.  And can you just tell us what was Maritza Diaz's role at

24   the firm?

25   A.  She was an attorney.  Her job when Mr. David left to answer

D1MLCIB5                          Grynsztajn - direct

1    the labor and immigration inquiries.

2    Q.  So she was an attorney like Mr. David?

3    A.  Yes.

4    Q.  Okay.  Why don't you go ahead and look at Government's 22.

5    Tell us if you recognize it and, if so, what it is.

6    A.  That's the photograph of Ali Gomaa.

7    Q.  And does it fairly and accurately depict Mr. Gomaa as you

8    knew him during the time period you worked at the law firm?

9    A.  Yes.

10          MR. PASTORE:  Government offers 22 and the associated

11   name plate.

12          THE COURT:  Received.

13          (Government's Exhibits 22, 22A received in evidence)

14          MR. DONALDSON:  No objection.

15   Q.  And you said Mr. Gomaa prepared applications; is that

16   right?

17   A.  Yes.

18          MR. PASTORE:  Your Honor, at this time the government

19   is going to read into evidence a stipulation previously signed

20   and marked Government's S-3.  It's a stipulation related to TD

21   Commerce Bank.  It has the caption of the case and it reads as

22   follows:

23          It is hereby stipulated and agreed by and between the

24   United States of America by Preet Bharara, United States

25   attorney for the Southern District of New York, James Pastore

D1MLCIB5                    Grynsztajn – direct

and Janis Echenberg, assistant United States attorneys, of

counsel, and the below named defendants by and through their

attorneys that:

    1.   If called as a witness, a custodian of records of

TD Commerce Bank would testify that Government Exhibits 202 and

700 consist of bank records of TD Commerce Bank which were:

    A.   Made at or near the time of the occurrence of the

matters set forth in the records, by, or from information

transmitted by, a person with knowledge of those matters;

    B.   Kept in the course of regularly conducted business

activity, and

    C.   Made by the regularly conducted business activity

as a regular practice.

    It's dated, New York, New York, January 15, 2013, and

it's signed by each of the defendants through their counsel as

well as the government by and through Ms. Echenberg.

    At this time, the government moves to admit both the

Stipulation S-3, as well as Government's Exhibit 700 at this

time.

    THE COURT:  Received.

    (Government's Exhibits S-3, 700 received in evidence)

Q.  Mr. Grynsztajn, if you could turn to Government

Exhibit 700, which should be in front of you, and it's a

multipage document consisting of over 100 pages.  If you could

turn to page 94, please.  If we could bring it up on the

1    screen.

2              Okay.  First, on page 94, can you see that on the

3    screen in front of you?

4    A.  Yes.

5    Q.  Do you recognize the name in the top left of the check?

6    A.  Yes.

7    Q.  Whose name is that?

8    A.  Gulay Cibik.

9    Q.  And do you see each of those two checks are made payable to

10   the order of Y.M. Pollack.  Again, tell us who Y.M. Pollack is.

11   A.  Yes.

12   Q.  Tell us who Y.M. Pollack is, how you're familiar with that

13   name, Mr. Grynsztajn.

14   A.  That's from Mr. Teitelbaum.

15   Q.  And if you could again lean a little bit up to the

16   microphone.  I think we're losing you again.

17             Page 97, please.  Okay.  On page 97, do you see where

18   it says pay to the order of Rachel Brodjik, are you familiar

19   with the name Rachel Brodjik?

20   A.  Yes.

21   Q.  How are you familiar with that name?

22   A.  That's Mr. Brodjik's wife.

23   Q.  When you say Mr. Brodjik, you're referring to Rafi Brodjik?

24   A.  Yes.

25   Q.  Page 100, please.  All right.  Taking a look at the check

D1MLCIB5                        Grynsztajn - direct

1    on the top of the screen, top check, do you recognize the name

2    Moishe Rosenberg?

3    A.   Yes.

4    Q.   How do you recognize the name Moishe Rosenberg?

5    A.   He worked in the office.

6    Q.   What were his duties or responsibilities in the office, if

7    you know?

8    A.   Make copies, mail out cases.

9    Q.   Make copies and mail out the cases?

10   A.   Also he provide some sponsor.

11   Q.   He provided some sponsors as well?

12   A.   Yeah.

13   Q.   If we could go to page 131, please.  Focusing on the bottom

14   check where it says pay to the order of Alex Levit, do you have

15   any idea who Alex Levit is?

16   A.   Yes.

17   Q.   How are you familiar with that name?

18   A.   Gentleman that prepared the tax returns.

19   Q.   And which tax returns did he prepare, the ones that just

20   had the copy stamp or the certification ones?

