D1p1cib1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        11-CR-424 (NRB)

5   GULAY CIBIK, REFAEL BRODJIK,
    a/k/a "Rafi," NATHAN SCHWARTZ,
6   HAROLD TISCHLER, a/k/a
    "Hershy,"
7
               Defendants.              Jury Trial
8
    ------------------------------x
9
                                        New York, N.Y.
10                                      January 25, 2013
                                        9:11 a.m.
11

12  Before:

13               HON. NAOMI REICE BUCHWALD,

14                                      District Judge

15                      APPEARANCES

16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  JANIS ECHENBERG
    JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
    MICHAEL DINET, Paralegal Specialist
20
    DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
    BY:  XAVIER R. DONALDSON, ESQ.
22
    LAWRENCE D. GERZOG, ESQ.
23  JEREMY L. GUTMAN, ESQ.
         Attorneys for Defendant Refeal Brodjik
24

25
```

D1p1cib1

                              APPEARANCES
                             (Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D1p1cib1

```
 1                 (Trial resumed)

 2                 (In open court; jury not present)

 3                 THE COURT:  Good morning.  Can we bring the jury in?

 4                 MR. PASTORE:  Your Honor, there are two matters that

 5      we just briefly wanted to address.

 6                 THE COURT:  Okay.

 7                 MR. PASTORE:  The first is, in light of the note that

 8      the jury passed up to the court yesterday, the government was

 9      considering whether it may be appropriate to admonish them

10      again that there should be no early deliberations.  We don't

11      think polling the jury about potential early deliberations is

12      at all necessary, but we offer up whether it might be helpful

13      just to remind them specifically, in light of the note, they're

14      not to be discussing any of the legal or factual issues around

15      the case until it's been given to them for deliberations.

16                 THE COURT:  Don't I tell them that every single day?

17                 MR. PASTORE:  You do, your Honor, and we had discussed

18      that, we had discussed that internally as well, and we thought,

19      in light of the specific note, that it may be worth mentioning.

20      We just offer it up.  I'm not sure if anyone else has a view.

21                 THE COURT:  Does anybody care?  I mean, do you object?

22                 MR. GERZOG:  No.

23                 MR. GUTMAN:  No.

24                 MR. DONALDSON:  No.

25                 THE COURT:  Okay.  That's fine.
```

D1p1cib1

1           MR. PASTORE:  And the second is, just for planning

2    purposes, in terms of defense cases, what we understand

3    right -- we've asked each defendant whether they intend to put

4    on a case.  We've also asked for courtesy copy of witness lists

5    and any disclosure of prior witness statements.  So far

6    Mr. Gerzog has indicated that there is no -- they don't intend

7    to put on a case.  None of the other three defendants have

8    indicated one way or the other, only that the -- that it's

9    going to depend on, somewhat, what Mr. Salamon says, but for

10   planning purposes, it will be helpful if we had that.

11          THE COURT:  It certainly would be helpful for me to

12   know.

13          MR. GERZOG:  I should point out, what I said

14   specifically was that while I don't plan to put on a case, that

15   might change depending on what Mr. Salamon says.  I don't

16   really expect it to, but --

17          MR. DONALDSON:  At this point, regarding Ms. Cibik, we

18   don't know.  We had not planned on doing that, but at this

19   point we don't know.

20          MR. BRILL:  We may have two or three very brief

21   witnesses, depending on what Mr. Salamon says.

22          MR. GREENFIELD:  I would say I'm in agreement with

23   Mr. Brill.  I don't anticipate any length of a defense case and

24   I may not put one on at all, but I do think it depends on

25   Mr. Salamon's testimony.

D1p1cib1

1      THE COURT:  All right.  I think the take-away is that

2  even assuming a defense case, it would not be of such length

3  that it will have a major impact on our plans going forward.

4  So --

5      MR. DONALDSON:  Judge, Ms. Cibik was whispering in my

6  ear that at this point -- she's telling me at this point she

7  has no intention of testifying, but I'm telling her we'll speak

8  about that further later.

9      MR. PASTORE:  If there are two or three witnesses that

10  are -- that defense counsel is considering, we just request

11  that those names be turned over to the government sufficiently

12  in advance of the witness being called.

13      THE COURT:  I assume that this is almost the last

14  witness for the government?

15      MR. PASTORE:  We anticipate one more witness, Special

16  Agent Gordon.

17      THE COURT:  How long is her testimony supposed to be?

18      MR. PASTORE:  Probably about two hours, at most.

19      THE COURT:  Oh, great.  Okay.  So then we're finishing

20  testimony on Monday; right?  I mean, that's what it comes down

21  to.  I mean, assume maybe Mr. Salamon occupies today or a good

22  part of today, Monday Agent Gordon testifies.

23      MS. ECHENBERG:  Your Honor, I think Mr. Salamon will

24  be on the stand today and at least part of Monday.

25      MR. BRILL:  The government informed us they have an

D1p1cib1

extensive direct of Mr. Salamon.

          THE COURT:  All right.  Then I think --

          MR. GERZOG:  And your Honor, all I ask is that as far
as summations go, we work it out so that the government's
rebuttal summation is not alone on a separate day.

          THE COURT:  I can't promise you that.

          MR. GERZOG:  Well --

          THE COURT:  I just can't.  I mean, this has all gone
on longer than I thought it was going to, and how it works out,
I don't know yet.  I mean, first of all, I don't have any
information from any of you.  I don't know how long the
government's planning on summing up, I don't know how long
you're planning on summing up.  I don't even have the hours --

          MR. GERZOG:  I for one will be willing to wait to go
to 3 or 3:30 if the court would, just so we can avoid that from
happening.  I don't know if your Honor wants -- is willing to,
I don't know if anyone else is willing to, but I for one would
be willing to do that.

          THE COURT:  Well, I guess I was not remembering that
Agent Gordon had to testify, so I really haven't given any, you
know, actual thought to the schedule.  And as I indicated
earlier, I often change the calendar for summations anyway.
But I do think I want to just remind you, because Brett
reminded me, that we have at least -- is it one juror who told
us that she had a conflict of a flight on the 30th?  So it's

D1p1cib1

1    clear we're going to lose that juror.  I don't believe there

2    was anybody else who has a -- is there one more?

3            Well, there's the 31st.  Let's hope that's not

4    necessary.  But anyway, we are going to lose a juror for the

5    30th.

6            MR. GREENFIELD:  Judge, I have one more issue to

7    raise.

8            THE COURT:  Yes.

9            MR. GREENFIELD:  Regarding the testimony of

10   Mr. Salamon.  A couple of weeks ago, Ms. Echenberg provided me

11   with a -- I guess it's what you call a screen shot of a message

12   that purports to come from Mr. Tischler to Mr. Salamon,

13   which -- in which Mr. Tischler uses the word "moser" --

14   actually misspells it, but he says moser, and she, in any

15   case --

16           MS. ECHENBERG:  Your Honor, if it's helpful, it's

17   Government Exhibit 501.

18           MR. GREENFIELD:  Okay.

19           MS. ECHENBERG:  We can also put it up on the screen,

20   if you'd like.

21           THE COURT:  Yeah, I'm not sure if I have it here.

22           Yeah, okay.  I've got it now.

23           First of all, I'm sorry, I don't know what the word

24   means.

25           MR. GREENFIELD:  I didn't know what the word meant

D1p1cib1

1    either.  Ms. Echenberg represented to me that it meant rat,

2    okay?  So I looked it up.  I did some research on it.  And it

3    doesn't quite mean rat.  And what I -- she and I had a sort of

4    a spirited, good-natured exchange over -- at least I took it as

5    good-natured -- over what the definition of moser was, and I --

6    I had a definition from the dean of Yeshiva University which

7    said that it was an animal of prey, preying upon society for

8    his own benefit.  So I said, "Well, if you're going to offer

9    that, do you want me to subpoena the dean?"

10           THE COURT:  You had actually called him?

11           MR. GREENFIELD:  No, I found him -- I found a

12   reference to it.  It seems that this word came up a few years

13   ago when Professor Dershowitz referred to someone in Israel as

14   a -- or was alleged to have said that the guy was a moser

15   and --

16           THE COURT:  How are you supposed to spell it?

17           MR. GREENFIELD:  M-O-S-E-R, no I.

18           THE COURT:  Okay.

19           MR. GREENFIELD:  So here's my concern.  I mean, she's

20   going to introduce it and ask Mr. Salamon what is Mr. -- "What

21   does moser mean or what did you understand it to mean?"  And

22   then we're going to have a little trial over what moser means

23   because --

24           THE COURT:  One second.  Explain to me what this

25   screen shot is supposed to be of.

D1p1cib1

1          MS. ECHENBERG:  Sure.  So this is on Facebook.  This

2     is a message.

3          THE COURT:  I don't do Facebook, so -- I don't think

4     judges should do Facebook.

5          MS. ECHENBERG:  I don't do Facebook either, your

6     Honor, same reason.  This is a message that Mr. Tischler sent

7     to Mr. Salamon.  The word I believe is moser, and I did some

8     research as well, your Honor, and in the -- in some parts of

9     the Jewish religion, there's this understanding of the Law of

10    Moser, which is, if someone gives information to the secular

11    government against another Jew, three Rabbis can get together,

12    determine them a moser, and they are essentially excommunicated

13    from --

14         THE COURT:  That's what a friend of mine said, that

15    the commandment is not, "Thou shalt not bear false witness,"

16    the commandment is, "Thou shalt not bear witness."

17         MS. ECHENBERG:  Against a Jew.  Right.  So what

18    Mr. Salamon will testify that he understood it to be saying,

19    "you ratted on me, you put me in jail, wow."  We have other

20    text messages that came on Mr. Salamon's phone between

21    Mr. Tischler and Mr. Salamon where the language is similar.  He

22    says "wow," like that's sort of his language to things he says.

23         Also, I would just note that that photograph, if you

24    see, there's a little cigarette there.  I believe right now, or

25    at least at the time of this message, Mr. Tischler was selling

D1p1cib1

1    electronic cigarettes, so that's sort of his little --

2           MR. GREENFIELD:  I'm not disputing that --

3           THE COURT:  Look, this is the issue.  Not what does it

4    mean abstractly and what some scholar would understand it to

5    be; it's what Mr. Salamon understood was being said to him.

6           MS. ECHENBERG:  Correct.

7           THE COURT:  Because to the extent that it's

8    derogatory/threatening -- small T -- it's his understanding of

9    what's being said.  So I don't understand why the academic

10   issue.

11          MR. GREENFIELD:  Well, he can say --

12          THE COURT:  If you want to call a witness that says

13   that --

14          MR. GREENFIELD:  Or cross-examine this witness as to

15   the basis of his knowledge.  I mean, I think it means something

16   different to every one of the defendants here and everybody who

17   they see on Saturday morning.  You know, this is the first time

18   I heard that three rabbis can get together and excommunicate

19   the guy, and if he's going to say that, I mean, there ought to

20   be some sort of foundation for that besides, "That's what I

21   thought it -- I understood it to mean."

22          THE COURT:  I think it's what he understands.  I mean,

23   I think that you can certainly suggest that there are other

24   meanings and that perhaps the other meanings is what

25   Mr. Tischler, you know, suggested, but I don't --

D1p1cib1

1          MR. GREENFIELD:  Could we have an offer as to what

2    Mr. Salamon did understand it to mean?

3          MS. ECHENBERG:  Yes.  He's going to say that he

4    understood it to mean:  You are testifying against me, you put

5    me in jail, you're someone who dealt with the secular

6    authorities against another Jew.  And that's how we've

7    described it in the 3500.  As Mr. Salamon described it to me, I

8    wrote it down and put it in the 3500 several weeks ago.

9          THE COURT:  All right.  Are we done with

10    preliminaries?

11          MS. ECHENBERG:  We're done, your Honor, yes.

12          THE COURT:  Okay.

13          MR. PASTORE:  And, Judge, we have received a letter

14    from Mr. Gutman and Mr. Gerzog regarding the jury charge, and

15    we'll take a look.  If it's okay if we get back to you on

16    Monday or over the weekend?

17          THE COURT:  We have a draft.  We have a draft jury

18    charge for you, done before receiving this, and I'm not sure

19    whether this will change anything, or I can think of possibly

20    one thing that I think would be unobjectionable to everybody,

21    but we were hoping I think to get at least responses by e-mail

22    on Sunday, maybe a little less important given that the trial's

23    going to go a little longer than I thought, but I think it

24    would be helpful because I think we don't want to waste a lot

25    of time, you know, arguing about the charge because I think a

D1p1cib1

1    lot of it will not be subject to any extreme discussion and the

2    number of things you might want to raise are going to be I

3    think small in substance, in sentences.  So we could, you know,

4    try to maybe talk about some of the stuff maybe on Monday.

5    Obviously if something happens, we can always adjust it, but

6    I'd like to, you know, focus on this earlier than --

7           MR. GERZOG:  Would your Honor think it might be a good

8    idea to inform the jury that while we had hoped we would be

9    done in two weeks, it appears that we're going to be going a

10   few more days?

11          THE COURT:  I think that might be a good idea, at the

12   end of the day.

13          MR. PASTORE:  And, Judge, the sentence that your Honor

14   was referring to, is it possible to e-mail in or would it be --

15          THE COURT:  You know, I haven't memorized the charge,

16   but the only immediate reaction, you know, off-the-cuff

17   reaction to Mr. Gutman's letter was that we might add a

18   sentence with respect to the substantive counts that simply

19   says there needs to be unanimity on at least one statement,

20   because we certainly have that unanimity charge generally but

21   also specifically on the object of the conspiracy.  So I would

22   have no problem with adding that.  I don't think it's in there,

23   but I have no problem adding it.

24          (Continued on next page)

25

D1p1cib1

1                (Jury present)

2                THE COURT:  Good morning, everyone.

3                THE JURORS:  Good morning.

4                THE COURT:  Sorry to keep you.  We just had some legal

5     matters we needed to discuss.

6                Ms. Echenberg?

7                MS. ECHENBERG:  The government calls Robert Salamon.

8                THE CLERK:  Could you raise your right hand.

9                (Witness sworn)

10               THE CLERK:  Please state and spell your full name for

11    the record.

12               THE WITNESS:  Robert Salamon, R-O-B-E-R-T, Salamon,

13    S-A-L-A-M-O-N.

14     ROBERT SALAMON,

15         called as a witness by the Government,

16         having been duly sworn, testified as follows:

17    DIRECT EXAMINATION

18    BY MS. ECHENBERG:

19    Q.  Good morning, Mr. Salamon.

20    A.  Good morning.

21    Q.  How old are you?

22    A.  49.

23    Q.  What was your highest grade of formal education?

24    A.  Secular studies, I would say elementary school.

25    Q.  Do you have -- and when you say elementary school, what

D1p1cib1                        Salamon - direct

1   grade?

2   A.   Sixth grade.

3   Q.   And did you have any other schooling after secular

4   schooling?

5   A.   Yes.

6   Q.   What was that?

7   A.   Religious schooling.

8   Q.   How long did you remain in religious schooling?

9   A.   Till I was 17.

10  Q.   Did you complete religious schooling?

11  A.   No.

12  Q.   Are you currently employed?

13  A.   Yes.

14  Q.   What do you do?

15  A.   I resell monitoring software for printing devices that

16  alerts company when a part is needed or when toners are low on

17  the device or service is needed.

18  Q.   How long have you had that job?

19  A.   Over a year.

20  Q.   Did there come a time when you were arrested by federal

21  agents in New York?

22  A.   Yes.

23  Q.   When was that?

24  A.   In May of 2009.

25  Q.   What were you arrested for?

D1p1cib1                          Salamon – direct

1   A.  Immigration fraud.

2   Q.  Did you appear in court on those charges you were arrested

3   for?

4   A.  Yes.

5   Q.  What did you plead?

6   A.  Not guilty.

7   Q.  Did you ever change your plea?

8   A.  Yes.

9   Q.  What did you change your plea to?

10  A.  Guilty.

11  Q.  When was that?

12  A.  July 2010.

13  Q.  Did you sign any sort of agreement with the government in

14  connection with your guilty plea?

15  A.  Yes.

16  Q.  What was that agreement?

17  A.  Cooperation agreement.

18  Q.  And before you signed that agreement, did you meet with the

19  government?

20  A.  Yes.

21  Q.  During your meetings with the government did you admit to

22  any criminal conduct?

23  A.  Yes.

24  Q.  What criminal conduct did you admit to?

25  A.  Immigration fraud, conspiracy of immigration fraud, bank

D1p1cib1                          Salamon – direct

1    fraud, conspiracy of bribing a US official, and conspiracy of

2    money laundering.

3    Q.  I'm going to ask you some questions about those crimes, but

4    before I do, I'm showing you what's been marked as Government

5    Exhibit 500.

6            Do you recognize that document?

7    A.  Yes.

8    Q.  What is it?

9    A.  Cooperation agreement.

10   Q.  Is it your cooperation agreement?

11   A.  Yes.

12   Q.  If you could turn to the last page of that agreement,

13   please.

14           Is that your signature on the last page?

15   A.  Yes.

16   Q.  What is your understanding of what you have to do under

17   this agreement?

18   A.  To be truthful and honest.

19   Q.  Do you have to do anything else?

20   A.  To say everything that happened that I did in the

21   immigration fraud and everything that went on.

22   Q.  And what happens if you commit any other crimes?

23   A.  This agreement is null and voided.

24   Q.  In addition to admitting -- the crimes that you just said

25   you admitted to the government, did you plead guilty to all of

D1p1cib1                          Salamon - direct

1   them in connection with this cooperation agreement?

2   A.  Yes.

3   Q.  And in addition to pleading guilty to those crimes, did you

4   also agree to forfeit money?

5   A.  Yes.

6   Q.  How much money did you agree to forfeit?

7   A.  $2 million.

8   Q.  Did you also agree to pay back taxes in connection with

9   this agreement?

10  A.  Yes.

11  Q.  Now if you do what you're supposed to do under this

12  agreement, what do you understand the government will do?

13  A.  They will write a letter to the judge and hopefully the

14  judge will have some leniency on my sentencing.

15  Q.  What information do you understand will be contained in

16  that letter to the judge?

17  A.  Everything that I -- that I've said to the government that

18  I did and I admitted all my crimes.

19  Q.  Anything else?

20  A.  I don't understand the question.

21  Q.  Will the letter also tell the government *[sic]* the things

22  you told the government?

23  A.  Yes.

24  Q.  What about what other people did?

25  A.  Yes.

D1p1cib1                          Salamon - direct

1  Q.  And will the government recommend a specific sentence to

2  the judge?

3  A.  No.

4  Q.  Who decides what sentence you will get?

5  A.  The judge.

6  Q.  Even if you get this letter, what's the maximum sentence

7  that you're facing?

8  A.  70 years.

9  Q.  Does anyone have to be convicted in order for you to do

10 your part under the agreement?

11 A.  No.

12 Q.  Have you been sentenced yet?

13 A.  No.

14 Q.  Okay.  Let's turn back to what you pled guilty to.  Let's

15 start with the immigration fraud.  If you could tell me briefly

16 what you did in connection with the two charges of immigration

17 fraud and conspiracy to commit immigration fraud.

18 A.  I was involved in a law firm that provided false documents

19 to the government for people to get green cards, legal status

20 in the United States.

21 Q.  And what did you do in connection with the bribery charge

22 that you pled guilty to?

23 A.  I was involved in the briberies of a US official in US

24 labor to alter paperwork for us to submit to immigration.

25 Q.  Connected with the immigration fraud?

D1p1cib1                         Salamon - direct

1    A.  Yes.

2    Q.  What did you do in connection with the money laundering

3    charge that you pled guilty to?

4    A.  The lawyer, main lawyer, Earl David, had a book that he

5    wrote and he had an account called Code of the Heart, so monies

6    that were profited -- those days, he wasn't in the country, he

7    was in Canada, so the profits that we made, part of the profits

8    went to him through a Code of the Heart, like to just cover up,

9    not to show that -- where it's coming from, to show that --

10   that he sold books from there, it was not profit from the

11   immigration fraud.

12   Q.  To make it look like it was book profits instead of profits

13   from the fraud?

14   A.  Yes.

15   Q.  And what did you do in connection with this bank fraud that

16   you pled guilty to?

17   A.  I instructed a computer guy to forge my coworker's

18   signature.

19   Q.  For what purpose?

20   A.  To -- to get money out of his account.

21   Q.  And you forged the signature on what, specifically?

22   A.  On the computer -- on our check.  I'm sorry.

23   Q.  One check or several checks?

24   A.  Several checks.

25   Q.  And you mentioned that the immigration fraud that you

D1p1cib1                         Salamon - direct

1    committed related to a law firm; is that right?

2    A.  Yes.

3    Q.  When you were working at that law firm, did you ever use

4    illegal drugs at the firm?

5    A.  Yes.

6    Q.  What did you use?

7    A.  Marijuana.  Tried it.

8    Q.  How many times?

9    A.  Once, that I remember.

10   Q.  And when you were working at that firm, did you ever drink

11   alcohol while you were at the firm?

12   A.  I had a glass or two of wine, yes.

13   Q.  When did you have a glass or two of wine?

14   A.  After the clients left.

15   Q.  Typically what hours would you see clients?

16   A.  In those days, till like I would say 11:30, 12:00 at night.

17   Q.  And then you would have a glass or two of wine?

18   A.  Yes.

19   Q.  And while you were working at this firm, were you ever a

20   lawyer?

21   A.  No.

22   Q.  Are you trained as a lawyer?

23   A.  No.

24   Q.  Are you licensed as a lawyer?

25   A.  No.

D1p1cib1                          Salamon - direct

1    Q.  Did you ever present yourself in any way as a lawyer to

2    anyone?

3    A.  Yes.  Yes.

4    Q.  What did you do?

5    A.  I told girls I'm a lawyer to impress them.

6    Q.  What do you mean by that?

7    A.  I -- meaning I was trying to impress girls, I told them I'm

8    an attorney so they think that I'm a very educated person so --

9    I felt that this would impress them.

10   Q.  How did you tell them that; in person, through another

11   form?

12   A.  Could be that I was in -- I put up on a dating site.  I

13   would put successful attorney.  And I would tell them verbally

14   as well.

15   Q.  Do you currently present yourself to women as a lawyer?

16   A.  No.

17   Q.  Is it possible that there are sites that still exist that

18   list you as a lawyer?

19   A.  Possible.

20   Q.  And have you ever presented yourself as a lawyer in any

21   other way?

22   A.  Yes.

23   Q.  What did you do?

24   A.  Initially when I started, I just put up -- I created a

25   website, and the wording of it sounded like I am a lawyer, and

D1p1cib1                          Salamon - direct

1    I was told that you cannot present yourself as a lawyer and I

2    should take it down.

3    Q.  Who told you that?

4    A.  It was Earl David and somebody else in the office.  I can't

5    remember the name.

6    Q.  And did you take it down?

7    A.  Yes.

8    Q.  How long was it up for?

9    A.  Couple of weeks.

10   Q.  Approximately during what time period?

11   A.  I would say sometime in 2002.

12   Q.  And are you still online?  Do you still use any online

13   presence?

14   A.  I'm on Facebook, yes.

15   Q.  And how do you list yourself on Facebook?  Well, let me

16   take a step back.

17           Do you go by any other names other than Robert

18   Salamon?

19   A.  Yes.

20   Q.  What names?

21   A.  Sam Salamon.

22   Q.  Is that the name most people know you by?

23   A.  Yes.

24   Q.  Do you go by any other first names?

25   A.  Shmuel, in Jewish they call me.  But most people call me

D1p1cib1                          Salamon - direct

1     Sam.

2     Q.  Okay.  And on Facebook, do you list yourself as Sam

3     Salamon?

4     A.  Yes.

5     Q.  And do you spell it S-A-L-A-M-O-N?

6     A.  No.

7     Q.  How do you spell it?

8     A.  S-O-L-O-M-O-N.

9     Q.  Why do you do that?

10    A.  To hide my arrest.  There is a record on Google.  I didn't

11    want anybody to know.

12    Q.  Have you ever received any tickets related to driving?

13    A.  Yes.

14    Q.  And did you ever lose your license in connection with that?

15    A.  Yes.

16    Q.  Tell me what happened.

17    A.  I was talking on the cellphone probably twice, and I paid

18    one ticket.  I didn't know there was another ticket

19    outstanding.  And I was involved in a fender bender, and the

20    officer said, "Do you know your license is suspended?"  I said

21    I did not know.  He said, "You paid the ticket?"  I said yes.

22    He said one ticket was paid, the other one is not paid, and he

23    said go pay the ticket, and he gave me a ticket for no license.

24    And I went the next day and I paid the ticket and I got back my

25    license.

D1p1cib1                    Salamon - direct

1    Q.   And was there any formal charge against you in relation to

2    that?

3    A.   No.

4    Q.   So turning back now to the immigration fraud, are you

5    familiar with an individual named Earl David?

6    A.   Yes.

7    Q.   Who is Earl David?

8    A.   Earl David was the one that was at that time head of the --

9    he was the lawyer for that immigration office.

10   Q.   When you say at that time, what time are you talking about?

11   A.   When I met him, was in 2001.

12   Q.   How did you meet him in 2001?

13   A.   He had called me up that he needs a copy machine.

14   Q.   Why did he call you for a copy machine?

15   A.   I used to be in the copy machine business and I used to

16   sell copiers, so I got a phone call from him, "Please come

17   down.  I need a copy machine."

18   Q.   Did you know him at that time?

19   A.   Personally, no.

20   Q.   Had you heard of him?

21   A.   I may have seen his name once or twice in my office on a

22   message.

23   Q.   So he called you and he says he wants to get a copy

24   machine, and what happens next?

25   A.   I went to his office.

D1p1cib1                          Salamon – direct

1   Q.  Where was his office?

2   A.  On Wall Street.

3   Q.  Do you remember the address?

4   A.  110 Wall Street.

5   Q.  And what happened next?

6   A.  I went upstairs and I was looking for him, and finally I --

7   I -- they said -- directed me over there, Earl David is there,

8   and I walked in, and he said, "Hey, what's going on?"  I said,

9   "I'm here to sell you a copy machine."  "When can you deliver

10  it?"  I said, "Probably the next two days."  "How much is it?"

11  I think it was $4500.  He gave me a check for $4500 and said

12  it's for the machine.  And he said, "By the way, I need you to

13  sign something."  I asked him, "What do you want me to sign?"

14  So he said, "Do you remember years ago you signed you were

15  looking for technicians and salespeople?"  I said, "I remember

16  something.  It was years ago."  He said, "Well --"

17  Q.  Let me stop you there.  Did you know what he was talking

18  about when he said you had signed something years earlier?

19  A.  Not right away until he told me what I signed, so my

20  recollection going back, I said yes, I remember.

21  Q.  And what had you signed years earlier?

22  A.  That we were looking for technicians.

23  Q.  And how did you come to sign a document saying you were

24  looking for technicians?

25  A.  A coworker approached me in the office and told me if

D1p1cib1                          Salamon - direct

1    you'll sign that you're looking for technicians.  I said yes,

2    I'm looking for technicians.  I'll pay $300 for each signature.

3    Q.  And so your coworker -- you signed and your coworker paid

4    you $300 for your signature?

5    A.  Yes.

6    Q.  And what happened after you signed those documents?

7    A.  Paperwork started coming from the Department of Labor to my

8    office, where we had the copy machines, and my father was the

9    main owner, I was only a 10 percent partner in the company, and

10   he said, "What is this?"  And I said, "No, it's something we're

11   looking for workers.  It's not a problem."  He said, "Still, I

12   don't want to have nothing to do with paperwork.  Please cease

13   it and stop it."  So I just threw it in the garbage, and that's

14   the last thing that I heard of that, at that time.

15   Q.  And that was approximately when?

16   A.  I would say sometime 19 -- 1998, 1999.

17   Q.  So now going back to 2001, Earl David reminds you of the

18   papers you had signed before, and then what happens?

19   A.  So he tells me, "There's an amnesty right now, I've got to

20   at least file the paperwork, and I want you to sign."  So I

21   re-signed them and he gave me a check for $1200.

22   Q.  And the check for $1200 was for what?

23   A.  For signing $600 for each signature.

24   Q.  And when was the next time you talked to Earl David after

25   that?

D1p1cib1                          Salamon - direct

1    A.  I would say two days later.

2    Q.  What was your conversation two days later?

3    A.  When delivering the copy machine and then he wanted to also

4    have a conversation, "Do you know other companies who are

5    looking for people, to hire people?"

6    Q.  If you know them, what?

7    A.  That I could make money.  He'll pay me.

8    Q.  Earl David would pay you to do what?

9    A.  To find companies that are looking to hire people.

10   Q.  And did you agree to do that?

11   A.  Yes.

12   Q.  And did you ever do any other work for Earl David other

13   than looking for these people to sign documents?

14   A.  Yes.  Eventually I started opening up cases, speaking to

15   clients, and continuing working at his office.

16   Q.  How long did you work in the office on this

17   immigration-related work?

18   A.  I would say 2001 till 2009.

19   Q.  What happened in 2009?

20   A.  2009, January 14 or 15 -- I don't remember exact date -- I

21   got a knock on my door saying, "Good morning," and I got a

22   subpoena from the government.  And at the same time I called up

23   my coworker Lipa Teitelbaum, and his wife picked up the phone

24   and said he was being arrested.  And I also heard that the

25   government went to the office and raided the office, the old

D1p1cib1                         Salamon - direct

1    offices that Earl David had, including mine.

2    Q.  So at that point was that the end of that -- the office

3    functioning with the immigration work?

4    A.  Yes.

5              MS. ECHENBERG:  If we could put on the screen

6    Government Exhibit 58, which I believe is in evidence.

7              (Pause)

8    Q.  I'm approaching with Government Exhibit 58.  Do you

9    recognize that photograph?

10   A.  Yes.

11   Q.  What is it?

12   A.  The law firm, 110 Wall Street.

13   Q.  And does that photograph fairly and accurately -- what part

14   of the law firm is this, or the office?

15   A.  It's the building where the office is located.

16   Q.  And does it fairly and accurately represent the building as

17   it looked when you worked there?

18   A.  Yes.

19             MS. ECHENBERG:  The government moves to admit

20   Government Exhibit 58.

21             MR. GERZOG:  Without objection.

22             THE COURT:  Received.

23             (Government's Exhibit 58 received in evidence)

24   Q.  And while we're getting it up on the screen, where was the

25   law firm in this building?

D1p1cib1                         Salamon - direct

1   A.  On the 21st -- 21st floor.

2   Q.  And how many people were working there when you first went

3   there?

4   A.  I would say at least 15.

5   Q.  What were the roles of the various people who were working

6   there at that time, in general?

7   A.  In general, I -- a lot of clients came from different

8   countries to gain legal ac -- to get legal status, so there

9   were Turkish people, there were Polish people, there were

10  Russian people, there were Jewish people, there were Spanish

11  people, so each person that knew a language, Polish dealt with

12  the Polish client, somebody that knew Hebrew dealt with the

13  Israeli clients, so forth, so there was a lot of people dealing

14  with different people that came from that -- from certain

15  countries.

16  Q.  And were there -- people dealing with clients that you just

17  mentioned of different languages, were they lawyers?

18  A.  No, they were not.

19  Q.  But there was a lawyer.

20  A.  Yes.

21  Q.  And who was that?

22  A.  Earl David.

23  Q.  What was his role?

24  A.  He was also dealing with clients, doing paperwork, opening

25  up cases, guiding everybody what to do, how to -- speaking to

D1p1cib1                          Salamon - direct