21   A.   The one that had the signature and certification.

22   Q.   Page 132, please.  Focusing your attention on the bottom

23   check, and this time if you could look at the memo line, do you

24   see there's a name written there?  You see the memo line,

25   Gamage Perera?

1   A.  Gamage Perera.

2   Q.  Do you recognize that name?

3   A.  I had a client named Perera.

4   Q.  And if we look at page 133.  Focusing first on the top

5   check where it says Imran Sadiq, do you recognize that name?

6   A.  Yes.

7   Q.  How do you recognize it?

8   A.  It was my client.

9   Q.  Moving down to the next check on this same page, please.  A

10  little difficult.  Can you make out what's in the memo line

11  there?

12  A.  Hamit Yiklz.

13  Q.  Do you recognize that name?

14  A.  Also my client.

15  Q.  Continue on to page 136, please.  Focusing on the top

16  check, do you recognize the name in the top check?

17  A.  Yes.

18  Q.  What is the name in the top check?

19  A.  Alexksandra Urbanek.

20  Q.  Is that the same name as the person who's on the board

21  there?

22  A.  Yes.

23  Q.  Now let's look at page 137, please.  All right.

24          On the bottom check, do you see where it says pay to

25  the order of and then something is written in.  Can you make

1   out what's written there?  Looks like H-Y-G-I-A.  Are you

2   familiar with that?

3   A.  Hygia.

4   Q.  Who or what is Hygia?

5   A.  Hygia was a company that was sponsoring people.

6   Q.  Do you know which sponsor was responsible for Hygia?

7   A.  Mr. Herbst.

8   Q.  Is that the same person that's on the board next to

9   Mr. Flam?

10  A.  Correct.

11  Q.  Page 138, please.  Focusing on the bottom check, Mazal and

12  Bracha.  Are you familiar with that?

13  A.  Yes.

14  Q.  What is it?

15  A.  That's Mr. David's publishing company.

16  Q.  When you say Mr. David's publishing company, what do you

17  mean by that?

18  A.  Mr. David was writing a book.

19  Q.  Do you know what type of a book Mr. David was writing?

20  A.  It's called the Code of the Heart.

21  Q.  Do you know who if anyone was assisting him in writing that

22  book?

23          MR. DONALDSON:  Code of the Art, did you say?

24          THE WITNESS:  Code of the Heart.

25  Q.  Code of the H-E-A-R-T?

D1MLCIB5                      Grynsztajn – direct

1    A.  Yeah.

2    Q.  Do you who if anyone was assisting Mr. David in writing

3    that book?

4    A.  Mr. Brodjik.

5    Q.  Do you know how it came about that Mr. Brodjik was

6    assisting Mr. David in writing Code of the Heart?

7    A.  He was a client of Mr. David and one day they got into a

8    discussion in the office and he needed assistant.  Every time

9    Mr. David typed up few pages, he needed to bring it to somebody

10   to correct the words and everything.  So Mr. Brodjik became the

11   personal -- he took the job, you know.

12   Q.  Okay.  So do I understand correctly that Mr. Brodjik was a

13   client of the firm at one point?

14   A.  Yes.

15   Q.  So was that before or after he started collecting money for

16   Earl David?

17   A.  Before.

18   Q.  And was that before or after he started remitting the money

19   to Mr. David in Canada?

20            MR. GERZOG:  Objection.

21            THE COURT:  Overruled.

22   Q.  Was that before or after he started remitting the money to

23   Mr. David in Canada?

24   A.  Before.

25   Q.  Let's go on to page 139, please.  Focusing on the bottom

D1MLCIB5                          Grynsztajn – direct

1    page, do you see that check written out to Hygia?

2    A.   Yes.

3    Q.   Do you see it's for a thousand dollars.

4            Let me ask you, as far as you're aware, was Mr. Herbst

5    paid for the use of his company, Hygia, for sponsoring aliens?

6    A.   Yes.

7    Q.   Are you familiar with an individual named Ita Schlickoren?

8    A.   Schlickoren.

9    Q.   Schlickoren?

10   A.   Schlickoren.

11   Q.   How are you familiar with that?

12   A.   She was a client of mine.

13   Q.   Did you personally work on her file?

14   A.   Yes, some parts, yes.

15   Q.   Some parts of her file you worked on?

16   A.   Yes.

17   Q.   In general, what can you remember about Ms. Schlickoren's

18   application?

19   A.   She was substituted.

20   Q.   When you say she was substituted, what do you mean by that?

21   A.   We withdraw the approved case and gave it to her.

22   Q.   You withdrew an approved case and give it to her?  Break

23   that down a little for us.