```
 1   clients.
 2   Q.  And when did you start working -- at some point did you
 3   start working full time at the office?
 4   A.  Yes.
 5   Q.  And approximately when was that?
 6   A.  End of 2001.
 7   Q.  And did you sit on the 21st floor as well?
 8   A.  Yes.
 9   Q.  Did you remain on the 21st floor the whole time you were
10   working in this building?
11   A.  No.
12   Q.  Where did you go?
13   A.  Went down to a different floor.
14   Q.  What was on that different floor?
15   A.  It was -- I had my desk over there and it was less crowded,
16   because it was very crowded on the 21st floor, and I told
17   Earl David I can't work in these circumstances, this
18   environment, it's too crowded, so I went downstairs in
19   another -- with another coworker downstairs to a different
20   office.
21   Q.  Who did you go downstairs with?
22   A.  It was me, Lipa Teitelbaum, Libby Vago, David Grynsztajn,
23   Martha Martinez.
24   Q.  Okay.  I'm going to show you some more exhibits.
25               Showing what has been admitted as Government Exhibit 6
```

D1p1cib1                          Salamon - direct

1    and 6A, and 9, 9A, B, 24, and 24A, 7 and 7A and 26 and 26A.

2    Just take a look at these and let me know if you recognize

3    these people.

4    A.   Earl David.

5    Q.   Go to anyone you'd like.

6    A.   Libby Vago.

7    Q.   Okay.

8    A.   David Grynsztajn.

9    Q.   You can keep going.

10   A.   Martha Martinez.  And Leo Teitelbaum.

11   Q.   And if you could tell me what the role -- you talked about

12   Earl David.  If you could just describe, did he go by --

13   A.   He went by Leo Teitelbaum and Lipa Teitelbaum.

14   Q.   And if you could just describe briefly the role of each of

15   these four people.

16   A.   Libby Vago was my assistant and also assistant of Earl

17   David; David Grynsztajn worked downstairs in the office dealing

18   with Polish clients; and Martha Martinez was my secretary

19   dealing with Spanish clients; and Lipa Teitelbaum was opening

20   up his own cases together with me and assisting me.

21          MS. ECHENBERG:  Okay.  And the government moves to

22   admit Government's Exhibits 7 and 7A and 26 and 26A.

23          THE COURT:  Received.

24          (Government's Exhibits 7 and 7A and 26 and 26A

25   received in evidence)

D1p1cib1                        Salomon - direct

1   Q.  Was there anyone else working on that floor with you?

2   A.  It was David Grynsztajn's secretary.  I think her name was

3   Amy.

4   Q.  And if you remember, who was up on the other floor?

5   A.  Earl David, of course.

6          MR. GERZOG:  Time period, your Honor?

7   A.  Mohammed --

8   Q.  If we could focus on the time period that you were working

9   at 110 Wall Street, that entire time that you were there.

10  A.  I worked on Wall Street from 2000 -- end of 2001 I was

11  there until 2000 -- I would say June, July of 2006.

12  Q.  Okay.  So to the best of your recollection who else was

13  working at 110 Wall Street up on the 21st floor during that

14  2001 to 2006 period?

15  A.  Okay.  A guy named Mohammed, Moin Act (ph), Alex.

16  Q.  What's Alex's last name?

17  A.  I don't know his last name, but he was doing cases and also

18  doing taxes afterwards.

19  Q.  Okay.

20  A.  David Grynsztajn, Ali Gomaa, Josh Flam, Amir Hussein (ph),

21  Libby Milano (ph), Linda, Gulay Cibik, Rafi Brodjik.  Maybe

22  there's more.  I can't remember all the names right now.  If

23  you would show me picture, I would be able to identify them.

24  Q.  Okay.  So let's focus on the people you've mentioned

25  already.  You mentioned Gulay Cibik.

D1p1cib1                          Salamon - direct

1    A.  Yes.

2    Q.  Would you recognize Gulay Cibik if you saw her again?

3    A.  Yes.

4    Q.  And if you could look around and tell me if you see

5    Ms. Cibik in the courtroom.

6    A.  Yes.

7    Q.  If you could describe where she's sitting and an item of

8    clothing she's wearing, please.

9    A.  Second row in the second seat to the right, to my right.

10           MS. ECHENBERG:  Let the record reflect the witness has

11   identified the defendant Gulay Cibik.

12   Q.  You also --

13           THE COURT:  Okay.

14   Q.  -- mentioned Refeal Brodjik.  Would you recognize him if

15   you saw him again?

16   A.  Yes.

17   Q.  And if you could look around the courtroom and let me know

18   if you see him in the courtroom.

19   A.  Yes.

20   Q.  If you could again describe where he is and an item of

21   clothing he's wearing.

22   A.  In the second row, the fifth seat to the right.

23           MR. GERZOG:  Identification acknowledged, your Honor.

24   Q.  Okay.  So let me show you a few more pictures.

25           Okay.  I'm putting in front of you Government

1    Exhibit 22, 30, 12, and 25.  If you could again just walk

2    through these and tell me who they are.

3    A.  Ali Gomaa.

4    Q.  Go ahead.

5    A.  Alex.  David Vago.  And Josh Flam.

6    Q.  And if you could again just explain to the jury the roles

7    of these four people that you've just identified.

8    A.  Ali Gomaa mostly catered to Arab, Middle Eastern people.

9    Alex, he would cater to mostly Russian, I would say.  David

10   Vago was an accountant, created false tax returns for the

11   company, for law firm.  And Josh Flam was also doing -- opening

12   cases to different clientele.

13             MS. ECHENBERG:  And the government moves to admit

14   Government Exhibits 12 and 25 and the accompanying nameplates.

15             MR. GERZOG:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibits 12 and 12A, 25 and 25A received

18   in evidence)

19   Q.  So if you could describe what types of immigration work the

20   firm was doing.

21   A.  Clients would come in and would say, "I need to -- I need a

22   green card.  How do I get legal in the country?"  So we would

23   tell him he would need a sponsor first, a company that would

24   say that they would hire him, and they would work for him and

25   they wouldn't go on public assistance, Medicare, or food

D1p1cib1                          Salamon – direct

1    stamps.  And they would have to show experience.  They have to

2    be a skilled worker, wouldn't be able to be just a driver or

3    limo driver, something, a skilled job that they do to qualify

4    for the green card.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. ECHENBERG:

2    Q.   Why did they have to have a skilled job?

3    A.   That's what the government required.

4    Q.   And did most of the clients that came to your firm have a

5    skilled job?

6    A.   I would say, I would say they didn't have the experience.

7    They might, they knew maybe about it, but I don't think they

8    ever worked in that field.

9    Q.   So what would the firm do?

10   A.   We would create false experience letters.  And if they

11   didn't have a sponsor, we would provide them with a sponsor.

12   Q.   How often would a client come to the firm and not have a

13   sponsor?

14   A.   90 percent of the time they didn't have a sponsor.

15   Q.   So what would you do or what would the firm do?

16   A.   We had certain amounts that we would charge somebody that

17   have a sponsor, that have the employer that wanted to sponsor

18   them for a green card, we had one fee, and much -- it was a

19   higher fee for someone that didn't have a sponsor and the law

20   firm had to provide a sponsor.

21   Q.   When you say the law firm had to provide the sponsor, what

22   do you mean by that?

23   A.   That mean we pay off employers to claim that they are

24   hiring workers, and we use that sponsorship to file the

25   paperwork with the labor department.

D1PLCIB2                    Salamon - direct

1    Q.  And other than getting green cards through the employer

2    sponsorship, was there any other type of immigration

3    applications that the firm worked on?

4    A.  Yeah, we did for a while religious workers.

5    Q.  And what's religious workers?

6    A.  It's an R1, it's called, that somebody has studied certain

7    amount of years and there is a school that wants to sponsor

8    them as a teacher, sponsor them as a teacher, and most of them

9    didn't have any experience.  They weren't that religious that

10   they have the religious schooling from a school abroad like

11   Israel.

12   Q.  What would the firm do in connection with those

13   applications?

14   A.  Also create false experience letters.  I would say that

15   they had schooling, that they attended schools.

16   Q.  And did the firm work on any other types of immigration

17   applications?

18   A.  Marriages, a person would come in and say I'm going to

19   marry an American citizen.  The marriages might have been real

20   and legit, but still they had to be qualified under the

21   amnesty, we have a case filed in April 30, 2001, which they

22   didn't have, so we provided that.

23   Q.  When you say you provided that, what do you mean?

24   A.  We altered the labor certification, the final determination

25   papers showing -- claiming it's showing that supposedly they

D1PLCIB2                         Salamon – direct

1  had a case filed in April 30, 2001, which they did not.

2  Q.  Did the firm work on any other types of immigration

3  applications?

4  A.  Extraordinary ability.

5  Q.  What's that?

6  A.  The government, in order to not to go through the labor

7  process, which is a long and lengthy process --

8  Q.  And that's the first type of application you were just

9  talking about?

10  A.  Yes.

11  Q.  Okay.

12  A.  They went, this particular process went straight to

13  immigration.  It was much faster for a person to get first

14  permission to work.

15       Extraordinary ability is a person that has abilities,

16  it would be somebody that knows how to sing, top singer out of

17  2 million people in the world and is famous, very famous in

18  other countries and is coming here to get to get some kind of

19  legal status.  The government would provide a legal status for

20  a person that has beyond talent that any other person, one in a

21  million, one in 2 million, I would say.

22  Q.  Did you have clients like that, that had these

23  extraordinary abilities?

24  A.  No.

25  Q.  So how is the firm working on extraordinary ability

D1PLCIB2                          Salamon - direct

1   applications?

2   A.  I did not personally work on them, but I know they have

3   been filed in the company, extraordinary ability.

4   Q.  Who works on these applications?

5   A.  Gulay Cibik.

6   Q.  Anyone else?

7   A.  I can't remember anybody else.

8   Q.  How do you know that Gulay Cibik worked on these

9   applications?

10  A.  Because she told me, Earl David told me.

11  Q.  Turning back to the initial agreement you had with Earl

12  David to recruit employers, what did you do?

13  A.  I would go over to friends, mutual friends, and say if

14  you're willing to say that you're willing to hire a worker, I

15  will pay a certain amount of money for every approval you get

16  from the labor department.

17  Q.  And how much would you pay them?

18  A.  Depends, sometimes 400, between 400 and $500.

19  Q.  And typically how would you pay them, in what form?

20  A.  Typically it would be in cash.

21  Q.  And you said you approached friends and mutual friends?

22  A.  Yes.

23  Q.  What do you mean by mutual friends?

24  A.  A friend that knows a friend.  I would call up a friend who

25  knows somebody in the construction field.  Again, I needed

D1PLCIB2                          Salamon - direct

companies that had -- that did construction in order to come up

with a skilled worker.  I didn't call car services or services

like that because it had to be strictly somebody that has a

skilled job.

Q.  So you looked for people in the construction business, any

other types of businesses?

A.  I would say catering business, cooking, mechanics.

Q.  And would you approach -- what size business would you

approach?

A.  Usually small businesses.

Q.  Why is that?

A.  Because I know small businesses -- a company would be doing

a lot of business, they don't need my $500 to get involved in

some kind of -- in sponsoring people.

Q.  And what in general would you say to these friends or

mutual friends that you would approach to be sponsors?

A.  Excuse me?

Q.  What would you say to them, these friends or mutual

friends, that you would approach to present the idea of being

paid to be a sponsor?

A.  I would say as long as you say that you want, you're

looking to hire people, you won't have a problem, and I'll pay

you every time you get an approval.  I will pay a certain

amount of money, if it was 400 or $500, depending on the person

or the time or the sponsor.

D1PLCIB2                        Salamon - direct

1    Q.  And was it your understanding that these small businesses

2    were looking for workers?

3    A.  No.

4    Q.  How long would a sponsor that you were paying typically

5    stay involved in being a sponsor?

6    A.  I would need them to be involved over time to use the

7    company because they used to get the correspondence from the

8    labor department and from immigration.

9    Q.  And did anyone you approached to be a sponsor say they were

10   not interested?

11   A.  Yes.

12   Q.  Did anyone who agreed to be a sponsor later change their

13   mind?

14   A.  Yes.

15   Q.  And what were those circumstances?

16   A.  I -- we would get the letters from the Department of Labor

17   stating Mr. So and so did not authorize to sign, did not

18   authorize to file any application for this company.  That was

19   twice we got letter from the labor department.

20           And I got a phone call once from someone saying,

21   listen, Sam, stop this.  I don't want to hear nothing about it.

22   I don't want to get one more piece of mail from the U.S.

23   Department of Labor or immigration or I will call them up.

24   Q.  So let's start with those two letters.

25           You said you got two letters from the Department of

D1PLCIB2                          Salamon - direct

1    Labor.  Is that about two different sponsors who said they

2    didn't authorize it?

3    A.  Yes.

4    Q.  So let's break it down.  Who was the first sponsor who you

5    got that letter in connection with?

6    A.  A friend of mine gave me -- his name is Jacob Koenig -- he

7    gave me a mechanic shop in Brooklyn.  And we got a letter in

8    the mail from this mechanic shop together with the paperwork

9    from the Department of Labor.  Department sent the letters and

10   they sent the copy that he wrote on, I did not authorize this

11   application.

12        So we called him up and he said you want me sponsor

13   anyone, it's going to be $20,000 a pop.  So I said forget it.

14   Q.  So let me make sure I understand.  You said you got the

15   mechanic shop from Jacob Koenig?

16   A.  Yes.

17   Q.  Who is Jacob Koenig?

18   A.  A person that I told him to bring me companies, if he knows

19   of companies that are looking to hire people supposedly, and I

20   will pay him a certain amount.  From that amount, he has to pay

21   the company as well.

22   Q.  So initially Earl David asked you to go out and look for

23   sponsors and then later you had other people going to find you

24   sponsors as well?

25   A.  Yes.

D1PLCIB2                          Salamon - direct

1    Q.   And did you continue to recruit sponsors yourself?

2    A.   I directed sponsors, I didn't deal that much, but I dealt

3    with like 15, 20 companies of people, yeah.

4    Q.   You had other people like Jacob Koenig going out to find

5    sponsors as well?

6    A.   Yes.

7    Q.   So Jacob Koenig recruited a mechanic, told you about it,

8    and then you later heard through a letter that that mechanic

9    was saying it was not --

10   A.   Not I heard.  I saw the letter.  Earl told me what's going

11   on.

12   Q.   Did you reach out to that mechanic?

13   A.   Yes.

14   Q.   And what was that conversation?

15   A.   I did not reach out personally.  I was in the car when Lipa

16   Teitelbaum called him up and Lipa said the guy wants $20,000

17   for each signature.

18   Q.   So what did you do?

19   A.   I ceased it, I stopped it.

20           THE COURT:  Okay.  Can we just clarify?  There was a

21   letter.  Was that letter a letter that the mechanic sent to the

22   Department of Labor?

23           THE WITNESS:  Correct.

24           THE COURT:  Okay.

25   Q.   So the mechanic sent a letter to the Department of Labor

D1PLCIB2                          Salamon - direct

1    saying I did not authorize sponsorship?

2    A.  Yes.

3    Q.  The Department of Labor then sent it to the law firm?

4    A.  It was attached to copies of the whole labor application

5    and the cover sheet was please -- not the cover, the second

6    letter -- please see second page and looked at the second page,

7    it was not authorized.

8    Q.  It was at that point that Lipa in your presence reached out

9    to the mechanic?

10   A.  The next day.

11   Q.  And what was the other letter that you remember, similar

12   letter?

13   A.  It was a glass company in Brooklyn.

14   Q.  A?

15   A.  Glass, glass.  They do glass.

16   Q.  And how had that company come to be a sponsor?

17   A.  Also through one of my -- a coworker, one of my coworker's

18   friends --

19   Q.  Who is that?

20   A.  -- that I recruited.  I don't remember his name.  It was a

21   friend of mine, a friend that I used to know.

22   Q.  And this was another person like Jacob Koenig who is going

23   out and finding sponsors?

24   A.  His first name was Mike.  I don't remember his last name.

25   Q.  So when you got this letter from the Department of Labor,

D1PLCIB2                          Salamon - direct

1   was it again attaching a letter from the glass company saying

2   we did not authorize this?

3   A.  Correct.

4   Q.  And what if anything did you do?

5   A.  We tried calling.  I called this guy Mike.  I said what are

6   you doing?  You're going to put me under over here because the

7   Department of Labor is seeing this is fraud going on here.  And

8   Earl David was saying, Sam, this is crazy.  I said what should

9   I do?  I paid the guy.  And whatever.  I don't know what he

10  did, so.

11  Q.  So what happened?

12  A.  We went on.  I mean I didn't do anything else with that

13  company.

14  Q.  Did you use that company again?

15  A.  I wouldn't dare, no.

16  Q.  And did you ever use the mechanic company that we were just

17  talking about again after you got the letter from the

18  Department of Labor?

19  A.  No.

20  Q.  Now focusing on the phone call that you got, tell us what

21  happened.

22  A.  I can't remember the name of the person, but I approached

23  him looking to sponsor some people.  He said, yeah, how much

24  are you going to make.  So I told him how much it is.  He got

25  correspondence from the labor and immigration and he called me

D1PLCIB2                          Salamon - direct

1    up yelling like Sam, you stop this.  I don't want to be

2    involved.  Please stop.

3            I called right then and there.  I said, Earl, please

4    take out this company.  Take it out.  The guy does not want

5    nothing to do with it.

6    Q.  And did you use that company again as a sponsor?

7    A.  No.

8    Q.  So what did a sponsor need to do in exchange for the four

9    or $500 that you were paying per approval?

10   A.  He had to bring me the original approval from the labor

11   department.  If the labor department would call to confirm a

12   certain case number or employee, client, he would have to say,

13   yes, I'm looking for workers and I did sponsor this person, and

14   also bring me all the correspondence that he gets from the

15   immigration and from the labor department.

16   Q.  And why did you need to get the original approval?

17   A.  We would get original approval.  If the labor department is

18   sent copies of the labor approval, they would reject the case.

19   They need the original blue-ish paper.  It has a special

20   signature, I would say a water mark on it that would tell them

21   it's the original approval and they wanted the original.

22   Q.  Who wanted the original?

23   A.  The Department of Labor, the Department of Immigration.

24   Q.  The Department of Immigration wanted the original?

25   A.  Yes.

D1PLCIB2                        Salamon - direct

1  Q.  And you mentioned that you recruited sponsors yourself.

2  Who were some of the sponsors you recruited?

3  A.  Sam Roth, Mayer Weber, Jacob Koenig, Jacob Landau, Arie

4  Flohr, Nathan Schwartz, and Harold Tischler.  Might be more but

5  I don't remember right now all the names.

6  Q.  Okay.  So let's start with Nathan Schwartz.  You started to

7  use another name before you said Nathan?

8  A.  Nuchem.

9  Q.  And why did you say Nuchem?

10  A.  Because that's the way I call him, Nuchem Schwartz.

11  Q.  Would you recognize Nathan Schwartz if you saw him again?

12  A.  Yes.

13  Q.  Would you look around the courtroom and tell me if you see

14  him in the courtroom and let me know where he's sitting?

15  A.  In the third row down in the second chair to the right.

16          MR. BRILL:  Stipulate to the ID.

17  Q.  And would you recognize Harold Tischler if you saw him

18  again?

19  A.  Yes.

20  Q.  Do you see him in the courtroom today?

21  A.  Yes.

22  Q.  Could you please identify him by where he's sitting in the

23  courtroom?

24  A.  He's on the third row on the fifth seat to the right.

25          MR. GREENFIELD:  Acknowledge the identification.

1    Q.  And I'm going to give you a couple more pictures.

2            Who is that?

3    A.  Jacob Landau.

4    Q.  Who is that?

5    A.  Mayer Weber.  Jacob Koenig.  Arie Flohr.

6    Q.  And all of these individuals served as sponsors?

7    A.  Yes.

8    Q.  And they were all paid in exchange for their sponsorship?

9    A.  Yes.

10   Q.  And that's true for Mr. Tischler and Mr. Schwartz as well?

11   A.  Yes.

12           MS. ECHENBERG:  The government offers Government

13   Exhibits 19, 27, 28, and 17 and the corresponding name plates.

14           MR. DONALDSON:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibits 19, 27, 28, 17 received in

17   evidence)

18   Q.  You mentioned that you remained at 110 Wall Street until

19   the middle of 2006; is that right?

20   A.  Yes.

21   Q.  And generally what was your role while you were there?

22   A.  I was directing opening up cases, speaking to clients,

23   sending out, directing to send out paperwork.

24   Q.  When you say opening up cases, what do you mean?

25   A.  A client would come in.  I would speak to them on how the

D1PLCIB2                          Salamon - direct

1    process works.  And either I would open it up myself or direct

2    Lipa Teitelbaum or Martha Martinez, my secretary, to open up

3    the case and take down their information and start filing for

4    Department of Labor or immigration.

5    Q.  And was there anyone else in the office that was opening

6    their own cases?

7    A.  At which location?

8    Q.  Let's focus on 110 Wall Street.

9    A.  Yeah, there was other people.  Everybody else in the 21st

10   floor was opening cases.  And David Grynsztajn is opening up

11   cases, Alex was opening up cases.

12   Q.  Was Ms. Cibik opening up cases?

13   A.  Excuse me?

14   Q.  Was Ms. Cibik opening up cases?

15   A.  Yes.

16   Q.  And looking up on the board, is there anyone else that's

17   not on the board that was in the office opening up cases?

18   A.  I don't remember.

19   Q.  But you mentioned there are different fees depending on

20   what a client needed?

21   A.  If they had a sponsor or didn't have a sponsor, yes.

22   Q.  If they had a sponsor, how much would they be charged?

23   A.  $6,500, approximately.

24   Q.  And that would be to get them from beginning to green card?

25   A.  Yes.

D1PLCIB2                          Salomon - direct

1    Q.  And how much would they be charged if they needed a

2    sponsor?

3    A.  15,000 to 18,000.

4    Q.  Was Earl David physically present in the 110 Wall Street

5    office the entire time you were there?

6    A.  Till about 2005, I would say, end of 2005.

7    Q.  What happened at the end of 2005?

8    A.  He left to Canada.  And he also got suspended sometime in

9    2004.

10   Q.  Did he go to any other office before he went to Canada?

11   A.  He went, while he was suspended, he rented out an apartment

12   a couple blocks away from the office and hiding so they didn't

13   see that he was working while he was suspended from the law.

14   Q.  Do you remember where that apartment where he sent up an

15   office was?

16   A.  I don't remember the street name.

17   Q.  It was somewhere near 110 Wall Street?

18   A.  Not far.

19   Q.  And then you said he went to Canada?

20   A.  Yes.

21   Q.  Did Earl David stay involved in the activities of the law

22   firm after he went to Canada?

23   A.  Yes.

24   Q.  How long did he stay involved?

25   A.  Till the government came to shut us down.

D1PLCIB2                        Salamon - direct

1    Q.   And that was in January of 2009?

2    A.   Yes.

3    Q.   How was he able to stay involved from afar?

4    A.   By fax, email, phone.

5    Q.   And what was his role from afar?

6    A.   Filing labor applications to the labor department.

7    Q.   When you say filing labor applications, is there a specific

8    document you're talking about?

9    A.   Yeah, it's online labor application.  It's called PERM,

10   P-E-R-M.  And I would not know how to fill it out, so he would

11   do all the filling out.  I would fax him the information, he

12   would fax it back and submit it to the labor department

13   electronically.

14   Q.   And when you say you didn't know how to fill it out, what

15   do you mean?

16   A.   I am not good with paperwork so I don't know how to fill

17   out.  I'm good at directing but I'm not good actually

18   paperwork.

19   Q.   How would Earl David get the information that needed to go

20   into the PERM?

21   A.   We would fax it over to him, mostly by fax, yes.

22   Q.   So the information would be retrieved from the client and

23   then faxed to Earl David and he would fill out the online form?

24   A.   Yes.

25   Q.   How did Earl David -- was Earl David compensated in any way

D1PLCIB2                        Salamon - direct

1   for this work that he did from Canada?

2   A.  Yes.

3   Q.  How was he compensated?

4   A.  He get -- we made up that he's going to get a certain

5   profit from whatever we make in the office.  So he got money

6   every single day.  If he wouldn't get, he would call me up.

7   But he'd get every day moneys, most of the days he got moneys

8   coming to him.

9   Q.  How would he get moneys coming to him?

10  A.  Either they would deposit in Code of the Heart account,

11  sometimes he would the charge credit card that Lipa Teitelbaum

12  had that look like credit card sales are coming in from the

13  book and not from the fraud.

14  Q.  So let's focus first on the time period while you're at 110

15  Wall Street.  How was the money transmitted to him during that

16  time period?

17  A.  Rafi Brodjik used to go around and asking every day how

18  much money was made, how much was profited, and he collected

19  the money and he sent it over to Earl David.

20  Q.  Who would Rafi Brodjik go around to and ask how much money

21  was made each day?

22  A.  Lipa Teitelbaum or his assistant, sometimes Yanki Kahn was

23  there, me.

24          And I ask Earl, am I the only one that has to report

25  to him?  He said, no, everybody in the office has to.  I left

D1PLCIB2                          Salamon – direct

1   to Canada and he's responsible to collect money for me.

2   Q.  Earl David said he left who in response?

3   A.  Rafi Brodjik.

4   Q.  Earl David told you he made Rafi Brodjik responsible?

5   A.  Yeah.  I didn't feel like answering to him, why did I have

6   to answer to him.

7   Q.  You didn't feel like answering to Rafi?

8   A.  No, because he didn't work for me.

9   Q.  Do you know who else, if anyone, he was collecting money

10  from?

11  A.  Gulay, I didn't see it but I was told.  I was told by Earl

12  he's collecting from everyone in office, David Grynsztajn,

13  Gulay, everybody else.

14  Q.  And how long did Mr. Brodjik continue to do this money

15  collection?

16  A.  I think sometime in April of 2006, I would say, or before,

17  March.

18  Q.  Why did it stop?

19  A.  The last time that he told me why, I was driving home with

20  him with Lipa Teitelbaum in the car.  He said I'm leaving.

21  This is enough.  You guys are lying to me, not telling me how

22  much money.  I'm not making no money.  I'm not making.  And the

23  government went to Gulay Cibik's house now and I'm leaving.

24  I'm out of here.

25            MS. ECHENBERG:  If we could put up on the screen

1    Government Exhibit 3031-4.

2             THE COURT:  Just clarify, this last conversation

3    you're talking about, there were three of you in the car?

4             THE WITNESS:  Yes.

5             THE COURT:  Okay.

6             MS. ECHENBERG:  Let me change that.  I'm actually

7    going to approach with Government Exhibit 3031 through 9.  3031

8    through 7.  303-1 through 3031-9.

9    Q.  And I'm also showing the defendant Government Exhibit 19.

10   Let's start with that.

11            Do you recognize that?

12   A.  Yeah.  His name is Leiby Walter.

13   Q.  And who is Leiby Walter?

14   A.  He used to do business and immigration fraud with Lipa

15   Teitelbaum.

16   Q.  And what did he do specifically?

17   A.  He authored final determination labor papers.

18   Q.  Did he do anything else, as far as you know?

19   A.  He sponsored people as well, clients.

20   Q.  In the same way, being paid to say he was hiring people

21   when he really wasn't?

22   A.  Yes.

23   Q.  Does he go by any other names, if you know?

24   A.  I think Henry.  I'm not sure.

25   Q.  Okay.  I'm now showing you what's been marked as Government

D1PLCIB2                          Salamon - direct

1   Exhibit 3031 through 9.  If you could just take a moment to

2   look through those, please.

3              Do you recognize those?

4   A.  Yes.

5   Q.  What are they?

6   A.  Correspondence between Rafi Brodjik and me and Earl David

7   and copy to some of them to Lipa Teitelbaum.

8   Q.  Do these correspondence -- do you remember receiving these

9   correspondence?

10  A.  Yes.

11             MR. GUTMAN:  Objection.  Do these questions refer to

12  all the documents collectively?

13             MS. ECHENBERG:  Yes.

14             MR. GUTMAN:  Could I ask that it be broken down

15  document by document?

16             MS. ECHENBERG:  I'm just trying to expedite things,

17  your Honor, but I can do it document by document.

18             THE COURT:  How many are there?

19             MS. ECHENBERG:  There are nine.

20             THE COURT:  Do you have a particular objection to any

21  one of them?

22             MR. GUTMAN:  Possibly.