24   A.   We replaced the alien in the case.

25   Q.   Okay.

1   A.  Somebody that had approved case, the company withdrew him

2   and replaced with Mrs. Schlickoren.

3   Q.  I'm just having a little trouble hearing you.

4           When you say an approved case, what are we talking

5   about, the labor certification?

6   A.  The I-140 approval.

7   Q.  And do you know whether substitutions were permitted by

8   immigration or by the Department of Labor, do you know?

9   A.  At that time, yes.

10  Q.  You say at that time, did that change at some point?

11  A.  I think a few years ago they stopped it.

12  Q.  They stopped it?

13  A.  Yeah.

14  Q.  Handing you what's been marked for identification and so

15  defense counsel knows, 113-10, I'm sorry, 1113-10, 1113-9,

16  1113-11, 1113-8, 1113-13, and 1113-2.

17          Mr. Grynsztajn, if you can look at 1113-11 and just

18  let us know if you recognize that document?

19  A.  It's a cover letter.

20  Q.  Can you tell to whom this cover letter relates?

21  A.  Earl David.

22  Q.  And is there an alien or a petitioner's name mentioned on

23  this cover letter?

24  A.  Yes, the petitioner and the alien both.

25  Q.  Okay.  Who is the petitioner?

D1MLCIB5                        Grynsztajn – direct

1    A.  My Favorite Bakery.

2    Q.  Are you familiar with My Favorite Bakery?

3    A.  Yes.

4    Q.  How are you familiar with My Favorite Bakery?

5    A.  It's one of Mr. Flam's companies.

6    Q.  How are you familiar or how do you know it's one of

7    Mr. Flam's companies?

8    A.  I had a few cases with his company.

9    Q.  When you say with this company, what do you mean by that?

10   A.  With My Favorite Bakery.

11   Q.  And do I understand correctly they were sponsors for some

12   of your clients?

13   A.  Yes.

14   Q.  Okay.  And what is the beneficiary's name on this

15   application or cover letter?

16   A.  Ita Schlickoren.

17   Q.  Does the cover letter have a date?

18   A.  Yes.

19   Q.  What is the date on the cover letter?

20   A.  February 4, '02.

21   Q.  Does the cover letter have a name in the signature block?

22   A.  Yes.

23   Q.  Whose name appears there?

24   A.  Mr. David.

25   Q.  And how are you familiar with these types of cover letters?

D1MLCIB5                        Grynsztajn - direct

1    A.  I see many of them.

2    Q.  And that was in connection with your employment at the law

3    firm?

4    A.  Yes.

5              MR. PASTORE:  Government offers 1113-10.

6              THE COURT:  Received.

7              MR. PASTORE:  If we could publish it.

8              I'm sorry.  This is my fault.  If we could actually

9    publish -- it is 1113-11, Mr. Grynsztajn, and I apologize.

10             So for the record, all of the questions I just asked

11   should have been related to -11, not -10, and that's my fault

12   I'm sorry.

13   Q.  So the cover letter that's in front of you, just look at

14   the Government Exhibit sticker.

15   A.  It's 11.

16             MR. PASTORE:  Eleven, okay.  So government offers

17   1113-11 and I apologize for the confusion.

18             THE COURT:  All right.  It's received.

19             (Government's Exhibit 1113-11 received in evidence)

20             MR. PASTORE:  Okay.  Now let's try 1113-11.

21   Q.  All right.  Is this the cover letter that we've been

22   discussing?

23   A.  Yes.

24   Q.  And then do you see where it says, please note that

25   petitioner is replacing former beneficiary with

1    Ms. Schlickoren, is that the substitution that you were

2    referring to a few moments ago?

3    A.  Yes.

4    Q.  Now let's look at government 1113-10, and tell us if you

5    recognize that document.

6    A.  Yes.

7    Q.  What is it?

8    A.  It's a labor certification from the Department of Labor.

9    Q.  That's 1113-10, is it the certification?

10   A.  Yes.

11   Q.  Okay.  To whom does it relate?

12   A.  Choudary Khalid.

13   Q.  Why would the labor certification -- well, is this the part

14   A or part B of the application?

15   A.  That's the part A, 758.

16   Q.  Okay.  And is there a company name listed on this?

17   A.  Yes.

18   Q.  What is the company name?

19   A.  My Favorite Bakery.

20   Q.  Is there an address for My Favorite Bakery?

21   A.  Yes.

22   Q.  What is the address?

23   A.  225 Second Street.

24   Q.  What city?

25   A.  Lakewood.

1   Q.  And, again, are you familiar with this company?

2   A.  Yes.

3   Q.  What state, you said Lakewood?

4   A.  Lakewood, New Jersey.

5   Q.  And going on to the next page, is the document signed by

6   anyone?