23             THE COURT:  Why don't we introduce them all at once

24  and then you can do your objection.

25  Q.  Do these emails appear the same as when you saw them

D1PLCIB2                         Salamon - direct

1   initially?

2   A.  Yes.

3          MS. ECHENBERG:  Government moves to admit Government

4   Exhibits 3031 through 9 -- sorry, 3031-1 through 3031-9.

5          MR. GUTMAN:  No objection.

6          THE COURT:  Received.

7          (Government's Exhibits 3031-1 through 3031-9 received

8   in evidence)

9   Q.  If you could start with Government Exhibit 3031-4, please.

10         MS. ECHENBERG:  If we can put that up on the screen as

11  well.

12  A.  Yes.

13  Q.  So if you can start from the bottom.

14  A.  Yes.

15  Q.  What does that, starting with -- let's start with the

16  language Sammy110wall@aol.com.  What is that?

17  A.  That's my email address.

18  Q.  Is this an email that you wrote?

19  A.  Yes.

20  Q.  And if you could read the first two lines.

21  A.  "Rafi, Lipa does not know that I am sending you this email.

22  If you want, you can call me or come over and now I have no

23  office cause you called Tischler."

24  Q.  And what are you referring to there?

25  A.  He is -- he was trying to extort money from me once he

D1PLCIB2                      Salamon - direct

1    left.

2    Q.  Who was trying to extort money?

3    A.  Rafi Brodjik.

4    Q.  What do you mean by he was trying to extort money from you?

5    A.  If you go ahead in the emails, further on, you'll see that

6    money that he was asking me.  Once he left, he threatened me if

7    I don't give him certain, if I don't give him money, he's going

8    to call Tischler and tell him that he shouldn't rent me the

9    office.

10            MR. GERZOG:  Your Honor, objection.

11            MR. GUTMAN:  403(b), lack of notice.

12            MS. ECHENBERG:  About what?

13            THE COURT:  What lack of notice?

14            MR. GUTMAN:  Can we approach?

15            MR. GERZOG:  Apparently, allegedly, other crimes.

16    There's no extortion charged in this indictment.

17            MS. ECHENBERG:  Your Honor, I think we should probably

18    approach if you want to discuss it.  These emails were

19    produced.  They're actually along the same lines as some of the

20    emails we've already looked at.

21            THE COURT:  Right.  Objection is overruled.  Let's go

22    on.

23    Q.  If -- so going back to the "no office because you called

24    Tischler," who is the Tischler you're referring to?

25    A.  Harold Tischler.

D1PLCIB2                          Salamon - direct

1    Q.   And what are you talking about specifically?

2    A.   I had asked -- at that time I was looking to move from 110

3    Wall Street to another location.

4    Q.   Why were you looking to move from 110 Wall Street to

5    another location?

6    A.   The lease expired.

7    Q.   And so where were you looking to move?

8    A.   At 17 Battery Place.

9    Q.   And what if anything did that have to do with Harold

10   Tischler?

11   A.   I didn't have no credit, I didn't have no financials, and

12   Earl was not around anymore to sign any leases.  And I needed

13   someone that would sign a lease under his name in order for me

14   to get a lease in another location.

15   Q.   Okay.  I'm going to show you some photographs.

16          MS. ECHENBERG:  Government Exhibit 60 and 200.

17   Q.   Showing you what's been marked as Government Exhibit 60, do

18   you recognize that?

19   A.   Yes.

20   Q.   What is that?

21   A.   That's the office that I rented, leased, at 17 Battery

22   Place, the building.

23   Q.   So you were able to ultimately rent that office at 17

24   Battery Place?

25   A.   Yes.

D1PLCIB2                        Salamon - direct

1    Q.  Does that picture fairly and accurately represent what 17

2    Battery Place looked like at the time that you had an office

3    there?

4    A.  Yes.

5              MS. ECHENBERG:  Government moves to admit Government

6    Exhibit 60.

7              MR. GREENFIELD:  No objection.

8              (Government's Exhibit 60 received in evidence)

9              MS. ECHENBERG:  If we could put that up on the screen

10   briefly.  Thank you.

11   Q.  You said you needed someone to sign the lease for you?

12   A.  Yes.

13   Q.  And did someone ultimately sign the lease for you?

14   A.  Yes.

15   Q.  If you could turn now to Government Exhibit 200 which has

16   been admitted.  Do you recognize that document?

17   A.  Yes.

18   Q.  What is it?

19   A.  That's a lease from 17 Battery Place.

20   Q.  There should be two pages that are flagged in that

21   document.  Can you turn to the first flagged page and this

22   is -- it's not numbered, but it's page 32.

23   A.  Yes.

24   Q.  Are there signatures on that page?

25   A.  Yes.

D1PLCIB2                        Salamon - direct

1    Q.   Whose signature is on the bottom part of the page?

2    A.   Harold Tischler.

3    Q.   Did he sign that document?

4    A.   Yes.

5    Q.   How do you know?

6    A.   He did it in front of me.

7    Q.   And what is Fix Anything Construction and Plumbing?

8    A.   That's his -- that's one of his companies.

9    Q.   And how did he come to sign this document?

10   A.   I offered him money.

11   Q.   How much money did you offer him?

12   A.   I can't remember exact amount, but it was close to $5,000.

13   Q.   If you could turn to the last page of this document, page

14   42 --

15   A.   Yes.

16   Q.   -- do you see a name and a signature there at the bottom?

17   A.   Yes.

18   Q.   Do you know whether Harold Tischler signed this document?

19   A.   No.

20   Q.   You don't know?

21   A.   No.

22   Q.   Do you have any recollection of how that document came to

23   be signed?

24   A.   I can't remember.

25   Q.   And the handwriting on this page, do you recognize that

D1PLCIB2                      Salamon - direct

1   handwriting?

2   A.   Yes.

3   Q.   Whose handwriting is that?

4   A.   Mine.

5   Q.   Okay.  So if we could go back to Government Exhibit 3031-4,

6   please.

7   A.   Yes.

8   Q.   So turning back to the email that you wrote, you said "now

9   I have no office cause you called Tischler."

10  A.   Yes.

11  Q.   But you were ultimately able to rent that office, correct?

12  A.   Yeah, but Tischler called me and said this guy Rafi Brodjik

13  called me, I shouldn't rent you an office.

14  Q.   But Mr. Tischler, after that call, ultimately decided to

15  rent you the office?

16  A.   Yes.

17  Q.   Why did you write this in the email?

18  A.   Because at that time it did hurt me that I got the phone

19  call and I wasn't a hundred percent sure that the office was

20  going to be rented.

21  Q.   Okay.  So if you could read the next sentence, please.

22  A.   "I offered you a job.  You can make in top what you make

23  from Earl extra 1,000 to $1,500 a week.  You can even fax it to

24  Earl, the PERM" -- which is the online -- "from your house.

25  You kept telling you want to work.  I know you have a family to

support.  I kept on telling you I'm here to help you.  You said

when I move, etc."

Q.  So what did you mean in that sort of long sentence there?

A.  At that time I told him, you don't have to leave, you can

stay.  And you don't even have to come into the office and I'll

offer you a job.  You can work online.  You can do your work.

And I know you have a family to support, I'm here to help you.

And he said he will help me when I move to 17 Battery Place, he

will help me as well at one point.

Q.  Did he end up continuing to work with you at all?

A.  No.

Q.  If you could go to the top email now, if you could just

look at the date on that email?

A.  Yes.

Q.  What's the date?

A.  17 May 2006.

Q.  And who is this email from?

A.  Rafi Brodjik.

Q.  And it says Rafi Bar.  Who is Rafi Bar?

A.  He calls himself Rafi Bar in the email.

Q.  Do you recognize that email address?

A.  Yes.

Q.  Is that an email address you used to correspond with

Mr. Brodjik?

A.  Yes.

D1PLCIB2                          Salamon - direct

1   Q.  So is this an email he sent you in response to the email

2   below?

3   A.  Yes.

4   Q.  So if you could read the first paragraph.

5   A.  "Sam, I don't know if you remember, but I am ready to

6   refresh your memory.  Two years ago I got a fight with you

7   because Lipa.  I tell you in time" -- I mean I'm just reading

8   off what he says.  I don't know if it makes sense -- "I tell

9   you in time as Lipa is going to take over all the office, all

10  the office down.  He don't care about nothing, only about

11  himself.  Two years later 'Lider I was writ'" -- that's in

12  Yiddish -- "this guy don't care about nobody, including you."

13  Q.  What's he talking about there?

14  A.  He's telling me that Lipa is going to bring the office

15  down, that Lipa doesn't care about nobody and Lipa is very

16  selfish.  And, look, two years later, I was right.  This guy

17  don't care about nobody, including you.

18  Q.  What is "Lider I was writ"?

19  A.  Unfortunately, I was right.

20  Q.  So "lider" is Yiddish for unfortunately?

21  A.  Yes.

22  Q.  And if you could, just look at the rest of the email and

23  just tell me generally -- well, let's skip down to the line

24  that starts "I want from you."

25  A.  Yes.

D1PLCIB2                          Salamon - direct

1    Q.  If you could read that line, please.

2    A.  "I want from you and Lipa the money what supposed to go to

3    my and my family pocket over the last year."

4    Q.  What did you understand him to mean there?

5    A.  He claims that we did not report the full amount to Earl

6    David, and he got 10 percent of whatever he grossed and brought

7    and sent over to Earl David.  So he think -- he thought at that

8    time we cheated him and he wants the money that supposedly he

9    claims that we cheated him off.

10   Q.  And was he right that you didn't report the full amount

11   that you were earning to Earl David?

12   A.  Yes.

13   Q.  Explain to me what you did.

14   A.  I did not report to him, let's say it would come in

15   $20,000.  I would even alter some the retainer showing we only

16   made 10,000 or 15,000.  I would not report to him the full

17   amount that we made on certain days.

18   Q.  And who were you making this report to?

19   A.  I was making it to Rafi.

20   Q.  And why would you underreport what were you bringing in

21   from clients?

22   A.  Because we were working hard in the office and Earl David

23   is sitting in Canada, so I figured he doesn't have to get the

24   full amount.

25   Q.  And so that's what Mr. Brodjik is referring to when he says

D1PLCIB2                          Salamon - direct

1  the money was supposed to go to "my and my family"?

2  A.  Yes.

3  Q.  Because he was getting a percentage of what he collected

4  for Earl David?

5  A.  Yes.

6  Q.  Then can you read the next line, please.

7  A.  "Sam, it's hard for me to write in English but I hope you

8  understand.  I'm not a Tipesh like Lipa thinking."

9  Q.  What is "tipesh"?

10 A.  A fool.

11 Q.  And do you remember Mr. Brodjik having trouble writing in

12 English?

13 A.  Yes.

14 Q.  If you could turn now to what's in front of you, to

15 Government Exhibit 3031-8, please?

16 A.  E?

17 Q.  Eight.

18 A.  Yes.

19 Q.  And looking back at 3031-4, that was on Wednesday, May 17,

20 2006, at 10:02?

21 A.  Yes.

22 Q.  Is that right?

23 A.  Yes.

24 Q.  And this email is at that same day at 11:39; is that

25 correct?

D1PLCIB2                          Salamon - direct

1   A.  Yes.

2   Q.  And, again, this is an email from Mr. Brodjik to you,

3   right?

4   A.  The top one, yes.

5   Q.  And the bottom one, which is cut off, is that your email?

6   A.  Yeah.  I think it was a reply to his writing the last

7   email.

8   Q.  Okay.  So if you could read what's visible on that page,

9   please.

10  A.  "You have a point with Lipa.  I have all the expenses, not

11  Lipa, what can I do?  And now I have no office as well?  We can

12  make money.  Call me or email me when you want to sit down.

13  You know I'm the sucker here, how much money goes out from my

14  pocket.  Sam, this is Sam, and now we're all F'ed and no

15  office.  So let me know."

16          I can't read -- I don't see no further.

17  Q.  Okay.  What are you talking about there?

18  A.  I told him, yes, maybe you have a point.  Lipa Teitelbaum

19  is selfish.  And I make money, but everybody is sucking off my

20  money at the end of the day.

21  Q.  But you were making a lot of money, right?

22  A.  Yes.

23  Q.  So turning to your response, which is above, if you could

24  start reading that as well, and I may interrupt you at points

25  to ask you questions.

1   A.   Which one?

2   Q.   The top email.  Is that your response to the email below?

3   A.   The top is from Rafi to Sammy.

4           THE COURT:  His is the one below.

5   Q.   Sorry.  The top email, is that Mr. Brodjik's response to

6   your email below?

7   A.   Yes.

8   Q.   If you could start reading that, please.

9   A.   "Sam, I think I don't have what to sit with you.  I tell

10  Lipa before exactly what I want.  This is that you don't have

11  office is thanks to 'Achitofel itzot Geber.'"

12  Q.   What does that mean?

13  A.   I don't know.  I can't make out.

14  Q.   Okay.  If you could keep reading.

15  A.   "He tell me do what you want.  So far you lost the fun with

16  Alex and the office with Tischler and ask Lipa who is the next

17  phone call."

18  Q.   What did you understand that line to mean?

19  A.   We had fun with a guy Alex in Florida and he called up Rafi

20  to tell him that Lipa and anybody else that says we're going to

21  give him money or whatever, that it's not true.

22  Q.   You said you had fun with this guy Alex, you were teasing

23  him?

24  A.   It was Lipa's friend Alex.  And Lipa, when he was bored, he

25  used to put him on the phone and just kibitz around with him,

D1PLCIB2                        Salamon - direct

1    as they say, to have fun.

2    Q.  And what did Mr. Brodjik do?

3    A.  He called up Alex and says they telling you lies, they're

4    not really going to send money.  They don't want to do business

5    with you.  Whatever we said, he just said everything is a lie.

6    Q.  And were you lying to Alex?

7    A.  Yes.

8    Q.  And he said "so far you lost the fun with Alex and the

9    office with Tischler."  What is he referring to there?

10   A.  That I lost, that he called Tischler not to rent me the

11   office.

12   Q.  And "ask Lipa who is the next phone call," what did you

13   understand that to mean?

14   A.  That he's going to call the government.

15   Q.  Okay.  If you could read the next two lines, please.

16   A.  "Sam, I am F'ed anyways.  I have to sell the house and go

17   back to Israel.  And also don't mix Earl in to you business.

18   Earl get very small cut from the big retainers, not even

19   10 percent."

20   Q.  What did you understand him to mean there?

21   A.  He said I'm screwed anyways, he doesn't care if he's going

22   to call the government or whatever is going to happen because

23   he's going back to Israel.

24   Q.  What's in Israel?

25   A.  That's his home country.

D1PLCIB2                        Salamon - direct

1   Q.  What's the next line about?

2   A.  "Also don't mix Earl into your business.  Earl get very

3   small cut from big retainers, not even 10 percent."

4           He's claiming we're cheating Earl.  We're not giving

5   him his full percentage.

6   Q.  That's in relation to the money Mr. Brodjik was collecting

7   from you and others at the firm?

8   A.  Yes.

9   Q.  If you could go on to the last three lines, if you could

10  read those.

11  A.  "If you have expense collect from the people what they make

12  big money in your office.  Lipa was making a week what Earl

13  making in a month.  Way Earl" -- why Earl, it says way Earl --

14  "has to pay all your expense.  Sof mase bemachshva tchila."

15  Q.  Do you know what that last line means?

16  A.  It means think before you do anything.  I think that's what

17  it means.  I'm not sure what it means.

18  Q.  What language is that in?

19  A.  In Hebrew.

20  Q.  Do you speak Hebrew?

21  A.  Yeah, but I don't understand everything.

22  Q.  If we could move on now to Government Exhibit 3031-9.

23  A.  Yes.

24  Q.  What is the date and time of this email?

25  A.  Wednesday the 17th of May 2006, 15:13 EDT.

D1PLCIB2                          Salamon - direct

1   Q.  And who is this email from and to?

2   A.  From me to Rafi Brodjik.

3   Q.  And what does it say?

4   A.  "I tried making peace with you."

5   Q.  What did you mean by this email?

6   A.  I was trying to sit down with him, as you saw in the email,

7   to come and either give him a job or do something.  I was

8   trying to be as much compassionate as I can.

9   Q.  Did you ultimately meet with him?

10  A.  No.  I met with him, again, we had a rabbinical court.  I

11  don't know if it was after this email or before this email, I'm

12  not sure, but I think it was before this email.

13  Q.  When you say rabbinical court, what are you talking about?

14          MR. GERZOG:  Objection, your Honor.  Relevance,

15  hearsay.

16          MS. ECHENBERG:  I can try to rephrase.  I can come to

17  the side bar.

18          THE COURT:  I don't know what you're talking about so

19  it's hard to rule.

20          MS. ECHENBERG:  Okay.

21  Q.  You said that -- did this dispute go on, this dispute over

22  email, did it continue after these emails?

23  A.  Not sure.  Again, there was a dispute that we made up to go

24  to a rabbi to see if he's right or wrong.  I don't know if it

25  was after this email or before.

D1PLCIB2                         Salamon – direct

1           MS. ECHENBERG:  Your Honor, I'm trying to establish --

2           MR. GERZOG:  We better come to the side bar.

3           THE COURT:  I think so.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           THE COURT:  If you want to hear, you've got to come up

3   a little faster.

4           MR. GREENFIELD:  Sorry.

5           MR. GERZOG:  Mr. Brodjik sued Mr. Salamon in a

6   rabbinical court, a so-called beth din, and --

7           THE COURT:  For?

8           MR. GERZOG:  For this money that Mr. Salamon allegedly

9   cheated Mr. David out of, and the beth din ruled against him.

10  But the proceedings in the beth din are just going to confuse

11  the jury.  It's all hearsay, it's not part of the conspiracy.

12          MS. ECHENBERG:  I think it goes directly to his

13  knowledge of the fraud.  He was trying to get this money.

14          THE COURT:  I don't think I care what the result in

15  the court was, but I think the fact he sued him in a rabbinical

16  court is certainly part of the story here.  I mean.

17          MR. GERZOG:  I mean the only way --

18          THE COURT:  I think, great, you go to rabbinical court

19  to recover moneys obtained through fraudulent activity.

20          MR. GREENFIELD:  How do you say clean hands in Hebrew?

21          MS. ECHENBERG:  I told you this would be some fun

22  stories.

23          MR. DONALDSON:  They need this in Harlem.

24          MR. GERZOG:  All right.  Mr. Gutman says I should

25  withdraw my objection.  I'll defer to him.

D1PLCIB2                          Salamon - direct

1              MR. GUTMAN:  Your Honor, I don't have to do it now,

2     but at some point I'd like to elaborate on the 404(b)

3     objection.

4              THE COURT:  That somebody as part of the events in the

5     case threatens somebody else to get money is not a 404(b)

6     problem.

7              MS. ECHENBERG:  This is exactly how this conspiracy

8     operated.

9              THE COURT:  This is like going forward.  This is not

10    something that happened in the past.

11             MR. GUTMAN:  The characterization of it as extortion

12    is a spin on what's --

13             THE COURT:  Extortion is a word both in the criminal

14    law and a word in English, not necessarily evoking the full

15    panoply of prosecutorial consequences.  The word threaten also

16    appears in the criminal law and it appears in English.

17             MR. GERZOG:  I'll talk to Mr. Gutman about this.  I

18    think I may persuade him to withdraw his objection because of

19    what I'm going to do on cross-examination.

20             MR. DONALDSON:  I think that's working together.

21             MR. GUTMAN:  Great minds don't think alike.

22             THE COURT:  It's evidence.  Whoever thinks alike on

23    evidence.

24                  (Continued on next page)

25

1              (In open court)

2              THE COURT:  Please proceed.

3    BY MS. ECHENBERG:

4    Q.  Mr. Salamon, you mentioned before we took the short side

5    bar that there was a rabbinical court involved in connection

6    with this dispute that we've been reading emails about; is that

7    right?

8    A.  We went, we both agreed --

9    Q.  Is it right, there was a rabbinical court involved?

10   A.  Yes.

11   Q.  How did, first of all, what is a rabbinical court?

12   A.  We went to a rabbi.  We called, we both agreed to go to a

13   rabbi to have the dispute ruled on by this particular rabbi.

14   Q.  And if you could explain to the jury what is a rabbinical

15   court because it may not be something they're familiar with.

16   A.  Usually a rabbinical court is you go to a rabbi or three

17   rabbis and you say your dispute and your claims and they all

18   decide or the rabbi decide what's wrong, what's fair, and who

19   is right and who is wrong.

20   Q.  And why go to a rabbinical court as opposed to a court like

21   this?

22   A.  We try to settle our things in the Jewish -- in front of a

23   Jewish rabbi.

24   Q.  And how did you and Mr. Brodjik come to go to rabbinical

25   court in connection with this dispute?

1    A.  We both agreed and I told him it's okay to go to this

2    particular rabbi, let's go ask him.  And whatever he says, are

3    you going to agree to the ruling?  Hundred percent he said.

4    Let's both go.  Let's sit down.  I'll tell him my claims, you

5    tell him your claims.  And I went there, Lipa Teitelbaum was

6    there, rabbi was there, Rafi was there.

7    Q.  In general, what did you present to the rabbi?

8    A.  I presented that Rafi does not work for me directly, so if

9    he have any claims, he should go to Earl David.

10   Q.  And what did Mr. Brodjik present to the rabbi?  If you

11   remember.

12   A.  He said to the rabbi that because him not reporting the

13   full amount of cheating Earl David, he has a loss from that.

14   Q.  He said that because you weren't reporting the full

15   amount --

16   A.  To Earl David.

17   Q.  -- that Mr. Brodjik had a loss from that?

18   A.  Yes.

19   Q.  And what was -- what happened after you went to the

20   rabbinical court?

21   A.  He made a ruling.  I ask him should I have it in writing.

22   I did not find the ruling -- that note of the ruling of the

23   rabbi.  But it was determined that since --

24            MR. DONALDSON:  Objection, objection.

25            THE COURT:  Wait a minute.  I'm really not interested

D1PLCIB2                          Salamon - direct

1   in what the rabbi found.

2          MR. DONALDSON:  Judge, I'm sorry.

3          MR. GERZOG:  I have no objection, Judge.

4          MR. DONALDSON:  I'll withdraw my objection.

5          THE COURT:  You want it?

6          MR. DONALDSON:  I'll withdraw my objection.

7          THE COURT:  Fine.  I'm interested.

8   Q.  How did the rabbi rule?

9   A.  He ruled that since I did not hire Rafi Brodjik, he cannot

10  come to claims -- I mean to claim anything from me.  If he have

11  a problem, he has to deal directly with Earl David.  Earl David

12  hired him.  If Earl David has a problem, Earl David should call

13  me and ask me why I'm cheating him.

14  Q.  And did as far as you can remember, did the ruling of the

15  rabbinical court resolve the dispute between the two of you?

16  A.  Again, it was off maybe for a month or two.  And, again, I

17  don't -- afterwards I started getting emails from him.

18  Q.  So is it your recollection that these emails that we've

19  been talking about came after the ruling by the rabbinical

20  court?

21  A.  Again, I'm not hundred percent certain, but I think it was.

22  I can't remember exactly, but I would lean towards more yes.

23          MR. GERZOG:  Your Honor, I'm going to object, your

24  Honor, to what he leans towards and strike that answer.

25          THE WITNESS:  I can't remember which came first.

D1PLCIB2                        Salamon - direct

1    Q.   So these emails may have come before the rabbinical court

2    or they may have come after?

3    A.   Correct.

4    Q.   But was the dispute resolved after the rabbinical court?

5    A.   I can't remember.

6    Q.   If we could turn back to Government Exhibit 3031-5.

7    A.   Yes.

8    Q.   If you could look at the bottom email.

9    A.   Yes.

10   Q.   If you could read that email, and it goes on to a second

11   page and, again, I may interrupt you at points.

12   A.   Want me to read it?

13   Q.   Yes, please.

14   A.   Thursday, May 18, 2006, from Rafi Bar to

15   Sammy110wall@aol.com.

16        "Sam, as you know, I have decided to terminate my

17   relationship with you and the office.  The time has come for me

18   to worry about myself and my family.  Based on my calculations,

19   over the past year your partner -- you and your partner have

20   directly and indirectly swindled me personally (not to mention

21   Earl) out of at least a thousand to $2,000 a week.  You do the

22   math.  My conservative estimate is at least 50 to $75,000.

23        "As now I am faced with responsibility to find another

24   source of income, perhaps relocate, I am presenting you with a

25   simple question which I need an answer for ASAP.  No bullshit,

1    no stories, no excuses.  I need to know point blank whether you

2    have any intention of paying me what you owe.  This is a yes or

3    no answer.  Tell me yes, how much and when.  Tell me no, and to

4    get lost.  Either way, it is your decision, the consequences of

5    which shall be of your own making.  I need to know where I

6    stand and I need to know now.

7            "Don't get me wrong.  I am not unsympathetic to

8    whatever issues you have.  I have no desire to cause you any

9    problems, but you keep on suggesting that I come work with you

10   and we can make money.  I'm sorry, Sam, but that is no longer

11   an option.  I have to move on.  I am not asking for anything

12   that is not rightfully mine.  I have sat back for long enough

13   watching everyone look after themselves and line their own

14   pockets at my expense and the expense of Earl.  This is not an

15   environment that I feel comfortable working in.  I want out.

16   And I want what is mine, what you deducted from my packet.

17           "This is not an issue of making peace.  I hold no

18   grudges, but I am entitled to what I am entitled and it is

19   entirely your decision whether you will do what is right.  We

20   cannot -- we can part ways as friends or not.  I have my

21   responsibilities to do.  I have to do and you have yours.  But

22   I need to know now what your decision is.  My future option

23   depends on this, and I will appreciate the courtesy of an

24   answer."

25   Q.  What did you understand this email to be about?

D1PLCIB2                        Salamon - direct

1    A.  That he wants the 50 or $75,000.  Otherwise, like he's

2    saying, it's my option, it's your decision, and the

3    consequences shall be yours.

4    Q.  If you turn now to 3031-6.  If you could read this email,

5    please, and first go through the date and time.

6    A.  I'm looking for the document.

7    Q.  3031-6?

8    A.  Yes, I have it.  It's from Earl David.  Subject, "when is

9    enough."  Sent to Rafi Brodjik, and I was copied on the email,

10   Sammy110wall@aol.com.

11   Q.  And what's the date and time of this email?

12   A.  May 19, 2006, at 3:44.

13   Q.  Okay.  Actually, if we could go back for a moment to

14   3031-5.

15   A.  Yes.

16   Q.  I realize I just skipped what's above.  If you could go

17   above the email that you read --

18   A.  Yes.

19   Q.  -- what if anything did you do with that email after you

20   received it?

21   A.  I think I forwarded it to Earl David.

22   Q.  And what did you say?

23   A.  "Earl, again, you hired him.  You told about the

24   10 percent.  You give him his share.  I have nothing with him.

25   He never worked for me.  He worked for you, not for me.  Cause

D1PLCIB2                    Salamon - direct

1    soon I'll be out as well."

2    Q.  Okay.  If you could look now, go back to 3031-6.

3    A.  Yes.

4    Q.  And if you could read that.

5    A.  "You should always remember that we are fellow Jews.  It

6    looks to me that fighting will lead to catastrophe

7    consequences.  Just remember about the temple.  If that could

8    be destroyed and God's presence was there.  Would you two just

9    wonder just for a second the end of you turning into situation.

10   Read the Tochecha and see our end if we cannot have peace.

11           "I try to go to shul almost every day and pray from my

12   heart for peace.  My only desire is to help everyone.  It looks

13   to me that I made a mistake.  From bringing in a person living

14   in a shelter to the office to work with me as well as you two

15   guys.  You three people are behaving the same way.  Wherever

16   there is fighting and complaining, God stays away from that

17   place.

18           "When there's no unity, there's no destruction.  What

19   a sad feeling that all that I have done for you, all of you is

20   being in vain because it looks like to me that every one of you

21   is never enough as well as it was to Adam and eve.  Reason why

22   we are here and became what we are only sinners with a chance

23   to redeem ourselves."

24           (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   (Continued) "May we all pray to god with truth and

2    sincereness for peace as he wants us to because we are Jewish,

3    aren't we?

4              "I only want to help everybody and I see in return

5    only greed, competition, and envy.

6              "When someone wants to grab everything, in the end

7    there is nothing.  Wake up, before it is too late and make an

8    agreement and Shalom.

9              "Didn't we just read vahavta leireacha camocha.  If

10   you guys can't love each other, please don't hate each other.

11   Remember you guys are now neighbors, and I'm thousands of miles

12   away, and believe me, I can be further and further away as if I

13   never existed in your lives.  Make peace before it is too late.

14             "Whoever is so crazy about quitting, selling a house,

15   leaving the country or just disappearing, just look at your

16   family and see how much baggage you have to pack.  It's not as

17   easy as it seems."