7   A.  Yes.

8   Q.  Does a name appear in the signature block?

9   A.  Yes.

10  Q.  What name appears in the signature block?

11  A.  Avraham Flam.

12  Q.  You said Avraham Flam?

13  A.  Yes.

14  Q.  Are you familiar with the name Avraham Flam?

15  A.  Yes.

16  Q.  How are you familiar with that name?

17  A.  That's the same Abe Flam.

18  Q.  It's the same Abe Flam as on the board?

19  A.  Yes.  Sometimes they call him by the Jewish name Avraham.

20  Q.  Did he go by any other names?

21  A.  Abrumee.

22  Q.  That's a nickname?

23  A.  Yeah.

24  Q.  You mentioned before there was part A, part B.  Is there

25  part B associated with this particular document?

1    A.  Yes.

2    Q.  Whose name is the part B in?

3    A.  Choudary Khalid.

4    Q.  And is there a second part B associated with this

5    particular document?

6    A.  Yes, Schlickoren.

7    Q.  Do you recognize the handwriting in the second part B?

8    A.  Yes.

9    Q.  Whose handwriting is it?

10   A.  It's mine.

11   Q.  So tell us what's going on here with the part A is in one

12   person's name and the second part B is in Ms. Schlickoren's

13   name?

14   A.  Schlickoren.

15   Q.  Tell us what's going on.

16   A.  When you replace an alien, you have to prepare a new --

17   you're required to prepare new B forms for the new alien.

18   Q.  And did you prepare those forms in connection with your

19   employment at the law firm?

20   A.  Yes.

21           MR. PASTORE:  Government offers 1113-10.

22           MR. DONALDSON:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 1113-10 received in evidence)

25           MR. PASTORE:  And if you could please publish that for

1    the jury.

2    Q.  Mr. Grynsztajn, if you could just take us through part A,

3    section 1, do you see it on your screen there where it says

4    Choudary Khalid Mukhtar?

5    A.  Yes.

6    Q.  Where would you get that information from?

7    A.  From the alien.

8    Q.  What about the next couple lines down where it says name of

9    employer, address, nature of employer's business activity,

10   where would you get all that information?

11   A.  From the sponsor.

12   Q.  And would you literally get it from the sponsor?

13   A.  Sometimes from the sponsor, sometimes from Mr. David.

14   Q.  So sometimes you get it from the sponsor and sometimes from

15   Mr. David?

16   A.  Yes.

17   Q.  What about the job duties?

18   A.  Come from Mr. David.

19   Q.  How do you know that came from Mr. David?

20   A.  He had a book with all the duties and everything.  He kept

21   a book.

22   Q.  He kept a book?

23   A.  Yeah.

24   Q.  Did you see him store it anywhere else?

25   A.  He had them on the computer.

D1MLCIB5                              Grynsztajn – direct

1   Q.  And if we could continue to just scroll down on this

2   document.

3           Okay.  And if you, do you see this stamp where it says

4   October 23, 2001?

5   A.  Yes.

6   Q.  If you could look at your original Government Exhibit in

7   front of you, the paper copy, is that stamp in color or black

8   and white?

9   A.  It look like black and white.

10  Q.  Okay.  So in your experience, have you ever seen this stamp

11  in color?

12  A.  Yes.

13  Q.  What if anything did that indicate to you when the stamp

14  was in color?

15  A.  The case was approved.

16  Q.  Okay.  That indicates it was approved?

17  A.  Yeah.

18  Q.  So why would a stamp be black and white as opposed to in

19  color?

20  A.  It might be a copy.

21  Q.  Okay.  Let's go to the next page of this document, please.

22  Okay.  Drawing your attention --

23          MR. PASTORE:  Apparently we're having some technical

24  difficulties.  So if it's okay with the Court, I'll retrieve

25  the document and do it the noncomputer way.

1    Q.  All right.  If you could direct your attention to the

2    screen, can you see what's displayed on the screen there, can

3    you see that okay?

4    A.  Yeah.

5    Q.  If we go down to the bottom of this page, all right.

6         What are we looking at right now, what's on the screen

7    under declarations?

8    A.  Signature.

9    Q.  And where is the name, if at all, printed on this form?

10   A.  Under the signature it's printed Avraham Flam.

11   Q.  If we could go to the next page of this document, please.

12   And if we could pull it down just a little bit more.  All

13   right.