18   Q.   What is Mr. David talking about in this e-mail?

19             MR. GERZOG:  Objection, Judge.

20   Q.   What did you understand him to be talking about?

21   A.   He's talking to me and to Rafi and to copy to me on trying

22   to make peace and that it's not easy to just pack up a family

23   and go away, we should try to live in peace because of god and

24   we are Jewish people.

25   Q.   And did you ultimately make peace with Mr. Brodjik?

D1p1cib3                          Salamon – direct

1   A.  No.

2   Q.  Did you give him any money?

3   A.  No.

4   Q.  Why not?

5   A.  We never came to agreement about money.

6   Q.  Okay.  Now when you moved -- turning back to 17 --

7           If we could look at the second paragraph in 3031-6

8   that starts with, "I try to go to shul almost every day."

9   A.  Yes.

10  Q.  Do you see the sentence from "bringing in a person living

11  in a shelter to the office to work with me as well as you two

12  guys"?

13  A.  Yes.

14  Q.  Do you know what -- or who Mr. David is referring to when

15  he says "bringing in a person living in a shelter"?

16  A.  Yes.

17  Q.  Who is he referring to?

18  A.  David Grynsztajn.

19  Q.  And why is he saying that?

20  A.  Because he was living in a shelter at one point.

21  Q.  David Grynsztajn was living in a shelter at one point?

22  A.  Yes.

23  Q.  Okay.  Let's turn back now to 17 Battery Place.

24  Approximately when did you move to that space to work?

25  A.  17 Battery, I would say between July 2006 or June -- June,

1    July 2006.

2    Q.  And who moved with you?

3    A.  Aleksandra.

4    Q.  Who's Aleksandra?

5    A.  Polish woman.  Urbanek.  I don't remember –- I don't know

6    the last name that well, how to pronounce her last name.

7    Q.  What do you think her last name is?

8    A.  Urbanek, Urbanek.  First name is Aleksandra.

9    Q.  Showing you what's been marked –- what's in evidence as

10   Government Exhibit 11.  Who is that?

11   A.  Aleksandra.

12   Q.  Is that the person you were just speaking to –- speaking

13   of?

14   A.  Yes.

15   Q.  And what was her role at the office?

16   A.  She used to bring clients to David Grynsztajn.  After David

17   Grynsztajn left, she was catering to those Polish clients.

18   Q.  When you say catering to those Polish clients, what do you

19   mean?

20   A.  Taking care of their cases, following up on the cases,

21   speaking to Earl about the cases.

22   Q.  And who else worked at 17 Battery Place with you?

23   A.  There was a guy named Sharoni.

24   Q.  Anyone else?

25   A.  Me, Lipa Teitelbaum, Evelina, Moishe Rosenberg.

D1p1cib3                          Salamon - direct

1    Q.  Was David Grynsztajn there?

2    A.  No.

3    Q.  Why was David Grynsztajn not there?

4    A.  'Cause he left.

5    Q.  Why did he leave?

6    A.  He told me that the government was investigating, he showed

7    me a card from the government, back in 2006, that they're

8    investigating.

9    Q.  Showing you what's been marked as Government Exhibit 23, do

10   you recognize that photograph?

11   A.  Yes.

12   Q.  Who is that?

13   A.  My assistant, Moishe Rosenberg.

14   Q.  What was Moishe Rosenberg's role at the office?

15   A.  He used to do my errands.

16   Q.  When you say do your errands, what do you mean?

17   A.  Go to the post office, buy me food, buy me lunch, Snapple,

18   anything we needed for office supplies.

19   Q.  Did he do anything else for you?

20   A.  He helped me send out deadlines.

21   Q.  Anything else?

22   A.  He sponsored -- not to me directly, but I think he

23   sponsored people with Lipa.  I don't know exactly.  I wasn't --

24   I can't remember exactly.

25   Q.  He served as a sponsor himself?

1  A.  Again, I can't remember, but I -- I am -- I can't remember

2  how -- if he signed it, but I know he was a sponsor, yes, he

3  sponsored some people.

4  Q.  And when did he start working with the law firm?

5  A.  I don't remember exact year, but I would say maybe 2004,

6  2005.

7  Q.  Do you remember him being at the 110 Wall Street space?

8  A.  Yeah, he used to come up, yes.

9  Q.  And do you remember him being at 17 Battery?

10  A.  Yes.

11  Q.  How long did he stay involved?

12  A.  Till 2009, till the government shut down the office.

13  Q.  And in relation to sponsors, did he do anything for you

14  related to sponsors?

15  A.  He -- again, he -- if I needed to send money to certain

16  sponsor, I would tell him to pick up approvals, to pick up mail

17  from Brooklyn, from the sponsors, and he used to give them the

18  money and I used to give him back later the money.

19  Q.  Was there anyone else at 17 Battery that you can remember?

20  A.  Working?

21  Q.  Mm-hmm.

22  A.  Evelina, Lipa, Martha.

23  Q.  Martha Martinez you mentioned before?

24  A.  Yes, yes.

25  Q.  And what happened to the rest of the people that were at

1   110 Wall Street?

2   A.   Went to a different location.

3   Q.   Where was that location?

4   A.   88 Wall Street.

5   Q.   And do you know who went to that location?

6   A.   The rest of the people that were upstairs.  I don't know

7   exactly who.

8   Q.   Do you know whether Ms. Cibik went to that location?

9   A.   I was told that yes.

10   Q.   Who were you told that by?

11   A.   Earl David.

12   Q.   And how long did you remain at that location?

13   A.   Till about July of 2008.

14   Q.   What happened in July of 2008?

15   A.   We got evicted.

16   Q.   Why did you get evicted?

17   A.   Because we didn't specify in the lease that we're going to

18   be doing law -- that it's going to be a law firm, doing law

19   work in that office.

20   Q.   The lease was under what company's name?

21   A.   Fix Anything.

22   Q.   Which was what kind of company?

23   A.   I would say plumbing or construction.

24   Q.   And were you evicted merely because the name on the door

25   was for a plumbing company, not a law firm?

D1p1cib3                         Salamon - direct

1    A.   That and also they had a lot of clients waiting on -- in

2    the hallways, so they didn't -- they didn't like it.

3    Q.   Who didn't like it?

4    A.   The landlord.

5    Q.   What was the setup of the office?

6    A.   Which office?

7    Q.   At 17 Battery.

8    A.   Came in, to the right there was a waiting room, to the left

9    it was one office where Sharoni was, right afterwards to the

10   left was another office where Aleksandra worked, right next to

11   the left again there was another office where Lipa worked with

12   Evelina.  To the right, to the front was my office, and to the

13   left was Martha's partition over there.  She had like an

14   office.

15   Q.   And you said Mr. Grynsztajn did not come to that new

16   location with you; is that right?

17   A.   No.

18   Q.   Did you have any communication with Mr. Grynsztajn after he

19   left the 110 Wall Street location?

20   A.   After he left the office, yes.

21   Q.   What was that communication about?

22   A.   Trying to extort money from me.

23   Q.   What do you mean by that?

24   A.   He was threatening me that he was going to call up all the

25   sponsors and tell them that I filed taxes, that the law firm

D1p1cib3                              Salamon - direct

1   filed tax -- fake tax returns, and he kept on extorting that he

2   wants money, money.

3   Q.   Okay.  Did you ever give him money?

4   A.   Yes.

5   Q.   Approximately how much did you give him?

6   A.   I can remember $1500 for sure.  I might have given him

7   more, but what I remember was $1500.

8   Q.   And where did you give him that money?

9   A.   I met him downstairs on Water Street in a deli.

10  Q.   Did you -- what form was the money you gave him?

11  A.   Cash.

12  Q.   I'm going to show you some more e-mails, Government

13  Exhibits 601-1 through 601-12.

14          Starting with 601-1, do you recognize this e-mail?

15  And you can -- well, look at it first, tell me if you recognize

16  it.  I know it's small.

17  A.   Forward from Earl David to sammy110wall.

18  Q.   And it's forwarded to?

19  A.   To me.

20  Q.   Do you remember receiving this e-mail from Earl David?

21  A.   Yes.

22  Q.   And is it -- does it appear to be the same e-mail that you

23  received on March 24th, 2006?

24  A.   Yes.  March 24, 2006, yes.

25          MS. ECHENBERG:  The government moves to admit 601-1.

D1p1cib3                          Salamon - direct

1              THE COURT:  Received.

2              (Government's Exhibit 601-1 received in evidence)

3              MS. ECHENBERG:  If we could put 601-1 on the screen.

4    Q.  So the original e-mail at the bottom is to Earl David from

5    whom?  Look at the --

6    A.  David grin, which is David Grynsztajn, to david110wall, to

7    Earl David.

8    Q.  And what's your understanding of what David Grynsztajn is

9    transmitting to Earl David in this e-mail?

10   A.  He's telling Earl that he needs by Friday some case numbers

11   from Kolarczyk, Kowalski, various clients.

12   Q.  What do you mean by case numbers?

13   A.  He needs case numbers, either immigration case numbers or

14   labor case numbers.  Each client, each alien gets a case

15   number, assigned a case number, and Earl would have that

16   information.

17   Q.  And Mr. David forwards this to you?

18   A.  Yes.

19   Q.  What is he asking you to do?

20   A.  Just -- he's telling to Mr. G, he needs your help, see case

21   number attachments.

22   Q.  If you could look now at 601-2.

23              And do you recognize this e-mail?  Look not at the

24   screen; look at what you have in front of you.

25   A.  Yes.

D1p1cib3                         Salamon - direct

1   Q.  Is this an e-mail you received from Earl David?

2   A.  Yes.

3   Q.  And who is this -- is this another forwarded e-mail?

4   A.  Yes.

5   Q.  And does this appear to be -- do you remember this e-mail?

6   A.  Yes.

7   Q.  Does this appear to be the e-mail that you received on

8   April 2nd, 2006 --

9   A.  Yes.

10  Q.  -- at 1:40?

11          MS. ECHENBERG:  The government moves to admit

12  Government Exhibit 601-2.

13          THE COURT:  Received.

14          (Government's Exhibit 601-2 received in evidence).

15          THE COURT:  Is this a good time to take our break?

16          MS. ECHENBERG:  Sure.

17          THE COURT:  Okay.  Ladies and gentlemen, remember the

18  rules about keeping an open mind and the important rule about

19  not discussing the case and, you know, not engaging in any

20  preliminary deliberations, okay?

21          All right.  We'll see you in a half an hour.

22          (Jury excused)

23          THE COURT:  Anything to talk about?

24          MS. ECHENBERG:  Mr. Salamon, you can step down.

25          (Witness excused)

D1p1cib3                          Salamon – direct

1           MR. PASTORE:  Nothing from the government.

2           MR. GERZOG:  Nothing from Mr. Brodjik.

3           May we be excused, your Honor?

4           THE COURT:  Of course.

5           (Recess)

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court; jury not present)

2    THE COURT:  All right.  There was just one little

3    matter I wanted to raise with everyone.  We mentioned -- it was

4    mentioned earlier that one juror, Ms. Thais, told us she had

5    plane reservations for January 30th and at the time that

6    didn't seem to me to be a problem, but it is a problem, and I

7    thought that perhaps at the end of the day I would ask her to

8    stay behind and tell her that realistically her service would

9    not be done by the 29th and essentially tell her, you know,

10    we can excuse her, or if she wanted to stay, you know, as long

11    as she could, that was okay too, but I thought if I kept her

12    here, then I wouldn't start a flood of other jurors, you know,

13    asking.

14    MR. GERZOG:  It makes sense.  Do we have -- I mean, do

15    we have a sense of really how long the trial is going to go on?

16    Are you going to finish -- are you still going to be directing

17    him --

18    MS. ECHENBERG:  We're actually going at a pretty good

19    clip so I could finish my direct today.  We'll see.  I mean, I

20    would say I'm about a third --

21    MR. GERZOG:  And then we have the cross of her -- I

22    mean of him, rather, and then Agent Gordon, and that's it;

23    right?

24    MR. PASTORE:  Currently that's all we have.  Unless

25    there's some --

D1p1cib3                          Salamon – direct

1            MR. GERZOG:  I mean, she's still not going to make it;

2     you're right.

3            THE COURT:  She's not going to make it.  There's no

4     way that we can get six summations and charge in by Tuesday,

5     and deliberations?  That's just not realistic.  She's not going

6     to make it.  Now she may be sufficiently invested to want to

7     change her plans, you know, I don't want to force her to leave,

8     but I also don't want to sort of keep her here under what I

9     would feel is sort of false pretenses.

10            MR. GERZOG:  Could you just remind me what her name is

11     we're talking about?

12            THE COURT:  Thais.  The blonde woman who is actually

13     70 years old.  Good for her.

14            MR. DONALDSON:  She's 70?

15            THE COURT:  Yes, she is.

16            MR. PASTORE:  Could we ask her her secret?

17            THE COURT:  Her secret?

18            All right.  We're on the same page, though.  That's

19     fine.

20            We'll bring the jury in.

21            (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1p1cib3                        Salamon - direct

1          (Jury present)

2          THE COURT:  You may continue, Ms. Echenberg.

3          MS. ECHENBERG:  Thank you, your Honor.

4          I believe before the break we admitted Government

5   Exhibit 601-2.  If we could put that up on the screen, please.

6   Q.  And Mr. Salamon, if you could either look at the version in

7   front of you or, if it's easier, it may be larger on the

8   screen.

9          Is this another e-mail that Mr. Grynsztajn had sent to

10  Earl David that Earl David then forwarded to you?

11  A.  Correct, yes.

12  Q.  And what is it regarding?

13  A.  He's saying that he needs proof of April 30, 2001 for

14  certain deadline.

15  Q.  Proof of what?

16  A.  Proof that this alien submitted the case back in the

17  amnesty of April 30, 2001.

18  Q.  And is this typically how Earl David would be involved with

19  cases, Mr. Grynsztajn would reach out to him for information or

20  to do things and then he would communicate by e-mail or in

21  other ways?

22  A.  By e-mail, yes.

23  Q.  And did you communicate in other ways?

24  A.  With Earl?

25  Q.  Yes.

D1p1cib3                          Salamon - direct

1    A.   By phone.

2    Q.   I'd now like you to -- just to expedite things, if you can

3    look at Government Exhibits 601-3, 601-4, 601-5, -6, -7, -8,

4    and -9, 10, 11, and 12, please.  If you could just look at all

5    of those e-mails.

6              Are those more e-mails that you -- that are to you?

7    A.   Yes.

8    Q.   And do you recognize these e-mails?

9    A.   Yes.

10   Q.   And do they accurately reflect e-mails that you received in

11   the past?

12   A.   Yes.

13             MS. ECHENBERG:  The government moves to admit

14   Government Exhibits 601-3 through 12.

15             THE COURT:  Received.

16             (Government's Exhibits 601-3 through 601-12 received

17   in evidence)

18             MS. ECHENBERG:  If we could have 601-3 up on the

19   screen, please.

20   Q.   And again, Mr. Salamon, is this an e-mail that Mr. David

21   forwarded to you?

22   A.   Yes.

23   Q.   Is anyone else copied on this e-mail?

24   A.   Yeah, Rafi Brodjik.

25   Q.   And what is the e-mail below that's been forwarded?

D1p1cib3                        Salamon - direct

1   A.  He's forwarding an e-mail from David Grynsztajn where it

2   read, "Not much time left."

3   Q.  What did you understand that e-mail to mean?

4   A.  He's going to call the government.

5   Q.  Turning now to 601-4.  Again, this is a forwarded message

6   from who to who?

7   A.  Forward message from David Grynsztajn, from Earl David to

8   sammy110wall, which is me, and to Lipa Teitelbaum.

9   Q.  What does this forwarded message say?

10  A.  He's giving a deadline that 1 p.m., no more, that's when

11  he's calling the government.

12  Q.  Do you know whether he called the government?

13  A.  I know he was in touch with the government.

14  Q.  What do you mean you know he was in touch with the

15  government?

16  A.  In 2006, the beginning, he came over to me and showed me a

17  card of one of the government investigators and said, "They

18  came to me and I'm talking to them."

19          MS. ECHENBERG:  And if we could bring up on the screen

20  Defendant Brodjik Exhibit 4.  Do we have a copy of that?

21          And I'll hand you the copy.  We'll have it up on the

22  screen as well.

23  Q.  Do you recognize that e-mail?

24          MS. ECHENBERG:  If we could just put on the screen

25  starting with Forwarded Message.

D1p1cib3                        Salamon - direct

1              Sorry.  A little bit further down.

2              Up.  Thank you.  Okay.

3   Q.  Okay.  So this top e-mail, what's the date of that e-mail?

4   If you want to look at -- if it's clearer in the original.

5   A.  All the way on top?  January 16, 2013.

6   Q.  And the e-mail is from what e-mail address?

7   A.  From Rafi Brodjik.

8   Q.  Rafi Brodjik's e-mail?

9   A.  Yes.

10  Q.  What's that e-mail address?

11  A.  Arye1991@yahoo.com.

12  Q.  Could you say it again and spell it slower, please.

13  A.  Arye1998@yahoo.com.

14  Q.  And who is this e-mail to?  Do you recognize --

15  A.  It's a forwarded message.

16  Q.  Well, the very top, it's from Rafi Brodjik?

17  A.  To Larry, Jeremy Gutman.

18  Q.  Do you know who either of those two people are?

19  A.  No.

20  Q.  And you said the date.  Okay.  So now moving down to the

21  forwarded message, it's from who to who?

22  A.  It's from Earl David to Leo Teitelbaum and to Sam Salamon.

23  Q.  And what's the date of that message?

24  A.  April 16, 2006.

25  Q.  And who -- going all the way down to the bottom now --

D1p1cib3                          Salamon − direct

1    A.   Yes.

2    Q.   −− who is that message from and to?

3    A.   David Grynsztajn.

4    Q.   It's from David Grynsztajn?

5    A.   Yes, to Earl David.

6    Q.   And it was then forwarded to you and Mr. Teitelbaum.

7    A.   Correct.

8    Q.   Do you remember receiving this e-mail?

9    A.   Yes.

10   Q.   And what is this e-mail about, as you recall?

11   A.   It's regarding −− he's threatening, he says no −− if

12   there's no settlement by tomorrow morning, this will be the

13   last Passover holiday in the free world, that he's going to

14   bring down everyone in the office.  'Cause what happened, his

15   clients came −− once he left the office, clients used to come

16   and they used to look for David Grynsztajn, and at one point I

17   asked, just give out his phone number, they were looking for

18   him, his clients, so he got very upset that we were giving out

19   his phone number to clients.  I had his cellphone number.  I

20   guess he must have −−

21   Q.   Okay.  But what do you understand this e-mail to be about?

22   A.   That he's going to bring everyone down if he doesn't have a

23   settlement by a certain date.

24   Q.   And was it in connection with this and some of the other

25   e-mails that you ultimately provided him with money?

D1p1cib3                        Salamon - direct

1    A.  Correct.

2    Q.  If you could go now to Government Exhibit 601-6.

3            Do you have that in front of you?

4    A.  Yes.

5    Q.  And what does it say?

6    A.  I'm sending an e-mail to David Grynsztajn.

7    Q.  On what date?

8    A.  May 7, 2006.

9    Q.  I'm sorry.  Did we skip over 601-5?  We did.  If you could

10   turn back to 601-5, please.

11           What's the date of this e-mail?

12   A.  May 5th, 2006.

13   Q.  And what's going on in this e-mail chain?

14   A.  The subject forward from Earl David to David Grynsztajn and

15   me.

16   Q.  What is Earl David saying in that top e-mail?

17   A.  It says, "Sam says once your threats and blackmail stops we

18   will help you out as a fellow Yid," which means a Jew.  "No one

19   will give in to threats.  He will also tell Gulay to help you."

20           MS. ECHENBERG:  If we could go now to Government

21   Exhibit 601-6.

22   Q.  So this is two days later; is that right?

23   A.  Correct.

24   Q.  Two days later from what was marked as 601-5; is that

25   right?

D1p1cib3                          Salamon - direct

1    A.  Yes, correct.

2    Q.  Okay.  And so what are you saying to David Grynsztajn here?

3    A.  I'm saying to David Grynsztajn, "Call me when you're

4    downstairs, I'll come down with Lipa."

5    Q.  What are you talking about?

6    A.  He was extorting money from me, extorting money, pestering

7    me for two, three months, and it kept on, and this is one time

8    I remember I went downstairs and I told him:  I'll be

9    downstairs soon to bring you the money.

10   Q.  Did you go downstairs with Lipa?

11   A.  No.

12   Q.  You went down by yourself?

13   A.  Correct.

14   Q.  And is this the time you talked about earlier at the deli?

15   A.  Yes.

16   Q.  Do you know how much you gave him?

17   A.  At that time, I remember it was $1800.

18   Q.  Okay.  Looking now at 601-7, this is a few days later.

19   What are you talking about here?

20   A.  "David, I'll call you tomorrow afternoon."  That I have --

21   that I'm going to be giving him money.

22   Q.  That you were going to be giving him more money?

23   A.  Yes.

24   Q.  Did you give him more money?

25   A.  I can't remember a hundred percent, but yes, I -- I know

1   there was another occasion, but I don't remember the date and

2   time or place.

3   Q.  If you could turn now to 601-8.

4           If you could read this e-mail that's on 5/16/2006,

5   again, from you to David Grynsztajn.

6   A.  "Hi, I have $1800 as now as a friend I'm giving to you, not

7   'cause I owe you anything.  I do not owe you anything but as a

8   friend I'm giving it to you.  I have a lot of expenses plus we

9   are all in tuches."  Means like we're going down so take your

10  money.

11  Q.  Okay.  And did you give him this $1800?

12  A.  Yes.

13  Q.  And where did you give it to him?

14  A.  As I said, I remember one time I gave it to him at the deli

15  on Water Street.  The second time I cannot remember exact

16  location where.

17  Q.  And what do you mean, "I'm giving it to you now as a

18  friend, not because I owe you anything"?

19  A.  I just wanted to make it clear that I don't owe him

20  anything and I'm not giving it to you because of the threats,

21  I'm just giving to him as a friend.

22  Q.  Did he need money, as far as you knew?

23  A.  Yes.

24  Q.  And turning now to 601-9.

25  A.  Yes.

D1p1cib3                          Salamon - direct

1   Q.  Could you please read this e-mail and tell me what you're

2   talking about.

3   A.  I sent a message to David Grynsztajn:  I'm leaving here

4   very soon, this office, immigration office.  I'm going back to

5   my father, settling with my clients.  It's dead.  I have no

6   money today.  I'm having now problems with Rafi.  I'm settling

7   with my clients.  I'm giving over my files to Aleksandra,

8   Linda, and Sharoni.  I have no money tonight.

9   Q.  So first, what do you mean, "going back to my father"?

10  A.  I used to sell copy machines.  I was a salesman for 15

11  years.

12  Q.  Were you intending to go back to that work at this time?

13  A.  Yeah, what I had in my mind, yes.

14  Q.  Did you go back to that work?

15  A.  No.

16  Q.  Why not?

17  A.  The threats stopped I guess with Grynsztajn so I figured

18  things were -- things quieted down, I'll continue.

19  Q.  And you said, "I'm having now problems with Rafi."  What

20  are you talking about?

21  A.  With the office, that he called up Tischler, and I'm also

22  being extorted from his side for money.

23  Q.  These are the e-mails we talked about before.

24  A.  Yes.

25  Q.  And you say, "I'm giving over my clients to Aleksandra and

D1p1cib3                          Salamon - direct

1    Linda and Sharoni."  Who's Aleksandra?

2    A.  Aleksandra, I mentioned her.  She's on the board.

3    Q.  And Linda?

4    A.  Linda was Earl David's secretary.

5    Q.  And she was continuing to work at the firm even after he

6    was gone?

7    A.  Yes.

8    Q.  And who's Sharoni?

9    A.  One of assistants who helped out Earl as well.  He worked

10   at my -- at that office.

11   Q.  At which office?

12   A.  At Battery Place.

13   Q.  And also at 110 Wall Street, or just at Battery?

14   A.  Yes, yes, but they were in my office.

15   Q.  Who was in your office?

16   A.  Sharoni was in my office.

17   Q.  When you say "my office," what do you mean?

18   A.  Aleksandra -- 17 Battery I considered because I separated

19   myself from most of the people, but Earl was still involved in

20   my office.

21   Q.  Was Earl still involved in the other office at 88 Wall

22   Street?

23   A.  Yes.

24   Q.  How do you know that?

25   A.  I -- I spoke to him.  He told me what he's doing, he's

D1p1cib3                         Salamon - direct

1    working with -- who he was working with.

2    Q.  Could we go to Government Exhibit 601-10 now, please.

3          What is this e-mail regarding?

4    A.  That's another e-mail from me to David Grynsztajn.

5    Q.  What are you talking about in this e-mail?

6    A.  I just moved offices.  I have moved in at that time

7    already, 17 Battery Place.  I have $15,000 in refunds that I

8    have to give to clients.  I gave refunds to clients as well.

9    Q.  What were you giving clients refunds for?

10   A.  They -- if they, after a certain period of time, didn't get

11   any paperwork, permission to work or the green card as promised

12   in the retainer and they came, they said, "Sam, you know, I

13   waited long enough," I would refund them the money.  Not the

14   full amount, but I would refund them an amount of money for

15   whatever the retainer agreed.

16   Q.  And then you say, "Everyone is waiting for the amnesty, no

17   new clients."  What are you talking about?

18   A.  Kept on pestering again for money, as I said before, so I

19   had to give him some answer.  I just told him, no clients, I

20   have no money, leave me alone.

21   Q.  And was that true, you had no money?

22   A.  Maybe that day I didn't make money.

23   Q.  But in general, did you have money at that time?

24   A.  Yes.

25   Q.  And then you say, "Anyways, how are you, what's doing?"

D1p1cib3                              Salamon – direct

1    A.   I was just trying to be nice to him.

2    Q.   Could you turn now to Exhibit 601-11.

3    A.   Yes.

4    Q.   This is the same day, another e-mail.  You say, "Call me

5    Thursday morning, I'll see what I can do."  What are you

6    talking about here?

7    A.   Giving him money again.

8    Q.   Did you give him any more money at this point?

9    A.   I can't remember.

10   Q.   And if you look at Government Exhibit 601-12, same day,

11   from David Grynsztajn to you, "Please call David," and then a

12   phone number.  Do you know what this is regarding?

13   A.   Yeah.  He wants me to call him.

14   Q.   Did you call him?

15   A.   Yes.

16   Q.   Do you remember what you talked about?

17   A.   Again, the only thing I could talk to him at that point

18   that he want -- he was trying to ask me for money and me

19   telling him I have no money.

20   Q.   Did you give him any more money after June of 2006?

21   A.   Possible.  I don't -- I can't remember.

22   Q.   When was the last time that you communicated with David

23   Grynsztajn?

24   A.   I would say end of 2006 or beginning of -- middle of 2006.

25   Maybe I would say August 2006.

D1p1cib3                          Salamon - direct

1    Q.  Have you had any communication with him since 2007?

2    A.  No.

3    Q.  Have you had any communication with him regarding your

4    testimony here?

5    A.  No.

6    Q.  How long did you stay -- turning back to the offices at 17

7    Battery Place -- actually, before we get there, we were talking

8    before about threats made by Rafi Brodjik to you.  Do you

9    remember that?

10   A.  Yes.

11   Q.  And you talked about trying to resolve those threats

12   through a rabbinical court.  Do you remember that?

13   A.  Yes.

14   Q.  Did you do anything else to try to stop those threats from

15   coming to you?

16   A.  Yes.

17   Q.  What did you do?

18   A.  I sent my son, one of my sons to speak to him.

19   Q.  Which son?

20   A.  David.

21   Q.  And how old was David at the time?

22   A.  17.

23   Q.  And what did you ask David to do?

24   A.  I just explained I cannot take this torture anymore from

25   Rafi, constant e-mails and extortion, extortion, please go and

1    speak to him.

2    Q.  Did your son speak to him?

3    A.  Yes.

4    Q.  And what, if anything, did he say to him?

5            MR. GERZOG:  Objection, your Honor, hearsay.

6            THE COURT:  Sustained.

7    Q.  Did the -- did the threats continue after your son spoke to

8    him?

9    A.  No.

10   Q.  Okay.  Moving on to the offices at Battery Place, you said

11   you were evicted at a certain point.  When was that?

12   A.  In June of 2006 or July of 2000 -- sorry -- July of 2008.

13   Q.  Did you and the people you were working with go to another

14   office after that?

15   A.  Yes.

16   Q.  Where did you go?

17   A.  125 Maiden Lane.

18           MS. ECHENBERG:  And if we could bring up --

19   Q.  Let me show you --

20           MS. ECHENBERG:  One moment, your Honor.

21           (Pause)

22           MS. ECHENBERG:  In the meantime why don't we bring up

23   3616, which has been admitted.  3616.

24   Q.  Do you recognize this drawing?  Let me ask you, do you

25   recognize what this drawing is depicting?

D1p1cib3                         Salamon - direct

1    A.  Yes.

2    Q.  What is it?

3    A.  That's the office on Maiden Lane.

4    Q.  This is the third office that you moved to in June or July

5    of 2008?

6    A.  Correct.

7    Q.  And did you have an office in this layout?

8    A.  Yes.

9    Q.  Where was your office?

10   A.  Right there at what says F.

11   Q.  Did you have a desk in that office?

12   A.  Yes.

13   Q.  Where was your desk?

14   A.  At what says number 1.

15   Q.  And what were the other spaces in the office?

16   A.  File cabinets and another desk.

17   Q.  And what about C, D, E, A, and B; what were those?

18   A.  C was -- there was a table, a desk, I would say, and

19   Evelina was there and Lipa was there, and E was Martha's

20   office, and D was Eugene and other people there.

21   Q.  What about A and B?

22   A.  A is the waiting room and B was the coat rack or some

23   closets.

24   Q.  And did you have a computer at your desk at F1?

25   A.  Yes.