14        So what are we looking at here?  We've just been

15   looking at the part A.  What is this?

16   A.  This is part B, 750B.

17   Q.  This is the 750B, okay.  Do you see at the very top next to

18   statement of qualifications, do you see there's sort of a hole

19   punch there?

20   A.  Can you repeat this one?

21   Q.  Do you see where it says statement of qualification of

22   alien and hole punched, do you see some words that are punched

23   out?

24   A.  Yes.

25   Q.  Do you know what words appear there when there's not a hole

D1MLCIB5                          Grynsztajn – direct

1   punch?

2   A.  Statement of qualification of alien.

3   Q.  Okay.  All right.  And if we go to the next page, what are

4   we looking at here?

5   A.  Looking at the duties that -- looking at the experience

6   that the alien possess in his country with the duties.

7   Q.  Sorry.  Go ahead.  I didn't mean to cut you off.

8   A.  With the duties that he perform.

9   Q.  And is this the part A or part B or some other part?

10  A.  That's part B.

11  Q.  If we continue on to the next page, please.

12          All right.  What are we looking at here?

13  A.  That's 750B, Ms. Schlickoren.

14  Q.  Now, at the very top of the page, do you see where it says

15  part B, statement of qualifications of alien?

16  A.  Yes.

17  Q.  Is that how you're able, among other ways, to determine

18  this is in fact the 750 part B?

19  A.  Yes.

20  Q.  And whose handwriting, where it says Schlickoren, Ita

21  Esther, whose handwriting is that?

22  A.  That's mine.

23  Q.  And My Favorite Bakery and Cafe, 225 2nd Street, whose

24  handwriting is that?

25  A.  It's mine.

D1MLCIB5                      Grynsztajn - direct

1   Q.  Where would you have gotten that information from?

2   A.  From the file, from Mr. David.

3   Q.  From the file or from Mr. David you said?

4   A.  Yes.

5   Q.  So that's not something the alien would have provided you

6   in this case; is that right?

7   A.  Correct.

8   Q.  And finally I think there may be one more page; is that

9   right?  This just another copy of part B; is that right?

10  A.  Yes.

11  Q.  And then finally what are we looking at here?

12  A.  That's 750A.

13  Q.  This is another copy of the original 750A or the 750A

14  associated with Mr. Mukhtar?

15  A.  Correct.

16  Q.  All right.  Now, let me direct your attention please to

17  government's 1113-8, I'm sorry, -9.  Do you recognize that?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's letter of certification, letter of certification,

21  labor approval.

22  Q.  This is the labor certification that you previously

23  mentioned?

24  A.  Yes.

25  Q.  What color is this particular document?

1   A.  White.

2   Q.  To whom does it relate?

3   A.  Khalid Choudary.

4   Q.  Does it mention any company name on it?

5   A.  Yes.

6   Q.  What company name?

7   A.  My Favorite Bakery.

8   Q.  Is there a name associated with that company?

9   A.  Yes.  Avraham Flam.

10  Q.  And does this document, how are you familiar with documents

11  such as these, these labor certifications?

12  A.  I see many of them.

13              MR. PASTORE:  Government offers 1113-9.

14              MR. DONALDSON:  No objection.

15              THE COURT:  Received.

16              (Government's Exhibit 1113-9 received in evidence)

17              MR. PASTORE:  Okay.  Are we still down?  We're good.

18  Q.  So if you could tell us how would this document be used in

19  connection with the application process that you've been

20  describing, the I-140, the I-45, how would this document play a

21  part, if at all?

22  A.  First of all, the right side.

23  Q.  I can't hear you.

24  A.  The right side had the priority date.

25  Q.  Okay.  Tell us where the priority date is on this?

1   A.  Where it says date of acceptance for processing.

2   Q.  And what is the priority date on this particular?

3   A.  August 20, '98.

4   Q.  Before when you were talking about April 30, 2001, is that

5   where the sort of priority date would actually be printed?

6   A.  Yes.

7   Q.  Okay.  What else can you tell us about this form?

8   A.  This labor certification approval goes with the I-140

9   petition.

10  Q.  So it's physically submitted with the I-140 petition?

11  A.  Correct.

12  Q.  Let me ask you, what if you didn't have the labor

13  certification, would you be able to submit that I-140?

14  A.  Not in this case.

15  Q.  Not in these cases?

16  A.  No.

17  Q.  Why don't we go, why don't we go to Government's 1113-8,

18  please.  Do you recognize that?