1  Q.  Okay.  I'm showing you now what's been marked as Government

2  Exhibit 3044.  Actually, I'm showing you 3044 through 3050.  If

3  you could just take a look at those.

4           MS. ECHENBERG:  If we could bring 3044 up on the

5  screen, please.

6  Q.  What is this?

7  A.  This is my office on 125 Maiden Lane.  Vintage Partners, it

8  says.

9           MS. ECHENBERG:  If we could make it -- is it possible

10  to make larger the sign to the right.

11  Q.  Who is David Schlachter?

12  A.  That was an attorney that I paid that I could use his name

13  for the filing and use -- use his name as the office.

14  Q.  What do you mean use his name as the office?

15  A.  That he was official attorney in the office.

16  Q.  Did he sign documents for you?

17  A.  Yes.

18  Q.  Did you pay other attorneys to sign documents for you as

19  well?

20  A.  Yes.

21  Q.  And why did you do that?

22  A.  I wanted it to be official; otherwise, it looks like

23  there's no lawyer and there's nobody in there.  So, you know,

24  for the clients, it was more prestigious if I show there's a

25  lawyer in the firm.

D1p1cib3                          Salamon – direct

1    Q.  And did the immigration department and -- also require a

2    lawyer's signature on certain things?

3    A.  Yes.

4    Q.  Now why didn't Earl David just sign documents if he was

5    still involved?

6    A.  He was not a lawyer at that time.

7    Q.  So other than David Schlachter, who were the other lawyers

8    that you paid to assist with the fraud?

9    A.  Jed David Philwin, Zvi Samuels.

10   Q.  Anyone else?

11   A.  And David Schlachter.

12   Q.  So I'm showing you what's been marked as Government

13   Exhibit 16.  Do you recognize that photograph?

14   A.  Yes.

15   Q.  Who is it?

16   A.  David Schlachter.

17            MS. ECHENBERG:  The government moves to admit

18   Government Exhibit 16 and the accompanying nameplate.

19            THE COURT:  Received.

20            (Government's Exhibits 16 and 16A received in

21   evidence)

22   Q.  I'm showing you what's been marked as Government

23   Exhibit 13.  Do you recognize that photograph?

24   A.  Yes.

25   Q.  Who's that?

D1p1cib3                          Salamon – direct

1   A.  Maritza Diaz.

2   Q.  Who was she?

3   A.  She was a lawyer working in the firm for Mr. Earl David.

4            MS. ECHENBERG:  Oh, sorry.  The government moves to

5   admit Government Exhibit 13.

6            MR. GERZOG:  No objection.

7            THE COURT:  I think it's in evidence already.

8            MS. ECHENBERG:  You're right, your Honor.

9   Q.  And I'm showing you Government Exhibit 14 and 15.  Do you

10  recognize those?

11  A.  Yes.  Yes.

12  Q.  Who are they?

13  A.  Jed Philwin and Zvi Samuel.

14  Q.  Which one is Jed Philwin?

15  A.  (Indicating.)

16           MS. ECHENBERG:  And the government moves to admit

17  Government Exhibit 15.

18           Your Honor, the government moves to admit Government

19  Exhibit 15.

20           THE COURT:  Received.

21           (Government's Exhibit 15 received in evidence)

22  Q.  Okay.  So what are the words underneath David Schlachter,

23  Esq.?

24  A.  Vintage Partners.

25  Q.  And what is Vintage Partners?

1   A.   That was one of Harold Tischler's companies.

2   Q.   And how did Vintage Partners come to be listed on the door

3   of the firm where you were working?

4   A.   Because I leased it under the company name.

5   Q.   Did you do that with Mr. Tischler's permission?

6   A.   No.

7   Q.   Why not?

8   A.   Because I paid him $5,000 to use it already, so I said to

9   myself, why pay another $5,000.

10  Q.   Did you have to sign documents to get that lease?

11  A.   Yes.

12  Q.   And whose name did you sign this documents in?

13  A.   Harold Tischler's.

14  Q.   You forged his signature?

15  A.   Yes.

16  Q.   Did he -- let me take a step back to 17 Battery Place.

17            MS. ECHENBERG:   If we could bring up the picture of 17

18  Battery Place, which is I believe Government Exhibit 60.   Yeah,

19  Government Exhibit 60, please.

20            Actually, sorry.   Take that down.   Let's go back to

21  Government Exhibit 3044.

22  Q.   Did Mr. Tischler ever come to this office?

23  A.   No.

24  Q.   Did he ever find out that the company had -- the office had

25  been rented in the name of one of his companies?

D1p1cib3                          Salamon - direct

1    A.  Yes.

2    Q.  When did he find out?

3    A.  After they raided my office.

4    Q.  And what -- how did he respond?

5    A.  How did I respond?

6    Q.  How did Mr. Tischler respond when he found out that you'd

7    rented the office in his company's name without his permission?

8    A.  He was upset.

9    Q.  What, if anything, did he say?

10   A.  He said, "Why did you do it?"

11   Q.  And did you discuss anything else during that conversation?

12   A.  Yes.

13   Q.  What did you discuss?

14   A.  That he needs to get attorneys, have money for attorney.

15   Q.  Why did he need to get an attorney?

16   A.  Because he was subpoenaed also at the same time as me.

17   Q.  And what, if anything, did you do in response?

18   A.  I gave him money for his attorney.

19   Q.  How much money did you give him?

20   A.  $5,000.

21        MS. ECHENBERG:  Your Honor, I'd like to read a

22   stipulation at this point.

23        THE COURT:  Okay.

24        MS. ECHENBERG:  This is Government Exhibit S8.  And it

25   has the caption of this case, Stipulation, JPMorgan Chase Bank

D1p1cib3                          Salamon - direct

1    and the case number.  And it reads:

2              "It is hereby stipulated and agreed by and between

3    United States of America by Preet Bharara, United States

4    Attorney for the Southern District of New York, James Pastore

5    and Janis Echenberg, Assistant United States Attorneys, Of

6    Counsel, and the below-named defendants by and through their

7    attorneys, that:

8              "If called as a witness, a custodian of records of

9    JPMorgan Chase would testify that Government Exhibits 307 and

10   307-1 through 307-3 and 504 consist of bank records of JPMorgan

11   Chase Bank, which were:

12             "(a) made at or near the time of the occurrence of the

13   matters set forth in the records by or from information

14   transmitted by a person with knowledge of those matters;

15             "(b) kept in the regular -- in the course of regularly

16   conducted business activity; and

17             "(c) made by the regularly conducted business activity

18   as a regular practice."

19             And it's dated January 15th, 2003 *[sic]*, and it's

20   signed by me and counsel for all of the defendants.

21   BY MS. ECHENBERG:

22   Q.  Mr. Salamon, I'm showing you what's been marked as

23   Government's Exhibit 504.

24             MS. ECHENBERG:  And the government moves to admit

25   Government Exhibit 504.

D1p1cib3                          Salamon - direct

1              MR. GERZOG:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibit 504 received in evidence)

4              MS. ECHENBERG:  Can we put that up on the screen,

5      please.

6      Q.  If we could actually start with the back two pages.  The

7      page that starts Business Depository Resolution.

8      A.  Yes.

9      Q.  What is United Immigration Services, Inc.?

10     A.  That was an account that I had, that I used to pay

11     immigration fees, or my own things from there.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1PLCIB4                        Salamon - direct

1    BY MS. ECHENBERG:

2    Q.  So this was an account you maintained at Chase bank?

3    A.  Yes.

4    Q.  And did you write checks from this account?

5    A.  Yes.

6    Q.  If we could turn back to the first page.  Is this a check

7    you wrote?

8    A.  Yes.

9    Q.  Is that your handwriting on the check?

10   A.  Yes.

11   Q.  Is that your signature?

12   A.  Yes.

13   Q.  And who is this check made out to?

14   A.  Harold Tischler.

15   Q.  Is that the same as the defendant Harold Tischler?

16   A.  Yes.

17   Q.  And what was this check for?

18   A.  For his attorney.

19   Q.  In connection with what you were just discussing?

20   A.  Yes.

21   Q.  And was it in relation to anything else --

22   A.  No.

23   Q.  -- other than his attorney?

24   A.  No.

25   Q.  And the memo line says "short of advance rent."

D1PLCIB4                        Salamon - direct

1              Why does it say that?

2   A.  He didn't want -- I didn't want and I didn't want it to say

3   it went to his attorney.

4   Q.  He didn't want it or you didn't want it?

5   A.  I didn't want it.

6   Q.  Why not?

7   A.  I didn't want the government should have any trace that I'm

8   giving money for people for attorneys.

9   Q.  And where did this -- and is this all the money you gave

10  him around this time?

11  A.  Again, my collection is $5,000.  I cannot remember when and

12  where the time I gave him the rest of the $1,500.

13  Q.  Do you remember whether it was a check or some other form?

14  A.  Again, I don't remember.  It might have been cash or check.

15  I don't remember.

16  Q.  And where did you get that money from?

17  A.  From my account.

18  Q.  From this bank account?

19  A.  Yes.

20  Q.  Were you still earning money through the law firm at this

21  time?

22  A.  No.

23  Q.  So where did you actually get the money to put into your

24  bank account?

25  A.  I had did a bank fraud.

D1PLCIB4                          Salamon - direct

1   Q.  Is that the bank fraud you testified about earlier?

2   A.  Yes.

3   Q.  How much money did you access through that bank fraud?

4   A.  I would say anywhere between 15 to 20,000.

5   Q.  And whose account did you fraudulently get that money from?

6   A.  From Lipa Teitelbaum.

7   Q.  How did you come to do that?

8        Let me ask you a different question:  Why didn't you

9   just ask Mr. Teitelbaum for the money?

10  A.  At that time he left or he got arrested and he wasn't

11  talking to me anymore.

12  Q.  Why wasn't he talking to you anymore?

13  A.  His lawyer, I guess his lawyer told him not to talk to me.

14  Q.  Were you able to communicate with him anyway?

15  A.  Yes.

16  Q.  How did you communicate with him?

17  A.  I used to send a friend.

18  Q.  Did you send a friend to ask him for money at this time?

19  A.  Yes.

20  Q.  Who was that friend?

21  A.  Nuchem Schwartz.

22  Q.  Is that the defendant Nathan Schwartz?

23  A.  Yeah.

24  Q.  What did you ask Nathan Schwartz to do?

25  A.  He should speak to him how can I get money.  The guy has

D1PLCIB4                        Salamon - direct

1   over $200,000 of my money.

2   Q.  Why did Mr. Teitelbaum have over $200,000 of your money?

3   A.  I kept my money by him.

4   Q.  Why?

5   A.  Since I was getting divorced and I was always missing my

6   safe.  For some reason, I was always missing money.  So I felt

7   safer by him than sitting in my house.

8   Q.  Was it in part that you didn't want your soon to be ex-wife

9   to have access to it?

10  A.  Yes.

11  Q.  So you asked Mr. Schwartz to do what exactly?

12  A.  To go and talk to him that I need money.

13  Q.  Did Mr. Schwartz do that?

14  A.  Yes.

15  Q.  How do you know?

16  A.  Because he came back to me and told me he spoke to him.

17  Q.  And what did he tell you, what did Mr. Schwartz tell you

18  about his conversation with Mr. Teitelbaum?

19  A.  That he knows I need money but there's nothing he can do

20  right now.

21  Q.  What happened next?

22  A.  So I told Mr. Schwartz to let him know that I have a way to

23  take out money and see what he says.

24           So he came back to me.  He says I spoke to him.  He

25  says, listen, if he has a way to take out money from my

D1PLCIB4                        Salamon – direct

1    account, let him go ahead.

2    Q.  What happened next?

3              MR. BRILL:  Objection.  Judge, may we approach?

4              THE COURT:  Okay.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1PLCIB4                          Salamon - direct

1           (At the side bar)

2           MR. BRILL:  It's not that -- if it's not, it hasn't

3   been previously noticed, but there is I believe on the cusp of

4   making an allegation that Mr. Schwartz was involved in

5   attempted or some -- what could be construed as a bank fraud.

6           MS. ECHENBERG:  That's right.  What he's going to say

7   is that Mr. Schwartz said I have a computer guy coming, he'll

8   come over and we'll make the false checks and Mr. Schwartz was

9   there for it.

10          THE COURT:  Who, Mr. Salamon?

11          MS. ECHENBERG:  Mr. Salamon went over to

12  Mr. Schwartz's office.  Mr. Schwartz had a computer guy who was

13  coming to work that day in his office.  They asked the computer

14  guy to place the fake signature onto these checks.  They made

15  the fake checks.  And then Mr. Salamon went and took out money

16  using those checks.  This is, it's all part of the conspiracy

17  as far as we're concerned.

18          MR. BRILL:  How is it part of an immigration fraud

19  conspiracy?

20          THE COURT:  It's how they're whacking up the money

21  they earned.

22          MR. BRILL:  Mr. Schwartz was not whacking up any

23  money.  There's no allegation here that Mr. Schwartz got money

24  from this transaction.

25          THE COURT:  But Schwartz assisted Salamon.

1           MS. ECHENBERG:  Correct.

2           THE COURT:  To get money.

3           MS. ECHENBERG:  Right.

4           THE COURT:  From Mr. Teitelbaum.

5           MS. ECHENBERG:  Right.

6           MR. BRILL:  Completely and wholly unrelated to any of

7   the allegations against Mr. Schwartz.

8           MS. ECHENBERG:  Mr. Schwartz is part of this fraud.

9   He assisted in many different ways --

10          MR. BRILL:  Broader sense.

11          MS. ECHENBERG:  -- many ways he assists the fraud and

12  distribution of proceeds.

13          MR. BRILL:  It would have been helpful if this were

14  brought up pretrial if they intended to bring this out.  They

15  brought up everything else pretrial.

16          MS. ECHENBERG:  We were very clear in our 3500 and we

17  always viewed this as part of the fraud and see it as something

18  that needed to be.

19          MR. BRILL:  They didn't bring an application to the

20  Court along with all the other applications they brought to the

21  Court with regard to --

22          MS. ECHENBERG:  The copier fraud, we agreed, the

23  insurance fraud that your Honor ruled doesn't come in.  It was

24  our view this is part and parcel of the fraud and not something

25  that would be considered 404(b).

1          MR. BRILL:  Their theory on copier fraud is it somehow

2     made Mr. Schwartz more inclined to help Mr. Salamon out.  Their

3     interpretation of this is somehow part of the immigration fraud

4     is only because --

5          THE COURT:  Because the funds involved are the

6     proceeds of the alleged fraud.

7          MS. ECHENBERG:  And the copier fraud was prior to

8     Mr. Schwartz's involvement, so it was to explain the

9     relationship and why it made sense he would get involved.

10         Now he's deep in.  He's been in it for years now.  He

11    knows what's up.  He knows the players and he's continuing to

12    assist.

13         MR. PASTORE:  Just for the record, it was obviously

14    fronted in the 3500.  And Mr. Tischler, after several things

15    were fronted, he made motions to preclude, so it's not --

16         MR. GREENFIELD:  What are you talking about?

17         THE COURT:  You're an example of good behavior.

18         MR. GREENFIELD:  Thank you.  I come to life when I

19    hear my client's name.

20         THE COURT:  You may proceed.

21         MS. ECHENBERG:  Thank you, your Honor.

22         (Continued on next page)

23

24

25

1    (In open court)

2    BY MS. ECHENBERG:

3    Q.  I think where we left off, you sent Mr. Schwartz back with

4    a message to Mr. Teitelbaum that you had a way to get the money

5    out of Mr. Teitelbaum's account.  And the message came back

6    from Mr. Schwartz, Mr. Teitelbaum says if you can do it, go for

7    it.

8    A.  Yes.

9    Q.  So what happened next?

10   A.  So I was discussing I don't know computers.  So Nathan said

11   his computer guy is going to be there tomorrow to fix his

12   computer and speak to him.  So I went up to the office.

13   Q.  Let me stop you.  You went up to what office?

14   A.  To Nathan Schwartz's office.

15   Q.  And where is that located?

16   A.  Route 59.

17   Q.  Had you been to that office before?

18   A.  Not to my recollection, no.

19   Q.  And what happened when you got to the office?

20   A.  I met Nuchem over there.  The computer guy was there.  And

21   I told the computer guy I got permission from Lipa Teitelbaum

22   to put in checks.  Here's the signature.  Copy and paste in a

23   couple of checks.  And at that time, just a couple days

24   later --

25   Q.  Let me stop you there.  Was Mr. Schwartz present for your

D1PLCIB4                          Salamon - direct

1   conversation with the computer guy?

2   A.   Yes.

3   Q.   And did the computer -- what's the computer person's name,

4   do you remember?

5   A.   Simon.

6   Q.   Did Simon do what you asked him to do?

7   A.   Yes.

8   Q.   And was Mr. Schwartz present when Mr. Simon did what you

9   asked him to do?

10  A.   Yeah.

11  Q.   So am I correct that he was basically taking a signature

12  from another check -- whose signature?

13  A.   Lipa Teitelbaum's signature.

14  Q.   And he was placing it on a check made out to you?

15  A.   Blank checks, yeah.

16  Q.   And how many blank checks did he place that signature on?

17  A.   Four or five.

18  Q.   And was Mr. Schwartz present while that was occurring?

19  A.   Yeah.

20  Q.   And what happened next?

21  A.   I went to the bank.

22  Q.   Did you print out the checks?

23  A.   I print out the checks and I made out the checks to United

24  Immigration Services.

25  Q.   And then what did you do?

D1PLCIB4                          Salamon - direct

1    A.   I deposit those checks.

2    Q.   Deposited those checks where?

3    A.   In United Immigration Services account.

4    Q.   Was anyone with you when you deposited those checks?

5    A.   Nathan was outside one time.  He dropped me off.

6    Q.   But you went into the bank alone and did it?

7    A.   Yes.

8    Q.   And that's the bank fraud that you pled guilty to, correct?

9    A.   Yes.

10   Q.   Now, after the office was raided in January of 2009, did

11   you continue to do any immigration work?

12   A.   Yes.

13   Q.   What did you do?

14   A.   I attended some clients that wanted to follow up on a case.

15   And I did two or three clients where they have their own legit

16   sponsors.  The owners came over to do it.

17   Q.   When you followed up with clients who -- these were clients

18   who had already been working with the firm?

19   A.   Yeah, they been coming down knocking down my door, so I had

20   to do something for them.

21   Q.   And where were you physically when you assisted those

22   clients?

23   A.   At one point I was in Nathan Schwartz's office.

24   Q.   And was that the -- when was that in relation to these

25   fraudulent checks?

D1PLCIB4                    Salamon – direct

1    A.  Might have been the same month.

2    Q.  How many times did you go to Nathan Schwartz's office to

3    see clients?

4    A.  Once or twice.

5    Q.  Did you go to anyone else's office to see clients?

6    A.  Yes.

7    Q.  Whose office?

8    A.  Harold Tischler's.

9    Q.  Where is Harold Tischler's office?

10   A.  In Brooklyn.

11   Q.  Do you know the address?

12   A.  16th Avenue and 54, 55.

13   Q.  And how many times you go to his office to see clients?

14   A.  Twice.

15   Q.  Were those new clients or old clients?

16   A.  New clients.

17   Q.  And these are clients who you said had legitimate sponsors?

18   A.  Yes.

19   Q.  Was there anything fraudulent about the work you did for

20   them?

21   A.  No.

22   Q.  And the clients that you saw at Nathan Schwartz's office,

23   were those new clients or old clients?

24   A.  Old clients.

25   Q.  Did you see any other clients after the raid other than

D1PLCIB4                       Salamon - direct

1   what we've just discussed?

2   A.   One time on Long Island.  His name is Assad, he's a lawyer.

3   So I met one client over there in his office on Long Island.

4   Q.   And the work, was that a new client or old client?

5   A.   New.

6   Q.   And was there anything fraudulent about that one?

7   A.   No.

8   Q.   When is the last time you did any immigration related work?

9   A.   End of 2009.

10  Q.   Other than following up on cases of clients at the firm in

11  2009, have you done any other fraudulent immigration work?

12  A.   No.

13  Q.   So I want to turn back now to Nathan Schwartz.  How did you

14  meet Mr. Schwartz?

15  A.   I met him since I'm a childhood friend, 17 years old, 18.

16  Q.   What were the circumstances of meeting him?

17  A.   We were at a gathering, I think.  I can't remember exactly,

18  but there was a gathering for Hanukkah something by a rabbi in

19  Williamsburg.

20  Q.   How did you come to meet him?

21  A.   Something about a coat, I don't remember exactly.

22  Q.   What do you mean?

23  A.   Something about exchanging coats.  I was missing my coat.

24  I don't know.  This is way, way before, so.

25  Q.   And you mentioned that you call him Nuchem?

1    A.  Yes.

2    Q.  Have you always called him Nuchem?

3    A.  Yes.

4    Q.  And so you met him when you were 17, and did you have much

5    interaction with him when you were a teenager?

6    A.  Not too much, no, till he moved to my area in Brooklyn.

7    Q.  What was your area in Brooklyn?

8    A.  Borough Park.

9    Q.  Is that where you live now?

10   A.  No.

11   Q.  Around when did he move to your area in Borough Park?

12   A.  I would say about '82, '83.

13   Q.  And what was your relationship then?

14   A.  We were very close friends.

15   Q.  Did you remain very close friends?

16   A.  I got married and moved to Mexico, so, no, we lost -- we

17   lost touch.

18   Q.  Did you get back in touch at some point?

19   A.  Yes, when I moved back to United States.

20   Q.  And where did you move at that time?

21   A.  Monsey, New York.

22   Q.  How did you get back in touch with him?

23   A.  I think I met him, I bumped into him or his wife and we

24   became friends again.

25   Q.  Where did you bump into him?

1    A.  Excuse me?

2    Q.  Where did you bump into him?

3    A.  In Monsey.

4    Q.  Was he living in Monsey at that time too?

5    A.  Yes.

6    Q.  And what was your relationship at that time when you came

7    back to the United States and ran into him again, did you

8    rekindle your friendship?

9    A.  Yes.

10   Q.  And did you remain friends at that time?

11   A.  Yes.

12   Q.  And did you remain friends with him -- how long did you

13   remain friends with him?

14   A.  I would say until 1995.

15   Q.  And what happened?

16   A.  I had a falling out with him.

17   Q.  You had a falling out with him in 1995, and then did you

18   ever become friends with him again?

19   A.  Yes.

20   Q.  Approximately when?

21   A.  About ten years later, 11 years later.

22   Q.  And at that time -- well, between 2005 and 2009, when you

23   were subpoenaed and there were searches, what was your

24   relationship?

25   A.  I was very close with him.

D1PLCIB4                          Salamon - direct

1   Q.  Between 2005 and 2009, what was your relationship with?

2   A.  I was very close friends with him.  I started becoming

3   friendly in 2005, then I became closer and closer friends

4   again.

5   Q.  And what is your current relationship with him?

6   A.  We're not friends.

7   Q.  When did you stop being friends?

8   A.  I would say August of 2011.

9   Q.  And what if anything happened then?

10  A.  We had a falling out about I was mad about my pool.  He

11  left my pool unfinished.  He said he was going to fix it.  He

12  was supposed to become a partner where I work right now and I

13  wasn't happy.  And then he moved later on to Florida, so.

14  Q.  How did Nathan Schwartz come to be a sponsor through the

15  law firm?

16  A.  He started by bringing his own employees to sponsor.

17  Q.  And when you say his own employees, what are you

18  understanding that Schwartz did for a living?

19  A.  Framing.

20  Q.  What does that mean?

21  A.  He frames houses.

22  Q.  It's a form of construction?

23  A.  Yes.

24  Q.  And so he came to you with two employees that he wanted to

25  do what with?

D1PLCIB4                         Salamon - direct

1   A.  To sponsor them to get legal, legal status.

2   Q.  And how did he know to come to you?

3   A.  He know I was in immigration.

4   Q.  Did you personally handle those cases?

5   A.  No.

6   Q.  Who handled those cases?

7   A.  Lipa Teitelbaum.

8   Q.  And did Mr. Schwartz ask for anything in return for

9   bringing clients to your -- to the law firm?

10  A.  He said to me once they get approved, when they got

11  approved -- initially he didn't say he want something.  When

12  they got approved, he said, Sam, I want a cut.

13  Q.  And what did you understand him to mean that he wanted a

14  cut?

15  A.  He said, Sam, I'm bringing money from my client and I want

16  part of it and I said yes.

17  Q.  You gave him part of it?

18  A.  Yeah.

19  Q.  Do you remember how much money you gave him?

20  A.  I can't remember.

21  Q.  I'm going to approach and give you Government Exhibit 3100

22  and 3101.

23          Can you take a look at government 3100, please.

24  A.  Yes.

25  Q.  Do you recognize that?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's a client file with Lipa Teitelbaum's handwriting.

4   Q.  When you say it's a client file, what do you mean?

5   A.  When the client comes in, we need to get copies of his

6   passport, his information, do a retainer.  So all the

7   information, it's called a client file, a client case.

8   Q.  And this is the client file for what client?

9   A.  For Castillo Henry, Henry Castillo.

10  Q.  Who is Henry Castillo?

11  A.  Nathan Schwartz's employee.

12  Q.  He was one of those two employees that Nathan Schwartz

13  brought to the firm?

14  A.  Yes.

15  Q.  If you could look inside the folder and if we could also

16  bring up on the screen 3100-1.

17          Do you see there's a folder -- there's a sticker

18  there?

19  A.  Yeah.

20  Q.  Do you see a notation there?

21  A.  Yeah, that's Lipa's handwriting.

22  Q.  And what does that notation say?

23  A.  "Nuchem will give me a new check."

24  Q.  And if you could look now at 3100-2 if we could bring that

25  up on the screen, please.

1              What is this?

2    A.   This is a copy of passport of Henry Castillo.

3    Q.   And that's something you would routinely collect from

4    clients for their applications?

5    A.   Correct.

6    Q.   If you look now at 3100-3, please.

7    A.   Yes.

8    Q.   What is this document?

9    A.   Once labor certification gets approved from the labor

10   department, it's sent in to immigration.  And this is the form

11   that has to be sent in for them to get an I-140 immigrant

12   petition alien worker.  That's part of the process from the

13   information we have to give in to immigration.

14   Q.   And this is the I-140 related to Henry Castillo?

15   A.   Yes.

16   Q.   If you look now at 3100-4 and -7.

17              MS. ECHENBERG:  If we could put those up on the screen

18   next to each other.

19   A.   I have it.

20   Q.   Do you recognize these documents?

21   A.   Yeah.

22   Q.   Okay.  Starting with the one to the left, final

23   determination, what is that?

24   A.   Which one, to my left?  That's a altered final

25   determination in order to show that in April 30, 2001, Henry

D1PLCIB4                           Salamon - direct

1    Castillo had a case in order for him to qualify to get a green

2    card here in the United States.

3    Q.  So Henry Castillo didn't actually have a case in

4    April 2001?

5    A.  Not with the labor department.

6    Q.  How do you know that this is a false document?

7    A.  Because it says AYN Enterprises, Maritza Diaz, and there's

8    no way Henry -- and 110 Wall Street.  I mean Henry Castillo

9    didn't know about 110 Wall Street at that time.  I would have

10   known if he would have been a client prior to that.

11   Q.  And how was this document created?

12   A.  Document is created, we scan into computer and we do it

13   through Microsoft Office -- again, I'm not tech savvy -- and

14   just delete it, put April 30, 2001.  Put skilled worker job

15   that you want immigration to see, carpenter, name, everything

16   is just put in a different name, different skill, different

17   job.  And the date stays April 30, 2001 to show immigration

18   that this was submitted in April 30, supposedly, in April 30,

19   2001.

20   Q.  So this is the type of document that you would submit with

21   clients' files to show that they had a case during the amnesty

22   period?

23   A.  Yes.

24   Q.  And you said you did not create this document?

25   A.  We created the document in the law firm.

D1PLCIB4                        Salamon - direct

1    Q.  Okay.  Who specifically would create these documents?

2    A.  Lipa.

3    Q.  Anyone else?

4    A.  Leiby Walter, Arie Flohr.

5    Q.  And looking to the right now, what is that document?

6            MS. ECHENBERG:  If we can have all of the text,

7    please.  Sorry.  The other document, 3100-7, please.  Thank

8    you.

9    Q.  What is this document?

10   A.  This is a screen shot from the labor department and also

11   have been altered.

12   Q.  And who altered this document?

13   A.  Initially the labor official in Philadelphia that work for

14   the labor department.  And, afterwards, Lipa Teitelbaum used to

15   do it.

16   Q.  So the labor official that you're talking about, that's the

17   person who you and others bribed; is that right?

18   A.  Yeah.

19   Q.  At this time was he still creating these documents for you?

20   A.  No.

21   Q.  How do you know that?

22   A.  I was told he got arrested and Lipa told me the guy doesn't

23   work there no more.

24   Q.  Do you know approximately when he got arrested?

25   A.  In --

1    Q.  If you know.

2    A.  Maybe 2008, I don't know.  I didn't follow.

3    Q.  So at a certain point he was not available to create these

4    documents for you anymore?

5    A.  Correct.

6    Q.  So what did you and Mr. Teitelbaum do?

7    A.  He just did a screen shot, altered, copy and pasted, and

8    just changed just April 3, the name, Henry Fernando Castillo

9    Gonzalez, that was put in there, and construction, the company

10   name.

11   Q.  And after this individual that was bribed, after he left,

12   did you have anyone else in the Department of Labor who could

13   alter documents for you?

14   A.  No.

15   Q.  Okay.  Turning now to Government Exhibit 3100-5, -8, and

16   -10.