19  A.  Yes.

20  Q.  What is it?

21  A.  I-140 petition.

22  Q.  To whom did it relate?

23  A.  My Favorite Bakery.

24  Q.  Is there also any alien's name on that?

25  A.  Schlickoren, Ita.

1   Q.  And what is the address listed for My Favorite Bakery?

2   A.  225 2nd Street.

3   Q.  Is this document signed by anyone?

4   A.  Mr. Flam.

5   Q.  Mr. Abraham Flam?

6   A.  Yes.

7   Q.  And is it dated?

8   A.  February 22, '02.

9   Q.  February 22, 2002?

10  A.  Yes.

11  Q.  And how do you recognize this as an I-140?

12  A.  I prepared many of them.

13          MR. PASTORE:  Government offers 1113-8.

14          MR. DONALDSON:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 1113-8 received in evidence)

17          MR. PASTORE:  Okay.  We could publish it.

18  Q.  Okay.  Do you recognize the handwriting that appears on

19  this particular document?

20  A.  Yes.

21  Q.  Whose handwriting is it?

22  A.  Mr. David.

23  Q.  Under what circumstances were you able to observe

24  Mr. David's handwriting?

25  A.  I knew him for years.  I seen him, I seen his handwriting

D1MLCIB5                    Grynsztajn - direct

 1   for years.

 2   Q.  And if we could go to the next page, please.

 3        Where would you get -- do you see where it says date

 4   established, current number of employees, and gross annual

 5   income, where would you get all that information?

 6   A.  That would come off tax returns.

 7   Q.  Off of tax return you said?

 8   A.  Yes.

 9   Q.  What kind of tax returns, tax returns for the company, for

10   the alien or for something else?

11   A.  For the company.

12   Q.  If we could go to the next page, please.

13        Were these the signatures that you were just

14   discussing before?

15   A.  Yes.

16   Q.  And if we could jump back to the first page, please,

17   part 2.

18        Do you see where it says petition type and then

19   there's a series of boxes?

20   A.  Yes.

21   Q.  Do you see that?

22   A.  Yes.

23   Q.  Why is box E checked on this I-140?

24   A.  Because this job requires two years experience, so he goes

25   to part B.

D1MLCIB5                           Grynsztajn – direct

1    Q.  So based on your training in the law firm and the forms

2    that you filled out, if a labor certification was obtained,

3    what box typically would be checked here?

4    A.  The E box.

5    Q.  Are you familiar with boxes, with box A at all?

6    A.  Yes.

7    Q.  When under what circumstances would box A be checked?

8    A.  That's people filing extraordinary ability cases.

9    Q.  Did you ever file extraordinary ability cases, you

10   personally?

11   A.  No.

12   Q.  Do you know if anybody in the office did file extraordinary

13   ability cases?

14   A.  Yes.

15   Q.  Who filed extraordinary ability cases?

16   A.  Mr. David, Ms. Cibik.

17   Q.  Did you ever discuss with Ms. Cibik her filing of

18   extraordinary ability applications?

19   A.  Yes.

20   Q.  What did she tell you?

21   A.  She said if I have clients, she will file them.

22   Q.  And why was it that you had clients filing extraordinary

23   ability applications?

24   A.  Because they been waiting for many years for the approval

25   of labor department and nothing was happening.  So the

1   extraordinary ability would give them permission to work

2   almost.

3   Q.  It would give them permission to work, you say?

4   A.  Yes.  Even if the case would be rejected later, it would

5   get immediately permission to work.

6   Q.  Who told you filing an extraordinary ability case would get

7   a person a work authorization immediately?

8   A.  Mr. David.

9   Q.  Okay.  And do you know whether clients that you referred to

10  Ms. Cibik in fact got work authorizations?

11  A.  Yes.

12  Q.  How do you know that?

13  A.  I seen them.  They were happy.

14  Q.  You saw them, they told you?

15  A.  Yeah.

16  Q.  Do you know whether their applications ultimately were

17  approved?

18  A.  My understanding must of them were denied.

19  Q.  How do you know the applications that Ms. Cibik filed as

20  extraordinary ability applications were denied?

21  A.  Some people told me that they got permission to work.

22  That's all they got from it.

23  Q.  So, again, the clients told you that directly?

24  A.  Yes.

25          MR. DONALDSON:  Told them what?

1    Q.  What did the clients tell you?

2    A.  That they only got permission to work but they never got

3    green card they were supposed to get.  They never got nothing.

4    Q.  Okay.  If we can go now to 1113-13.

5           THE COURT:  Can we just finish up this series and

6    break?

7           MR. PASTORE:  I was just about to say, I think I have

8    two more documents.  Well, we'll finish up the series that's in

9    front of the witness.