17          MS. ECHENBERG:  And if we could look at them together,

18   and if you could bring up -5 and -8 side by side, please.

19   Q.  First of all, what -- is Government Exhibit 3100-5 a single

20   page or are there multiple pages there?

21   A.  You're asking me?  Single page.

22   Q.  What is that?

23   A.  That's a cover sheet from the labor department on a

24   certified labor approval.

25   Q.  And who is it addressed to?

1    A.  Contour Framing care of Nathan Schwartz, 1274 49th Street,

2    Suite 299, Brooklyn, New York 11219.

3    Q.  Do you recognize that address?

4    A.  Yes.

5    Q.  What is that address?

6    A.  It's a P.O. box.

7    Q.  Do you know who controlled that P.O. box?

8    A.  I'm not sure.

9    Q.  Do you know if anyone at the firm controlled that P.O. box?

10   A.  Lipa Teitelbaum.

11   Q.  You believe Lipa Teitelbaum controlled that P.O. box?

12   A.  I can't affirm that, no.

13   Q.  Turning now to Government Exhibit 3100-8, what is that?

14   A.  That's a cover sheet for the labor approval explaining they

15   have been certified and the enclosed labor approval.

16   Q.  Is that being sent to the same address?

17   A.  Yes.

18   Q.  And if we could go now to 3100-10.  Is this a one-page

19   document or a multipage document?

20   A.  Multipages.

21   Q.  And what is this?

22   A.  These are not the real labor approval; these are copies of

23   the labor approval I have in my hand.

24   Q.  And why is there a copy of the labor approval in the file?

25   A.  We try -- we weren't that organized, but we try to keep

D1PLCIB4                         Salamon - direct

1   every -- of every document we sent out to immigration, copy, or

2   anything that we had related to the case, we kept in the file.

3   Q.  Is that an original labor approval?

4   A.  No.

5   Q.  How can you tell?

6   A.  Original labor approval have the watermark and also has

7   blue letters and each one, there's a watermark you put it up to

8   the light.

9   Q.  Blue letters?

10  A.  Blue color on the paper, bluish paper.

11  Q.  And can you tell by looking at these three documents where

12  the original approval would have been sent?

13  A.  The original approval?  You mean the address where it was

14  sent to?

15  Q.  Yes.

16  A.  1274 49th Street, Suite 299, Brooklyn, New York 11219.

17  Q.  If you can tell us what section you're looking at?

18  A.  Section D.

19  Q.  That's the employer contact information?

20  A.  Correct.

21  Q.  Is there a phone number there?

22  A.  Yes.

23  Q.  Do you recognize that phone number?

24  A.  Yes.

25  Q.  Whose phone number is it?

D1PLCIB4                         Salamon - direct

1   A.  Lipa Teitelbaum.

2   Q.  And do you, as far as you know, did Nathan Schwartz control

3   the mailbox at 1274 49th Street?

4   A.  No.

5   Q.  No, you don't know, or no --

6   A.  No, as far as I know, I don't think he did.  I don't know

7   if -- I don't think he did.

8   Q.  And moving on to the section in this form called primary

9   work site --

10  A.  Yes.

11  Q.  -- do you see that section?  What section is that?  If you

12  can look at what's in front of you.

13  A.  It has employer information, headquarters, main office.

14  Q.  Okay.  Can you look at the section on the labor approval

15  called primary work site.  I believe it's Section H, do you see

16  that?  It's on page 2.

17  A.  Yes.

18  Q.  And what's listed as the primary work site?

19  A.  214 Route 59, Suffern, New York 10901.

20  Q.  Do you recognize that address?

21  A.  Yes.

22  Q.  What is that address?

23  A.  Nathan Schwartz's office.

24  Q.  Is that the office that you were referring to previously?

25  A.  Yes.

D1PLCIB4                        Salamon - direct

1    Q.  And if you could look now at employer information, which I

2    think is back on the first page.  It's above employer contact,

3    that's Section C.

4              What's listed as the employer and the address here?

5    A.  It says employer name, Contour Framing, 46 Main Street,

6    Suite 226, Monsey, New York 10952.

7    Q.  Did you recognize that phone number?

8    A.  I can't remember right now.

9    Q.  Okay.  And what's listed under number of employees?

10   A.  Seventeen.

11   Q.  Do you know how many employees Nathan Schwartz had at this

12   time?

13   A.  No idea.

14   Q.  Turning now to Government 3100-6.  So if you can look back

15   in the folder that's in front of you, Mr. Salamon.

16   A.  Excuse me?

17   Q.  You can look back in the folder that's in front of you and

18   if you could look for Government Exhibit 3100-6.

19   A.  Yes.

20   Q.  Do you recognize this?

21   A.  Yes.

22   Q.  What is this?

23   A.  This is a check made out to U.S. Citizenship Immigration

24   Services.  These are the fees that have to be paid to the

25   government when you filing an I-140 or adjustment of status.

D1PLCIB4                          Salamon - direct

1    Q.  And what is CFI Contour Framing, Inc.?

2    A.  That's Nathan Schwartz's company.

3    Q.  And do you -- did he provide this check, do you know?

4    A.  I wasn't there.

5    Q.  What does the note say in the memo line?

6    A.  Memo, "immigration Henry."

7    Q.  And in general, did clients of the firm pay their own fees

8    or did someone else pay fees for them?

9              MR. BRILL:  Objection as to relevance.

10             THE COURT:  I'll allow that.

11   Q.  Do you want me to repeat the question?

12   A.  Yes, please.

13   Q.  In general, did clients of the firm pay their own fees with

14   regard to Department of Labor and immigration or did someone

15   else pay those fees for them?

16   A.  90 percent, I would say, they had legitimate sponsors, they

17   would bring a check from the company.

18   Q.  So if they had a legitimate sponsor, they would bring a

19   check from the company?

20   A.  Correct.

21   Q.  How many of your clients had legitimate sponsors?

22   A.  10 percent.

23   Q.  And if they didn't have a legitimate sponsor, who typically

24   would pay the fees?

25   A.  The client himself.

D1PLCIB4                        Salamon – direct

1   Q.  Moving on to Government Exhibit -- and if you could, what's
2   the address for CFI Contour Framing on that check?
3   A.  214 Route 59, Suite 110, Suffern, New York 10901.
4   Q.  Again, is that the address of the office of Nathan Schwartz
5   that you testified about?
6   A.  I don't remember the address by heart, but I know it's
7   Route 59.
8   Q.  If you could turn now to Government Exhibit 3100-9.  Do you
9   have that in front of you?
10  A.  Yeah.
11  Q.  What is this?
12          MS. ECHENBERG:  If we could have actually the whole
13  thing on the screen, please.
14  A.  This is something that I handed over to Lipa Teitelbaum to
15  fax over to Earl to register in the Department of Labor.
16  Q.  Do you recognize the handwriting on this document?
17  A.  Yes.
18  Q.  Is this the same handwriting on the top and the bottom?
19  A.  No.
20  Q.  What's the top handwriting?
21  A.  Lipa's handwriting.
22  Q.  And what's the bottom handwriting?
23  A.  My handwriting.
24  Q.  So starting with the bottom, I believe that says 455 Route
25  306, Suite 119, Monsey, New York, and there's a zip code?

D1PLCIB4                          Salamon - direct

 1   A.   Yes.

 2   Q.   What is that?

 3   A.   That's information that I got from Nathan Schwartz that I

 4   could file applications in that company.

 5   Q.   And what is the number on bottom?

 6   A.   That's tax ID number that he provide to me.

 7   Q.   And what is the typed information in the middle, Olympia

 8   York Builders and Developers?

 9   A.   Excuse me?

10   Q.   The typed information in the middle where it says current

11   entity name, Olympia York Builders and Developers --

12   A.   Yes.

13   Q.   -- what is that?

14   A.   That's a company name.

15   Q.   Whose company is that, if you know?

16   A.   Nathan Schwartz.

17   Q.   And why is this document in this file, if you know?

18   A.   I guess -- we weren't the best organized office around, so

19   papers could be flying from here, but something Nathan Schwartz

20   and Henry Castillo, Lipa knew that Henry Castillo has to do

21   with Nathan Schwartz, he could put it in this file by mistake.

22   Q.   What's the purpose of this document?

23   A.   This document usually sent over in order to sponsor, a

24   company to sponsor clients, aliens, the way you want to call

25   it.  So we needed this information to enter and to register

D1PLCIB4                          Salamon - direct

 1    with the Department of Labor first.  And then we would get an

 2    email, a notification that they checked it out, the company

 3    exists and everything is okay, and you're ready to file labor

 4    applications.

 5    Q.   Was Olympia York Builders and Developers a company you were

 6    generally familiar with?

 7    A.   No.

 8    Q.   How did you become familiar with that company?

 9    A.   Nathan Schwartz provided me the information.

10    Q.   And why did he provide you the information?

11    A.   To sponsor clients.

12    Q.   Okay.  Turning now Government Exhibit 3100-11, please.

13    A.   Yes.

14    Q.   What is that document?

15    A.   This is a memorandum from the U.S. Citizenship Immigration

16    explaining the act to be grant for petition I-245, an alien

17    must be a beneficiary of a qualifying immigrant visa petition

18    or application for labor certification filed on or before

19    April 30, 2001, and meets applicable statutory and regulatory

20    requirements.

21    Q.   Is this the amnesty you've been talking about?

22    A.   Yes.

23    Q.   You can look now to Government Exhibit 3100-12, please.

24    What's this document?

25    A.   When the client would come in, I would give him, we would

1    give him an application form to fill out so we could enter it

2    later on into the labor application.

3    Q.   So this is one of those forms?

4    A.   Yes.

5    Q.   Do you know what that notation is on the right-hand side,

6    on the left-hand side?

7    A.   No.

8    Q.   Okay.  So moving on, you can close that file and move to

9    the other file that I put up in front of you, Government

10   Exhibit 3101.

11            MS. ECHENBERG:  If we could bring up, sorry, the whole

12   file is Government Exhibit 3101.  If we could bring up

13   Government Exhibit 3101-1.

14   Q.   If you could look at that in your file, please.

15            What is this?

16   A.   Copy of a passport.

17   Q.   For who?

18   A.   From Jose Francisco Torres.

19   Q.   And who is Jose Francisco Torres, if you know?

20   A.   Another person that Nathan brought to the office that works

21   for Nathan Schwartz.

22   Q.   So this is the second employee that he was sponsoring

23   through the office?

24   A.   Yes.

25   Q.   If you could look now at Government Exhibit 3101-2 and -5,

D1PLCIB4                         Salamon – direct

1    and if we could put those up next to each other, please.

2    A.  Yes.

3    Q.  And what are these?

4    A.  The same altered labor that we did for the other file.

5    Jose Torres, this was edited out, was put in there, was pasted

6    in there.  Woodworker was pasted in.  And Maritza Diaz, all

7    that, Post Lane Limited is just a company that we put in there

8    to supposedly to say that Jose Torres had a case back in

9    April 30, 2001, he should qualify for green card.

10   Q.  Did these two clients, Jose Torres and Henry Castillo, know

11   that these altered documents were being submitted on their

12   behalf?

13              MR. BRILL:  Objection as to what someone else knew.

14              THE COURT:  Sustained.

15   Q.  Did you ever have any discussions with Leo Teitelbaum

16   regarding these clients' knowledge of these altered documents

17   being submitted on their behalf?

18   A.  No, no.

19   Q.  And did you ever have any discussion with Nathan Schwartz

20   about these altered documents being submitted on behalf of his

21   clients?

22   A.  No.

23   Q.  Okay.  Turning now to Government Exhibit 3101-3.

24   A.  Yes.

25   Q.  What is this document?

D1PLCIB4                        Salamon - direct

1    A.  This is, again, the fees for the immigration for I-140 and

2    the adjustment of status.

3    Q.  And what is in the memo line of these two checks?

4    A.  Francisco, I don't know the other word, and another one,

5    Francisco.

6    Q.  If you look now at 3101-4.  And if you could look on the

7    inside of your folder again.

8    A.  Yes.

9    Q.  Do you know -- do you recognize that handwriting?

10   A.  Yes.

11   Q.  And what does it relate to?

12   A.  To the moneys to start the case.

13   Q.  So how much was this client charged?

14   A.  12,000.

15   Q.  And this client had a legitimate sponsor, right?

16   A.  Yes.

17   Q.  So why was this client charged $1,200?

18            THE COURT:  12,000.

19   Q.  Excuse me, $12,000, if you know?

20   A.  I can't remember.

21   Q.  And was a percentage of that $12,000 provided to Nathan

22   Schwartz?

23   A.  Yes.

24   Q.  Do you know how much?

25   A.  I can't remember.

D1PLCIB4                          Salamon - direct

1    Q.  If you could go to Government Exhibit 3101-6 and -7,

2    please, if we could put those up side by side.

3           What is the document to the left?

4    A.  You want me to look at 3105?

5    Q.  Look at 3101-11, which is the document that's up on the

6    left-hand side of the screen.  Sorry, six.  I can't see that

7    far.

8           What is 3101-6?

9    A.  3106 looks like a copy, it is a copy of labor approval,

10   labor certification.

11   Q.  And what's 3101 -- what's on the front page of 3101-6?

12   A.  Cover letter where the labor certification was mailed to.

13   Q.  And where -- that's the original labor certification?

14          You can take it out if that's easier.

15   A.  No.

16   Q.  Can you tell by looking at that where the original labor

17   certification was mail?

18   A.  Yes.

19   Q.  Where was it mailed?

20   A.  Immigration.  You mean where it was mail?

21   Q.  The original labor approval, where was that mailed?

22   A.  Care of Nathan Schwartz, 46 Main Street, Suite 226, Monsey,

23   New York 10952.

24   Q.  Do you recognize that address?

25   A.  Yes.

D1PLCIB4                        Salamon - direct

 1   Q.  What is it?

 2   A.  Post office, shipping company, they ship -- I think it's a

 3   printing.  I was never inside, but I know they had this P.O.

 4   box in there.

 5   Q.  How do you know that?

 6   A.  Because Nathan once told me to stop and he went inside to

 7   get some mail.

 8          MS. ECHENBERG:  Can we put up Government Exhibit 53,

 9   please.

10   Q.  Do you recognize that?

11   A.  Yes.

12   Q.  What is that?

13   A.  That's the place on Main Street.

14   Q.  That's the place you were just talking about?

15   A.  Yes.

16   Q.  Have you ever been inside there?

17   A.  No.

18   Q.  Have you been to the location generally?

19   A.  Like I said, when Nathan was once in the car and said stop

20   and went in to get the mail.

21   Q.  If we could go back to 3101-6 and -7.

22   A.  Want to go back to 3106?

23   Q.  Yes.  Behind this cover sheet there's a copy of the labor

24   certification; is that right?

25   A.  3107, yes.

D1PLCIB4                         Salamon - direct

1    Q.  And where was that labor certification mailed?

2    A.  Contour Framing care of Nathan Schwartz, 46 Main Street,

3    Suite 226, Monsey, New York 10952.

4    Q.  Okay.  If we can move now to Government Exhibit --

5    actually, if we can stay with this for one moment.

6           Do you notice that the alien's name here is not the

7    person we've been talking about, Jose Torres?

8    A.  Yeah.

9    Q.  Do you know why that is?

10   A.  No idea.

11   Q.  In looking through the file is there anything in the file

12   that could indicate to you why it's a different alien in this

13   file?

14   A.  Again, like I said, we were not the most organized office.

15   And something came in on Contour Framing that was related to

16   Nathan Schwartz, Lipa would put it in the file, the girl would

17   put it in that file.

18   Q.  Do you know whether Jose Torres ever got a labor approval

19   through the law firm?

20   A.  Yes.

21   Q.  How do you know that?

22   A.  I see what's sent in to immigration and there's immigration

23   receipts also.

24   Q.  And where are those immigration receipts sent?

25   A.  1301 47th Street.

D1PLCIB4                    Salamon - direct

1    Q.  And are there any other addresses that those are sent?

2    A.  It was sent in to Texas processing center first.

3    Q.  What was sent to the Texas processing center?

4    A.  The labor approval.

5    Q.  The labor approval for who?

6    A.  For Jose Torres.

7    Q.  And that original labor approval, can you tell where it was

8    sent?

9    A.  I have to go through this whole file.

10   Q.  Can you just focus on the labor approval and the employer

11   contact information, the labor approval for Jose Torres that

12   you just pointed out, Mr. Salamon.

13   A.  Yes.

14   Q.  You were looking at the Texas service center documents?

15   A.  Yes.

16   Q.  You said there was a labor approval in there for Jose

17   Torres?

18   A.  I will check.

19   Q.  If you were mistaken, that's fine.  We'll move on.  I

20   thought you said you saw a labor approval in there for Jose

21   Torres?

22   A.  I saw it was sent to immigration.  It says here find

23   attachment in the documents.  It was sent to Texas.  I did not

24   say I saw -- I don't remember.

25   Q.  You didn't see the actual labor approval?

D1PLCIB4                        Salamon - direct

1    A.  No, I just saw it was sent in to Texas.

2    Q.  What was sent in to Texas?

3    A.  The labor approval.

4    Q.  So you saw a receipt that it was sent to Texas, but not the

5    approval itself?

6    A.  Yes, exactly.

7    Q.  Okay.  If you can move on to Government Exhibit 31.

8    A.  May I interrupt.  This is the proof it was sent in to

9    Texas.

10   Q.  If we can move on to 3101-8.  What is this document?

11           If you could look at 3101-8 on the screen, please.

12   A.  Yes.

13   Q.  What is that?

14   A.  This is a form we gave to the client when they came in to

15   get their information, when they enter the United States, all

16   their background information regarding to file to gain legal

17   status in the United States.

18   Q.  And looking at 3101-9 and 3101-10.  If we could put these

19   up next to each other, please.

20           What's 3101-9?

21   A.  That's authorization permission to work.

22   Q.  For who?

23   A.  Jose Torres.

24   Q.  And the 3101-10, what is that?

25   A.  That's their immigration receipt that I showed you before.

D1PLCIB4                        Salamon - direct

1    Q.  So I think what you said is this indicates that his

2    immigration --

3    A.  The labor approval was sent in to immigration.  That's a

4    receipt from the immigration stating that they had received the

5    labor approval.

6    Q.  And after Mr. Schwartz brought these two clients to the

7    firm, did he have any further involvement with the firm?

8    A.  Yes.

9    Q.  What was that involvement?

10   A.  He would give me companies to sponsor people and I would

11   pay him for it.

12   Q.  How did he come to do that?

13   A.  He needed money and I said -- Sam, I need to make money, I

14   need to make money.  And I told him if you're willing to give

15   me companies to sponsor people, as long as you say you're

16   willing to hire people, you won't have a problem.

17   Q.  And he agreed to do that?

18   A.  Yes.

19   Q.  And how much did you agree to pay him?

20   A.  $500 an approval.

21   Q.  And what information did you need from him to use his

22   company as a sponsor?

23   A.  Company name, company address, phone number, tax ID.

24   Q.  Once you had that information for a particular company,

25   what would you do?

D1PLCIB4                         Salamon - direct

1  A.  I would go to Earl and fax it over to him and say to

2  register the company.  And then we get a notification labor

3  department that we could file, so we filed applications.

4  Q.  Let me stop you for one second.

5         MS. ECHENBERG:  If we could put 3100-9 back up on the

6  screen, please.

7  Q.  So is this the type of information that you would get from

8  Mr. Schwartz and then provide to Earl David?

9  A.  Yes.

10  Q.  And in the registration process, did you need to provide an

11  email address?

12  A.  Yes.

13  Q.  And what email address would you provide for companies?

14  A.  Earl would make up an email address.  He would create an

15  address for that particular company.

16  Q.  And who would have access to that email address?

17  A.  If I wanted to see it, I would just go to see.  I would

18  have access.  Lipa would have access, Earl would have access.

19  Q.  Would the sponsor have access?

20  A.  No.

21  Q.  So what did Mr. Schwartz have to do in exchange for the

22  $500 that you were paying him for an approval?

23  A.  To bring me the original labor approval, I should be able

24  to file it with immigration.  And also he, if anybody calls, he

25  would have to say, yes, I'm looking to hire people.  I'm

D1PLCIB4                    Salamon - direct

1    looking to hire this person.  And also if a phone call from the

2    labor department asking about a particular alien or client, he

3    would have to say yes.

4    Q.  Why did the original approval go to Nathan Schwartz, why

5    didn't you just have it sent to the law firm?

6    A.  Because initially we did have it sent to the office and it

7    just -- we did a lot of applications and we were afraid since

8    we're not legit that it's going to raise red flags.  And Earl

9    David said, you know what, it looks more legitimate if it goes

10   straight to the sponsor.

11   Q.  And so you had to get it back from the sponsor; is that

12   right?

13   A.  Yes.

14   Q.  In the case of Nathan Schwartz, how would you do that?

15   A.  I would send it straight to him, what address he provide,

16   whatever address he provided on that company.

17   Q.  And how would you get it back from him so that you could

18   send it to the immigration department?

19   A.  He would bring it to me.

20   Q.  Where would he bring it to you?

21   A.  To my house.

22   Q.  And what does -- how often would he bring approvals to your

23   house?

24   A.  Any time they came an approval, pretty often.

25   Q.  Would he let you know if there was an approval or would you

D1PLCIB4                          Salomon – direct

1   let him know if there was an approval or did it work in some
2   other way?
3   A.  Same way.  Either I would ask him if any came or he would
4   check the mail because he wanted money so he would bring me the
5   approval.
6   Q.  So would you pay him $500 every time you made an
7   application?
8   A.  No.
9   Q.  When would you pay him the $500?
10  A.  When he brings me the original approval.
11  Q.  And that's the blue document that you've talked about?
12  A.  Correct.
13  Q.  So would you make applications with companies associated
14  with him –- let me take a step back.
15          We've looked at Olympia York up here, and we've looked
16  at Contour Framing.  Those are two companies of Nathan
17  Schwartz?
18  A.  Yes.
19  Q.  Did you use any other companies associated with Nathan
20  Schwartz to apply for labor approvals for clients?
21  A.  Yes.
22  Q.  Approximately how many companies?
23  A.  Four.
24  Q.  And how did you come to use those six companies?
25  A.  I said four.

D1PLCIB4                        Salamon - direct

1    Q.  Four.

2    A.  Maybe there's six.  I don't recall.  Right now at the

3    moment I remember four.

4    Q.  Okay.  So I was focused on these two -- Olympia York and

5    Contour -- and you think there were two additional?

6    A.  Could be.  I just don't remember the names right now by

7    heart.

8    Q.  And how did you come to use those various companies

9    associated with Nathan Schwartz?

10   A.  He would give me the information and said, Sam, here, start

11   filing.

12   Q.  And why did you get more than one company from him?

13   A.  Because it's -- if you file more than 15 or 20 applications

14   on one company, it's going to start to look very, very -- it's

15   going to raise a lot of red flags.  So there comes a time that

16   you have to give me a different company.  There's only so much

17   you can sponsor on one company.

18   Q.  And did you ask for multiple companies from the beginning?

19   A.  No.  When one company, I said, Nathan, do you have another

20   company?  There's too much on this company.  I have another

21   company.  So forth and so forth.

22   Q.  And when you would make filings for clients using these

23   companies, did you let Nathan Schwartz know every time you were

24   filing an application?

25   A.  No.

1    Q.  Why not?

2    A.  The agreement was that he'll get money only when he gets

3    approved.  I mean we filed a lot of filings and a lot of

4    denials came in.  So we would lose money actually because we

5    got a lot of denials.  So if every time we file an application

6    to pay for a sponsor, it would be very, very expensive.

7    Q.  So you would pay him only when you got that blue approval

8    from him?

9    A.  Yes.

10   Q.  And you said that he was also asked to communicate with the

11   Department of Labor?

12   A.  Yes.

13   Q.  And explain what you meant by that.

14   A.  The labor department did randomly call up to verify certain

15   application on a certain alien and he would say have to say

16   just yes, yes, yes, yes.

17   Q.  Do you know whether he ever was contacted by the Department

18   of Labor?

19   A.  Yes.

20   Q.  How do you know that?

21   A.  He played me one time a voice mail message.  And he used to

22   call me, Sam, the labor department called, what am I going to

23   do.  So I was having to call a lot of times.  So usually Lipa

24   Teitelbaum used to call.

25   Q.  So how would that work?  He would let you know that the

D1PLCIB4                          Salamon - direct

1    Department of Labor had called and what would happen next?

2    A.  I would call Lipa and tell him Nuchem said the Department

3    of Labor called or he would contact Nuchem directly and take

4    care of it.

5    Q.  When you say Lipa would take care of it --

6    A.  He would call the Department of Labor on behalf of Nathan

7    Schwartz.

8    Q.  Would he pretend to be Nathan Schwartz?

9    A.  I wasn't on the call so I can't say.

10   Q.  And after Lipa would take care of it, were at least some of

11   those applications approved?

12   A.  Yes.

13   Q.  And you mentioned there were a lot of denials.  Did you

14   ever discuss denials with Nathan Schwartz?

15   A.  Yes.

16   Q.  And what if anything did he say to you about that?

17   A.  He used to come to me and he used to tell me, Sam, he used

18   to be upset, how come the denials are coming in.

19   Q.  What would you say?

20   A.  What can I do, I feel bad.  You know, I'm not making money

21   either when the denials come in.

22   Q.  Why was he upset the denials were coming in?

23   A.  Because he doesn't get paid on the denials.

24   Q.  The address on Government Exhibit 3100-9, 455 Route 306,

25   are you familiar with that address?

D1PLCIB4                          Salamon – direct

1    A.  I don't see anything on the screen.

2              MS. ECHENBERG:  If you could bring up 3100-9.

3    Q.  See that address that you wrote on the bottom?

4    A.  Yes.

5    Q.  Are you familiar with that address?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's a shipping company, used to be around the corner from

9    me.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1p1cib5                          Salamon - direct

1    BY MS. ECHENBERG:

2    Q.   Look at Government Exhibit 54, please.

3            Do you recognize that?

4    A.   Yes.

5    Q.   What is that?

6    A.   That's the P.O. box that Nathan Schwartz had over there.

7    Q.   Over where?

8    A.   The shipping place company.

9    Q.   Do you know the address?

10   A.   At Route 306.

11   Q.   Have you been inside this location?

12   A.   Maybe once in 2009, shipped something.

13   Q.   And do you know whether Nathan Schwartz has ever been

14   inside this location?

15   A.   Yes.

16   Q.   How do you know that?

17   A.   Because he went in once or twice to check mail and he used

18   to come out and bring the approvals and he'd bring me denials,

19   and I was in the car waiting for him.

20   Q.   And did you ever use a mailbox in this location?

21   A.   No.

22   Q.   Did you ever have a mailbox in this location?

23   A.   Hmm?

24   Q.   Did you ever have a mailbox, rent a mailbox in this

25   location?

D1p1cib5                        Salomon – direct

1    A.  No.

2    Q.  Did you ever receive any mail at a mailbox here?

3    A.  I received mail from clients, yes.

4    Q.  Explain that to me.

5    A.  Once the office closed down, a client called me that he

6    wants to send me money, January sometime in 2009, so I didn't

7    want the client to know where I lived, I didn't want him to

8    send it to my address, so I asked Nathan if I could use his

9    address to send the check, the client wants to send a check.

10   Q.  Did the client send the check?

11   A.  Yes.

12   Q.  And did you get the check?

13   A.  Yes.

14   Q.  How did you get the check?

15   A.  Nathan gave it to me.

16   Q.  The labor approvals that were sent to Nathan -- do you want

17   to have a sip of water.  Go ahead.

18           The blue labor approvals that were sent to Nathan

19   Schwartz that he provided to you, did you ask him to sign those

20   documents?

21   A.  No.

22   Q.  Did those documents need to be signed before they went to

23   immigration?

24   A.  Yes.

25   Q.  Why didn't you ask Nathan Schwartz to sign them?

D1p1cib5                          Salamon - direct

1   A.  There was no need for him to actually sign.  The original

2   labor approval came over to me.  Why would I need him to give

3   me full permission to go ahead and file?  Otherwise he wouldn't

4   bring me labor approvals.

5   Q.  Who signed the labor approvals?

6   A.  Excuse me?

7   Q.  Who signed -- you needed a signature from the company on

8   the labor approval before it went to immigration; right?

9   A.  Yeah.

10  Q.  So who would sign for the company?

11  A.  Either me or Lipa.

12  Q.  And you said that Nathan Schwartz would come to your house

13  to give you labor approvals and you would give him money; is

14  that right?

15  A.  Yes.

16  Q.  Did you ever keep any records of the money that you were

17  giving him?

18  A.  Yes.

19  Q.  How did you keep those records?

20  A.  I just had a pad and I wrote down every time I gave him

21  money.

22  Q.  Do you still have that pad?

23  A.  No.

24  Q.  Do you know what happened to it?

25  A.  I have no idea.

D1p1cib5                              Salamon - direct