10           THE COURT:  Yep.

11           MR. PASTORE:  So we'll try to move a little more

12    quickly.

13    Q.  1113-13, do you recognize what that is?

14    A.  Yes tax return for the company.

15    Q.  Which company?

16    A.  My Favorite Bakery.

17    Q.  Have you seen these tax returns before?

18    A.  Yes.

19    Q.  Where have you seen the tax returns before?

20    A.  In the office.

21    Q.  And from looking at the tax returns, can you tell who

22    prepared them?

23    A.  Mr. Vago.

24    Q.  Why do you say Mr. Vago prepared these tax returns?

25    A.  No signature, copy stamp.

1                MR. PASTORE:  Government offers 1113-13.

2                THE COURT:  Received.

3                (Government's Exhibit 1113-13 received in evidence)

4                MR. PASTORE:  And if we could publish them for the

5      jury, please.

6      Q.  So just looking at your screen, before on the I-140, do you

7      remember there was field that said date established and gross

8      income; do you remember discussing that?

9      A.  Yes.

10     Q.  And you said that you got them from the taxes.  Where on

11     these tax returns would you find that information?

12     A.  On the right side, on the front page on the right side.

13     Q.  Front page, right side.

14                So if we look at section C where it says date

15     incorporated, is that what you're referring to?

16     A.  Yes.

17     Q.  And with respect to the gross income, is that section 1A

18     where it says gross receipt/sales?

19     A.  Correct.

20     Q.  And how many different years of tax returns are included in

21     this particular Government Exhibit?  I believe it's multipage

22     exhibit, if you can pull it out of the sleeve.

23     A.  One year.

24     Q.  It's just 1998?

25     A.  Yes.

1   Q.  And now focusing your attention on Government's 1113-2.

2           We can bag up the tax returns later.  I see you

3   struggling there.

4   A.  Okay.

5   Q.  So 1113-2, do you recognize that?

6   A.  Yes.

7   Q.  What is it?

8   A.  It's a application for adjustment status I-485.

9   Q.  How do you recognize it as such?

10  A.  I prepared it.

11  Q.  To whom does relate?

12  A.  Schlickoren, Ita.

13          MR. PASTORE:  Government offers 1113-2.

14          THE COURT:  Received.

15          (Government's Exhibit 1113-2 received in evidence)

16  Q.  And if we can publish it for the jury.

17          I want to focus your attention on one field, part 2,

18  the various boxes, application type, do you see that, do you

19  see how there's different boxes there, A, B, C, D?

20  A.  Yes.

21  Q.  Why is box A checked?

22  A.  There's few people in the case.  The main person on the

23  case with the visa is available.  The main person goes into

24  this part A.

25  Q.  So the main person, what do you mean by main person and

1    what will be an example of someone who's not a main person?

2    A.  If like Schlickoren had a husband and children, they would

3    go in part B.

4    Q.  So their I-485 would be part B; is that correct?

5    A.  Correct.

6    Q.  Would the children and husband have an I-140 or would only

7    Ms. Schlickoren have?

8    A.  Schlickoren.  Only one I-140.

9    Q.  Is this document signed and dated on the last page?

10   A.  Yes.

11   Q.  If we could bring up the last page, please, I believe it's

12   page 4.  Okay.

13             And what is the date on this particular document?

14   A.  May 8, '02.

15   Q.  I think those are all the exhibits that you currently have

16   in front of you from the 1113 series; is that right?

17   A.  Yes.

18             THE COURT:  Why don't we break for the day.  Remember

19   the two rules:  Don't speak about the case, keep an open mind.

20   See you in the morning.

21             (Continued on next page)

22

23

24

25

D1MLCIB5

1                (Jury not present)

2                (Witness not present)

3            THE COURT:  Anything we need to talk about?  Hearing

4    nothing, we're adjourned.

5            MR. PASTORE:  Your Honor, I did hand up a letter on

6    Ms. Cibik, provided copies to Mr. Donaldson.  I provided copies

7    to the rest of defense counsel.

8            For planning purposes if it's helpful, I think I have

9    probably an hour, probably maximum is two hours, but probably

10   more like an hour of direct left.  And then our next witness

11   will be Sam Salamon.  So seems like we'll get to him tomorrow

12   depending on the cross.

13           THE COURT:  Okay.

14           MR. BRILL:  Judge, I'm sorry, there was one thing.  If

15   you recall a couple weeks ago we talked about the fact that I

16   had this family situation.  I had to leave on Wednesday, the

17   24th, at 1 o'clock.  The Court had asked the government to have

18   a witness available who wasn't directly affecting Mr. Schwartz.