```
 1   Q.  And how much do you think you paid Nathan Schwartz over --
 2   well, was Nathan Schwartz still allowing his companies to be
 3   used as sponsors when there was the raid in 2009?
 4   A.  You mean after the raid?
 5   Q.  Prior to the raid, were you still using his companies with
 6   his permission up until that point?
 7   A.  Yes.
 8   Q.  So -- and approximately when did you start paying him for
 9   use of his companies?
10   A.  When did I start paying him?
11   Q.  Mm-hmm.  If you know.
12   A.  2000 -- end of 2006, beginning 2007 till 2009.
13   Q.  So in that time approximately how much do you think you
14   paid Nathan Schwartz?
15            MR. BRILL:  Objection.
16            THE COURT:  I think if you could reframe that
17   question.
18   Q.  Between around 2006 or 2007, when you started paying him to
19   serve as a sponsor, and 2009, when the law firm was raided, how
20   much money did you pay Nathan Schwartz, if you know?
21   A.  Approximately $30,000.
22   Q.  And did you ever have discussions with Nathan Schwartz
23   about how much money he was being paid?
24   A.  I don't understand the question.
25   Q.  Did Nathan Schwartz ever ask you for more money?
```

D1p1cib5                          Salamon - direct

1    A.  For more money besides what?

2    Q.  For more money than you were already paying him for

3    sponsorship.

4    A.  I can't remember.

5    Q.  And what, if anything, did Nathan Schwartz say about what

6    he was doing with the money you were paying him?

7    A.  He was putting it away for one day to bail me out.

8    Q.  Did you ever advance him any money?

9    A.  Yes.

10   Q.  What -- why did you advance him money?

11   A.  I advanced him money when I did my kitchen.

12   Q.  What do you mean when he did your kitchen?

13   A.  I was supposed to pay him $5,000 and he wanted a loan, so I

14   advanced him like $4500.

15   Q.  When you say he did your kitchen, what do you mean?

16   A.  He came in with his worker and did my kitchen and -- he was

17   the contractor redesigned my kitchen.

18   Q.  How much did you pay him for work on your kitchen?

19   A.  I paid his fee.  He wanted $5,000.

20   Q.  And did you lay out other money to pay for supplies and

21   things?

22   A.  Yes.

23   Q.  Showing you what's been marked as Government Exhibit 3002.

24   Look at those documents and tell me if you recognize them.

25   A.  Yeah, this is the payments that I paid in the kitchen and

D1p1cib5                          Salamon - direct

1    supplies for kitchen.

2    Q.  Those are the receipts for the work on the kitchen?

3    A.  Yes.

4            MS. ECHENBERG:  If we could just put the first page up

5    on the screen so the jury can see.

6            The government actually moves to admit this exhibit.

7    I just realized it's not admitted.

8            THE COURT:  Received.

9            (Government's Exhibit 3002 received in evidence)

10           THE COURT:  2002?

11           MS. ECHENBERG:  3002.

12           Can you just put that up on the screen.

13   Q.  And that's your handwriting on this document?

14   A.  Yes.

15   Q.  And those notations are regarding what?

16   A.  The kitchen.

17   Q.  So where it says Nuchem and then amount --

18   A.  Then it says loan $4,000.

19   Q.  Where does it say loan -- oh, down at the bottom?  Okay.

20   And this was around what time period?

21   A.  Toward the end of 2007, beginning of 2008.

22   Q.  And other than -- did you ever advance Mr. Schwartz money

23   in any other context?

24   A.  Yeah.  He used to come in the morning and say, "Sam, I need

25   to cover my bank, I'm behind in my bank," and it was early in

1     the morning, so yes, I did lay him out -- gave him $500 every

2     time he knew he had to cover his bank.

3     Q.  And how -- how, if at all, were you paid back that money?

4     A.  He used to give me approvals so he used to write it down

5     himself, "Sam, I don't owe you," or he'd give me approval and

6     that would take care of that $500 from that time.

7               MS. ECHENBERG:  You can take that down.

8     Q.  Did Nathan Schwartz help you with any other aspect of the

9     immigration fraud?

10    A.  Yes.

11    Q.  What did he do?

12    A.  He altered final determination papers.

13    Q.  What do you mean he altered final determination papers?

14    A.  Same thing that Lipa did and everybody else did that I

15    mentioned before, he did it also.

16              MS. ECHENBERG:  If we could bring up Government

17    Exhibit 3101-2, please.

18    Q.  Is this what you're talking about?

19    A.  Yes.

20    Q.  He altered documents like this for you?

21    A.  Yes.

22    Q.  And how -- how did that work?  I mean, what would you do,

23    what would he do?

24    A.  I would give him a name and he would have to copy and paste

25    it on the -- on the final determination.

1  Q.  And I'm showing you now what's been marked as Government's

2  Exhibit -- actually, one moment.

3          MS. ECHENBERG:  Okay.  If we could bring up Government

4  Exhibit 3613 and 3614 side by side, please.

5  Q.  If it's easier to read, here, I'll give you copies as well.

6          Do you recognize those e-mails?

7  A.  Yes.

8          MS. ECHENBERG:  If you could blow them up, if

9  possible.

10  Q.  What are they?

11  A.  I sent an e-mail from sammy110wall on June 23, 2008 to

12  nathan@monseyframing that he should go ahead and put one of the

13  final determinations in Lidia Chalen.

14  Q.  That's the name that you were asking him to put on the

15  altered final determination?

16  A.  Yes.

17  Q.  Okay.  And what is the other document?

18  A.  It's another -- it's another e-mail in 2008, to

19  nathan@monseyframing, just complaining -- I told him I need a

20  cook and he could put -- and I gave him the corporation and I

21  gave him the address what exactly he should put on that final

22  determination.

23  Q.  And what is that e-mail address, nathan@monseyframing.com?

24  A.  Yes.

25  Q.  Whose e-mail address is that?

D1p1cib5                          Salamon - direct

1   A.  Nathan Schwartz.

2   Q.  I'm going to show you what's been marked as Government

3   Exhibit 505-B.  Do you recognize that?

4   A.  Yes.

5   Q.  What is that?

6   A.  That's the text message.

7   Q.  Whose the text message between?

8   A.  Me and Nuchem, Nathan.

9   Q.  And how do you recognize that?

10  A.  It says Nuchem.

11  Q.  How do you recognize the message?

12  A.  I remember the message.

13  Q.  Is it a true and accurate copy of the message on your

14  phone?

15  A.  Yes.

16          MS. ECHENBERG:  Government moves to admit Government

17  Exhibit 505-B.

18          MR. BRILL:  Brief voir dire, please.

19  VOIR DIRE EXAMINATION

20  BY MR. BRILL:

21  Q.  Mr. Salamon, what's the date of that text message?

22  A.  June 22, 2011.

23  Q.  You didn't know his e-mail address prior to that?

24  A.  Excuse me?

25  Q.  You didn't know his e-mail address prior to that?

1    A.  Yes, I did.

2    Q.  You needed a refresher?

3          MR. BRILL:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 505-B received in evidence)

6    Q.  So who is asking -- do you see where it says, "E-mail?"

7    A.  Yes.

8    Q.  Who is writing that message?

9    A.  Me.

10   Q.  And then the response is, "nathan@monseyframing.com"?

11   A.  Yes.

12   Q.  And that's from Nuchem?

13   A.  Nathan Schwartz.  I asked him who to e-mail to.  I haven't

14   been e-mailing to him for years and -- it's been a couple

15   years.

16   Q.  And this is the e-mail that he provided you at that time?

17   A.  He wanted me to e-mail something, yes.

18          MS. ECHENBERG:  Could I have one moment, your Honor.

19          (Pause)

20   Q.  Okay.  I'm going to show you one more exhibit, Government

21   Exhibit 3001.  And 310.

22          MS. ECHENBERG:  We could take that down.

23   Q.  Okay.  I'm showing you what's been marked as Government

24   Exhibit 3001.  Do you recognize that?

25   A.  Yes.

D1p1cib5                          Salamon - direct

1              MS. ECHENBERG:  I'm going to leave this up here for

2    now.

3    Q.   What is that?

4    A.   That's Pitney Bowes stamp machine bill, invoice.

5    Q.   And what -- how do you recognize this document?

6    A.   'Cause it was in my house.

7    Q.   Did you provide it to the government?

8    A.   Yes.

9    Q.   And is this the document that you provided to the

10   government?

11   A.   Yes.

12             MS. ECHENBERG:  The government moves to admit

13   Government Exhibit 3001.

14             MR. BRILL:  No objection.

15             THE COURT:  Received.

16             (Government's Exhibit 3001 received in evidence)

17             MS. ECHENBERG:  If we could put that up on the screen,

18   please.

19   Q.   What stamp machine does this document relate to?

20   A.   To a stamp machine that we leased or put in his name.

21   Q.   For what?

22   A.   For my office.

23             MS. ECHENBERG:  If we could go to page 3, please.

24   Actually, sorry, page 4.

25             If we could highlight the Shipped To section, please.

1  Q.  That was your office there?

2  A.  Yes.

3  Q.  So this stamp machine was in your office?

4  A.  Yes.

5  Q.  And was it shipped to your office on January 13th, 2009?

6  A.  No.  I had a stamp machine before.

7  Q.  You had this stamp machine before?

8  A.  Yes.

9  Q.  How did Nathan Schwartz come to be the person in whose name

10 the bill for your office's stamp machine --

11 A.  'Cause I complained to him, I had to send people to the

12 mail, to the post office, it takes a long time, and he says,

13 "You know what?  Why don't you take a stamp machine?"  I said,

14 "I have no credit.  They're not going to give me no stamp

15 machine."  So he offered to take it out in his name, the stamp

16 machine.

17 Q.  And did you pay for the stamp machine?

18 A.  Not me personally, no.

19 Q.  Who paid for the stamp machine?

20 A.  Somebody in the office paid with credit card.

21 Q.  Someone in the office paid with a credit card.

22 A.  Yes.

23 Q.  But not Nathan Schwartz.

24 A.  No.

25 Q.  He just rented it in his name.

1   A.  Yes.

2   Q.  And how did this receipt come to be in your house?

3   A.  'Cause he was upset, he showed me that I should pay the

4   bill, you know, and I didn't pay.

5   Q.  Why was he upset at this time that you should pay the bill?

6   A.  I -- they raided my office at that time already and he told

7   me, "Sam, I got this bill."  I said I'll try to pay it.

8   Q.  Prior to that the bills were just getting paid?

9   A.  Yeah.

10          MS. ECHENBERG:  And if I could read in one more

11  stipulation, your Honor?

12          THE COURT:  Sure.

13          MS. ECHENBERG:  Government Exhibit S14.  And it has

14  the same caption and introductory language as we read before.

15          "If called as a witness, a custodian of records of

16  Pitney Bowes would testify that Government Exhibit 3001

17  consists of records of Pitney Bowes that were made at or near

18  the time of the occurrence of the matters set forth in the

19  records by or from information transmitted by a person with

20  knowledge of these matters, kept in the course of regularly

21  conducted business, and made by the regularly conducted

22  business activity as a regular practice."

23          Dated January 23rd, 2013, and it's signed by me and

24  defense counsel, all defense counsel.

25          And I would move to admit Government Exhibit 3 -- you

D1p1cib5                        Salamon - direct

1    know what?  It has the wrong number here, your Honor.  It

2    should be Government Exhibit 310.  I'm going to change that on

3    the stipulation.

4                (Pause)

5                MS. ECHENBERG:  Government moves to admit Government

6    Exhibit 310.

7                MR. BRILL:  No objection.

8                THE COURT:  Received.

9                (Government's Exhibit 301 received in evidence)

10               MS. ECHENBERG:  And the government moves to admit S8,

11   which we read in before, and S14.

12               THE COURT:  Received.

13               (Government's Exhibits S8 and S14 received in

14   evidence)

15   BY MS. ECHENBERG:

16   Q.  Do you have it in front of you, Mr. Salamon?  Could you

17   tell me generally what Government Exhibit 310 is.

18               It's face down on the corner of the desk up there.

19   A.  This is a copy of the invoices from the stamp machine,

20   Pitney Bowes.

21   Q.  The same stamp machine that Nathan Schwartz rented?

22   A.  Yes.

23   Q.  And if you look on -- there are numbers on the bottom of

24   the page.  Do you see that?  Do you see the numbers on the

25   bottom of the page?

D1p1cib5                    Salamon - direct

1   A.   Which numbers are you referring to?

2   Q.   In the document -- how about on the top of the page?  Do

3   you see the numbers on the top of the page?

4        If you could turn to the fourth page -- the ninth page

5   of this document, which at the top says 74609.

6        If you want to look on your screen, you can do that as

7   well.

8        Do you see the date at the top of this document?

9   A.   Yes.

10  Q.   Do you see where it says July 14th, 2008?

11  A.   Yes.

12  Q.   And then if you go to the end of the document -- well, is

13  that around the time that Nathan Schwartz first rented this

14  stamp machine for the office?

15  A.   Yes.

16  Q.   Okay.  I'm going to show you what's been marked as -- I'm

17  going to turn now to Harold Tischler.

18  A.   Yes.

19  Q.   How did you meet Harold Tischler?

20  A.   Mutual friend.

21  Q.   What's that mutual friend's name?

22  A.   Morty Katz.

23  Q.   How did you come to meet Harold Tischler?

24  A.   I said through a mutual friend.

25  Q.   And how did that come up?

D1p1cib5                          Salamon - direct

1   A.  Oh, I was just talking to my friend, I'm doing immigration,

2   do you know someone in construction that is looking to hire

3   workers.

4   Q.  And why did you want someone in construction?

5   A.  'Cause I needed again at that time carpenters, those jobs.

6   Q.  And does Mr. Tischler go by any other names, as far as you

7   know?

8   A.  Excuse me?

9   Q.  Does Mr. Tischler go by any other names, as far as you

10  know?

11  A.  Heshy.

12  Q.  Can you spell that.

13  A.  A -- H-E-S-H-Y.

14  Q.  Heshy?

15  A.  Or H-E-S-H-I.

16  Q.  And when did you first meet Harold Tischler, if you know?

17  A.  Sometime at the end of 2002, beginning of 2003.

18  Q.  So after you got the reference from Morty Katz, what did

19  you do?

20  A.  I called him up and I said, "I do immigration and I'm

21  looking for companies that could sponsor people, and for every

22  signature I'll give you certain amount of money."

23  Q.  You said every signature.  Was there something different at

24  that time than when you approached Nathan Schwartz?

25  A.  Yes.  Sorry.  Yes, at that time we didn't do it online so

D1p1cib5                        Salamon - direct

1   we required a signature.

2   Q.  So what did you offer to Mr. Tischler, if anything?

3   A.  I can't recall exact amount, 2003, but somewhere around

4   $400.

5   Q.  $400 for what?

6   A.  Per signature.

7   Q.  And what were you asking him to do?  Were you asking him to

8   do anything other than sign a document?

9   A.  Yes.  He should let me know if Department of Labor calls,

10  and if he gets any correspondence, he should bring it over to

11  me or I'll meet him and/or I'll send someone to pick it up.

12  Q.  And when you first approached Harold Tischler, was he

13  actually looking to hire workers?

14  A.  No.

15  Q.  What happened next after you made this offer to him?

16  A.  I started getting information from -- I got information

17  from him, and when it was online -- he started with the

18  company, he would get labor approval originals, and I would

19  have either -- he would come to the office on Battery Place and

20  come up and bring me the approvals and hand them to me and I

21  would hand him cash on the spot.  If I was busy, I would send

22  Moishe Rosenberg to go downstairs.  Sometimes he would call me,

23  "Sam, I'm coming," and I was not in the mood that day or I

24  didn't have the money, I'd tell him turn around or don't come

25  today, come tomorrow.  Otherwise, I would send Moishe Rosenberg

1  and he would pay him or if I was busy, I would send Lipa

2  Teitelbaum to pay him as well.

3  Q.  Did you ever ask Harold Tischler to speak to the labor

4  department?

5  A.  Yes.

6  Q.  Do you know if he did that?

7  A.  Yes.

8  Q.  In what context would he speak -- or did he speak to the

9  Department of Labor?

10  A.  To confirm.  He used to call me and he was nervous that

11  they called, so I just told him just don't be nervous, just

12  call, and he used to call me back and say yes, it's confirmed.

13          MS. ECHENBERG:  And can we put on the screen

14  Government Exhibit 3612, please.

15  Q.  Do you recognize this e-mail?

16  A.  Yes.

17  Q.  What is it?

18  A.  That's forwarded case status from Harold Tischler to me.

19  Q.  How do you know that's from Harold Tischler?

20  A.  Harrythemn, that's his e-mail address, private e-mail

21  address.

22  Q.  What is he forwarding to you?

23  A.  Thank you -- that he spoke to national processing center.

24  There was one client who was driving me up the wall and he came

25  every day, "I need to know my status, I need to know my status,

D1p1cib5                              Salamon - direct

1   I need to know my status."  I called him and said, "Can you

2   please help me out here.  Call the labor department."  So he

3   called over to me saying he did speak to the labor department

4   about this case.

5   Q.  Why didn't you just call the labor department yourself?

6   A.  I was very hesitant to call.  That was not my regular thing

7   to call.

8         MR. GREENFIELD:  I'm sorry.  I didn't hear that.

9   A.  I was hesitant to call.  I don't usually call the labor

10  department.

11  Q.  Why not?

12  A.  I don't.  That's not one of the things I do.

13  Q.  Okay.  And so how was -- you said you would pay Harold

14  Tischler in cash if he would come to the office or you would

15  send Moishe -- or you would send Moishe Rosenberg out to pay

16  him in Brooklyn.  What's in Brooklyn?

17  A.  That's where they used to meet.

18  Q.  And where would Moishe Rosenberg get the money to pay him?

19  A.  From me.

20  Q.  And did anyone else ever pay him at the office?

21  A.  Lipa Teitelbaum.

22  Q.  How do you know that?

23  A.  I -- like I said, when I used to be busy, I'd tell Lipa,

24  "Take care of Heshy.  He's waiting outside."  There was a lot

25  of people in my office, so I used to send out Heshy -- Lipa

1    Teitelbaum to pay him.

2    Q.  Do you know how Lipa Teitelbaum paid him?

3    A.  I don't know exactly.

4            MS. ECHENBERG:  I'm going to read in one more

5    stipulation, your Honor, if that's okay?

6            THE COURT:  Mm-hmm.

7            MS. ECHENBERG:  Actually, one moment.

8            (Pause)

9    Q.  Okay.  I'm showing you what's been marked as Government

10   Exhibit 202.  If you could take --

11           MS. ECHENBERG:  Oh, so these -- we move to admit

12   Government Exhibit 202 pursuant to stipulation S3 that we read

13   in earlier.

14           MR. GREENFIELD:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibit 202 received in evidence)

17           MS. ECHENBERG:  If we could bring up Government

18   Exhibit 202, please.

19   Q.  Do you see the check at the very bottom of that first page?

20   A.  Yes.

21   Q.  Who is Yisruel Pollack?

22   A.  That's the name Lipa Teitelbaum used.

23   Q.  Did Harold Tischler also go by Hershy Tischler?

24   A.  Yes.

25   Q.  Look at the next page.  Look at the check at the very top,

1    please.

2    A.   Yes.

3    Q.   If you could read the Pay To the Order of there?

4    A.   Excuse me?

5    Q.   If you could read who that check is made out to?

6    A.   Harold Tischler.

7    Q.   If you could look at the next page, the third check down.

8    A.   Harold Tischler.

9    Q.   If you could look at the next page, the fourth check down.

10   A.   Harold Tischler.

11   Q.   Does it say Harold?

12   A.   Hershy Tischler.

13   Q.   And if you look at the next page, the third check down.

14   A.   Harold Tischler.

15        MS. ECHENBERG:  You could take those down.

16   Q.   What, if anything, did Leo Teitelbaum tell you about

17   Yisruel Pollack?

18   A.   Told me that a friend in Montreal, Canada lets him use his

19   bank account.

20   Q.   Did Mr. Tischler ever come to the 110 Wall Street office to

21   be paid?

22   A.   I can't remember right now.

23   Q.   How was he -- were you paying him as a sponsor during the

24   time you were at the 110 Wall Street office?

25   A.   Yes.

1    Q.  So during that time was he either paid directly by you or

2    by Moishe Rosenberg?

3              MR. GREENFIELD:  Objection.  Leading.

4    A.  He used to wait downstairs.  I used to go downstairs, at

5    one point I remember, and I used to come downstairs and pay

6    him.

7    Q.  But you don't remember if he ever came up to the office.

8    A.  Exactly.

9    Q.  And what about at 17 Battery Place?  Do you remember him

10   ever coming to that office?

11   A.  Yes.

12   Q.  And what the did the sign say at the entrance to that

13   office?

14   A.  Fix Anything Construction and Plumbing, or Fix Anything

15   Plumbing.  I don't have the name right in front of me.

16   Q.  And do you know whether he ever came out to the 125 Maiden

17   Lane office?

18   A.  No.

19   Q.  No, you don't know or no, he didn't?

20   A.  No, he did not.

21   Q.  How do you know that?

22   A.  'Cause I didn't want him to come up.

23   Q.  Why not?

24   A.  'Cause it's in Vintage Partners.  I didn't want him to know

25   that I leased the second building -- the second office in his

D1p1cib5                              Salamon - direct

1    name.

2    Q.  And did you use a single company in connection with Harold

3    Tischler's sponsorship or more than one company?

4    A.  More than one.

5    Q.  Do you know how many?

6    A.  I can roughly say four, five.

7    Q.  Do you remember the names of those companies?

8    A.  Some.

9    Q.  What?

10   A.  I would remember some.

11   Q.  Okay.  What are some of the names of those?

12   A.  Fix Anything, Vintage Partners, Vintage Builders.  If you

13   would show me to remember my recollection.  I can't remember at

14   the moment.

15   Q.  Okay.  I'm going to show you now what's been marked as

16   Government Exhibit 505-A.

17            Do you recognize that?

18   A.  Yes.

19   Q.  What is that?

20   A.  When I was diagnosed with cancer --

21   Q.  Well, just tell me what it is generally.

22   A.  Oh, he sent me a text reaching out to me and there was a

23   whole discussion with --

24   Q.  Who sent you a text?

25   A.  Tischler.  Harold.

D1p1cib5                          Salamon - direct

1  Q.  And is this a true and accurate copy of the text that he

2  sent you?

3  A.  Yes.

4        MS. ECHENBERG:  The government moves to admit

5  Government Exhibit 505-A.

6        MR. GREENFIELD:  No objection.

7        THE COURT:  Received.

8        (Government's Exhibit 505-A received in evidence)

9        MS. ECHENBERG:  If we could publish this exhibit,

10  please.

11  Q.  So first, who is this message from?

12  A.  Harold Tischler.

13  Q.  To who?

14  A.  To me.

15  Q.  If you could just read the message and then I'll ask you

16  questions about it.

17  A.  "Are you nuts?  I forgive you for always keeping me waiting

18  and always making me come back and lying to me and filing docs

19  to labor department more than you ever told me.  To this date

20  I'm still getting calls and mail.  I forgive you for

21  everything.  I screwed up once and you upset wow."

22  Q.  Okay.  So what is Mr. Tischler referring to in this text

23  message?

24  A.  That I was very upset at him -- I don't know if you want me

25  to get into it, but I was very upset at him, and he's writing

D1p1cib5                         Salamon - direct

1   me back:  Why are you upset?  You used to make me wait

2   sometimes at your office to get money, and you know, you made

3   me also run around, come back later, come tomorrow.

4   Q.  So let me stop you there.  I'm going to try to break it

5   down a little bit.  In general what were you upset with

6   Mr. Tischler about at this time?

7   A.  He reached out to me when I was diagnosed with cancer and I

8   was under chemotherapy two years ago and trying to be nice to

9   me and how I'm feeling.  I said, "If you want to be nice, I'm

10  penniless, I don't have a dime to my name, can I come pick up