19   We seem to be diminishing in witnesses.  So I just wanted to

20   bring that to everyone's attention again.

21           MR. PASTORE:  Your Honor, at this point we anticipate

22   only two more witnesses, Mr. Salamon and Agent Gordon.  And I

23   think we had discussed the January 24 when Mr. Flam was still

24   in the case so we expected approximately a half dozen witnesses

25   more.  So at this point, this is what we're down to.

D1MLCIB5

1          THE COURT:  Then we may have to break at one unless

2     there's some way to manipulate.

3          MR. BRILL:  If it's Agent Gordon, if we can maybe

4     figure out what the testimony is going to be at that time

5     period, I may be able to have somebody sit in.

6          THE COURT:  You guys need to talk about it because I

7     really don't know what the testimony is going to be.

8          MR. BRILL:  I don't really exactly either, but I'll

9     figure it out.  Thank you.

10          (Adjourned to January 23, 2013, at 9 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3   JOHN MIRANDONA

4   Direct By Mr. Pastore . . . . . . . . . . . 610

5   Cross By Mr. Donaldson . . . . . . . . . . . 620

6   Cross By Mr. Gerzog . . . . . . . . . . . . 622

7   Cross By Mr. Greenfield . . . . . . . . . . 643

8   Cross By Mr. Brill . . . . . . . . . . . . . 645

9   Redirect By Mr. Pastore . . . . . . . . . . 654

10  Recross By Mr. Donaldson . . . . . . . . . . 662

11  Recross By Mr. Gerzog . . . . . . . . . . . 664

12  Redirect By Mr. Pastore . . . . . . . . . . 666

13  Recross By Mr. Gerzog . . . . . . . . . . . 667

14  MARK COZINE

15  Direct By Mr. Pastore . . . . . . . . . . . 667

16  Cross By Mr. Gerzog . . . . . . . . . . . . 674

17  Cross By Mr. Greenfield . . . . . . . . . . 676

18  Redirect By Mr. Pastore . . . . . . . . . . 676

19  Recross By Mr. Gerzog . . . . . . . . . . . 677

20  Recross By Mr. Greenfield . . . . . . . . . 677

21  LAVALE JACKSON

22  Direct By Mr. Pastore . . . . . . . . . . . 682

23  ERIC SILVERMAN

24  Direct By Mr. Pastore . . . . . . . . . . . 686

25  DAVID GRYNSZTAJN
```

```
 1   Direct By Mr. Pastore  . . . . . . . . . . . 693
 2                     GOVERNMENT EXHIBITS
 3   Exhibit No.                              Received
 4    3044 through 3050  . . . . . . . . . . . . 670
 5    3037, 3038, 3043, 3100 through 3116,  . . . 673
 6             3118 through 3127, 3129
 7             through 3133, 3135 through
 8             3139, 3200 through 3219, 3224
 9             through 3234, 3239 through
10             3241, 3243 through 3244
11    3055 through 3063  . . . . . . . . . . . . 688
12    3036, 3065, 3128, 3134, 3140, 3222, and . . . 692
13             3223
14    6 and 6A  . . . . . . . . . . . . . . . . 720
15    8 and 8A  . . . . . . . . . . . . . . . . 723
16    9 and 9A  . . . . . . . . . . . . . . . . 724
17    4 and 4A  . . . . . . . . . . . . . . . . 730
18    3032-2 through 3032-12  . . . . . . . . . . 762
19    21, 21A  . . . . . . . . . . . . . . . . . 773
20    13, 13A  . . . . . . . . . . . . . . . . . 773
21    22, 22A  . . . . . . . . . . . . . . . . . 774
22    S-3, 700  . . . . . . . . . . . . . . . . 775
23    11  . . . . . . . . . . . . . . . . . .749
24    11A  . . . . . . . . . . . . . . . . . .750
25    18  . . . . . . . . . . . . . . . . . .730
```

1   20      . . . . . . . . . . . . . . .719

2   20A     . . . . . . . . . . . . . . .720

3   30      . . . . . . . . . . . . . . .750

4   601-5   . . . . . . . . . . . . . . .707

5   1113-11  . . . . . . . . . . . . . .784

6   1113-10  . . . . . . . . . . . . . .787

7   1113-9   . . . . . . . . . . . . . .793

8   1113-8   . . . . . . . . . . . . . .795

9   1113-13  . . . . . . . . . . . . . .800

10  1113-2   . . . . . . . . . . . . . .801

11  3051 through 3054   . . . . . . . . .684

12

13

14

15

16

17

18

19

20

21

22

23

24

25