11  $500 from you?"  He said yes.

12  Q.  Did he agree to give you $500?

13  A.  He agreed by text.

14  Q.  And did you go to pick up money?

15  A.  I went to Brooklyn --

16  Q.  Did you go to pick up money?

17  A.  Yes.

18  Q.  Where did you go?

19  A.  I went to Brooklyn.

20  Q.  And what happened?

21  A.  Nothing.  He didn't answer my phone, he was picking up some

22  equipment from outside and just completely ignored me.

23  Q.  And what did you do?

24  A.  What did I do?  I wrote him back a message.  I was very,

25  very upset.  You don't do that to a friend.  Why you make me

1   come for nothing?

2   Q.  And this was his response to that message?

3   A.  Yes.

4   Q.  Okay.  So let's go through the message line by line.  It

5   says, "Are you nuts?  I forgive you for always keeping me

6   waiting, always making me come back."  What did you understand

7   him to mean?

8   A.  That he forgave me for the times that I told him to come to

9   the office to pick up money and make him -- and never call, and

10  make him come back again.

11  Q.  Why would you make him come back again?

12  A.  I don't remember.  Possibly once or twice I told him,

13  "Listen, I don't have money right now for the approval or

14  sponsorship.  Come back tomorrow."  But always I would call

15  him, "Don't come today.  Come tomorrow."  "I'm on my way."  I

16  said, "I don't have the money now."

17  Q.  That's what you were referring to before, that he would

18  call and say he was on his way and you would tell him you

19  didn't have money and you'd tell him to come back?

20  A.  Yes.

21  Q.  Let's move on to the next part.  "And lying to me," it

22  says, "a filing docs to the labor department more than you ever

23  told me."  What did you understand --

24  A.  Claiming that I filed documentation to the labor department

25  more than I told him.

D1p1cib5                          Salamon - direct

1   Q.  And is that correct that you filed applications that he

2   didn't know about?

3   A.  Yes, it was -- yes.

4   Q.  And which, if any, applications would he know about?

5   A.  When he would get approvals, then he would know.  He will

6   get paid.

7   Q.  Did he also receive correspondence for denials?

8   A.  Yes.

9   Q.  And do you know whether he received that correspondence?

10  A.  Yes.

11  Q.  How do you know?

12  A.  He came to the office and showed me.

13  Q.  What would he show you?

14  A.  Either was opened the mail sometimes or I opened it up, and

15  I said, "Sorry, it's actually a denial.  Sorry, you came for

16  nothing," and I would give him a couple dollars, $300 just for

17  his time and effort and also for him sponsoring people.  I

18  didn't want him -- I wanted to motivate him.

19  Q.  And then he said, "To this day I'm still getting calls and

20  mail.  I forgive you for everything.  I screwed up once and you

21  upset wow."  What did you understand that to mean?

22  A.  He said he's still getting calls from the labor department

23  and mail from immigration or labor department.  "I forgive you

24  for everything.  I screwed up once and you upset wow."  That

25  he's saying to me that he screwed up by not giving me money,

D1p1cib5                          Salamon – direct

1   making me come all the way to Brooklyn for nothing.

2   Q.  Okay.  And I'm showing you now what's been marked as

3   Government's Exhibit 501.

4           Do you recognize this?

5   A.  Yes.

6   Q.  Generally what is that?

7   A.  Message from Facebook.

8   Q.  How do you recognize it?

9   A.  Because I have Facebook.

10  Q.  It's a message on your Facebook?

11  A.  Yes.

12  Q.  And is this a true and accurate copy of a message on your

13  Facebook?

14  A.  Yes.

15          MS. ECHENBERG:  Government moves to admit Government

16  Exhibit 501.

17          MR. GREENFIELD:  It's going to be the objection I

18  raised earlier.

19          THE COURT:  Overruled.

20          (Government's Exhibit 501 received in evidence)

21          MS. ECHENBERG:  Could you please pull up Government

22  Exhibit 501.

23  Q.  First of all, you said this is a message on Facebook?

24  A.  Yes.

25  Q.  And you received this -- where did you receive this?

D1p1cib5                          Salamon - direct

1   A.   In my inbox message on Facebook.  There's messages that I

2   can see -- if I'm live, it goes into the chat box.  If I'm not

3   logged on, it will go into the message box.

4   Q.   And what is the date on this message?

5   A.   July 19, 2012.

6   Q.   And who is the message from?

7   A.   Harold Tischler.

8   Q.   How do you know that?

9   A.   Because I was friends with him on Facebook prior to that.

10  Q.   And other than the name, is there anything that you

11  recognize about this?

12  A.   Yeah.  He used to sell electronic cigarettes, so this was a

13  symbol I think he used -- to be used for marketing cigarettes.

14  Q.   What does the message say?

15  A.   "Moiser."  That I'm a snitch --

16  Q.   Well, actually, just read the whole message first.

17  A.   "Moiser you put me in jail wow."

18  Q.   What does "moiser" mean?

19  A.   "Moiser" means that I'm a snitch.

20  Q.   And what did you understand this message to mean?

21  A.   That he's upset because I'm talking to the government, that

22  I'm -- whatever, that I'm cooperating with the government.

23  Q.   I'm showing you what's been marked as Government

24  Exhibit 505-C.  Do you recognize that?

25  A.   Yes.

1    Q.   In general, what is it?

2    A.   Text message from iPhone.

3    Q.   Between who and who?

4    A.   Me and Harold.

5    Q.   And did this -- is this a fair and accurate copy of the

6    text message between you and Harold on the dates indicated?

7    A.   Yes.

8              MS. ECHENBERG:  Government moves to admit Government

9    Exhibit 505-C.

10             MR. GREENFIELD:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibit 505-C received in evidence)

13             MS. ECHENBERG:  If we could publish that, please.

14   Q.   So who is writing the message in the green at the top?

15   A.   I'm not good at colors, but --

16   Q.   Who's writing the first three messages on the top?

17   A.   Me.

18   Q.   And who is writing the response?

19   A.   Harold Tischler.

20   Q.   And can you read the message that starts, "Call me."

21   A.   "Call me in the office 718-871-0382."

22   Q.   Okay.  Turning now to defendant Refeal Brodjik.  You said

23   he went by the name Rafi?

24   A.   Yes.

25   Q.   And what was his role in the office?

D1p1cib5                              Salamon - direct

1   A.  He collected money for Earl David, he was Earl David's

2   personal assistant.

3   Q.  Did he do anything else, as far as you knew?

4   A.  He did some fake experience letters.

5   Q.  When you said he did some fake experience letters, what do

6   you mean?

7   A.  We needed experience letters to show person in Israel has

8   religious schooling, so he would fake -- fake experience

9   letter.

10  Q.  Those are for the R-1 applications that you talked about

11  earlier?

12  A.  Yes.

13  Q.  And did he do anything else in connection with the fraud?

14  A.  I can't remember.

15  Q.  How did Rafi Brodjik get involved with Earl David, if you

16  know?

17  A.  Through a friend, going to the office.

18  Q.  Why did he come to the office initially?

19  A.  He wanted to gain legal status in the United States.

20  Q.  And was he able to do that?

21  A.  Yes.

22  Q.  How did he do that?

23  A.  Earl David gave him a sponsor.

24  Q.  Who was that sponsor?

25  A.  Flam.

D1p1cib5                                    Salamon - direct

1    Q.  Do you know Flam's first name?

2    A.  Yes, Avraham Flam.

3    Q.  Does he go by any other names?

4    A.  Abraham.

5    Q.  Showing you Government Exhibit 4.  Do you recognize that?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Abraham Flam.

9    Q.  And was that a legitimate sponsorship that Earl David gave

10   to Rafi Brodjik?

11   A.  As far as I know, no.

12   Q.  Why do you say no?

13          MR. GERZOG:  Objection, your Honor, to -- in terms of

14   the "as far as I know."  Either he knows or he doesn't know.

15   Q.  Do you know whether it was a legitimate sponsorship?

16   A.  No.

17   Q.  Did you ever have any conversations with Rafi Brodjik about

18   his sponsorship?

19   A.  Yes.

20   Q.  What did he say to you?

21   A.  He just was happy that he got permission to work and he was

22   contemplating to go to Israel and -- I mean, he wasn't hiding

23   it.

24   Q.  Did he ever express any concern about his sponsorship?

25   A.  Yes.

D1p1cib5                            Salamon - direct

 1              MR. GUTMAN:  Objection to leading.

 2              THE COURT:  He answered yes.

 3   Q.  What did he express to you?  Did he express that concern to

 4   you?

 5   A.  I was with him when he expressed that concern.

 6   Q.  And what was the concern that he expressed?

 7   A.  He had some falling out with Libby Milano, the girlfriend

 8   of Earl David, and he was just scared that Libby Milano was

 9   going to call up the government about his green card.

10   Q.  Did she work in the office as well?

11   A.  Yes.

12   Q.  What was he concerned Ms. Milano might do?

13   A.  Call the government and tell them that he was -- he had a

14   fake -- a fake green card.

15   Q.  Why would she say he has a fake green card?

16   A.  He got into some fight -- she used to threaten everybody,

17   so if Earl got in a fight with -- with his girlfriend, his

18   friends suffered as well.

19   Q.  Was Ms. Milano aware of the fraud in the law firm?

20   A.  Excuse me?

21   Q.  Was Ms. Milano aware of the fraud in the law firm?

22              MR. GUTMAN:  Objection, your Honor.

23   A.  Yes.

24   Q.  What sort of work?  Did you ever work with Ms. Milano?

25   A.  Yes.

1    Q.  Did you ever see the type of work that she did in the law

2    firm?

3    A.  Yes.

4    Q.  What did she do in the law firm?

5    A.  She opened up cases with clients.

6    Q.  Legitimate cases, as far as you knew?

7    A.  I don't know.  I can't remember.

8    Q.  What percentage of the work in the law firm was legitimate,

9    as far as you know?

10   A.  10 percent.

11   Q.  Turning to Ms. Cibik --

12          THE COURT:  Excuse me, Ms. Echenberg.

13          MS. ECHENBERG:  Yes.

14          THE COURT:  Where are you in percentage terms?

15          MS. ECHENBERG:  I would say I have maybe an hour left.

16   At the most.  I'm just not -- we have some files to go through.

17   They may go quickly.

18          THE COURT:  Okay.  Then I think we'll have to break

19   for the day then.

20          MS. ECHENBERG:  I understand.

21          THE COURT:  All right.  Everybody, have a good

22   weekend.  Remember the rules.

23          And could I just ask Ms. Thais to stay behind.  She

24   shouldn't worry.

25          (Jury excused)

D1p1cib5

1           (Witness excused)

2           (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1p1cib5

1          (In open court; jury not present; one juror present)

2          THE COURT:  If we remember correctly, you told us that

3    you had a plane on the 30th of the month?

4          JUROR:  That's correct.

5          THE COURT:  I'm afraid we're still going to be going

6    on the 30th, and we wanted to give you a chance to bail out

7    today.

8          JUROR:  Okay.

9          THE COURT:  You're also welcome, if you're just

10   curious, to stay as long as, you know, your plans permit, but I

11   would have felt badly if I kept you here through Tuesday and

12   then sprung on you that I didn't think you'd get to be part of

13   the deliberative process.

14         JUROR:  I appreciate that, your Honor.  I would like

15   to come Monday just in case things move forward and then --

16         THE COURT:  Well, they will move but they won't be

17   done, unfortunately.

18         JUROR:  So you're certain that they will not be done

19   by Tuesday?

20         THE COURT:  Sadly, yes.

21         JUROR:  All right.  Well, then I won't come back.

22         THE COURT:  Okay.  All right.  Thanks so much.

23         You know, we really do appreciate every time someone

24   participates in the jury process, and we understand, you know,

25   it's one of the highlights of our Constitution, and unless

D1p1cib5

1    you're willing to do it, the system just doesn't work, so we do

2    thank you.

3            Why don't you just hang here for just a minute, or

4    about a minute, or you're welcome to actually go back but just

5    don't tell them that I've excused you, because I don't want a

6    rush of other people trying --

7            JUROR:  I don't mind waiting.

8            THE COURT:  Okay.  Why don't you wait.

9            We'll call you and tell you what happens, that's for

10   sure, either way.

11           JUROR:  Okay.  Thank you.

12           (Pause)

13           (Juror excused)

14           THE COURT:  Just a few things that we have on our list

15   about the charge that are not, you know, sort of resolved in

16   any way.

17           First, I think we need another revised indictment,

18   okay?

19           We have yet to hear from Mr. Donaldson on the sort of

20   duress/following orders question.

21           I don't know if the government is intending to put in

22   evidence of flight with respect to Ms. Cibik.  I don't know if

23   you were planning on doing it.  If you are, then there's a

24   whole issue about the charge, you know, on that, given that, if

25   I understand, she left and came back in a month.  But I could

D1p1cib5

1    be wrong about that.  I don't know what the evidence is.

2              MR. DONALDSON:  I hadn't heard any yet.  I was

3    actually just doing some research on that but I hadn't heard

4    anything yet, but -- as of right now, of course I'll be

5    objecting to it because I haven't heard anything related to it.

6              THE COURT:  No, I'm not saying it belongs in the

7    charge.  I'm just trying to put on the floor the things that,

8    you know, Brett and I have been thinking about, because there

9    have been I think requests for these things.  I haven't heard

10   the evidence, and I don't know if the government was pursuing

11   that sort of line of argument.

12             MR. PASTORE:  Your Honor, at this time there's -- we

13   agree there's no evidence of flight.  The evidence of flight

14   would come in if the proffer statements came in.  And so far,

15   as your Honor has noted, they aren't, and so unless something

16   changes, we don't believe that's going to be in there.

17             THE COURT:  Okay.  Fine.  We'll leave it if applicable

18   maybe now.  Sounds like it probably won't be.  But if somehow

19   it works its way in, I suspect it needs to be revised, because

20   I think it would be incomplete at this point.

21             Okay.  Just in terms of proffer statements, so far

22   there's been no suggestion that Mr. Brodjik's proffer

23   statements should be in.

24             And I guess the last matter which is on the agenda is

25   the letter that we received this morning from Mr. Gutman.

D1p1cib5

1              All right.  Now just in terms of planning, can I get

2       any guidance from anybody on length of summations?

3              MR. PASTORE:  Judge, I think we go a maximum of two

4       hours.  That will be the outside.

5              THE COURT:  Combined?

6              MR. PASTORE:  For the government.  No, no, I'm sorry,

7       for the government's.

8              MR. DONALDSON:  No.  Combined meaning both of you?

9              THE COURT:  Combined meaning main and rebuttal or --

10             MR. PASTORE:  Oh.  We'll add half an hour just to be

11      safe.

12             THE COURT:  Two and a half hours.  Main and rebuttal.

13             MR. DONALDSON:  I am working on between 45 minutes and

14      an hour.

15             MR. BRILL:  It will be about the same for me.

16             MR. GREENFIELD:  I can't imagine -- I would say

17      between a half an hour and 45 minutes.

18             MR. GERZOG:  I would allow an hour and a half for me

19      but I probably wouldn't take it all.

20             THE COURT:  What did you say?

21             MR. GERZOG:  I say I would ask to allow for an hour

22      and a half but I probably won't take it all.

23             THE COURT:  Let me ask one more question.  Do defense

24      counsel expect an extensive cross of the agent?

25             MR. GERZOG:  Of the agent.  Not sure what the agent's

D1p1cib5

1    going to say really, Judge, so it's hard to tell.  Not as

2    extensive, obviously, as Grynsztajn and Salamon, but, you know,

3    if she's -- may I ask the government how long her direct will

4    be?  Because that might inform me somewhat.

5              MR. PASTORE:  Yeah.  As we mentioned earlier today, we

6    don't anticipate it would be more than two hours of testimony,

7    probably substantially less than that, but --

8              MR. GERZOG:  So then no, I wouldn't imagine my cross

9    would be that lengthy.

10             THE COURT:  Say that again?

11             MR. GERZOG:  I couldn't imagine that -- if she's only

12   going to take two hours on direct, I can't imagine my cross

13   would be particularly lengthy.

14             MR. GREENFIELD:  I thought I was with Mr. Grynsztajn

15   for about half an hour, so I think -- so I don't --

16             THE COURT:  I don't know.

17             MR. GREENFIELD:  Yeah, okay.

18             THE COURT:  I haven't been timing you.

19             MR. GREENFIELD:  Yeah, no.  That was just my feeling.

20             THE CLERK:  I have.

21             MR. GREENFIELD:  So I would anticipate, based on

22   that -- that would be three days with him.  About the same with

23   the agent; a little less, maybe.  I mean, I assume that she's

24   going to summarize the entire case, so I'm going to --

25             THE COURT:  In two hours?  That's good.

D1p1cib5

1          MR. GREENFIELD:  I'm going to try to, you know, land

2     every punch that I land with everybody else one more time with

3     her.  So that would be about it.

4          MR. GERZOG:  He doesn't mean punch.

5          MR. GREENFIELD:  No, I do.

6          MR. GERZOG:  He means gentle --

7          THE COURT:  We won't have any fisticuffs here.

8          MR. GREENFIELD:  No.  I mean what's in my mind when

9     I'm making a good point.

10         THE COURT:  Okay.  That's a whole lot of food for

11    thought.  All right.

12         MR. GUTMAN:  Just so we're clear, your Honor would

13    like written comments on the draft charge by Sunday?

14         THE COURT:  Yes.

15         MR. GUTMAN:  And will we have some --

16         THE COURT:  We'll have an oral discussion, but we'll

17    be able to start thinking about what you have to say, okay?

18         So it doesn't really sound like testimony finishes on

19    Monday.

20         MR. DONALDSON:  On Monday?  No.

21         THE COURT:  Doesn't sound like it.

22         MR. DONALDSON:  No.

23         MR. BRILL:  Another hour with Salamon, I have to think

24    the cross is going to be extensive, so maybe, if the cross has

25    started, late on Monday.

D1p1cib5

1          MR. DONALDSON:  I think that's not likely.

2          THE COURT:  Just give me one second.

3          (Pause)

4          THE COURT:  Well, I think at least the government

5     should be prepared to sum up on Tuesday.  Whether it happens or

6     not, I can't tell you.  Okay?

7          MR. PASTORE:  And Judge, now that most of

8     Mr. Salamon's testimony is in, I don't know if we have any

9     better sense from the defendants whether their clients intend

10    to testify, whether they intend to put on a defense case.

11         THE COURT:  Government has a question for defense

12    counsel.  Having heard most of Mr. Salamon's testimony -- I

13    guess we've heard it against everyone except Ms. Cibik; right?

14         MR. DONALDSON:  No, we heard some stuff about

15    Ms. Cibik in there too.

16         THE COURT:  No, but I mean, Ms. Echenberg was starting

17    at the end to sort of change topics.

18         MR. BRILL:  I don't think it's going to be an hour on

19    Ms. Cibik, though.

20         MS. ECHENBERG:  No, I skipped over -- there are client

21    files relating to Ms. Cibik specifically, but I'm going to go

22    through -- I'm going to try to start thinking about that.

23         THE COURT:  So the question on the floor is whether

24    the defense counsel, having heard a day's worth of Mr. Salamon,

25    have reached any different inclination about whether there

D1p1cib5

1     would be an affirmative defense case.

2          MR. GERZOG:  No current inclination.

3          MR. GREENFIELD:  I'm thinking of calling some

4     witnesses, but I don't know who they are yet.  I'm going to

5     work on that this weekend.  But I do have a sense of what I'm

6     going to want to establish.

7          THE COURT:  Okay.

8          MR. GREENFIELD:  And again, it may not be necessary,

9     to one extent or the other.  Depends on my cross.

10         THE COURT:  How many of those blows you land.

11         MR. GREENFIELD:  Exactly.  You know, just punches.

12     There are jabs and then there are knockout blows.  I'm not

13     expecting one of those.

14         MS. ECHENBERG:  Your Honor, I would just put on the

15     record that we've made a request to defense counsel for a

16     witness list and for prior statements.  We, of course, provided

17     all of that well in advance of trial.  We would ask the same

18     courtesy of defense counsel.

19         MR. GREENFIELD:  I got 3500 material this morning.  I

20     get it at 2:00 in the morning.  When I'm sleeping, it comes to

21     my e-mail.  I don't know what, you know --

22         MR. BRILL:  We got a "names you might hear" list.

23         MS. ECHENBERG:  And then we told you every day and the

24     night before who of that list.

25         THE COURT:  Well, I would expect on Monday that

D1p1cib5

1    defense counsel would tell the government who, if anyone,

2    they're going to call.  Okay?

3            MR. DONALDSON:  Just one last thing.

4            THE COURT:  Yes.

5            MR. DONALDSON:  As I said before, my client -- I want

6    to discuss it with her again -- instructed me she does not want

7    to testify, and again, I want to talk to her about that again

8    this weekend, but I think -- and I'm being pressed to bring

9    this up -- her concern is her English.  I informed her that we

10   could obtain a Turkish interpreter for her if that's necessary.

11   She is opposed to that as well.  So that's where we are right

12   now.

13           DEFENDANT CIBIK:  Can I say something, your Honor?

14           THE COURT:  No, please don't say anything.  I just

15   confirm the advice that you've received from Mr. Donaldson, and

16   that is that the interpreter will be provided if you choose to

17   testify and if it's necessary.  But I guess at some point,

18   Mr. Donaldson, you need to give us some notice of that just so

19   that we can get a Turkish interpreter, because unlike the

20   Spanish interpreters, you know, who we have sort of on call,

21   we're not in exactly the same situation.

22           MR. DONALDSON:  I understand.

23           THE COURT:  Okay.  All right.  Very good.  Thank you.

24           (Adjourned to January 28, 2013, at 9:00 a.m.)

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   ROBERT SALAMON

 4   Direct By Ms. Echenberg  . . . . . . . . . .1167

 5                        GOVERNMENT EXHIBITS

 6   Exhibit No.                              Received

 7    7 and 7A and 26 and 26A   . . . . . . . . .1185

 8    12 and 12A, 25 and 25A . . . . . . . . . .1188

 9    19, 27, 28, 17 . . . . . . . . . . . . . .1202

10    3031-1 through 3031-9  . . . . . . . . . .1210

11    601-3 through 601-12 . . . . . . . . . . .1249

12    16 and 16A . . . . . . . . . . . . . . . .1264

13    S8 and S14 . . . . . . . . . . . . . . . .1329

14    15    . . . . . . . . . . . . . . . . 1265

15    58    . . . . . . . . . . . . . . . . 1182

16    60    . . . . . . . . . . . . . . . . 1213

17    202   . . . . . . . . . . . . . . . . 1335

18    301   . . . . . . . . . . . . . . . . 1329

19    501   . . . . . . . . . . . . . . . . 1343

20    504   . . . . . . . . . . . . . . . . 1269

21    505-B . . . . . . . . . . . . . . . . 1325

22    505-A . . . . . . . . . . . . . . . . 1339

23    505-C . . . . . . . . . . . . . . . . 1345

24    601-1 . . . . . . . . . . . . . . . . 1243

25    601-2 . . . . . . . . . . . . . . . . 1244
```

3001    . . . . . . . . . . . . . . . 1326

3002    . . . . . . . . . . . . . . 1321