D1ULCIB1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                   11-CR-424 (NRB)

5   GULAY CIBIK, REFAEL BRODJIK,
    a/k/a "Rafi," NATHAN SCHWARTZ,
6   HAROLD TISCHLER, a/k/a
    "Hershy,",

7
               Defendants.        Jury Trial
8
    ------------------------------x
9
                         New York, N.Y.
10                         January 30, 2013
                         9:17 a.m.
11

12   Before:

13              HON. NAOMI REICE BUCHWALD,

14                        District Judge

15
                  APPEARANCES
16
    PREET BHARARA
17       United States Attorney for the
        Southern District of New York
18   JANIS ECHENBERG
    JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
    MICHAEL DINET, Paralegal Specialist
20
    DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
    BY:  XAVIER R. DONALDSON, ESQ.
22
    LAWRENCE D. GERZOG, ESQ.
23   JEREMY L. GUTMAN, ESQ.
       Attorneys for Defendant Refeal Brodjik
24

25

D1ULCIB1

APPEARANCES
(Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:   DEIDRE GORDON, Special Agent, Homeland Security
                RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D1ULCIB1

1            (Trial resumed)

2            (Jury not present)

3            THE COURT:  Ready?  I see the empty chair.  Sort of

4    like out of Les Mis.

5            Can we get started otherwise?

6            MR. PASTORE:  The government has nothing.

7            Judge, actually, on the jury charge, is it okay if we

8    give your Honor comments this evening?  I think we're prepared

9    to discuss.

10            THE COURT:  I think we were planning I'd talk about

11    it -- I thought I said we'd talk about it the end of the day

12    today if we can.

13            MR. PASTORE:  End of the day today.  Okay.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D1ULCIB1

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          Mr. Brill.

4          MR. BRILL:  Thank you, your Honor.

5      ROBERT SALAMON, resumed.

6    CROSS-EXAMINATION (cont'd)

7    BY MR. BRILL:

8    Q.  Good morning, Mr. Salamon.

9    A.  Good morning.

10          MR. BRILL:  Mr. Dinet, could we put No. 3101-4 back

11   up, please.

12   Q.  Mr. Salamon, do you remember we were talking about this

13   exhibit when we left off yesterday?

14   A.  Yes.

15   Q.  And correct me if I'm wrong, but on Friday you told the

16   government that this note indicated that there was a kickback

17   to Mr. Schwartz of part of this fee, and then yesterday you

18   said you didn't know anything about that.  Is that right?

19   A.  I was asked if this particular writing means a kickback.

20   No, it does not mean a kickback.

21   Q.  So this particular note, despite what you mentioned on

22   Friday, does not mean that there was a kickback to

23   Mr. Schwartz?

24   A.  On the writing it doesn't mean a kickback.

25   Q.  How much, based upon your recollection today, was the

D1ULCIB1                        Salamon - cross

1  kickback to Mr. Schwartz for Henry and Francisco's

2  applications?

3  A.   One is they had permission to work.  He brought me money to

4  my house and he said how much is mine.  And we made up we're

5  not going to tell Lipa Teitelbaum.  Lipa Teitelbaum never knew

6  about it that he got his kickback, and I can't remember if it

7  was 2,000, 3,000, I can't remember the amount.

8  Q.   Isn't it the case that this note indicates that

9  Mr. Schwartz made an arrangement with you that one of the

10 legitimate applicants was going to be paying on behalf of the

11 other legitimate applicant; do you recall that?

12 A.   Excuse me?

13 Q.   Do you remember that one, that is, either Henry or

14 Francisco, was less able to pay for his application so that the

15 other one was going to be paying a larger portion?

16 A.   Wrong.  Never said that to me.

17 Q.   Never said that.

18        MR. BRILL:  Can we look at 3101-6, please.  Now, if

19 you can scroll down to the application page, please.  Thank

20 you.

21 Q.   This, if we look, let's just look at this page first,

22 Mr. Salamon.  This is mailed to, excuse me, the sponsor, that

23 is, the employer information, is Contour Framing, 46 Main

24 Street, Suite 226, correct, in Monsey?

25 A.   Employer's name, yes.

D1ULCIB1                        Salamon - cross

1    Q.  And that's the correct -- that's the mailing address that
2    is included in that employer's name, right?
3    A.  I don't know where it was mailed.  This is the employer
4    information.
5    Q.  Do you have any reason to dispute --
6    A.  If I seen it on the cover sheet, I would be able to see
7    where it's mailed.
8    Q.  So let's go back to page 1.  That's where it was mailed,
9    right?
10   A.  Yes.
11          MR. BRILL:  If we go back to page 2, briefly.  Just
12   leave it like that, that's fine.
13   Q.  See the number of employees indicates 17, right?
14   A.  Correct.
15   Q.  Now, in many of your applications you had to inflate the
16   number of employees that a company had in order to show that
17   the company had enough cash flow to support additional
18   employees, right?
19   A.  What's the question again?
20   Q.  In many of the false applications that you filed, you had
21   to inflate the number of employees that the company had in
22   order to justify that the company had enough cash flow to hire
23   more employees, right?
24   A.  No.  The only justification was with tax returns.  The 17
25   employees was not the reason for that.

1    Q.  Do you have any reason to doubt in this case that Contour

2    Framing had at least 17 employees?

3    A.  Excuse me?

4    Q.  Do you have any reason to doubt in this case that Contour

5    Framing had at least 17 employees?

6    A.  I don't know only of two employees.  I don't know 17

7    employees.

8    Q.  So you don't know?

9    A.  I've never seen them.

10   Q.  So you don't know?

11   A.  I don't know.

12   Q.  Can we look then at the lower portion here in Section D.

13   It's the employer contact information, right, and that would

14   indicate the actual mailing address that would show up on the

15   first page, right?

16   A.  If it's showing up on the first page, yes.

17   Q.  Now, can we look at 3101-7, please.

18        You testified on direct that this actually was refiled

19   because Pablo Antonio Avila Leon is actually not the person for

20   whom this application was filed; do you recall that?

21   A.  Can you repeat it again?

22   Q.  Do you remember testifying on direct that this Pablo

23   Antonio Avila Leon did not match up to the rest of the

24   application in the file, this in fact was an application on

25   behalf of one of the legitimate employees; do you remember

1    that?

2    A.  Legitimate employees?

3    Q.  Legitimate application.

4    A.  I never said this is a legitimate employee.

5    Q.  Look at 3101-8, please.  This is the work sheet that

6    accompanied 3101-7, right?

7    A.  Excuse me?

8    Q.  This is the work sheet that accompanied 3101-7, the one you

9    just looked at, correct?

10   A.  I have to see the file.

11   Q.  Why don't we give you all of 3101.  I'm going to show you

12   everything that's been marked into evidence at 3101, including

13   all of the subexhibits.  If you take a look at that, and then

14   let me know when you're ready.

15   A.  No problem.  Yes.

16   Q.  This is the file for Jose Francisco Torres Garderas, right?

17   A.  Yes.

18   Q.  One of the two people that Mr. Schwartz approached you with

19   as his legitimate employees, right?

20   A.  Yes.

21   Q.  So the name on the Exhibit 3101-7 does not match up to the

22   rest of the file, right, that's Mr. Avila?

23   A.  3107?

24   Q.  3101-7.

25           MR. BRILL:  You can put it up on the screen if that's

1    easier.

2    A.  3101-7 is Pablo Antonio Avila.

3    Q.  So either it's in the wrong file or it's a mistake, right?

4    A.  I said we were not organized.  So we saw something on

5    Nathan Schwartz's company, we might have put it in Jose

6    Torres's file.  That's what I said and that's what it was.

7    Q.  So it's purely based upon a lack of organization?

8    A.  Yes.

9    Q.  Now, why then in the case of Exhibit 3101 did one of the

10   legitimate employee's applications get mailed to Main Street in

11   Monsey where the other legitimate employee's application got

12   mailed to the random address that we talked about yesterday in

13   Brooklyn?

14   A.  3101 was mailed where?

15   Q.  To Main Street in Monsey, right?  We talked about that.

16   46 Main Street, Suite 226?

17   A.  I have to see it.

18   Q.  Look at 3101-6, first page of the application that we just

19   spoke about.  It's up on the screen.

20   A.  Yeah, but I need to know to whom that belongs to.

21   Q.  Okay.  So take your time.

22   A.  31106 belongs to Pablo Avila.  It was not his employee.

23   Q.  Oh.  So the entire file was mixed in then?

24   A.  No, not the entire file.  This particular 3106, and I keep

25   telling you, was put in over here because we were not

D1ULCIB1                              Salamon - cross

1    organized.

2    Q.  3101-6 was, 3101-7 was also Mr. Avila Leon's information.

3    The work sheet then is 3101-8.  That's for Mr. Francisco

4    Torres.

5            Do you have any idea -- 3101-1 has Mr. Francisco

6    Torres's passport in it; do you see that?

7    A.  Correct.

8    Q.  So which, so is this Mr. Avila Leon's file or Mr. Francisco

9    Torres?

10   A.  3107 and 3101-11 is one labor approval.  It's not separate

11   papers.  The government separated as a different exhibit, but

12   this is one labor approval.

13   Q.  The file in front of you is labeled 3101, right, the entire

14   green file?

15   A.  Yes.

16   Q.  That is a file that was taken from your if you want to call

17   it that law office, right?

18   A.  Yes.

19   Q.  You have at least two applications mixed into one file,

20   correct?

21   A.  One person was mixed in, one labor approval was mixed in.

22   Not two, not multiple.  One went in by mistake, the labor

23   approval that went to Contour Framing.

24   Q.  So your argument or your answer is that the government

25   separated out multiple pages of one document into multiple

1   exhibits, right?

2   A.  It's possible.  It's one person, one person, not multiple

3   person.

4   Q.  Can you tell us based upon the information that you have

5   where Jose Francisco Torres's labor approval was mailed?

6   A.  I would have to check it out.  I don't remember by heart.

7   Q.  Would it be in that file?

8   A.  I don't know.

9   Q.  Why don't you check and see.

10          THE COURT:  These cover mailing sheets, do they in any

11  place on the front or the back link to a particular name?

12          MR. BRILL:  I don't want to testify, Judge.  I don't

13  think there's any alien name attached to this specific sheet.

14          THE COURT:  And that's true throughout.  In other

15  words, there's a cover sheet and it never has a name of an

16  alien attached to it.

17          MR. BRILL:  Right.

18          THE COURT:  Correct.

19  Q.  The question is, Mr. Salamon, can you tell from your file

20  where Jose Francisco Torres's application was mailed?  Because

21  it should show in Section D has the mailing address, right?

22          THE COURT:  Is the document you just referenced in the

23  file?  The document you said which would show where it was

24  mailed.

25          MR. BRILL:  The document that I referenced previously,

1  Judge, is the one that has Mr. Avila Leon's name on it.  The

2  question I have for Mr. Salamon is whether -- whether he can

3  tell whether this is Mr. Avila Leon's file or Mr. Francisco

4  Torres's file.

5          THE COURT:  He's already told you that it's somewhat

6  misfiled, so.

7          THE WITNESS:  Again, this cover sheet wouldn't tell me

8  if it's Pablo Avila or Jose Torres.  This is just a cover

9  sheet.

10  Q.  Right.  So let's start with the simple question:  Is there

11  an application on behalf of Francisco Torres in that file?

12  A.  There is receipts that it went to immigration, yes.

13  Q.  But the actual physical application?

14  A.  I don't see it at this moment.

15  Q.  Do you know if that exists in a separate file?

16  A.  It's possible.  Again, like I said, we were misorganized.

17  Q.  Let's move on.  In terms of access to Mr. Schwartz's office

18  in Monsey, you were able to get into that office on occasion

19  without Mr. Schwartz being there, right?

20  A.  Wrong.

21  Q.  Mr. Schwartz had a buzzer system installed on the exterior

22  door of the office, right?

23  A.  Possible.

24  Q.  And he shared that office building with a car service,

25  correct?

D1ULCIB1                    Salamon - cross

1   A.  Possible.

2   Q.  And that car service had equal, excuse me, equal access to

3   the buzzer in the exterior door, right?

4   A.  I don't know about that.

5   Q.  You never gained access to that office by calling the car

6   service and asked to be buzzed in?

7   A.  Never.

8   Q.  And I'm assuming it's also your testimony that Mr. Schwartz

9   never gave you the code to the upstairs door?

10  A.  I don't know if it's the code upstairs.  I was twice in his

11  office.  That was in 2009 after my office was raided, not

12  before that.

13  Q.  But you don't dispute that you were in his house multiple

14  times, right?

15  A.  In his house?

16  Q.  In his house.

17  A.  Private house, yes.

18  Q.  And you weren't -- there wasn't a problem with you being

19  left alone in his house, right?

20  A.  I was never there alone and there's no reason I should be

21  there alone.  Nobody would leave me alone.  I would not go

22  uninvited, only invited and together with Nathan and his wife

23  would be there and his kids would be there.

24  Q.  When he you went to the bathroom, no one was following you

25  around?

1            THE COURT:  Oh, come on.

2            MR. BRILL:  Withdrawn.

3            THE COURT:  Yes.  Good idea.

4            MR. BRILL:  Can we look at Exhibit 101, please.

5   Q.  Do you know what that is, Mr. Salamon?

6   A.  Not exactly.

7   Q.  Have you ever seen something like this before?

8   A.  The government has showed it to me, but I never dealt with

9   such paperwork that I'd be able to know what is this exactly.

10  Q.  Would it be fair to say that based upon your limited

11  knowledge, this is a list of applications filed on behalf of an

12  employer named CFI Framing and Developers?

13  A.  Again, I have never seen that document before.  The

14  government had shown it to me.  I never worked with this

15  document in my office.

16  Q.  You have a limited working knowledge of this document?

17  A.  What do you mean by limited working knowledge?

18  Q.  Do you know, for example, what employer name would mean on

19  this document?  If you don't, you don't.

20  A.  I mean the names look familiar.

21  Q.  Why don't we do this.  Why don't we look at 101-1 instead.

22            THE COURT:  Is this the document maintained by the

23  Department of Labor?

24            MR. BRILL:  Yes, Judge.

25            THE COURT:  Or document maintained by a group such as

1    the David law firm?

2              MR. BRILL:  I believe it's maintained by the

3    Department of Labor.

4              THE COURT:  And are documents like this sent from the

5    Department of Labor to law firms like the David firm?

6              MR. BRILL:  I don't know, Judge.

7              THE WITNESS:  No.

8              THE COURT:  So then.

9              MR. BRILL:  If the witness says's not familiar with

10   it, I'm happy to move on.

11             THE COURT:  There's no reason he ought to be familiar

12   with it, is there?

13             MR. BRILL:  He may have been prepared.

14             THE COURT:  That doesn't make him a particularly good

15   witness on it, does it, any more than you or I having seen it

16   could testify about it.

17             MR. BRILL:  That's why I'm moving on.

18             Can we look at 101-1, please.  And can we scroll down

19   to the second page.

20   Q.  Do you recall, Mr. Salamon, that this was a company that

21   you used in making false applications to the Department of

22   Labor?

23   A.  Yes.

24   Q.  And this is different than Contour Framing, right, you

25   filed other applications on behalf of Contour Framing?

1    A.  Whatever information I got from Nathan Schwartz I filed

2    under.

3    Q.  The question is did you file separate applications for

4    Contour Framing and CFI Framing and Developers?

5    A.  It's possible, yes.

6    Q.  And it's your testimony that -- well, do you believe that

7    CFI Framing and Developers and Contour Framing are separate

8    companies?

9    A.  I remember there was an email Earl David asked me about it.

10   And I don't know.  I didn't give an answer to that.  I don't

11   know his books.  I don't know his corporations.  I don't know

12   what he have, what he doesn't have.  So I wouldn't be able to

13   tell CFI framing and Contour Framing is the same company.

14   Q.  If we look at page 15, please.  Is it fair to say,

15   Mr. Salamon, that the information in this ETA Form 9089 was

16   filled out by you or another employee of the law firm?

17   A.  Yes.

18           MR. BRILL:  Can we focus on the employer

19   identification number.  I'm sorry, a little bit higher up.

20   Q.  Where did you get this employer identification number from?

21   A.  Nathan Schwartz.

22   Q.  You knew that this was not an accurate employer

23   identification number for a company, right?

24   A.  Why would I know?

25   Q.  Did you check?

1   A.  I don't do corporations, so I'm not an expert in

2   corporations.  So whatever information I'm getting I relayed.

3   Q.  And you didn't make it up?

4   A.  No.

5   Q.  Nathan Schwartz, again, had no access to the email address

6   CFIframing@yahoo.com?

7   A.  No, he did not have no access to that email address.

8   Q.  And no access to any of the other email addresses that

9   Mr. David created, correct?

10  A.  The ones Mr. David created, no, he did not have access.

11          MR. BRILL:  Exhibit 53, please.

12  Q.  Mr. Salamon, you said you were familiar with this location?

13  A.  Yes.

14  Q.  You've been inside this location?

15  A.  No.

16  Q.  Never?

17  A.  Never.

18  Q.  You're familiar this is on Main Street, right?

19  A.  Yes.

20  Q.  Okay.  And this is what, you waited in the car when

21  Mr. Schwartz picked up mail?

22  A.  Yes.

23  Q.  Can we look at Exhibit 54.  And this one is actually closer

24  to your house, right?

25  A.  It's around the corner from my house.

D1ULCIB1                        Salamon – cross

1   Q.  And it's your testimony that you're not familiar with this

2   location either?

3   A.  Not until Mr. Schwartz went in to get mail.

4   Q.  Did you ever go in to get mail?

5   A.  No.

6   Q.  You never opened up a mailbox there?

7   A.  No.

8   Q.  It's your testimony that when a sponsor received -- well,

9   withdrawn.

10          It was your testimony that the Department of Labor

11  randomly called sponsors to verify sponsorship; do you remember

12  testifying to that?

13  A.  Yes.

14  Q.  And you know that's actually not true, right, only -- let

15  me ask you that question:  You know that wasn't true, right?

16  A.  You could call Department of Labor if you have any doubt

17  that they called any sponsors.

18  Q.  That's not the question.  The question is did they randomly

19  call sponsors?

20  A.  Yes.

21  Q.  Isn't it true, Mr. Salamon, the only time the Department of

22  Labor called sponsors is if the sponsor failed to verify by

23  email?

24          THE COURT:  Excuse me, you're asking him to testify

25  about Department of Labor policy?  He's not qualified to do

1    that.

2            MR. BRILL:  Okay.

3    Q.  So it's your testimony when a sponsor received a phone call

4    from the Department of Labor, he would occasionally call and

5    ask what to do in that situation?

6    A.  Can you repeat that question?

7    Q.  It's your testimony that when a sponsor received a call

8    from the Department of Labor, he would occasionally call the

9    firm and ask what to do, right?

10   A.  The firm?  If I dealt directly with the sponsor, they would

11   call me.

12   Q.  And then either you or Lipa would sometimes call the

13   Department of Labor back?

14   A.  After Mr. Nathan Schwartz or any sponsor that I dealt

15   directly told me, listen, Department of Labor called to confirm

16   this employee, I don't want to call, I'm scared.  I said, you

17   know what, Lipa, call.  This is information that I got from

18   Nathan.  Lipa call back Department of Labor to confirm.

19   Q.  Did you call back as well?

20   A.  I might have maybe once called Department of Labor, twice.

21   Q.  You were in Lipa's presence when he made those calls?

22   A.  Sometimes he would do it in the car on the way in.

23   Sometimes I was not in his presence, no.

24   Q.  But sometimes you were?

25   A.  Occasionally, maybe one time I was.

D1ULCIB1                        Salamon - cross

1   Q.  And on that one time did Lipa impersonate the sponsor?

2   A.  What do you mean by impersonate?

3   Q.  Say that he was the sponsor on the phone with the

4   Department of Labor.

5   A.  I can't remember exactly the phone call, what it was.

6   Q.  When you called the Department of Labor, did you

7   impersonate the sponsor?

8   A.  I can't remember either.

9   Q.  You also said Nathan Schwartz was getting upset, as did

10  other sponsors, when denials came in, right?

11  A.  Other sponsors?  What do you mean other sponsors?

12  Q.  You said you had conversations with Nathan Schwartz where

13  he expressed his being upset about the denials, but you said

14  that other sponsors expressed that to you as well, right?

15  A.  Yes, yes.

16  Q.  And the reason that you stated that is because if a denial

17  came in, or that the sponsor expressed to you that if a denial

18  came in, they didn't get paid, right?

19  A.  He didn't get paid.  Some sponsors, if they came all the

20  way from Brooklyn, they brought me papers, I would pay them

21  just for coming in and for their time.  But him I did not pay

22  for denials, no.

23  Q.  Because Mr. Schwartz would only come to your house?

24  A.  Yes.

25  Q.  Not all the way to Brooklyn?

1    A.  Yes.

2    Q.  Now, in those situations, you didn't have some sort of

3    contingency fee at the firm, that is, if the person didn't get

4    approved, you didn't get paid, right?

5    A.  What do you mean by contingency fee?

6    Q.  Meaning a results-based fee.  The applicants did not only

7    pay you upon a good result, right?

8    A.  The applicant paid me.  If in a year and a half to two

9    years I did not get their permission to work, they got

10   80 percent of the money refunded.

11   Q.  That was an agreement that you signed with them?

12   A.  Yes.

13   Q.  You testified yesterday that Mr. Schwartz came to know the

14   difference between denials and approvals because he provided

15   you with envelopes that had already been opened; do you

16   remember saying that?

17   A.  Yes, at times, yes.

18   Q.  Do you also remember being asked the same questions or

19   similar questions on Friday and not saying that?

20   A.  I don't remember.

21   Q.  So in a situation, let's say using what you're telling us

22   about Mr. Schwartz, he brings you a labor approval, right, and

23   you said this happened on multiple occasions, correct,

24   Mr. Schwartz brought you opened envelopes containing --

25   A.  Open or closed.

D1ULCIB1                      Salamon - cross

1    Q.   In both situations?

2    A.   After a while I would say he knew.  He opened it himself

3    and he brought it open.  Sometimes open, sometimes closed.

4    Q.   In either situation, you testified that it was you didn't

5    require the sponsors to sign the labor approvals, right?

6    A.   I did not ask them to sign.

7    Q.   And in no situation that you can recall did Mr. Schwartz

8    sign a labor approval, right?

9    A.   Excuse me?

10   Q.   Is there any situation that you can recall that

11   Mr. Schwartz signed a labor approval?

12   A.   It's possible.

13   Q.   Now, Mr. Schwartz, as you said, would come to your house

14   with these labor approvals, right?

15   A.   Yes.

16   Q.   It would have taken what, five or ten seconds to open the

17   envelope and ask him to sign?

18   A.   Five or ten seconds?  We used to sit down.  We used to have

19   coffee and he brought me the approvals and I saw it was an

20   approval and I took it back to the office.  And sometimes we

21   used to stay in the office until we called the person to pay

22   for the approval.  It can take a week or two weeks, and then I

23   signed it.

24   Q.   So it was based upon the client paying?

25   A.   Based when the client comes to pay and the client is there

1   to mail out the information we needed and all the information

2   is there to mail out to immigration.

3   Q.  But it never occurred to you that it would have been more

4   helpful to have the actual sponsor sign the actual labor

5   approval?

6   A.  Not really because if he brings me original labor approval,

7   that gives me full permission.  He knows I'm not going to take

8   approvals and decorate my office with it.

9          THE COURT:  Do denials come in one size envelopes and

10  approvals come in another size envelope?

11         THE WITNESS:  No.

12         THE COURT:  Same size.

13         THE WITNESS:  Same size.

14         THE COURT:  Is one envelope thicker than the other?

15         THE WITNESS:  It might be thicker because the labor

16  approval has more papers in there.

17         THE COURT:  Okay.

18  Q.  One additional piece of paper?

19  A.  One?  Labor approval has -- I can count them, probably like

20  eight, nine pages, labor approval, not one.

21  Q.  An actual approved application has eight more pages than a

22  disapproved?

23  A.  Don't count me on the exact numbers.  I would have to count

24  it here and see exactly how many numbers, but it's more than a

25  denial, yes.

D1ULCIB1                    Salamon – cross

1          THE COURT:  So the envelope, although the same size,

2     is thicker if it is an approval.

3          THE WITNESS:  Yes, should.

4          THE COURT:  It's like college applications and

5     rejections, right.

6          THE WITNESS:  It's thicker.  I mean if somebody see

7     it, it's thicker.

8     Q.  You testified that you advanced money to Nathan Schwartz

9     when he did your kitchen?

10    A.  Yes.

11         MR. BRILL:  Can we look at Exhibit 3002, please.

12    Q.  You testified that the writing on the bottom indicates a

13    $4,000 loan to Nathan Schwartz?

14    A.  Yes.

15    Q.  And, again, Mr. Salamon, isn't it a fact that this is

16    actually an advance from Nathan Schwartz because you didn't

17    want to pay for the kitchen until it was completed?

18    A.  Excuse me, can you repeat that question?

19    Q.  Yeah.  Isn't it an advance from Nathan Schwartz because you

20    didn't want to pay for a kitchen until it was completed?

21    A.  That's why I wrote back in 2008, even before the government

22    knew about it and before I even went down, my office was closed

23    down, why would I lie?  Why would I write $4,000 loan Nuchem

24    and that was at the same time I gave him 500 January 28, 400

25    December, 300 this date.  Granite was $2,600 that I gave him

1    for.  $4,000 I advance him on a loan.  $2,700 deposit Nuchem.

2    1,500 deposit.  When there's a deposit and a there's loan,

3    there's a difference.

4    Q.  It doesn't say $4,000 loan to Nuchem or from?

5    A.  It has to say the word "to"?  I guess the money I didn't

6    give neither for the deposit because it doesn't say to, right?

7    So he's denying I ever paid for the kitchen.  He paid for the

8    whole kitchen.  Can we bring the person that has the kitchen

9    and ask him if I paid for the kitchen.

10   Q.  You paid for the kitchen at the end, right?

11   A.  I gave him advance money.  Here it is.  I don't have to

12   write to Nuchem.  Sorry I didn't put the word to.  I didn't

13   write "to" when I gave him the deposit either.  So maybe I

14   didn't give him the deposit either so all this is false.

15   Q.  You didn't say to Mr. Schwartz that basically only a sucker

16   would pay for something until he got it?

17   A.  At one point he said to me, Sam, there was half of the

18   kitchen paid off.  I said I want to see the cabinets delivered,

19   then I want to pay for it.

20   Q.  You also testified looking at let's say 3101-2, please,

21   that Mr. Schwartz at some point agreed to alter final

22   determination letters for you?

23   A.  Yes.

24   Q.  Did you teach him how to do this?

25   A.  I can't teach because I wasn't -- Lipa did it for me, so,

D1ULCIB1                        Salamon - cross

1   no.  I just asked him to do this and to do this particular

2   thing.  I'm not good with computer.  That's why actually I was

3   subject to Lipa Teitelbaum or somebody else to do it.

4   Otherwise, I would do it myself.

5   Q.  Did Lipa Teitelbaum teach him how to do it?

6   A.  Not as far as I know.

7   Q.  As you testified to earlier, Mr. Schwartz had a computer

8   guy because he wasn't very good at computers either, right?

9   A.  Yes.  I don't know if it was -- I said he has a computer

10  guy to fix his computer.  I did not say that he's not good on

11  computers.

12  Q.  And so did he use a scissors and paste to do this or did he

13  change it on his own computer?

14  A.  He, as far as I know, he told me he has Microsoft Office

15  program.

16  Q.  And, again, I'm assuming these were brought to you at your

17  house?

18  A.  Correct.  Some of them were emailed to my office.

19  Q.  Okay.  Do you have any of those emails?

20  A.  I have an email sending him what name I wanted on certain

21  alter, to alter certain final determination.  But I don't have

22  the emails he sent me back with the final determination.

23  Q.  So that was 3613.  Let's look at 3613.  This is the email,

24  "name is Lidia Chalen"?

25  A.  Lidia Chalen.

D1ULCIB1                       Salamon – cross

1   Q.  That's the email you're saying is the instruction?

2   A.  That is one of the emails I sent.

3   Q.  Do you have any others?

4   A.  There was another one.

5   Q.  We'll look at that in a second.  Other than those two, do

6   you have any others?

7   A.  I would have to search my computer.  The government would

8   have to search my computer.  I don't know.

9   Q.  So these are the instructions to Mr. Schwartz on doing

10  final determination letter, "name is Lidia Chalen"?

11  A.  Yeah.  It's from Sammy110wall to Nathan@Monseyframing.com.

12  That's his email.

13  Q.  We look back at what we just looked at 3101-2.  Does this

14  top number, the one that starts P2004, have to be changed with

15  each file determination?

16  A.  Not necessarily.

17  Q.  Did the alien's occupation have to be changed with each

18  final determination?

19  A.  No.  If it's a woodworker, it would stay there.

20  Q.  So it's okay if Lidia Chalen was a woodworker?

21  A.  Again, it depends what the profession was.

22  Q.  Do you know what company Lidia Chalen was being submitted

23  for?

24  A.  No.

25  Q.  If Lidia Chalen was being submitted for a bus driving

D1ULCIB1                    Salamon – cross

1   company, woodworker would be okay?

2   A.   Whatever her profession was at that time that she said she

3   knows.

4   Q.   Okay.  And does the date have to be changed?

5   A.   Which date?

6   Q.   June 10, 2005?

7   A.   No.

8   Q.   So an application -- can we look back at 3613, please -- an

9   application from say 2008, it was okay if it had a 2005 final

10  determination?

11  A.   Excuse me?

12  Q.   Your email was from June 23, 2008, correct?

13  A.   Yes.

14  Q.   Is it okay if the final determination letter had 2005 date

15  on it?

16  A.   2005?

17  Q.   Looking at the one we just looked at, the exhibit -- I

18  can't remember.  Sorry.

19  A.   Yeah, it's possible.  It could be any date from before

20  2008, yes.

21  Q.   Any date is okay?

22  A.   It's possible, yes.

23  Q.   Do you have the final determination letter for Lidia

24  Chalen?

25  A.   No, I don't.

1    Q.  You don't know what company she was submitted for, right?

2    A.  No.

3    Q.  Look at 3614, please.  This is the second email you say you

4    sent to Mr. Schwartz, right?

5    A.  One of the emails, yes.

6    Q.  And I know you said you're not good at computers, but can

7    you explain how this email was not in your sent mail folder on

8    your computer?

9    A.  I have no idea.

10             MR. PASTORE:  Objection.

11             THE COURT:  He's answered it.

12   A.  It says Sammy110wall to Nathan@Monseyframing.  So it must

13   have gotten to him.

14   Q.  That's your understanding of email?

15   A.  That's what I know.  That's what I look at facts.  I don't

16   know.  It says Sammy110wall to Nathan@Monseyframing, June 23,

17   2008, at 6:12 p.m.

18   Q.  You know you at least have to hit the send button before it

19   gets sent?

20   A.  Yes.

21             MR. BRILL:  Can we look at 3001, please.

22   Q.  Can you explain again, Mr. Salamon, how Mr. Schwartz came

23   to rent you a Pitney Bowes machine?

24   A.  Yes.  We had a discussion that I have to send people to the

25   post office.  It costs me money and waiting on line.  So he

D1ULCIB1                     Salamon - cross

1   came up and said why don't you have a stamp machine.  I said I

2   don't know how to do it and I don't have credit.  Do you want

3   to do it?  He says, yeah, I'll do it for you.

4   Q.  So it's 2008, 2009 when you get this, I think we discussed

5   it?

6   A.  I would have to see the days, yes.

7   Q.  You had started with Mr. David sometime in 2001?

8   A.  Yes.

9   Q.  Eight years later you still didn't have any credit?

10  A.  No, I didn't have any credit, no.  I don't have credit

11  since 1990s.

12  Q.  Okay.  I mean he's doing you a favor, essentially,

13  Mr. Schwartz?

14  A.  You could say that, possible.

15  Q.  And yet someone in the office with a credit card paid the

16  bill?

17  A.  I didn't see who's paying or paying, but I know credit

18  cards were used to pay, yes.

19  Q.  And that same person with a credit card couldn't have just

20  set up the Pitney Bowes machine?

21  A.  Excuse me?

22  Q.  That same person with the credit card couldn't have just

23  rented the Pitney Bowes machine?

24  A.  No, because this came from Nathan Schwartz.

25  Q.  As a gift?

D1ULCIB1                      Salamon - cross

1    A.  Not as a gift.  He did me a favor.

2    Q.  In fact, as you testified, no Earl David firm employee ever

3    was sent to meet Nathan Schwartz?

4    A.  Excuse me?

5    Q.  You testified earlier that no employee of the Earl David

6    firm was ever sent to meet Mr. Schwartz, right?

7    A.  I never sent any employee to meet him.  I didn't say

8    employee.  I said applicants.  You said employee?

9    Q.  No employee of the Earl David firm was ever sent to meet

10   Mr. Schwartz; isn't that what you said?

11   A.  I didn't say employee.

12           THE COURT:  If you want to repeat his direct

13   testimony, let's have page and line references.  This is not a

14   memory game.

15           MR. BRILL:  Okay.  I'll move on.

16           THE WITNESS:  I said I never sent any applicant.

17           THE COURT:  You can stop.

18           THE WITNESS:  Okay.

19   Q.  Mr. Salamon, isn't a fact that you simply took advantage of

20   your friend, Mr. Schwartz?

21   A.  I would say the opposite.

22   Q.  He took advantage of you?

23   A.  Yes.

24           MR. BRILL:  I have nothing further.

25           THE COURT:  It looks like Mr. Greenfield is stirring.

D1ULCIB1                         Salamon – cross

1           MR. GREENFIELD:  Yes.

2    CROSS-EXAMINATION

3    BY MR. GREENFIELD:

4    Q.  Good morning, Mr. Salamon.

5    A.  Good morning.

6    Q.  I want to ask you a couple questions about, and I mean no

7    disrespect, but you testified I believe earlier at your direct

8    and again on your cross-examination that you weren't

9    particularly good with forms; is that correct?

10   A.  Yes.

11   Q.  Does that have anything to do with your grammar, your

12   mastery of English grammar?

13   A.  Not really.  I'm just not computer savvy when it comes to

14   forms or anything.

15   Q.  You don't have any problem writing English in a formal

16   clear way?

17   A.  I don't think I do.

18   Q.  How about Earl David, would you say he was a better writer

19   than you or --

20   A.  Yes.

21   Q.  -- worse?

22   A.  He was a better writer than me.

23           (Continued on next page)

24

25

D1u1cib2                          Salamon - cross

1    BY MR. GREENFIELD:

2    Q.  Okay.  So he would be more likely to write a complete and

3    proper sentence than you would; is that right?

4    A.  Yes.

5    Q.  Do you recall you testified yesterday about a time in 2006

6    when a subpoena was served upon Mr. Tischler, or one of -- or

7    his company?  Do you recall that?

8    A.  Yes.

9    Q.  What company was that?

10   A.  Excuse me?

11   Q.  Pardon me?

12   A.  What are you asking me?

13   Q.  What company was that?

14   A.  It had Vintage Partners on it.

15   Q.  And you have a pretty clear recollection of what took place

16   between you and Mr. Tischler and Mr. David with reference to

17   that event?

18   A.  I will say what I remember.  What I don't remember, I won't

19   say.

20   Q.  Okay.  So yesterday you said that you remembered that

21   Mr. Tischler brought the subpoena to you; is that correct?

22   A.  Yes.

23   Q.  What did you do when he brought it to you?

24   A.  I said I faxed it over to Earl David.

25   Q.  Where was Earl David?

1   A.  I think at that time he was in Canada.

2   Q.  Okay.  So you faxed it over while Mr. Tischler was there;

3   is that correct?

4   A.  I don't remember if he was there, but I said I will take

5   care of it and we will see what documents are needed to bring

6   it to -- bring it in, and we'll send it in to the investigation

7   office.

8   Q.  Okay.  So do you recall how long it took Mr. David to

9   respond to your request?

10  A.  No, I can't remember.

11  Q.  Well, was it the same day or --

12  A.  It was in 2006.  I remember every detail?  I remember what

13  happened, that's what I remember.

14  Q.  Okay.  Do you recall that ultimately Mr. David wrote a

15  letter?

16  A.  Yes.

17  Q.  Okay.  And the letter that he wrote was on Vintage Partners

18  stationery; right?

19  A.  Earl David I think wrote Vintage Partners on the

20  stationery.

21  Q.  Right.  He made it up, right, with his computer?

22  A.  I would say so, yes.

23  Q.  Pretty common, right, for him to do something like that?

24  A.  Yes, he would do that.

25  Q.  Okay.  And do you recall who it was -- who signed that

D1u1cib2                         Salamon - cross

1   letter that was sent to the government?

2   A.  I have to see it again --

3   Q.  All right.  Can we --

4   A.  -- to be able to say.

5           MR. GREENFIELD:  Can we see 202.

6           I've got the whole exhibit here.

7   Q.  I'm going to show you the cover letter on the Vintage

8   Partners stationery and Mr. Tischler's name and the signature

9   below.  Do you recall who it was who signed that?

10  A.  No.

11  Q.  Okay.  Would you recognize Mr. Tischler's signature if you

12  saw it?

13  A.  I can't say if that was.

14  Q.  Okay.  Give me back the -- I don't want to take back more

15  than I gave you.

16          Now is it your recollection that Mr. Tischler did or

17  did not sign it or you just don't remember?

18  A.  I don't remember if he did.

19  Q.  And once the documents were put together, what did you or

20  somebody in your office do with the documents?

21  A.  We mailed it wherever you're supposed to mail it to, that

22  investigation office.

23  Q.  Okay.  You know that.  You recall that.

24  A.  Yes.

25  Q.  Okay.  Now where was your office located?

1    A.  At that time it was in 17 Battery Place.

2    Q.  Okay.  Let me show you the outside of the envelope.  Oh,

3    where was Mr. Tischler's office located?

4    A.  I have no idea.

5    Q.  You don't know whether he was in Brooklyn or Manhattan?

6    A.  Oh, he was in Brooklyn.

7    Q.  Okay.

8    A.  As far as I know.

9    Q.  Okay.  Let me show you the stamp on the outside of the

10   envelope.  Do you see that?  Does that indicate where it was

11   mailed?

12   A.  Where?

13   Q.  Yeah.  You don't know?

14   A.  No.

15            MR. GREENFIELD:  Okay.  Can we put this up, this --

16   can we focus on the upper right corner there, where it says

17   $14.40.  See if you can get the word "Brooklyn" nice and sharp.

18   A.  Okay.

19   Q.  Okay?  So let me ask you now:  Did somebody from your

20   office in Battery Park get on a subway, go down to Brooklyn, go

21   into a post office, pay $14.40, and send that to Deidre Gordon?

22   A.  I don't know how it was, but I remember --

23   Q.  So maybe that's what they did; right?

24   A.  I only know what I saw.  When he came up to the office, he

25   brought me the papers.

D1u1cib2                          Salamon - cross

1    Q.  That's not what I asked you.  I just asked you before

2    whether you were sure that somebody in your office mailed it.

3    A.  I have no idea.

4    Q.  And that he didn't sign it.

5    A.  I know -- I don't know if this is his signature and I don't

6    know how it was mailed.

7    Q.  You don't know how it was mailed.  But a minute ago you

8    said you did know how it was mailed.

9    A.  I said we mailed it out.  I did not say that I went to

10   Brooklyn or Tischler maybe mailed it off in Brooklyn.  I said

11   we mailed it out.  Tischler and me went to office, we mailed it

12   out.  If he took it to mail out, if I mailed it out, I don't

13   remember.

14   Q.  You understand, do you -- or don't you -- that what you say

15   is important here?

16   A.  Very important.

17   Q.  That we want you to be precise.  If you remember that it

18   was mailed, you're supposed to say so.  If you don't, you're

19   not supposed to say so.  Do you recall -- do you know that?

20   A.  I recall it was mailed.  I don't know who mailed it.

21   Q.  Okay.  You don't know who mailed it, but it's unlikely,

22   isn't it, that somebody from your office would have gone to

23   Brooklyn to mail it?

24   A.  Maybe Mr. Tischler from Brooklyn mailed it.

25   Q.  I didn't ask you that.  I asked you whether it's likely

D1u1cib2                          Salomon - cross

1   that somebody in your office would have gone to Brooklyn to

2   mail something.

3   A.  It's possible.  Moishe Rosenberg, he went back and forth to

4   Brooklyn.  He was my messenger.

5   Q.  Did you have people who lived and worked in Brooklyn?

6   A.  Yes.

7   Q.  So they might have done it too; right?  Or maybe

8   Mr. Tischler mailed it and never came to your office; isn't

9   that so?  Isn't that possible?

10  A.  No, he did come to the office.

11  Q.  And maybe it was Mr. Tischler who wrote that, the letter,

12  not Mr. David.

13  A.  I remember Mr. David writing -- putting up the letter.

14          MR. GREENFIELD:  Okay.  Can we go to the -- do you

15  have the entire package?  The cover letter.  I think it's the

16  first one.

17  Q.  Take a look at where it says, "Dear Sir/Madam."  Do you see

18  under that?

19  A.  Yes.

20  Q.  Read the next line, if you would.

21  A.  "Our company is producing following requested documents as

22  per grand jury subpoena, United States District, Southern

23  District of New York."

24  Q.  United States District, Southern District of New York.

25  There's a word missing there, isn't there?

1    A.  I don't know.  I didn't write this.

2    Q.  "Court"?

3    A.  I did not write this letter.  I wouldn't know.

4    Q.  Do you think that Mr. David, a lawyer, would have known

5    that it's the Southern District Court?

6              MR. PASTORE:  Objection.  Speculation as to what

7    Mr. David knew and didn't know.

8              THE COURT:  Sustained.

9    Q.  Mr. Tischler's not a lawyer, is he?

10   A.  Excuse me?

11   Q.  Mr. Tischler is not a lawyer, is he?

12   A.  As far as I know, no.

13   Q.  You're not a lawyer.

14   A.  No.

15   Q.  Mr. David's a lawyer?

16   A.  Yes.

17   Q.  Thank you.

18              You testified yesterday that you got an e-mail or a --

19   I think it was a Facebook message from Mr. Tischler in which he

20   called you a moiser or moser?  How do you pronounce that?

21   A.  Moser.  He wrote moiser but it's moser, yes.

22   Q.  How would you spell it, if we were to sort of pronounce it

23   correctly?

24   A.  Moiser or moser, either way.

25   Q.  With a U or OI or O, doesn't matter, but it's pronounced

D1u1cib2                          Salamon - cross

1    "musser"?

2    A.  Yes.  You're a moiser, musser, same thing.

3    Q.  You said that means a snitch; right?

4    A.  Yes.

5    Q.  In fact, did you -- have you ever been told or do you know

6    that it's defined as someone who is basically a traitor, who is

7    trying to gain favor in the eyes of the rest of the world --

8              MR. PASTORE:  Objection.

9    Q.  -- by --

10             MR. PASTORE:  Objection.

11             THE COURT:  Hold on.  Wait.

12             MR. PASTORE:  It appears counsel is reading a

13    definition.  What's relevant is the witness' understanding.

14             MR. GREENFIELD:  We discussed this at sidebar before.

15             MR. PASTORE:  Exactly.

16             MR. GREENFIELD:  Two days ago.

17             THE COURT:  What we said at sidebar is that it's this

18    witness' understanding of the word, not some other dictionary

19    definition or some other --

20             MR. GREENFIELD:  I'm asking him what his understanding

21    of it is.

22    A.  When say musser or moiser, that's what it means, you're a

23    snitch.

24    Q.  That's all it means?

25    A.  We don't go into the definition of Google, we don't go into

D1u1cib2                    Salamon – cross

1   depth what it means.  In our community, with our friends,

2   you're a moiser, if you ask anybody, that's what it means in

3   the Jewish community, in our Jewish community.

4   Q.  It doesn't mean somebody preying on other Jews for his own

5   benefit?

6   A.  Not to my knowledge, no.

7   Q.  It doesn't have anything to do with whether you tell the

8   truth or not either, does it?  It's just someone who talks

9   about someone --

10  A.  Someone who relays information to the government is a

11  snitch, and you're a moser, you're a moser to the government,

12  that's what we use -- that's what we use the terminology.

13  Q.  Whether he tells the truth or not; right?

14  A.  Has nothing to do with the truth or not.

15  Q.  Exactly.  So you in fact are a moser; right?

16  A.  I'm not a moser, no.

17  Q.  No?

18  A.  No.

19  Q.  Okay.  Did you hear -- did you read an e-mail yesterday in

20  which someone wrote to Mr. David to stay away from mental sick

21  money and animal people?

22  A.  Yes.

23  Q.  Do you recall that?  Do you know who they were referring

24  to?

25          MR. PASTORE:  Objection.  Speculation.

D1u1cib2                         Salamon – cross

1          MR. GREENFIELD:  I asked him if he knows.

2          I'll withdraw the question.

3          THE COURT:  Yes.

4   Q.  Do you know if it was you who was being referred to?

5   A.  No.  I don't think so.

6   Q.  You don't?  Do you recall testifying to a conversation that

7   you had with Mr. Tischler that was printed out -- I don't

8   recall what the media was or -- regarding someone by the name

9   of Yona Abenson?

10  A.  Correct.

11  Q.  What's your recollection of how that conversation came

12  about?

13  A.  Mr. Abenson came to my house and said, "I was told by

14  Harold Tischler you're a bad person."  I said, "How do you know

15  him?"  He said, "It's not important.  I met him."

16          So I sent message to Harold and I asked him, "Why are

17  you talking bad about me to Yona Abenson, to my ex-client?"  He

18  said, "I never said bad anything about you."

19          And I wanted to have the proof so when Mr. Abenson

20  come again to my house and saying that Mr. Harold Tischler

21  spoke bad about me, and I kept the copies.

22  Q.  But it was Yona Abenson who was complaining about -- didn't

23  Yona Abenson claim that you swindled him, cheated him out of

24  $5,000?

25  A.  No.  I said because he was coming to my house, and I told

1    him when I have money, I'll pay him back.

2    Q.  So you don't think that it was Mr. Abenson who felt that

3    you were cheating him.

4    A.  I could only tell you what I heard from Mr. Abenson and

5    what I saw, Mr. Tischler replying to --

6    Q.  And what did you hear from Mr. Abenson?  Didn't he ask you

7    to pay him back the $5,000 you took from him and did nothing

8    for?

9    A.  Excuse me?

10   Q.  Didn't he say to you, "You didn't do anything for me, you

11   took $5,000"?

12   A.  I did do for him.  He got --

13   Q.  I'm not asking you what you did or didn't do.  I'm asking

14   you what Mr. Abenson said to you.

15   A.  Mr. Abenson said, "I need some money back.  Not the full

16   5,000, but I need some money back," yes.

17   Q.  So was Mr. Abenson happy with the services that you

18   rendered for -- to him?

19   A.  Some of the services.  Not fully, though.

20   Q.  So he was in fact complaining to Mr. Tischler; isn't that

21   your understanding?  And you were concerned that Mr. Tischler

22   was agreeing with him.

23   A.  Mr. Yona Abenson said, "Mr. Tischler said you're a liar,

24   swindler," whatever I wrote in that e-mail.

25   Q.  And Mr. Tischler didn't have anything to do with the

D1u1cib2                    Salamon - cross

1    sponsorship of Mr. Abenson; right?

2    A.  I would have to see the file who sponsored him.

3    Q.  Well, let me ask you this:  Did Mr. Abenson come to your

4    house to inquire about the status of his labor certification?

5    A.  No.  He just came to my house asking for money back.

6    Q.  Did you ever tell Special Agent Gibbs -- you know who

7    Special Agent Gibbs is; right?

8    A.  Yes.

9    Q.  On March 15th, 2010, do you recall telling him that Yona

10   Abenson came to your house to inquire about the status of his

11   alien labor certification?

12   A.  Can't remember that.

13   Q.  Do you recall that -- do you recall what company his labor

14   certification was filed through?

15   A.  Could be at that time I knew, 'cause he told me -- he came

16   to my house, but, yes, could be.

17   Q.  Could be at what time?  At the time --

18   A.  When Mr. Abenson came to my house the first time.

19   Q.  Well, do you recall that it was Success Office Products?

20   A.  It's possible that was his sponsor, yes.

21   Q.  What did you tell him?

22   A.  What did I tell him?

23   Q.  Yeah.

24   A.  If he asked me about his -- I don't -- what do you mean?

25   He wanted his money back.  That's what the final thing was.

D1u1cib2                        Salamon - cross

1   Q.  Well, did you tell Abenson that there was nothing you could

2   do about his case and he should go to Success Office Products?

3   A.  Yes.  Initially, yes.

4   Q.  And did he call you back after he did that?

5   A.  No.  He came to my house, asked for money back.  He didn't

6   tell me if he went or if he spoke to him.  He didn't tell me

7   anything.

8   Q.  He didn't tell you that the owner of Success Office

9   Products stated to him that he had not sponsored Abenson and

10  had no idea what you were talking about?

11          MR. PASTORE:  Objection.  Hearsay.

12  A.  I can't remember that that's what he told me.  I can't

13  remember that.

14          THE COURT:  Hold on.

15          I don't think it's offered for the truth of that.

16          MR. GREENFIELD:  I'm sorry.  I didn't hear.

17          THE COURT:  I said, it's okay, I don't think it was

18  offered for the truth.

19          MR. GREENFIELD:  Right.

20  Q.  So you can answer that.

21  A.  Excuse me?

22  Q.  You can answer the question.

23  A.  I told him to call Jacob Landau, yes, Success Office

24  Products.

25  Q.  And did he come back to you and say, "I spoke to Landau and

D1u1cib2                     Salamon - cross

1    Landau says, 'I don't know what Sam Salamon is talking about'"?

2    A.  Yes.

3            You reminded me.  I cannot remember something from

4    2010 to 2013, but if you remind me about it, I can say yes or

5    no.

6    Q.  What reminded you?  Is it the fact that you see me holding

7    a piece of paper while I'm asking you?

8    A.  No.  Lipa told me the story and I remember yes, he came

9    back and Jacob Landau said no, he never -- "I never sponsored

10   you."

11   Q.  You used the phrase -- by my count, anyway -- six times in

12   the last two days, "cut and paste."  Do you recall using that

13   phrase?

14   A.  Possible, yes.

15            THE COURT:  Did you or didn't you?

16   Q.  Did you or didn't you use the phrase "cut and paste," both

17   on your direct testimony and on your cross-examination?

18   A.  Yes.

19   Q.  And what do you mean when you say "cut and paste"?

20   A.  It depends on what document you would ask me.  I would be

21   able to tell you if we did a cut-and-paste or we edited.

22   Q.  What is a cut-and-paste?

23   A.  It's a copy-and-paste.  You copy something from the

24   computer, you paste it on, on a different document.

25   Q.  And then you make a photocopy of it so it looks like the

D1u1cib2                         Salamon - cross

1    real thing; is that right?

2    A.  I don't think you need to make a photocopy, but print it

3    out.

4    Q.  It looks like the real thing.

5    A.  Yes.

6    Q.  Even though it was a forgery; right?

7    A.  Excuse me?

8    Q.  Even though in fact it's a fraud, a forgery.

9    A.  Yes.

10   Q.  Is that something that was done frequently at these law

11   offices?

12   A.  On certain documents, yes.

13   Q.  Okay.  And who is it -- withdrawn.

14         Was there anybody who was particularly adept at doing

15   cut-and-paste jobs?

16   A.  You mean copy and paste.

17   Q.  No, I mean cut and paste.  I just asked you about that.

18   You just testified to it.

19   A.  I don't know.  I call it copy and paste, yes.  There was --

20   somebody doing the final determinations was doing it, yes.

21   Q.  So who was the -- where was the copy and paste department

22   located?

23   A.  There was no copy and paste department.

24   Q.  No?

25   A.  No.

D1u1cib2                        Salamon - cross

1    Q.  Was there a cut and paste department?

2    A.  No.

3    Q.  Was there a forgery department?

4    A.  You submitted paperwork, you want a forgery.

5    Q.  The whole place was a forgery department; right?

6    A.  It was fraud, yes.

7            (Counsel conferring)

8    Q.  When did you meet Harold Tischler?

9    A.  I would say sometime the end of 2002, 2000 -- beginning of

10   2003.  I don't remember exactly the year.

11   Q.  How did you meet him?

12   A.  Through a mutual friend.

13   Q.  Guy by the name of Katz?

14   A.  Yes.

15   Q.  And did you speak to Mr. Katz -- did you know Katz before

16   you knew Harold?

17   A.  Yes.

18   Q.  And did Mr. -- did you ask Mr. Katz if he knew someone who

19   would be willing to sponsor aliens for work?

20   A.  I asked Mr. Katz, "Do you know somebody in construction?

21   Because I'm in immigration.  I'm looking for somebody that's

22   looking to hire people."

23   Q.  Try and answer my questions yes or no, if you can, okay?

24   A.  Okay.

25   Q.  Okay.  So the answer is yes, you asked him if he knew

D1u1cib2                          Salamon - cross

1    somebody who would sponsor aliens; is that correct?

2    A.   I don't know if that was the exact wording.

3    Q.   In words or substance.

4    A.   That was in 2002 and this is 2013.  I cannot tell you

5    exactly the words.

6    Q.   In any event, as a result of your conversation with

7    Mr. Katz, you got in touch with Mr. Tischler; is that right?

8    A.   Yes.

9    Q.   Did you telephone Mr. Tischler?

10   A.   I think I did.

11   Q.   You had never met him before; right?

12   A.   No.

13   Q.   Did you propose a criminal conspiracy to him on the

14   telephone?

15   A.   Again, I don't remember what the conversation was.  It

16   was -- we're in 2013 right now.  In 2002, I cannot remember the

17   conversations I had exactly, what I said.

18   Q.   Well, here's what I'm asking.  Did you say to him, in words

19   or substance -- I understand it was nine or ten years ago.  Did

20   you say to him, "Hello, Harold, I was referred to you by

21   Mr. --" what was Katz's first name, Marty, Modi?

22   A.   Monty.

23   Q.   Monty Katz.  Did you tell him, say to him, "Harold, I'm

24   referred to you by Monty Katz, listen, I have a criminal

25   conspiracy in mind, would you like to make some easy money by

D1u1cib2                          Salamon - cross

1    committing -- helping me commit a fraud?"

2    A.  That was not the words that I think I used.

3          THE COURT:  I'm sure you didn't use those words.

4    Q.  As a matter of fact, you didn't tell him anything about

5    intending to commit any crimes when you first met him, you told

6    him that you needed somebody to sponsor alien workers; isn't

7    that so?

8    A.  Yes, correct.

9    Q.  And as a matter of fact, at that time -- and you told this

10   to the agents when you were interviewed at one time -- he was

11   looking -- he was looking for workers and said to you that he'd

12   be willing to sponsor some; isn't that so?

13   A.  I said it's possible he was looking for workers.  I didn't

14   know he was not at that time or he was looking for workers.  I

15   don't know.

16   Q.  Did he indicate that he would be willing to sponsor some

17   workers?

18   A.  That he was willing to sign that he was willing to hire

19   people.

20   Q.  Well, did you understand him to be saying, "I want to join

21   a criminal conspiracy," or did you understand him to be saying,

22   "Yes, I'm willing to employ some alien workers"?

23   A.  No, he never used that he was willing to employ people, no.

24   Q.  So you didn't think -- right from the start, the first time

25   you spoke to him, you had a meeting of the minds with him, in

D1u1cib2                          Salamon - cross

1    your mind, that this was going to be a criminal enterprise; is

2    that right?

3              MR. PASTORE:  Objection.  Calls for a legal

4    conclusion.

5              THE COURT:  Sustained.

6    Q.  Did you have an understanding -- did you feel in your

7    conversation, your first conversation with him, that he

8    understood that he was never going to really hire somebody,

9    that he was only going to say he was going to hire somebody?

10   A.  Like I said, initially, I didn't know what went on in his

11   mind.  I'm not a mind reader.

12             MR. GREENFIELD:  Okay.  Could we have 3100-7 put up.

13   Q.  I believe you testified yesterday that this is an example

14   of a cut-and-paste job out of your office; is that right?

15   A.  Yes.

16   Q.  What's cut and pasted here?

17   A.  The alien's name.

18   Q.  So this is a copy of a legitimate form where you simply

19   somehow --

20   A.  No.  You go on the computer, the foreign labor

21   certification, it's a piece of paper, and then I don't know how

22   you did it, but you could put in the different name over there,

23   you copy the whole thing, and you paste different things on it.

24   Q.  So if you know, do you have to scan this document into the

25   computer before you can start fiddling with it?

D1u1cib2                          Salamon - cross

1    A.  I don't know.

2    Q.  Okay.  But somebody in your office did know how to do that.

3    A.  Yes.

4    Q.  And did.  Now do you recall testifying that -- I think you

5    just testified this morning that you had terrible credit since

6    sometime in the '90s; is that right?

7    A.  I wouldn't say terrible.  I said I didn't have good credit.

8    Q.  You had no credit.

9    A.  Possible, yes.

10   Q.  That's sort of having no pulse; isn't it?  It's not good;

11   right?

12   A.  Right.  Credit was not good.

13   Q.  You couldn't -- did you have credit cards?

14   A.  Yeah, I had credit cards.  That's why I'm saying, I didn't

15   have good credit.

16   Q.  So what was it about your credit that prevented you from

17   signing a lease?

18   A.  I would have to look at my credit report.  I haven't

19   checked it in a long time.

20   Q.  No, then.  Back in 2006, you -- withdrawn.

21        You met Mr. Tischler 2004, was it?

22   A.  I would say some -- end of 2002, beginning of 2003.

23   Q.  Okay.  And you told us how you met him.  Did, to your --

24   withdrawn.

25        Did Mr. Tischler act towards you as if he considered

1    you a friend?

2    A.   Yes.

3    Q.   Okay.  And did you encourage that feeling in him?

4    A.   We were both friends, yes.

5    Q.   So it wasn't strictly -- withdrawn.

6              And when you needed a lease to be signed at Battery

7    Place in 2006, you asked Mr. Tischler to sign the lease; is

8    that right?

9    A.   Yes.

10   Q.   And did you tell him why you needed him to sign the lease?

11   A.   Yeah, because I have no -- I have no corporation papers.

12   I'm not a corporation.  And they required corporation papers,

13   somebody to have a corporation.

14   Q.   Did you tell him that you had bad credit as well?

15   A.   Possible.

16   Q.   Okay.  And there was no closing -- withdrawn.

17             The landlord wasn't present when that lease was signed

18   on behalf of Fix Anything Construction & Plumbing, was he?

19   A.   I don't think so, no.

20   Q.   And that's the same thing at the next place, Maiden Lane;

21   right?  The landlord wasn't there when the lease was signed by

22   the tenant; right?

23   A.   No.

24   Q.   And as a matter of fact, you've testified and told the

25   agents when you interviewed that as far as Maiden Lane was

D1u1cib2                          Salamon - cross

1   concerned, you forged Mr. Tischler's name and didn't even tell

2   him that you were leasing the place.

3   A.  Correct.

4   Q.  But it's your testimony that two years earlier, you asked

5   him to sign the lease for Battery Place and he willingly did

6   so.

7   A.  With a fee.  I gave him a fee.  I had to pay him for it.

8   Q.  I see.  And how much did you pay him?

9   A.  Again, like I say, must have been between 4 to $5,000.

10  Q.  But you can't remember.

11  A.  I can't remember exact amount, no.

12  Q.  Okay.  And you testified that, just in general, you kept a

13  ledger of how much you paid everybody; right?

14  A.  I didn't say everybody.  Certain sponsors.

15  Q.  You mean certain sponsors you kept a ledger and others you

16  didn't.

17  A.  Yes.

18  Q.  Did you keep a ledger as to what you paid Mr. Tischler?

19  A.  I can't -- maybe in the beginning, yes, but then

20  afterwards, no.

21  Q.  Why not?

22  A.  Didn't keep ledgers around.  Like I said, once in a while I

23  would keep ledgers from certain people.

24  Q.  Didn't you want to know how much you were paying a guy?

25  A.  I paid him and signed the lease.  What does it do to keep a

D1u1cib2                          Salamon - cross

1    ledger?

2    Q.  I'm not talking about the lease.  I'm talking about just in

3    general.  You testified you paid Mr. Tischler money on a

4    regular occasion -- basis; right?

5    A.  Yes.

6    Q.  But you didn't keep a record of how much you paid him, when

7    you paid him, for which case you paid him?

8    A.  No.  I never kept whether for this case or that case for no

9    one.

10   Q.  So you weren't concerned that some guy, Mr. Tischler or

11   anybody else, would come up to you and say, "You know, you

12   never paid me on the XYZ case"?

13   A.  Not at all.  I got original labor approvals and it came to

14   his place, so that would be proof enough that he got paid on

15   it.

16   Q.  Okay.  So let me ask you another thing.  You testified on

17   direct examination that you once said, I believe it was to

18   Mr. Tischler, "You know, I can't pay you of the denials because

19   I don't make any money on denials so you don't make any money

20   on denials."  Is that right?

21   A.  But I still paid him, yes.

22   Q.  I didn't ask you that.  Try and answer my question.  You

23   know, you'll get your opportunity, okay?  How's that?

24   A.  No problem.

25   Q.  So did you tell that to Mr. Tischler?

D1u1cib2                    Salamon - cross

1    A.  Yes.

2    Q.  That's not true, is it?

3    A.  What's not true?

4         THE COURT:  Could you clarify.  There's been so much

5    back-and-forth, I don't know exactly what you're asking him.

6    Q.  Okay.  Okay.  You told this jury and the judge, when you

7    were testifying about Mr. Tischler, that you didn't get paid

8    for denials.

9    A.  No.

10   Q.  But you got paid for opening cases; right?

11   A.  Yes.

12   Q.  And that was whether the case ultimately ended up in an

13   approval or a denial, you got paid to open the case; right?

14   A.  Wrong.

15   Q.  Wrong?

16   A.  Yes.

17   Q.  You opened a case for no money.

18   A.  I opened a case for money.

19   Q.  Okay.

20   A.  You want me to explain or you don't want -- you just want

21   yes or no, so I have no problem, I'll say yes or no.

22   Q.  I just want you to answer my questions.

23   A.  Well, your questions come with the explanation to it.

24   Q.  Really?

25   A.  Yes.

D1u1cib2                          Salamon - cross

1    Q.  Then maybe I'll ask you the next question.  Give me a

2    second here.

3    A.  Okay.

4    Q.  Okay?  Don't get impatient with me.

5    A.  Not at all.

6              THE COURT:  Okay, guys, stop fighting, all right?

7              MR. GREENFIELD:  You're right.  You're right.

8    Q.  In order to open a case, an alien had to pay you money;

9    right?

10   A.  Excuse me?

11   Q.  In order to open a case, a client had to pay you money;

12   correct?

13   A.  Correct.

14   Q.  Now if the case resulted in an approval, they had to pay

15   you more money; right?

16   A.  Correct.

17   Q.  And if the case ultimately ended up in a denial --

18   A.  Yes.

19   Q.  -- you testified that you had to give back some money;

20   right?

21   A.  Correct.

22   Q.  You didn't give back as much as you got, did you?

23   A.  No.

24   Q.  So just by opening a case, you made some money; right?

25   A.  Some money, yes.

D1u1cib2                         Salamon - cross

1  Q.  And you guys didn't particularly care much about the

2  clients, did you?

3  A.  Yeah, we did.

4  Q.  You did?

5  A.  Yeah.

6  Q.  You weren't just in it for the money?

7  A.  It's a business.  I mean, we helped the client, we made

8  more money, that brought more clients.  If we don't help

9  clients, the word goes out there, do not go to Sam 'cause he's

10  ripping off everyone.

11  Q.  You had a lot of clients; right?

12  A.  Because you help clients, that's what makes you --

13  Q.  You had a lot of denials, didn't you?

14  A.  We had some, yes.

15        MR. PASTORE:  Judge, clarification.  Denials:  Labor

16  certifications, immigration?

17  Q.  When you say denials -- when you testified, you used the

18  word denial, what do you mean?

19  A.  Denials from the labor department.

20  Q.  You had an awful lot of those, did you not?

21  A.  We got a lot of approvals and a lot of denials, yes.

22  Q.  You had many more denials than approvals; isn't that so?

23  A.  I don't know about that.

24  Q.  You don't know about that?

25  A.  No.  I don't think so we had more denials than approvals.

1   Q.  You think you had more approvals than denials?

2   A.  Yes.

3   Q.  So now you rent this -- you talk to Mr. Tischler and you

4   ask him to help you by signing the lease at 17 Battery.

5   A.  Yes.

6   Q.  And he said he would do so; correct?

7   A.  For a price.

8   Q.  There you go.  What's the answer to that question?  He said

9   he would do so; correct?  Is that a yes or no?

10  A.  Yes.

11  Q.  Okay.  And then somebody spoke to him and told him not to

12  do it; correct?

13  A.  Yes.

14  Q.  And you know who that was; correct?

15  A.  Yes.

16  Q.  And as a matter of fact, you wrote a couple of e-mails, I

17  believe in May and June of 2006, in which you said, "Now I have

18  no office"; correct?

19  A.  Yes.

20  Q.  So you needed that lease signed; correct?

21  A.  I needed to get somebody to sign the lease.

22  Q.  The lease had to be signed; correct?

23  A.  I needed to get somebody to sign the lease.

24  Q.  Yes.  You needed somebody to sign that lease.  The landlord

25  wasn't going to see the person who signed that lease; yes or

D1u1cib2                        Salamon - cross

1    no?

2    A.  Are you asking if I knew from before the landlord is not

3    going to see or the agent?  No, I didn't -- I don't know.

4    Q.  You thought they might see it; right?

5    A.  Maybe the agent would be there, yes.

6    Q.  Okay.  But in fact, nobody was there.

7    A.  I was there.  And Lipa Teitelbaum was there.

8    Q.  Okay.  Okay.  Anybody there -- nobody was there from the

9    landlord side; right?  You just sent that signed lease over?

10   A.  I didn't send no signed lease over.  He signed in front of

11   me.

12   Q.  How did it get to the landlord?

13   A.  I gave it to the agent.

14   Q.  And the agent and the landlord, nobody on that side of the

15   fence saw the person who actually signed that lease; correct?

16   A.  Correct.

17   Q.  And you guys were really good at cut and paste; correct?

18   A.  Not me.

19   Q.  Plenty of people in your office.  Lipa was; right?

20   A.  Yes.

21   Q.  And Lipa was there, you said; right?

22   A.  Lipa was in the car, yes.

23   Q.  Oh, that's right.  Lipa was in the car.  You told the

24   agents that Mr. Tischler signed that lease under the FDR

25   sitting in a car; is that right?

D1u1cib2                         Salamon – cross

1   A.  Yes, he came out to the car and I gave it to him.

2   Q.  So he just signed it on the hood of the car?

3   A.  I seen him sign it inside and I gave him the money.

4   Q.  So you don't remember now.

5   A.  If it was outside or inside, I know he signed it.

6   Q.  Did he sign it on your back or on Lipa's back?

7   A.  No, he didn't sign on the back.

8   Q.  Or on the car?  You don't recall; right?

9   A.  I know he signed it.  I was there.

10  Q.  Did you yourself ever call the labor department and claim

11  to be a sponsor?

12  A.  Possible.

13  Q.  Do you recall doing so?

14  A.  That was not my duties.  I never called the Department of

15  Labor.  So I cannot say that I did call.  It's possible I

16  called once or twice the Labor Department in my whole time that

17  I was there.

18  Q.  But you know Mr. Grynsztajn testified that he heard you and

19  Teitelbaum call --

20          MR. PASTORE:  Objection.

21  Q.  -- correct?

22          MR. PASTORE:  Objection as to what Mr. Grynsztajn

23  testified to, your Honor.

24          MR. GREENFIELD:  I didn't ask him what he testified.

25  I asked him whether he knew it.

D1u1cib2                        Salamon - cross

1          MR. PASTORE:  He said --

2          THE COURT:  "Do you know Mr. Grynsztajn testified that

3     he heard you and Teitelbaum call?"

4     A.  I didn't know about --

5          MR. PASTORE:  Wait.

6          THE COURT:  Wait.

7          No, you don't get to ask him about what's being

8     testified to here.

9     Q.  Okay.  Was Grynsztajn sitting near you when you were in the

10    office?

11    A.  At 110 wall?  I wouldn't say he's sitting next to me.  He

12    was on one side of the room and I was on the other side of the

13    room.

14    Q.  He was in the same room as you.

15    A.  Yes.

16    Q.  So if you had made a phone call, would he have been in a

17    position to hear it?

18    A.  I can't say, because I didn't hear all his phone calls, so

19    I don't think he heard all my phone calls.

20          THE COURT:  The question was whether he could hear

21    your phone calls.

22    Q.  Was he within earshot of you if you were talking on the

23    phone?

24    A.  I don't know if he heard my phone calls.

25    Q.  Did you whisper so he wouldn't hear your phone calls?

D1u1cib2                          Salamon - cross

1    A.  I mean, we had clients in the office so we wouldn't talk

2    that loud because each one of us respected each other that we

3    should not -- we were one big office.

4    Q.  Is it a fact that a lot of sponsors complained initially

5    that they had agreed to sponsor one or two people and they were

6    getting letters and mailings for 20, 30, 40 people?

7    A.  I wouldn't say many.  There was sponsors, they said they

8    got letters from the United -- from the Labor Department.

9    "Sam, I'm not interested.  Cancel."  Earl David, I would call,

10   "Cancel up everything from this sponsor."

11   Q.  So anybody who told you, "I don't want to do it," you

12   wouldn't do it.

13   A.  No.  I wouldn't do it.

14   Q.  So you wouldn't do something behind somebody's back; right?

15   A.  I would not file without his permission.

16   Q.  How about an income tax?  Would you create an income tax

17   return without their permission?

18   A.  Income -- you mean a federal tax return for the company?

19   Q.  Yes.

20   A.  Yes.

21   Q.  You would do that.

22   A.  Not me, but we had somebody.

23   Q.  Well, listen, we're talking about a conspiracy here, okay?

24   A.  Okay.

25   Q.  So you knew what was going on; right?  It was part of

D1u1cib2                      Salamon - cross

1    the --

2    A.  Yes.

3    Q.  It was part of the program; correct?

4    A.  Yes.

5    Q.  And you had -- as far as calling the Labor Department, you

6    actually had the Labor Department's phone number on your

7    cellphone; right?

8    A.  Yes.

9    Q.  And did you ever tell Mr. Tischler, when he called and

10   said, "I'm getting a lot of letters, what's this all about,"

11   "Don't worry about it, just throw them away or bring them in"?

12            MR. PASTORE:  Objection, your Honor.  Assumes facts

13   not in evidence.  The question was when Mr. Tischler called and

14   said that he was upset.  Assumes facts not in evidence.

15            THE COURT:  Sustained.

16   Q.  Did Mr. Tischler ever call or come up to your office and

17   complain that he was getting an awful lot of letters?

18   A.  He never complained.

19   Q.  Never complained.

20   A.  He never complained.  I mean, he used to complain when he

21   got denials.  I used to give him something.  I said, "Heshy,

22   you know what, here's a couple of dollars.  Don't worry.

23   Approvals are going to be coming."

24   Q.  Because you were such a generous fellow.

25   A.  I was very generous.  Oh, yes.  You can ask anyone around.

D1u1cib2                         Salamon - cross

1    Q.  I will.  Anybody who gets on the witness stand.

2              MR. GREENFIELD:  I apologize.

3              THE COURT:  Mr. Greenfield, you know, a little

4    self-control here?

5              MR. GREENFIELD:  You know, you're absolutely right.  I

6    apologize.

7    Q.  Did you ever tell any sponsor -- withdrawn.

8              Did any sponsor ever call up and complain about the

9    number of letters they were getting in relation to the number

10   of people they had agreed to sponsor?

11             THE COURT:  Asked and answered.

12   Q.  Okay.  Did you, when you first started, hear Earl David

13   tell somebody, "Don't worry about the extra mail, just throw it

14   away"?

15   A.  It's possible he said that.

16   Q.  Well, did that happen?  When you first were learning this

17   business from Earl David, did you hear him say that to

18   somebody, in response to a sponsor, in response to a complaint?

19   A.  I would ask him, initially in 2002 or 2001, people are

20   getting résumés or mail.  He said, "Don't worry about it,

21   Sammy.  I got copies of it.  I don't need it.  Tell them to

22   throw in the garbage."

23   Q.  Did you ever tell Mr. Tischler that it was okay, it was

24   legitimate to substitute one alien for another?

25   A.  What was the question again?

D1u1cib2                              Salamon – cross

1    Q.  Did you ever tell Mr. Tischler that it was okay to

2    substitute one alien for another who had been denied?

3    A.  I did not discuss that detail with him.

4    Q.  Now did you ever tell a client that you were a lawyer?

5    A.  No.

6    Q.  Did you ever tell people in the community, in synagogue or

7    people you knew generally in the community --

8    A.  Whoever knew me --

9    Q.  Let me finish the question.

10   A.  Oh.

11   Q.  Did you hold yourself -- I'll withdraw it.

12            Did you hold yourself out as a lawyer to other people?

13   A.  No.

14   Q.  Except you did hold yourself out to --

15   A.  The girls?

16   Q.  -- to women --

17   A.  Yes.

18   Q.  -- as a lawyer.

19            THE COURT:  We're not people.

20   A.  Yes.

21   Q.  And did you --

22            MR. GREENFIELD:  I'm not going to say anything.

23   Q.  Did you ever represent to women that you were a lawyer and

24   you were making half a million dollars a year?

25            MR. PASTORE:  This has been asked and answered.

D1u1cib2                          Salamon - cross

1          THE COURT:  I think he admitted that long ago.

2          MR. GREENFIELD:  I thought he said he made 250,000.

3          THE COURT:  Okay.  Maybe not the half million.

4     Q.  Did you ever say you made a half a million dollars a year?

5     A.  I did not discuss exactly how much I'm making but I was

6     saying yes, I'm doing well.

7     Q.  Did you put on a website that you're making 4 to 500,000 a

8     year?

9     A.  On the website, it says you make 100 to 200 or 200 to 500,

10    so that's what it came up, 200 to 500, it came up 500,000.

11    Q.  So you didn't say 400,000 or 500,000?

12    A.  I didn't say anything.  I didn't say -- there was no

13    option.  It was either 1 to 2 or 2 to 4 or 4 or something like

14    that.  It comes up -- it spits out the higher number on it.

15    Q.  Do you know a man named Isaac Sheiderman (ph)?

16    A.  Who?

17    Q.  Isaac Sheiderman.  Belongs to the temple that you go to.

18    A.  Isaac Sheiderman?

19    Q.  Yes.

20    A.  I have no idea.  I have no idea what you're talking about.

21    Q.  Did you ever tell him or anyone else at that synagogue that

22    you were an attorney?

23    A.  I have no idea who's Isaac Sheiderman.

24    Q.  When people came to the office at 17 Battery, they were

25    looking for a lawyer; right?

D1u1cib2                          Salamon – cross

1              MR. PASTORE:  Objection.  Speculation what they were

2     looking for.

3              MR. GREENFIELD:  Speculation?

4              MR. PASTORE:  Looking for a --

5              THE COURT:  Sustained.

6     Q.  Did you hold -- did you represent -- did you represent to

7     these alien clients who came to your office at 17 Battery Place

8     that they were going to see a lawyer?

9     A.  No.

10    Q.  I'm going to show you what I've marked as Defendant's

11    Exhibit HT6.  Did you ever -- have you ever seen HT6 before?

12    A.  Yes.

13    Q.  What is it?

14    A.  It says Law Office of Jed David Philwin.

15    Q.  No.  What is it?

16    A.  Oh, it's a business card.

17    Q.  Whose business card?

18    A.  My business card.

19    Q.  Okay.  And are these cards that you gave out to people who

20    came to 17 Battery Place?

21    A.  Yes.

22              MR. GREENFIELD:  I offer defendant's HT6 into

23    evidence, your Honor.

24              MR. PASTORE:  Just one clarification.  I think it's --

25    Mr. Tischler -- sorry -- Mr. Greenfield's only shown the first

1    page.  It looks like it's a multipage exhibit.

2            MR. GREENFIELD:  Only for completeness.  I'll only

3    offer the first page if you want.

4            MR. PASTORE:  Okay.  Either way.  I have no objection.

5    I think the witness has properly identified it, so I have no

6    objection.

7            THE COURT:  Received.

8            (Defendant's Exhibit HT6 received in evidence)

9            MR. GREENFIELD:  There's no objection to this.  May I?

10           THE COURT:  Yes.

11           MR. GREENFIELD:  Can we publish this, Mr. Dinet, as my

12   colleagues are wont to say.

13   BY MR. GREENFIELD:

14   Q.  So is it your testimony that when you gave this to clients

15   at 17 Battery Place, you didn't intend them to think that you

16   were a lawyer?

17   A.  How can I intend it?  It says I'm not a lawyer.

18   Q.  It says you're not a lawyer?

19   A.  It says Law Offices of Jed David Philwin, not Sam Salamon.

20   Q.  Aha.  So that means that you couldn't be a lawyer in his

21   office; is that what you're saying?

22   A.  Does it say I am?

23   Q.  It doesn't say you're Mickey Mouse either.  I'm asking you

24   a question.

25   A.  I'm saying what it says here.

D1u1cib2                        Salamon - cross

1          THE COURT:  Come on.

2   A.  You can't -- I'm saying what it says here.

3          THE COURT:  Excuse me.  There's a way to ask this

4   question.

5          MR. GREENFIELD:  I'm not going to make that mistake

6   again.  I apologize for the third time and last time.

7   Q.  Let me ask you something.  Did you intend for people who

8   received that card from you to believe that you were a lawyer?

9          MR. PASTORE:  Asked and answered.

10          THE COURT:  Just yes or no.

11  A.  No.

12  Q.  Do you know a man by the name of Taddeo Morocho,

13  M-O-R-O-C-H-O?

14  A.  I can't recall.

15  Q.  I'm going to show you what's been marked as Defendant's

16  Exhibit HT7.  Do you recognize that?

17  A.  Yes.  I mean, it looks like it's a client.

18  Q.  Okay.  And that's in fact a check made out to you for

19  $5,000, two separate checks; right?

20  A.  I wasn't present when they made out the check.  I wasn't --

21  Q.  I didn't ask you that.  You didn't make out the check?

22  A.  Make out the check -- the client didn't make it out to me,

23  made it out -- it's a Spanish client.  She gave it to Martha.

24  Martha opened up the file.

25  Q.  Who is that check made out to?

D1u1cib2                          Salamon - cross

1   A.  Sam Salamon.

2   Q.  You're Sam Salamon.

3   A.  Yes.

4   Q.  Is there a memo on that check as to what it's for?

5   A.  It says, "Lawyer."

6   Q.  And do you still say that you didn't hold yourself out to

7   clients as a lawyer?

8   A.  No.

9   Q.  No, you don't still say it or you do?

10  A.  I said I've never said to a client that I am a lawyer, and

11  I wasn't present probably when I received this check because

12  Martha opened up all the cases, so what Martha said, it's one

13  thing.  I'm saying what I said, and I never said to a client

14  that I'm a lawyer.

15          MR. GREENFIELD:  I offer HT7.

16          MR. PASTORE:  Objection.  Defendant -- I'm sorry --

17  witness hasn't authenticated it.  In fact, he said that it was

18  someone else who filled it out, it was provided to someone

19  else.  It looks like he's never seen it before.

20          THE COURT:  Were these checks deposited into your bank

21  account?

22          THE WITNESS:  No.

23          THE COURT:  Sustained.

24          MR. GREENFIELD:  Can I be heard at sidebar?  I don't

25  want to argue in front of the jury.

D1u1cib2                          Salamon – cross

1           THE COURT:  Sure.

2               (Continued on next page)

D1u1cib2                          Salamon - cross

1              (At the sidebar)

2              MR. GREENFIELD:  This is a document that was provided

3     to me during discovery by the government as something that came

4     out of the law firm's files.

5              THE COURT:  I think they're willing to accept that.

6              MR. GREENFIELD:  Well --

7              MS. ECHENBERG:  That's our Bates stamp, but I'm just

8     confused, because these were documents that were personal to

9     Harold Tischler, so that's why I'm confused.

10             MR. GREENFIELD:  Personal to Harold Tischler?  I don't

11    know.  You provided it to me.

12             MS. ECHENBERG:  These were documents you selected.

13             MR. GREENFIELD:  I did.

14             THE COURT:  Look, I think you've got that business

15    card.  Why don't you just ask him whether he would agree with

16    you that somebody receiving that card could conclude that he

17    was a lawyer, and then really that's --

18             MR. GREENFIELD:  Then I got enough?  Okay.

19             MR. PASTORE:  I'm sorry.  The document came from the

20    search?

21             MR. GREENFIELD:  No, no.  But this is a document that

22    the government -- I went down to their office, ICE offices.

23             Okay.  That's fine. I'll ask him --

24             (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                (In open court)

2                MR. GREENFIELD:  Your Honor, I'll withdraw the offer

3     of HT7 at this point.

4     Q.  Let me ask you, sir, do you think it's possible that when

5     you handed somebody, an alien, at 17 Broadway --

6     A.  17 Battery.

7     Q.  -- Battery, your business card, that they could have

8     thought you were a lawyer?

9     A.  It's possible.  What they thought I don't know.  I don't

10    know what went on in their mind.

11    Q.  Did the law office -- did the office itself at 17 Battery

12    say it was a law firm?

13    A.  It said something but I don't know if we put some kind of a

14    paper outside the office.  I can't remember.

15    Q.  You certainly didn't have a sign outside that said plumber,

16    Fix Anything plumber, did you?

17    A.  I don't remember exactly what was outside.

18    Q.  It's not your recollection that any of the aliens who came

19    to 17 Battery Place were looking for a plumber, is it?

20    A.  No.

21    Q.  Would you recognize -- I think I asked you, I'll ask

22    again -- would you know Mr. Tischler's signature if you saw it?

23    A.  Again, I can't say which is his, which is not.  I don't

24    know by heart his signature, no.  If you showed me two

25    signatures, I don't know which one is his, which one is not.

1    Q.  Would you agree that within the records of the law firm

2    there were signatures purporting to be his in at least 50

3    files?

4    A.  I don't know how many files but, yes, his signature was

5    around, if not his signature was around.

6    Q.  Something that was supposed to be his signature was around?

7    A.  Correct.

8    Q.  Was any effort made to your knowledge to make the forged

9    signatures look like his actual signature?

10   A.  I can't tell.  I don't know.

11   Q.  You don't recall --

12   A.  No.

13   Q.  -- that being discussed, do you?

14   A.  No.

15   Q.  Do you know whether there was any effort made to have one

16   forged signature look like another forged signature?

17   A.  No.

18   Q.  Do you know whether his signature was forged by more than

19   one person at the law firm?

20   A.  I have no idea.

21   Q.  Do you know who did the forgeries?

22   A.  I know what I did.  I don't know what anybody did.

23   Q.  Did you have -- so if you didn't sign his name, you don't

24   know anybody else who might have signed his name?

25   A.  I would have signed his name on the labor approvals when he

1    brought it to me most of the time or sometimes Lipa.

2    Q.   What about the other, the sponsorship application?

3    A.   That's what I was saying.

4    Q.   The I-140?

5    A.   I-140?

6    Q.   Where the employer has to sign.

7    A.   Yeah, either I would sign it or Lipa.

8    Q.   But you never asked Mr. Tischler to sign any of those

9    papers?

10   A.   I think back in 2002, 2003, when I required a signature

11   before filing, I did ask him.

12   Q.   So would that have been when you first met with him?

13   A.   Yes.

14   Q.   And that was at a time when you don't recall whether he

15   intended to be part of a false scheme or not, right?

16   A.   At that time initially when I met him, I didn't know what

17   was in his mind, no.

18   Q.   Do you recall there coming a time when -- did there come a

19   time when you found it necessary to have Delaware corporations

20   to use in the business of the law firm?

21   A.   Yes.

22   Q.   And why was that?

23   A.   Supposedly it was supposed to be faster, the labor

24   certification is faster in Delaware.  There's less population

25   of people.  So Earl David said Delaware would be a good idea.

1  Q.  So are you aware of a company known as L&T Realty?

2  A.  I heard the name, yes.

3  Q.  Okay.  Did you tell the agents -- withdrawn.

4          Is it a fact that that's a Delaware corporation that

5  Leo Teitelbaum formed in Harold Tischler's name without Harold

6  Tischler's knowledge?

7  A.  Wrong.

8  Q.  Wrong?

9  A.  Yes.

10  Q.  So he knew that -- withdrawn.

11          MR. GREENFIELD:  Can we have 3043 put up, please.  The

12  first page, just put it up.  I'm sorry.  I'll show you what

13  page I want.

14  Q.  Do you recall telling Agent Gibbs in March of 2011 that Leo

15  Teitelbaum opened two companies in Harold Tischler's name, LT

16  Realty and New York Capital, and that Tischler did not know

17  about these companies; do you recall saying that to the agent?

18  A.  I don't remember saying that Tischler, that Tischler didn't

19  give permission or did not know about it.

20  Q.  Okay.  Well, let me show you a document that was provided

21  to me by the government pursuant to law and give you three

22  pages.  First page to help you --

23          THE COURT:  Give a number, please, Mr. Greenfield,

24  give a number.

25          MR. GREENFIELD:  My copy doesn't seem to have a 3500

D1ULCIB3                          Salamon - cross

1    stamp on it.

2    Q.  Does that refresh your recollection that you told the

3    agents that Lipa Teitelbaum formed this company and another

4    company without Harold Tischler's knowledge?

5    A.  If it says over here, that's what I said.

6    Q.  Well, is it your testimony that that was not true when you

7    said it?

8    A.  I'm not saying that.  New York Capital Realty, Harold

9    Tischler I don't think knew about it.  But L&T Realty, I

10   remember discussing with him that I need a company in Delaware.

11   And this was a company that's not a new, brand-new company.

12   It's a company listed in New York, and Lipa Teitelbaum opened

13   it up in Delaware.

14   Q.  Did you tell the agent in March of 2011 that Teitelbaum

15   opened two companies in Tischler's name, LT Realty and New York

16   Capital, Tischler did not know about these companies; did you

17   tell the agent that, yes or no?

18   A.  If it's there, yes, I told him.

19   Q.  Is it your testimony that you were mistaken when you said

20   that?

21   A.  It's my testimony that one company he knew about.

22   Q.  I ask you to try and focus on my question, okay.

23            THE COURT:  I think he's trying to answer your

24   question.

25            MR. GREENFIELD:  He is?

1          THE COURT:  Yeah.

2   Q.  I thought I was asking for a yes or no.  But, I'm sorry, go

3   ahead.

4   A.  One company, L&T Realty, was a company that Harold Tischler

5   had.  It's not a brand-new company.  It was Lipa Teitelbaum

6   created afterwards a company in Delaware.  But I remember

7   having a discussion with Harold Tischler, does he have a phone

8   number that was forwarded to his office.

9   Q.  Let me show you --

10          MR. GREENFIELD:  Could you move it up a little bit so

11   we can see that center box.

12   Q.  Do you recognize this document?  This is Government

13   Exhibit 3043 in evidence.

14          MR. GREENFIELD:  I'm sorry, could he see the whole

15   document at first.

16   Q.  Take a look at this page from Exhibit 3043, Government

17   Exhibit in evidence, tell me if you recognize it.

18   A.  Yes.

19   Q.  What is it?

20   A.  It's Harold Tischler's information to form a corporation

21   Delaware.

22   Q.  So is that something that Lipa Teitelbaum caused to be sent

23   to this Delaware Business Incorporated in order to form this

24   corporation?

25   A.  Yeah.  This is the way he formed, I believe, the

D1ULCIB3                    Salamon - cross

1   corporation Delaware.

2   Q.  And do you see the center area, billing contact, do you see

3   that?

4   A.  Where?

5   Q.  Where it says billing contact person and mailing address.

6   A.  Yes.

7   Q.  And the address, P.O. Box 901301, do you see that?

8   A.  Yes.

9   Q.  Whose post office box is that?

10  A.  I don't know.

11  Q.  Did you tell the agents it was Lipa Teitelbaum's?

12  A.  No.  I never said that.

13  Q.  So you don't know whose it was?

14  A.  I don't know who.  It might be Harold Tischler.

15  Q.  It might be but you don't know it is?

16  A.  I don't know.  I cannot say that I know whose mailbox, P.O.

17  box that is.

18  Q.  Does that middle section appear to you to be the product of

19  a cut and paste job by Lipa Teitelbaum?

20  A.  Which one?

21  Q.  The middle section where it says billing, Harold Tischler,

22  all the way down to where it says email address Harrythemn,

23  does that look like a cut and paste job that Lipa Teitelbaum

24  had done?

25  A.  Not to me.

D1ULCIB3                              Salamon - cross

1    Q.  Did you ever tell -- did you ever meet Harold Tischler's

2    son Avrom?

3    A.  Outside on the street for two seconds.

4    Q.  How about up in the office at Battery Place?

5    A.  Don't recall.

6    Q.  Did you ever tell Avrom that you were an attorney?

7    A.  No.  I hardly spoke to him.  I don't know who he is.

8    Q.  Do you recall you testified yesterday to a number of checks

9    written on the YM Pollack account to Mr. Tischler; do you

10   recall those checks?

11   A.  Excuse me, YM Pollack made out to Tischler?

12   Q.  Yes.

13   A.  If you show it to me, please.

14           MR. GREENFIELD:  Can we put 202 up, please.

15   Q.  Do you recall testifying to those checks yesterday?

16   A.  Yes.

17   Q.  Do you see one check is payable on the bottom there to

18   Harold Tischler or actually it says Hershy Tischler?

19   A.  Yeah.

20   Q.  Were you present when that check was written?

21   A.  I can't remember if I was present.

22           MR. GREENFIELD:  Could we have it moved over to the

23   back of that check.

24   Q.  Can you tell if that signature as the endorsement is

25   Mr. Tischler's signature?

D1ULCIB3                          Salamon - cross

1   A.  I don't know his signature, like I said before.

2   Q.  Did you testify yesterday -- withdrawn.

3          Did Lipa Teitelbaum make money by cashing checks, did

4   he charge a percentage or something to cash checks?

5   A.  When somebody from the office would get checks from

6   clients, he used to give it to him, he used to charge a

7   percentage, yes.

8   Q.  So you don't know whose signature that is, right?

9   A.  No.

10          MR. GREENFIELD:  Could we invert this so we can read

11   what's upside down.

12   Q.  Do you know whether Mr. Tischler had an account with a bank

13   in Palisades Park, New Jersey?

14   A.  I wouldn't know what accounts he has, no.

15   Q.  You do know he lived in Brooklyn, right?

16   A.  I know he lived in Brooklyn, yes.

17   Q.  Did you ever see him or meet him in Palisades Park, New

18   Jersey?

19   A.  Not that I can recall.

20   Q.  How far is Palisades Park, New Jersey, if you know, from

21   Rockland County?

22          MR. PASTORE:  Objection, Judge.

23   A.  I don't know.  I haven't got --

24          THE COURT:  Let's --

25   Q.  Do you know if it's close?

1              MR. PASTORE:  Judge, objection.

2              THE COURT:  He just said he didn't know.

3              MR. GREENFIELD:  I didn't hear.  I'm sorry.

4    Q.  Show you what's been marked as HT-8.  Do you recognize

5    HT-8?

6    A.  Yes.

7    Q.  What is it?

8    A.  That's a letter that I sent to the landlord at June at the

9    17 Battery Place that I'll be moving out.

10             MR. GREENFIELD:  I offer HT-8 into evidence.

11             MR. PASTORE:  No objection.

12             MR. GREENFIELD:  Could you put it up.

13             (Defendant's Exhibit HT-8 received in evidence)

14   Q.  Is that your signature on the bottom?

15   A.  Yes.

16   Q.  As president of Fix Anything whatever, right?

17   A.  I signed it.  Whoever made the letter, I signed it, yes.

18   Q.  Who made the letter?  That's my question.

19   A.  Could be Earl, I told him to make a letter.  I didn't type

20   it up.  Again, I don't know how to do to Fix Anything

21   Construction logo, all that.

22   Q.  So somebody -- withdrawn.

23             Mr. Tischler didn't do that, right?

24   A.  No.

25   Q.  Now, you listed yourself as president of the lessee on that

1    letter, right?

2    A.  Yes, it looks like it, yes.

3    Q.  Not only does it look like it, that's what you did, right?

4    A.  Again, I didn't type it up and I might have not seen it

5    says president.

6              THE COURT:  You signed it as president, right?

7              THE WITNESS:  Yes.

8    Q.  Now, did you have any concern that -- withdrawn.

9              When the lease was executed two years before, did you

10   represent that you were the president of Fix Anything?

11   A.  No.

12   Q.  Was there anything that stopped you two years before from

13   doing so?

14   A.  I had no need so I didn't write it down.

15   Q.  You could have just signed on behalf of the corporation as

16   president, could you not?

17   A.  He signed the lease, so I don't have to put anything there.

18   Q.  You what?

19   A.  Mr. Harold Tischler signed the lease at 17 Battery so I

20   don't -- I wouldn't.  So that's not a question.

21   Q.  But you could have signed it as president of that company,

22   right?

23   A.  I did not.

24   Q.  That's the question.  Okay.

25              Do you know somebody by the name of Henry Tischler?

1    A.  Henry?

2    Q.  Yes.

3    A.  I know Harold Tischler.

4    Q.  Well, I know you know Harold Tischler.  I'm asking you

5    whether you know Henry Tischler.

6    A.  I don't know if that's the same name, Harold and Henry, I

7    don't know.

8    Q.  To your knowledge, did the company ever file documents in

9    the name of Henry Tischler?

10   A.  I don't know.  I would have to see it.

11   Q.  Show you what's been marked as HT-11.  Do you recognize

12   that?

13   A.  I don't remember it right now, but it looks like something

14   that I saw, yes.

15   Q.  Well, what is it?

16   A.  It's -- they wanted a question about case status of a case.

17            MR. GREENFIELD:  I offer HT-11 into evidence.

18            MR. PASTORE:  Without objection.

19            (Defendant's Exhibit HT-11 received in evidence)

20            THE COURT:  Mr. Greenfield, are you just about to --

21            MR. GREENFIELD:  Honestly, Judge, if we take our break

22   now, I need five or seven minutes when we resume.  But if we

23   don't take our break, it will probably take me 15 minutes to do

24   it.  I just need a little moment to organize.  I'm sorry.

25            THE COURT:  Okay.  Let's take our break and come back

1    in half an hour.  Remember the rules, don't talk about the

2    case, keep an open mind.

3                (Jury not present)

4                (Witness not present)

5                THE COURT:  Let's go off the record for a second.

6                (Discussion off the record)

7                (Recess)

8                THE COURT:  Okay.  My law clerk just handed me a note

9    from a single juror.  I just want to -- we'll make copies for

10   you.  I just want to read it.  I don't think we should stop to

11   consider it now, but you might want to know what the questions

12   were.

13               "Can you clarify which office the Pitney Bowes postage

14   machine was in?  Why wouldn't Earl David pay for something like

15   that?"

16               Questions marks at the end of each of those sentences.

17               New section:  "Can Salamon clarify the payment

18   structure between office's employees, i.e., why would Gulay

19   have to pay Salamon or Leo out of her pocket for a sponsor when

20   they're all working under the umbrella of 'Earl David'?  Were

21   they like independent contractors working for Earl David?"

22               If it's important to you, I can ask someone from my

23   chambers to make copies right now, but I don't want to stop.  I

24   just think you should know what the questions were.

25               MR. GERZOG:  Judge, the only thing that concerns me

1    about that is that they're not following your instruction about

2    the case.

3            THE COURT:  This is not from the jury as a whole.

4    It's from a single juror.

5            MR. GERZOG:  All right.

6            THE COURT:  Okay.  You know, you can't really stop

7    them from thinking.  I didn't think you would want to.

8            MR. PASTORE:  Judge, the government would have no

9    objection, although we don't think it's necessary, but if we

10   want to just take care of defense counsel's potential concern,

11   just, again, the usual two things that your Honor always

12   instructs the jury day after day after day.  We're perfectly

13   happy, again, we don't think polling the jury is necessary.  I

14   don't know if Mr. Gerzog does.

15           MR. GERZOG:  I don't want to poll the jury.  But I

16   wouldn't mind if you said keep an open mind again, frankly.

17           THE COURT:  I can only say it twice a day.

18           (Witness present)

19           (Continued on next page)

20

21

22

23

24

25

 1          (Jury present)

 2          THE COURT:  Okay, Mr. Greenfield, we're looking

 3   forward to that crisp five minutes.

 4          MR. GREENFIELD:  It's going to be less, Judge.

 5          Can we just put up that exhibit.

 6   Q.  Taking a look at this, can you tell us what it is?

 7   A.  That's an email to the labor department advising the

 8   info -- asking for info on status of a client.

 9   Q.  Okay.  And does it say who sent the request for the

10   information to the labor department?

11   A.  It says from Henry Tischler, Vintage Partners.

12   Q.  And do you see the email address,

13   VintagePartners@yahoo.com?

14   A.  Yes.

15   Q.  That wasn't Harold Tischler's email, was it?

16   A.  I don't think so, no.

17   Q.  And that was an email that Earl David created just like he

18   created all the other ones, correct?

19   A.  Yes.

20   Q.  And when it says it's from Henry Tischler, did you ever get

21   any email other than this one from an email address that said

22   Henry Tischler?

23   A.  I don't know, maybe.

24   Q.  Can you recall?

25   A.  I can't recall.

D1ULCIB3                    Salamon - cross

1   Q.  Have you seen one since you've been preparing for this

2   case?

3   A.  I can't recall.

4   Q.  Why would this have been sent to you?

5   A.  Earl David was trying to find out information for a client

6   of mine for case status.  So he sent the email to the

7   Department of Labor because this particular client was driving

8   me probably crazy, so he sent an email to find out status on

9   this case.

10  Q.  And he sent you a copy of it, is that it?

11  A.  He sent it to me, yes.

12  Q.  Well, did he at the same time --

13  A.  He sent it, Vintage Partners email, he sent that email to

14  PLChelp.gov, and then sent it to me to say that he asked

15  already status.

16  Q.  So he was telling you that he had done it?

17  A.  Yes.

18  Q.  So the address, Henry Tischler Vintage Partners, that's --

19  that would have been generated by Earl David, right?

20  A.  I don't know the word Henry.  I know

21  VintagePartners@yahoo.com was generated by Earl David.

22  Q.  Do you see --

23  A.  I wasn't there so how can I know.

24  Q.  I don't know.

25          Do you see where it says Henry Tischler and then the

D1ULCIB3                        Salamon - cross

1   carets where Vintage Partners are in there?

2   A.  Yeah.

3   Q.  Do you know what that means?

4   A.  I don't know how email works.  I'm sorry.

5          MR. GREENFIELD:  No further questions.

6   CROSS-EXAMINATION

7   BY MR. GERZOG:

8   Q.  Mr. Salamon, do you see what's been received as Tischler

9   Exhibit HT-8?

10  A.  I see what's on the screen, yes.

11  Q.  And you don't know that it's HT-8, you didn't hear two

12  seconds ago it was HT-8?

13  A.  We had a break since then.

14  Q.  And you forgot?

15  A.  I don't remember numbers.

16  Q.  Okay.  That is HT-8, Mr. Salamon.

17         Now, with respect to it, there's a signature on the

18  bottom, correct?

19  A.  Yes.

20  Q.  And you said it was your signature, correct?

21  A.  Yes.

22  Q.  Okay.  And then when Mr. Tischler asked you if you prepared

23  it -- I'm sorry, Mr. Greenfield asked you if you prepared it,

24  you said no, right?

25  A.  Probably no.  I did not.

D1ULCIB3                    Salamon – cross

1   Q.  And then you said maybe Earl David did, right?

2   A.  Not me.  I didn't do it.  Maybe Earl David did.

3   Q.  In 2008 Earl David did it in Canada?

4   A.  Yes.  He faxed it over to me, yes.  Emailed it to me.

5   Q.  Now, I want you to tell me again how it is that you first

6   met Earl David.

7   A.  I met him in January of 2001.

8   Q.  That's not true.  You met him in 1999, right?

9   A.  Wrong.

10  Q.  You signed labor certifications for him, right?

11  A.  Two labor certifications, but I had not met him.

12  Q.  You didn't see him there, someone else helped you do that?

13  A.  I have not seen him until January -- the first time in my

14  life -- on January of 2001.

15  Q.  Who paid you for the labor certifications in 1999?

16  A.  Labor certifications?

17  Q.  Or for the applications that you signed.

18  A.  Ex brother-in-law of mine.

19  Q.  Named?

20  A.  Aaron Plotnik (phonetic).

21  Q.  You told the jury that those were absolutely legitimate,

22  right?

23  A.  At that time we were looking for workers and I signed for

24  legitimate, yes, sponsor.

25  Q.  Your sworn testimony is that those were absolutely

D1ULCIB3                          Salamon - cross

1   legitimate, correct?

2   A.  At that time, yes.

3   Q.  Okay.  Now, tell me again how Rafi Brodjik got his green

4   card.

5   A.  He came to our office and with one of his friends, Jacob

6   Kahn, I think, or another person, and he was supposedly

7   supposed to pay for a green card and didn't have money.  Then

8   he became friends with Earl David and he helped him out with

9   something in Hebrew funds.  And then Earl David asked him to

10  help him out with his book, help him out with his website.  And

11  at one point Earl David tells me, yes, I'm going to help him

12  out with a green card.  I'm not going to charge him anything.

13  He's working for me.

14  Q.  Is it your testimony that Earl David filed a new case for

15  Rafi Brodjik to get a green card?

16  A.  New case, no.  He said he substituted a case for him.

17  Q.  And he substituted Rafi Brodjik into the case?

18  A.  Yes.

19  Q.  And what did he say Rafi Brodjik was going to do as for

20  work?

21  A.  He was working there already.

22  Q.  No, no.  What did he tell the Department of Labor Rafi

23  Brodjik was going to do for work?

24  A.  What did who say to the Department of Labor?

25  Q.  Earl David.

1    A.  I don't know if he spoke to Department of Labor.

2    Q.  You have no idea what the application said Rafi Brodjik was

3    going to do for work?

4    A.  You're saying Earl David?  Earl David didn't sponsor him.

5    Q.  I'm saying the office.  You know what I'm saying.

6            MS. ECHENBERG:  Objection, your Honor.  The witness is

7    clearly confused.

8            MR. GERZOG:  Don't get me started.

9    Q.  You say the Earl David law firm filed an application on

10   behalf of Rafi Brodjik, correct?

11   A.  A substitution for a green card.

12   Q.  Right.  For Rafi Brodjik, right?

13   A.  Yes.

14   Q.  And who was the employer?

15   A.  As far as I remember, it was Flam.

16   Q.  And what was the job?

17   A.  As far as I can remember, a cook.

18   Q.  Okay.  And you testified that Rafi thought it was

19   hilarious, went around the office laughing about the fact that

20   he was a cook, right?

21   A.  He went around showing that he's been substituted to a case

22   and went around with the case, yes, Earl is helping me out.

23           MR. GERZOG:  Would you please put up Government

24   Exhibit 410-1.  Can you highlight it, please.

25           What I need I think is 401-1.

1    MS. ECHENBERG:  Sorry, what?  401-1?

2    MR. GERZOG:  The Polish person's application, yes,

3    that he was substituted for.

4    Q.  400-1.  Do you see that there?

5    A.  Yes.

6    Q.  Have you ever seen that before?

7    A.  I can't recall.

8    Q.  You have no idea?

9    A.  I can't recall if I've seen this.

10   Q.  Is that the case that was used for Rafi Brodjik to be

11   substituted into?

12   A.  I don't know if this is the particular one, but I know.

13   Q.  You don't know one way or the other?

14   A.  I know the sponsor was Flam.  I don't know the company.

15   Q.  You don't know one way or the other, do you?

16   A.  I do know sponsored by Flam, yes.

17   Q.  You don't know one way or the other that was the case he

18   was substituted in to?

19   A.  I don't know, no.

20   Q.  Right.  Now, could we have 400-4, and what is this?

21   A.  This is something that immigration received, the stamp.

22   Q.  Right.  What is it?

23   A.  It's called adjustment application.

24   Q.  Right.  And that's the form that was used to substitute a

25   new person into the 400-1 case, right?

1    A.  I don't know.

2    Q.  You don't, you have no idea?

3    A.  I have no idea.

4    Q.  And, in fact, the person that's listed as the applicant is

5    Rachel Brodjik, correct?

6    A.  It says over there, yes.

7    Q.  And that's who, that's how Rafi Brodjik got his green card,

8    correct, through Rachel Brodjik?

9    A.  I don't know the particulars of the file.

10            MS. ECHENBERG:  Objection.  Objection.

11            THE COURT:  Sustained.

12   Q.  You don't know; is that correct?

13            THE COURT:  Listen.  He doesn't.  Immigration gives

14   this out.  He didn't do it.

15            MR. GERZOG:  It was filled in, Judge.  There's a name

16   on it.  He said it was Rafi Brodjik's application.  It was not.

17   That is untrue.

18            THE WITNESS:  I never said.

19            MS. ECHENBERG:  Your Honor, can we have a side bar?

20            THE COURT:  Yeah.

21            (Continued on next page)

22

23

24

25

D1ULCIB3                        Salamon – cross

1           (At the side bar)

2           MS. ECHENBERG:  I think his testimony was clear what

3   he thought happened.  Showing him a bunch of documents and

4   telling him to read names and get him to agree about what

5   happened when he already said what he believes happened, he

6   doesn't know.

7           MR. GERZOG:  What he testified, that's what happened.

8           MS. ECHENBERG:  But you're trying to imply he's lying.

9           MR. GERZOG:  Which he is.

10          THE COURT:  He can't be lying.

11          MR. GERZOG:  How can he not be lying?  Rafi couldn't

12  have, Rafi couldn't have run around bragging that he was a cook

13  because Rafi knew it was his wife whose application was

14  submitted.  It was never going to be Rafi.

15          THE COURT:  Wait a second.  You can -- your argument

16  is essentially these documents speak for themselves, then they

17  speak for themselves.  You will do your summation with a

18  sequence of documents.  But I don't think that throwing a

19  document up on the screen because there's this document

20  necessarily --

21          MR. GERZOG:  Very well, your Honor.

22          THE COURT:  If this connects back to some other

23  document.

24          MR. GUTMAN:  Your Honor, on direct he testified

25  without equivocation that he knew how Rafi Brodjik got his

D1ULCIB3                          Salamon - cross

1  green card.  Whether he's lying or he's mistaken, I think we

2  have a right to show the jury that his certainty on direct --

3          MS. ECHENBERG:  In closing.

4          MR. GERZOG:  We have a right.

5          MR. GUTMAN:  You can do it on cross also.

6          THE COURT:  But you aren't -- the problem is that

7  throwing the document up doesn't prove anything because you

8  aren't even having two documents on the screen with like a

9  similar number on them which shows that one is connected to the

10  other.

11          MR. GERZOG:  Here's the point, your Honor.  The

12  government admitted this exhibit to show that Rachel Brodjik

13  applied to be substituted into that Polish person's case.

14  That's how we all know that the truth is that that's how Rafi

15  Brodjik got his green card.  He testified, he testified not

16  that he thinks or he heard but that's how it happened and the

17  government let him.  The government let him testify falsely.

18  They didn't come up and say that's not true.

19          THE COURT:  There's a difference between the facts and

20  his understanding of the facts and that is not the same thing

21  as perjury.

22          MR. GUTMAN:  Whether it's perjury or not, his

23  willingness to say something with certainty --

24          MR. PASTORE:  Judge, I think we need to keep our

25  voices down.

D1ULCIB3                       Salamon - cross

1                   THE COURT:  You're not proving anything with this.

2                   MR. GERZOG:  I'm proving it was Rachel Brodjik that

3     applied.

4                   THE COURT:  How do you prove from that document that

5     he is the substituted person?

6                   MR. GERZOG:  Because we had government testimony to

7     that effect.

8                   THE COURT:  You're going to have to do that in

9     summation.  You can't.

10                  MR. GERZOG:  Fair enough.

11                  MR. PASTORE:  Judge, just so to the extent they argue

12    he's lying, Mr. Brodjik admitted that he knew there was a false

13    application filed in his wife's name.

14                  MR. GUTMAN:  In his wife's name.

15                  MR. GERZOG:  He said, that witness said that Rafi

16    danced around saying I'm a cook, I'm a cook.  No one ever

17    suggested Rafi was a cook.  It's ridiculous for him to say that

18    Rafi said he was a cook.

19                  MR. PASTORE:  Again, this is a bit of gamesmanship.

20                  MR. GERZOG:  It's not gamesmanship.  It's perjury.

21                  THE COURT:  Come on.

22                  (Continued on next page)

23

24

25

 1              (In open court)
 2   Q.  Have you ever seen this document before, Government
 3   Exhibit 400-4?
 4   A.  This particular document?
 5   Q.  That particular document.
 6   A.  No.
 7   Q.  So you don't really know how Rafi Brodjik got his green
 8   card, do you?
 9   A.  I only know what he said and Earl said.
10   Q.  So when you said a minute ago that if I wasn't there, I
11   can't testify about it, this is an example of you not being
12   there, correct?
13              MS. ECHENBERG:  Objection.
14   Q.  Withdrawn.
15              You don't have any firsthand knowledge of how Rafi
16   Brodjik got --
17   A.  He showed me the file.  I didn't see the inside of the
18   file.
19   Q.  He showed you a file that listed him as the applicant,
20   that's your sworn testimony?
21   A.  No.  He showed me a file, this is the file that I got
22   substituted.
23   Q.  Right.  And he said it was him, not Rachel?
24   A.  He said this is the file that I'm going to get a green card
25   and he went around with it.

D1ULCIB3                          Salamon - cross

1  Q.  So now you're backing off a little bit.

2            MS. ECHENBERG:  Objection.

3            THE COURT:  No commentary.

4  Q.  Did you say it was -- did he say it was him that was being

5  substituted or did he say that it was his wife?

6  A.  I never went to that particulars with him.

7  Q.  So you don't know one way or the other, do you?

8  A.  I don't know who was substituted.  I only went by what he

9  said.

10  Q.  And you're testifying that he told you that it was him that

11  was going to be substituted, is that what you're saying?

12  A.  That's what he told me, yes.

13  Q.  Now, you testified that the documents you signed were on

14  the up and up; is that correct?

15  A.  Excuse me?

16  Q.  You testified that the applications you signed for workers

17  were not fraudulent, correct?

18            MS. ECHENBERG:  Objection.  Vague.

19            MR. GERZOG:  Excuse me?

20  Q.  The first two applications that you came in and signed in

21  1999 were completely legitimate, not fraudulent, correct?

22            MS. ECHENBERG:  Objection, asked and answered.

23  Q.  Is that what you testified to?

24            MS. ECHENBERG:  There's an objection.

25            THE COURT:  I just don't remember.  I know he's

D1ULCIB3                        Salamon - cross

```
 1   asked -- this has been asked and answered.  I don't know by
 2   this counsel.  But I think repeating things that have been
 3   covered is not a good way to go.
 4             MR. GERZOG:  It hasn't been covered, Judge.
 5             THE COURT:  Oh, it has been covered.  Actually,
 6   probably even by you.
 7             MR. PASTORE:  Your Honor, I believe it was the first
 8   question perhaps or maybe the second.
 9   Q.  Okay.  Do you remember meeting with the government on
10   July 1, 2010, you met with Agent Gordon, Agent Gibbs, and an
11   AUSA?
12   A.  Yes.
13   Q.  And did you state in or about 1999, Earl David paid Salamon
14   $350 for each of two applications that Salamon signed.  The
15   applications falsely indicated that United Photocopy was
16   looking to sponsor aliens for employment.
17             Did you say that?
18   A.  I didn't say Earl David paid me.
19   Q.  Did you say, did you make that statement?
20   A.  I have to see it.
21   Q.  I'll show it to you.
22             (Pause)
23   A.  I guess it was a misunderstanding.
24   Q.  It was a misunderstanding?
25   A.  Yes.
```

D1ULCIB3                        Salamon - cross

1   Q.  So when it got written down, that's not what you said?

2   A.  I wouldn't be able to say that Earl David gave me money.  I

3   haven't met him in 1999.

4   Q.  What about the fact that it was false?

5   A.  What false?

6   Q.  It says right here that the applications falsely indicated

7   that United Photocopy was looking for sponsors.  Is that true

8   or not true?

9           MS. ECHENBERG:  Objection, your Honor.  I think the

10  tone has gotten a little --

11          THE COURT:  Yes, let's keep it down.

12  A.  I guess the agent misunderstood because there's no way Earl

13  David paid me because in 1999 I didn't even know this person

14  exists.

15  Q.  I'm not talking about whether Earl David paid you or not.

16  I'm talking about whether the applications were true or false.

17  A.  I was looking at that time for workers, for technicians.

18  Q.  So your testimony still today is that they were true,

19  correct?

20  A.  At that time, yes.

21  Q.  And you did not tell the agents that they were false,

22  correct?

23  A.  They misunderstood me probably.

24  Q.  They misunderstood.  That's not what you said.  Right?

25  A.  1999, no.

D1ULCIB3                        Salamon - cross

1           MR. GERZOG:  Now, I would like to ask you, please, to

2     put up Government Exhibit 3031 -- can I get some help from the

3     government.  Can you please put up 3031-4?

4           MS. ECHENBERG:  I beg your pardon.

5           THE COURT:  Okay.

6           MR. GERZOG:  Would you highlight this, please?

7           THE COURT:  Highlight what?

8           MR. GERZOG:  From the word Sam to where it says

9     Sammy110.

10    Q.  Okay.  Do you see that?

11    A.  Yes.

12    Q.  That's an email from Rafi Brodjik to you, right?

13    A.  I have to see the header to see it.

14          MR. GERZOG:  All right.  Would you show him the

15    header, please.

16    Q.  Now, is that an email from Rafi Brodjik to you?

17    A.  Yes.

18    Q.  Okay.  And you testified that Rafi Brodjik could -- was a

19    very poor writer in English, correct?

20    A.  As far as I know, yes.

21    Q.  And that's an example of that, correct?

22    A.  Yes.

23          MR. GERZOG:  Okay.  Now I'm going to ask you, please,

24    government, to put up 3604.

25    Q.  Now, this is an email from you to Earl David, correct?

D1ULCIB3                         Salamon - cross

1    A.  Yes.

2    Q.  And it says, "I wonder and wonder who helped Rafi with the

3    letter.  He can't even spell his own name."  Correct?

4    A.  Yes.

5    Q.  And you were making the point that Rafi was almost

6    illiterate in English, correct?

7    A.  He wasn't that good in English, yes.

8    Q.  He can't even spell his own name, correct?

9    A.  That, I didn't say that.

10   Q.  You didn't say that?

11   A.  Oh, it says over there, yes.

12   Q.  So you did say it?

13   A.  Yes.

14           MR. GERZOG:  Now, would you please put up Government

15   Exhibit 3607.  Would you please highlight where it starts Rafi

16   Bar.  And if I could ask you a kindness, would you please put

17   up 3031-4 next to it.  And could you highlight the text from

18   Rafi Bar.  Thank you.  And the text from Sam to Sammy110wall.

19   Q.  Can you make those out, Mr. Salamon?

20   A.  I can make out the right-hand side.  The Sam, I don't know.

21   Q.  Is it not on your monitor?

22   A.  It is, but it's --

23           THE COURT:  It's hard to read.

24           MR. GERZOG:  Please expand the item on the left.

25   Q.  Now can you make it out?

1   A.  Yes.

2   Q.  Is it your testimony that it is your understanding that the

3   same person wrote that email as wrote the previous email?

4   A.  My testimony was that he didn't write it.  He had somebody

5   write this email.

6   Q.  You think he had somebody write this email, correct?

7   A.  Yes.

8   Q.  You don't know if he did or not?

9   A.  I don't know, speculate.

10  Q.  You don't know.  It's speculation.  You don't know if he

11  had anything to do with this email, do you?

12  A.  I know it came from him, so I know a hundred percent it had

13  to do with him.

14  Q.  You know it came from his address, correct?

15  A.  Excuse me?

16  Q.  You know it came from his email address, correct?

17  A.  Yes.

18  Q.  But just a few minutes ago we saw an email that came,

19  allegedly came from someone's email address that didn't, wasn't

20  sent by them, correct?

21  A.  It was a sponsorship.  We created this email.  This was not

22  created.  This is I've been in constant contact with him about

23  extortion, coming back and forth.  And he replies to my

24  question, so it came from him.

25  Q.  We'll get to extortion.  Are you saying this email was

D1ULCIB3                          Salamon - cross

1  written by the same person who wrote the other email?

2  A.  I don't know.

3  Q.  You have no idea, right?

4  A.  I know the email address.

5  Q.  Right.  That's all you know, right?

6  A.  No.

7  Q.  Is the address?

8  A.  No, and I know the content of the message.

9  Q.  And you believe that a man who you say could barely spell

10 his name could write that email?

11        THE COURT:  I think that's not his testimony.

12        MS. ECHENBERG:  Objection.

13 Q.  Is that your testimony, do you believe Rafi David -- Rafi

14 Brodjik wrote that email?

15 A.  It's either he had somebody write it for him.  But it was

16 his email, coming from his email, and that's what I replied to

17 him.

18 Q.  How do you know it was coming from him?

19 A.  When I replied to him, he should have said who are you, why

20 are you replying to this email.  I'm not Rafi.  Come on.

21 Q.  That's why, because when you replied to him, he didn't send

22 you back another email, that's why you think --

23 A.  No, because he did send me back an email.  This email keeps

24 going on a thread.  And if it were not Rafi, why at one point

25 his wording is totally not the same grammar as over here.

D1ULCIB3                    Salamon - cross

1    Q.  Right.  In other words, it's totally different grammar.

2    This is written by someone who can write English.

3    A.  And it came from Rafi Bar.

4    Q.  And this came from someone who can write English, and the

5    other one from Rafi Bar is from someone who can't write

6    English, right?

7    A.  Yes.

8    Q.  Now, Mr. Salamon, you were married at age 20, correct?

9    A.  1984 I got married.

10   Q.  Was that age 20?

11   A.  I assume, yes.

12   Q.  What do you mean you assume?

13   A.  I didn't calculate numbers.  I know I was 19 or 20.  I'm

14   under oath so every word has to truthful.  So I don't remember

15   if I was 20 or 21.

16   Q.  When were you born?

17   A.  June 24, 1963.

18   Q.  And when did you get married?

19   A.  June -- when I got married, February in '84.

20   Q.  So you hadn't reached your 21st birthday, correct?

21   A.  Correct.

22   Q.  Now, the woman -- after you got married, you moved to

23   Mexico; is that correct?

24   A.  Yes.

25   Q.  And you stayed there seven years, correct?

D1ULCIB3                           Salamon - cross

1    A.   I think about eight years.

2    Q.   And what kind of work did you do there?

3    A.   I work for my father-in-law.

4    Q.   Doing what?

5    A.   Managing his factory.

6    Q.   How much money did you make?

7    A.   I have no idea.

8    Q.   You have absolutely no idea?

9    A.   No.

10   Q.   Then you came back to the United States -- well, withdrawn.

11            Did you make good money or not such good money?

12   A.   Surviving.

13   Q.   Just surviving?

14   A.   He was very stingy, my ex-father-in-law.

15   Q.   So you barely made a living, is that fair to say?

16   A.   Surviving.  In Mexico, you don't need too much money to

17   survive.

18   Q.   But all you were doing was surviving, right?

19   A.   Yeah.

20   Q.   Then you came back to the United States, correct?

21   A.   Yes.

22            (Continued on next page)

23

24

25

D1u1cib4                          Salamon – cross

1   BY MR. GERZOG:

2   Q.  Did you get a job as soon as you came back to the United

3   States?

4   A.  A year later, yes.

5   Q.  What kind of job did you get then?

6   A.  Doing sales.

7   Q.  Okay.  For what type of company?

8   A.  Copy machines.

9   Q.  Okay.  So this is the company that you started in 1990 or

10  this is a different company?

11  A.  It's a company that was bought off another company.

12  Q.  All right.  And how much money were you making at that

13  time?

14  A.  I can't remember.

15  Q.  Okay.  You have no idea.

16  A.  Probably about 50,000 a year, maybe.

17  Q.  Okay.  So it was, we'll say, medium money, all right?  Is

18  that a fair characterization?

19  A.  Hmm?

20  Q.  We'll say, it's not good money, it's not bad money, it's

21  medium money.  Is that a fair characterization?

22  A.  I don't know if it's medium.  I don't know.  $50,000,

23  but --

24  Q.  To you.  What is 50,000?

25  A.  I was not making a salary.  I was making commission, I

D1u1cib4                        Salamon - cross

1  would say.

2  Q.  And you were making about $50,000 a year; right?

3  A.  I think so, yes.

4  Q.  And is that -- in your mind, to your way of thinking, do

5  you characterize that in terms of it being a lot of money, a

6  little money, or a medium amount of money?

7  A.  I was not -- I'm not billing clients, but we had -- we were

8  barely surviving, I would say.  Surviving.  Surviving.

9  Q.  Again, you were just barely surviving.

10  A.  At that time, yes.

11  Q.  On $50,000 a year; right?

12  A.  Right.

13  Q.  Then you started a company, a photocopying company;

14  correct?

15  A.  Excuse me?

16  Q.  You started a photocopier sales company, correct, with your

17  father and others?

18  A.  No.

19  Q.  No.  In 1990, you didn't do that?

20  A.  In 19 -- we didn't start a company.  We bought off a

21  company that was already existing.

22  Q.  Okay.  And you were a partner in that company; correct?

23  A.  Yes.

24  Q.  10 percent; correct?

25  A.  Yes.

D1u1cib4                    Salamon – cross

1   Q.  And other people, including your father, owned the other

2   90 percent; correct?

3   A.  Yes.

4   Q.  And you made an annual income, whether it was a salary or

5   commission or profit, you made an annual income from that

6   company; correct?

7   A.  Yeah, but I lost money at the end because I invested over a

8   hundred thousand dollars.

9   Q.  That's not what I asked you, sir.  I asked you, you made an

10  annual income; is that correct?

11  A.  Yes.

12  Q.  How much income did you make per year?

13  A.  Like I said, I can't remember exactly how much, but I would

14  say around 50.

15  Q.  You don't remember at all.

16  A.  I can't remember 20 years ago how much I made.

17  Q.  Okay.  So in 1998, you don't remember how much you made.

18  A.  1998?

19  Q.  Correct.  That was the last year you were with the company;

20  correct?

21  A.  No.

22  Q.  What was the last year you were with that company?

23  A.  In -- I left in 2001.

24  Q.  Okay.  What was your income in 2001?

25  A.  Where?

D1u1cib4                          Salamon - cross

1    Q.  At the copier company.

2    A.  Not a lot because I had been part time working over there.

3    Q.  Okay.  So approximately how much?

4    A.  I don't know, 'cause I was working with Earl David and I

5    was working by -- in the copier still a little bit.

6    Q.  All right.  The last time you worked for the copier -- copy

7    company exclusively, before you started working for Earl David,

8    how much did you make?

9    A.  You just asked me that question.  I said I was making about

10   $50,000 a year.

11   Q.  No.  You said you were making $50,000 a year before you

12   started the company.  In 19 -- the last year --

13           MS. ECHENBERG:  Objection, your Honor.

14           MR. GERZOG:  That's what he said.

15           THE COURT:  I'm not quite sure what the relevance of

16   all of this is, but can we just clarify, the year before you

17   went to work for Earl David, what did you make?  Is that what

18   you want to know?

19   A.  50,000, around $50,000.

20   Q.  Okay.  So then in, what, 2001, you went to sell Earl David

21   a copier; correct?

22   A.  Correct.

23   Q.  And you saw that his waiting room was full of people,

24   jammed to the rafters; right?  Isn't that what you told the

25   agents?

D1u1cib4                        Salamon - cross

1   A.  I didn't say jammed to the rafters, no.

2   Q.  No, you didn't use those words, but you saw --

3   A.  There was a lot of people, yes.

4   Q.  A lot of people, right, and you knew that Earl David had

5   become very successful; correct?

6   A.  Yes, he was making money.

7   Q.  Right.  And you wanted in on it, didn't you?

8   A.  I wanted to make money, yes.  I had to work.

9   Q.  It didn't matter how; right?

10  A.  If I have to -- I asked him, "How can I make money?"  He

11  said, "If you bring me sponsors, yes."

12  Q.  Fraudulent sponsors; correct?

13  A.  Bringing sponsors.  He didn't tell me fraudulent.

14  Q.  Okay.  Did you bring him fraudulent sponsors?

15  A.  What do you mean by fraudulent sponsors?

16  Q.  You don't know what it means?

17  A.  No, you need to define it.  Did I do it fraudulent or the

18  company was fraudulent?

19  Q.  The company -- sponsors that did not actually have jobs to

20  give.

21  A.  Correct.

22  Q.  You brought him fraudulent sponsors; correct?

23  A.  Correct.

24  Q.  And it didn't matter to you that they were fraudulent.  You

25  were making money; correct?

D1u1cib4                          Salamon - cross

1    A.  So were the sponsors, yes.

2    Q.  Because it was all about making money, as far as you were

3    concerned; right?

4    A.  At that time, yes.

5    Q.  At that time?  Is it different now?

6    A.  Yes, different, because I --

7    Q.  Because you got caught; right?

8    A.  -- started doing cases and helping out green cards.  My

9    position got upgraded as I went along, so --

10   Q.  So when you started doing the green card applications, they

11   were fraudulent too; right?

12   A.  Yes.

13   Q.  So you didn't change.  You still committed fraud for money;

14   right?

15   A.  Yes.

16   Q.  And that was fine with you; right?

17   A.  Yes.

18   Q.  Finally you made the big time, you made $250,000 a year;

19   right?

20   A.  Yes.

21   Q.  You had a safe in your house; right?

22   A.  Yes.

23   Q.  How much cash at the most was in that safe, the largest

24   amount of cash at any one time?

25   A.  I can't remember.  Probably like 50,000.

D1u1cib4                        Salamon - cross

1    Q.  $50,000?

2    A.  Yes.

3    Q.  And that was money that you were not putting in the bank

4    because you knew it was fraudulent money; correct?

5    A.  I didn't have a bank account.

6    Q.  Right.  Because the money that you were making was

7    fraudulent and you were afraid to show that you were -- you had

8    a lot of money; correct?

9            MS. ECHENBERG:  Objection.

10           MR. GERZOG:  Withdrawn.

11           THE COURT:  I think you can clarify that.

12           MR. GERZOG:  Withdrawn.

13   Q.  Why didn't you put the money in the bank?

14   A.  I didn't.

15   Q.  I know you didn't.  Why?

16   A.  Excuse me?

17   Q.  Why?

18   A.  Why?

19           MS. ECHENBERG:  Objection.  He just testified he

20   didn't have a bank account.

21           THE COURT:  Well, but it's a perfectly legitimate

22   question.

23   Q.  Why didn't you start a bank account?

24   A.  I never had a bank account.  Not even United Photocopy,

25   with the sales copiers.  My wife, she took care of it.  She had

D1u1cib4                          Salamon - cross

1    a bank account.

2    Q.  She had a bank account?

3    A.  Yeah.  I never had a bank account.

4    Q.  Did you put the fraudulent money in her bank account?

5    A.  No.

6    Q.  Why?

7    A.  Why?

8    Q.  Yeah.  Why?

9    A.  Because I didn't trust her and I thought she would take

10   away all my money.  I didn't have the best relationship.

11   Q.  You thought your wife was stealing your money, is that why

12   you didn't put it in the account?

13   A.  I was getting divorced at one point so I didn't give her

14   the money.

15   Q.  At one point.  When did you get divorced?

16   A.  2006.

17   Q.  Okay.  So between 2001 and 2006 when you got divorced, why

18   didn't you put the money in your wife's bank account?

19   A.  I used to give her the money.  I don't know if she put it

20   in the account.  I used to give her.  She had access to my

21   money.

22   Q.  You gave her all the money?

23   A.  Everything I made at that point, yes.

24   Q.  Did you tell her where it came from?

25   A.  She knew I was working in immigration.

D1u1cib4                            Salamon - cross

1    Q.  Right.  Did she know it was fraudulent?

2    A.  I don't think so.

3    Q.  You don't think so?  You thought it was legitimate -- you

4    thought she thought --

5    A.  I don't know what she thought.

6    Q.  Okay.  What was your understanding of what she thought?

7             MS. ECHENBERG:  Objection.  Relevance.

8    A.  I have no idea.

9             THE COURT:  What his wife thought is relevant?

10            MR. GERZOG:  Yes, Judge.

11            THE COURT:  Okay.  Then let's go on.

12   Q.  Okay.  Were you -- how many children do you have?

13   A.  Three boys.

14   Q.  Okay.  How -- how old are they, or when were they born?

15   Let's do it that way.

16   A.  I don't remember the dates.

17   Q.  You don't remember the years?

18   A.  No.  Approximately, I would say.

19   Q.  So approximately, in 2001, how old were they?

20   A.  I can tell you the birthdate, year date.

21            THE COURT:  Come on.  Just ask how old are they today

22   and everybody can do the subtraction.

23   Q.  Okay.  How old are they?

24   A.  One is 27.

25   Q.  What's his name?

D1u1cib4                          Salamon - cross

1  A.  Menachem.

2          MS. ECHENBERG:  Objection, your Honor.  I don't think

3  we should be getting into this personal stuff.

4          MR. GERZOG:  Your Honor, do you want me to say it now

5  or do you want me to come to sidebar?

6          THE COURT:  It better be good.

7          MR. GERZOG:  Do you want me to --

8          THE COURT:  No.  I'm going to let you go.

9          MR. GERZOG:  All right.

10 Q.  Menachem is 27?

11 A.  28, I think, yes.

12 Q.  Okay.  The next boy?

13 A.  David.

14 Q.  Okay.  And how old is he?

15 A.  He's 26, I think.

16 Q.  And the next boy?

17 A.  Mordechai.

18 Q.  And he's how old?

19 A.  24.

20 Q.  Okay.  Now which was the one that was 17 when you sent him

21 to speak to Rafi Brodjik?

22 A.  David.

23 Q.  Okay.  And did he have any idea what you were doing for a

24 living?

25 A.  I don't know.

D1u1cib4                          Salamon – cross

1    Q.  You have no idea.

2    A.  He knew I worked in immigration.

3    Q.  Right.  But did you know -- did he know it was fraudulent?

4    A.  I don't think so.

5    Q.  Okay.  So when you sent him to Rafi Brodjik, you didn't

6    tell him that "we had this fraudulent operation going and this

7    guy is extorting from me"; correct?

8    A.  He was -- didn't extort from me because it's fraudulent.  I

9    just explained the guy was extorting money, yes.

10   Q.  You told him that he was extorting money.  And your son

11   didn't say, "Well, what do you mean, Dad?  What is the problem?

12   What is he asking you about?"

13            MS. ECHENBERG:  Objection, hearsay.

14            MR. GERZOG:  It's a question, Judge.  Can't have any

15   truth value.

16            MS. ECHENBERG:  I think there was an objection when I

17   was asking about this area as to what his son said or didn't

18   say, so if it couldn't come in then --

19            MR. GERZOG:  The question is:  Does it have truth

20   value or not.

21            THE COURT:  Could you just frame your question again.

22   Q.  Okay.  When -- it was David that you sent to speak to Rafi

23   Brodjik; correct?

24   A.  Yes.

25   Q.  And you said, "This guy is extorting from me"; correct?

D1u1cib4                          Salamon - cross

1    A.  Yes.

2    Q.  Did your son ask you, "What do you mean he's extorting from

3    you?"

4              THE COURT:  You can answer that yes or no.

5              THE WITNESS:  Excuse me?

6              THE COURT:  Did your son ask you for an explanation?

7    Q.  Did your son ask you, "What do you mean?"

8    A.  No.

9    Q.  "What do you mean?"

10   A.  No.

11   Q.  No, he didn't ask you about that.

12   A.  No.

13   Q.  He just went and spoke to Rafi Brodjik; right?

14   A.  I told him what's going on, that he's extorting money, and

15   I want him to leave me alone and never come again, I don't feel

16   safe anymore.

17   Q.  Okay.  And so you sent your 17-year-old son to protect you?

18   A.  With his friend, yeah.  Another friend went over there with

19   him.

20   Q.  Was that for muscle, to scare Mr. Brodjik?

21   A.  No.

22   Q.  So then why did two people go?

23   A.  He had a friend he went around with all the time, and he

24   went with his friend.

25   Q.  And was the reason that two people went because it was more

D1u1cib4                          Salamon - cross

1    threatening than one person?

2    A.  I don't know.

3    Q.  You have no idea.

4    A.  I have no idea.

5    Q.  Did you ask him to bring a second person?

6    A.  No.

7    Q.  That was his idea.

8    A.  I asked him afterwards.  He said, "Yes, I went with my

9    friend.  We went in the car."

10   Q.  So it was the 17-year-old's idea.

11   A.  Yes.

12   Q.  Now who is the son that recommended lawyers to you after

13   Jed David what's his name dropped out?

14          MS. ECHENBERG:  Objection.

15   Q.  Did a son -- withdrawn.

16          Did a son recommend potential lawyers to you when Jed

17   David Philwin dropped out of the picture?

18   A.  The one -- one of my younger -- my younger son, yes.

19   Q.  Okay.  That was Mordechai?

20   A.  Yes.

21   Q.  He recommended how many lawyers to you?

22   A.  He said that he knows people out of college, "And if you

23   want a lawyer, I'm going to have somebody that goes to

24   college."  So he recommended one, and then somebody else

25   recommended another one.

D1u1cib4                        Salamon - cross

1    Q.   Somebody else not your son?

2    A.   Through somebody else recommended David Schlachter.

3    Q.   Okay.  So two -- so your son ultimately recommended to you

4    two lawyers.

5    A.   What do you mean ultimately?  Ultimately one, and that

6    person that I know because of my son recommended somebody else.

7    Q.   Okay.  Did you end up hiring either of those lawyers?

8    A.   Yes.

9    Q.   Did Mordechai know that you were hiring him to do

10   fraudulent work?

11   A.   No.  He was 15 years old or 14 years old.  What would he

12   know?

13   Q.   So when he made a reference to you, you didn't say, "You

14   know, you should think about this because I'm hiring him to

15   break the law"?

16   A.   What is the question?

17   Q.   You didn't say to your 15-year-old son, "You should be

18   careful about this recommendation because I'm hiring him to

19   break the law"?

20   A.   No.

21   Q.   Now you say that Rafi Brodjik -- that you never gave Rafi

22   Brodjik money; correct?

23            MS. ECHENBERG:  Objection.

24            MR. GERZOG:  On what basis?

25            MS. ECHENBERG:  Maybe I didn't hear the question,

D1u1cib4                          Salamon - cross

1      but --

2                THE COURT:  "Now you say that you never gave Rafi

3      Brodjik money; correct?"

4      A.  I said I cannot recall when he was in the office giving him

5      money, account -- accountability of handing him the money that

6      came in every day.

7      Q.  So you didn't do that; correct?

8      A.  I might have given him other money, but this particular

9      money, I don't think I gave it to him, no.

10     Q.  All right.  And you don't know, you think other people may

11     have given him money; correct?

12     A.  Not I think.  I know.

13     Q.  Okay.  How do you know?

14     A.  Because Lipa told me, "This is what I'm going to do.  I'm

15     not reporting to him the gross total that he wants.  I'm going

16     to give him this."  I said, "Fine.  Do it."

17     Q.  Did you see him do it?

18     A.  Yes, I seen him in the room, yes.

19     Q.  You've seen him hand -- Lipa hand Mr. Brodjik money.

20     A.  No.

21     Q.  No.  You've never seen him do that; right?

22     A.  I can't recall when I saw him, no.

23     Q.  Have you seen him or have you not seen him?

24     A.  I can't remember that I did.

25     Q.  Okay.  And you have no idea, if Lipa gave him money, what

D1u1cib4                         Salamon - cross

1    Mr. Brodjik might have done with the money; right?

2    A.  I know he got -- Earl got the money.

3    Q.  How do you know that?

4    A.  He'd automatically call me up, "Sam, what's going on?  How

5    come you're not giving money to Rafi?"

6    Q.  Excuse me.  You didn't give him any money.

7    A.  Me personally, no.

8    Q.  Right.  So did he call you up and say, "Sam, what's going

9    on?  Why aren't you giving money to Rafi?"

10   A.  I just asked him, "Why am I giving money?  Why do we have

11   to give accountability to Rafi?"  He said, "That's what he --

12   that's his job."

13   Q.  But you didn't give Rafi any money; right?

14   A.  I said no.

15   Q.  Right.  So why would Sam ask you about --

16           THE COURT:  He's Sam.

17           MR. GERZOG:  I'm sorry.  My mistake.

18   Q.  Why would Earl -- why wouldn't Earl David make that call

19   that you just said he would have made?

20   A.  He wouldn't have gotten money.  He would say, "Sam, I'm not

21   going to work for you today because I didn't get paid," and he

22   did many times to me, and I used to tell Lipa, "What's going

23   on?"

24   Q.  Isn't that speculation as to what Earl David might have

25   done?

D1u1cib4                          Salamon - cross

1    A.  I didn't say might have done.  He had done it.  When he

2    doesn't get paid, he used to call me, "Sam, I'm not working for

3    you today."

4    Q.  And you never gave him money; right?

5    A.  Again?

6    Q.  You never gave Rafi money to give to Sam -- to give to

7    Earl; right?

8    A.  I mean, you asked me this like three times already.

9    Q.  Right.  And you said no.  So did Earl say to you, "I'm

10   never working for you ever because you're never giving Rafi any

11   money?"

12   A.  If he would not have received money, I would have gotten a

13   call the next day, "Sam, I'm not working for you today."

14   Q.  Excuse me.  You just said you didn't give money.  Did you

15   receive that call?

16        MS. ECHENBERG:  Your Honor --

17   A.  I didn't give money but Lipa did.

18   Q.  And Lipa said that that money was from you and Lipa.

19   A.  Yes, from what we made that night at the office, yes.

20   Q.  And was it from the other -- whatever you guys were --

21   lawyers or not lawyers or crooks or whatever it is you were?

22        THE COURT:  Come on.  That's not a question.

23   Q.  All right.  Was it money from everybody in the office?

24   A.  Not everybody.  Just from my office, me and Lipa.

25   Q.  Now there was the woman working in that office, at the

D1u1cib4                    Salamon - cross

1   17 Battery Park office named Aleksandra Urbanek or something

2   like that; right?

3   A.  Battery Place, yes.

4   Q.  And you say she was essentially working for David

5   Grynsztajn; correct?

6   A.  She was working for David Grynsztajn?

7   Q.  Yes, that's the question.

8   A.  She used to bring clients to David Grynsztajn initially.

9   Q.  Right.  So was she working -- forgive me for saying working

10  for.  Was she working with David Grynsztajn?

11  A.  At one point, yes.  Not at 17 Battery.

12  Q.  Never at 17 Battery?

13  A.  No.

14  Q.  Didn't you just testify the other day on direct that she

15  was David Grynsztajn's connection at 17 Battery?

16  A.  What are you talking about?

17  Q.  Did you ever say that?

18  A.  Can I see it, please, that I testified like that?

19  Q.  I don't have the transcript.  Did you say that or did you

20  not?

21  A.  Can I see it, please.

22  Q.  Your sworn testimony here is that you didn't say it.

23  A.  I said David Grynsztajn was connected to 17 Battery Place

24  with Aleksandra?  No, I didn't say that.

25  Q.  Aleksandra --

D1u1cib4                           Salamon - cross

1              MS. ECHENBERG:  Objection, your Honor.

2              THE COURT:  Wait.  If you want to cross him on

3     something he said, ask him, "Did you say this?  Were you asked

4     this question, did you give this answer?"

5     Q.  Did you testify on direct examination that Aleksandra

6     Urbanek was working with David Grynsztajn at 17 Battery?

7     A.  Never said anything like that, no.

8     Q.  Is it a fact that Aleksandra Urbanek gave David Grynsztajn

9     money for fraudulent immigration matters?

10    A.  At what year?  From when to when?

11    Q.  Let's say in 2006.

12    A.  Which location, where?

13    Q.  I don't care.  Any time in 2006.  Did Aleksandra give David

14    money for fraudulent immigration cases?

15    A.  David Grynsztajn?

16    Q.  Yes.

17    A.  I didn't see it.

18    Q.  You don't -- so the answer is no?

19    A.  I had not seen it.  You ask me if I saw it, no, I didn't

20    see it.

21    Q.  Did any of the people that was working with you tell you

22    that that was the case?

23    A.  I don't remember, no.

24    Q.  Okay.  What about in 2007?

25    A.  What's the question again?

D1u1cib4                          Salamon - cross

1    Q.  The question again is:  Did Aleksandra give David

2    Grynsztajn any money for fraudulent immigration cases or for

3    fraudulent immigration work in 2007?

4    A.  Not that I know of.

5    Q.  Okay.  What about 2008?

6    A.  Not that I know of.

7    Q.  Okay.  Now you say that you gave David Grynsztajn money on

8    at least two occasions; correct?

9    A.  I said I remember once and I said this -- I probably gave

10   the second time.  I did not say for sure the second time.  I

11   received e-mails that they're giving him first time money and

12   was trying to extort from me money, but on one occasion I

13   remember, that I gave him, yes.

14   Q.  The first time you went down in the street and you handed

15   him money; correct?

16   A.  Right, at the deli.

17   Q.  Right.  And there was another time about two weeks later

18   when you e-mailed him and you said, "Today I have $1800, come

19   around and I'll give it to you," or words to that effect;

20   correct?

21            MS. ECHENBERG:  Objection.

22            THE COURT:  I think it's the same event.  I thought

23   the deli was the 1800.

24            MR. GERZOG:  No, there's two -- it's my understanding

25   that there were two times.  There was the deli and then about

D1u1cib4                          Salamon – cross

1    two weeks later --

2              THE COURT:  My memory is that it's not 15 plus 18.

3    Q.  Well, did you make payments to him on two different

4    occasions --

5              MS. ECHENBERG:  Objection.

6    Q.  -- if you recall?

7    A.  I recall once.  That's it.

8    Q.  You just recall doing it once.

9    A.  It might have been more than once again, but I'm -- I need

10   to say what I know.

11   Q.  Do you recall sending him an e-mail saying something to the

12   effect of, "Today I have 1800 to give you"?  Do you remember

13   that e-mail?

14   A.  Yes.

15   Q.  Okay.  Was that after you gave him money at the deli or at

16   the same time?

17   A.  I have to see the dates.

18   Q.  You don't remember?

19   A.  It might have been afterwards, again.  I said he extorted

20   me for money and I said -- but I don't remember giving him

21   twice money.

22   Q.  Now you said you were a generous man; right?

23   A.  Yes.

24   Q.  Okay.  You gave $15,000 to a yeshiva; correct?

25   A.  15?

D1u1cib4                        Salamon - cross

1   Q.  Did you give thousands of dollars to a yeshiva?

2   A.  I gave money to schools, yes, to Brooklyn people, yes, I

3   gave a lot of money for that.

4   Q.  All this time while you were working with Earl David, you

5   were very generous, you gave money to lots of charities; right?

6   A.  Yes.

7   Q.  It was fraudulent money, stolen money; correct?

8   A.  Fraudulent money I would say, yes.

9   Q.  So you were generous with stolen money; is that what you're

10  saying?

11          MS. ECHENBERG:  Objection to the mischaracterization.

12          THE COURT:  Overruled.

13          MR. GERZOG:  Fraudulent is different -- obtaining

14  money by fraud is different from stealing?

15          THE COURT:  No.

16  Q.  All right.  It's money you obtained by fraud; correct?

17  A.  Yes.

18  Q.  By lying to people to obtain money; correct?

19  A.  To whom was the lie?

20  Q.  The government.

21  A.  Yes.

22  Q.  Now there came a time when you were arrested; correct?

23  A.  Yes.

24  Q.  When was that?

25  A.  May of 2009.

D1u1cib4                          Salamon - cross

1    Q.  Okay.  And what was your financial situation like at that

2    time?

3    A.  Define financial situation.

4    Q.  You were in good shape?

5    A.  No, not at all.

6    Q.  Okay.  So you had -- you had very little money?

7    A.  Zero money.

8    Q.  Okay.  Did you hire a lawyer named Paul Shechtman?

9    A.  Yes, at one point.

10   Q.  Okay.  Did you retain him or was he appointed to represent

11   you?

12            THE COURT:  What's the relevance of that?

13            MR. GERZOG:  To see how much money he had, Judge.

14   A.  Was he appointed?  What do you mean by appointed?

15   Appointed by whom?

16            MS. ECHENBERG:  Wait.

17   Q.  Did you pay him?

18            THE COURT:  Did you pay him?  You can answer that.

19   A.  Yes.

20   Q.  How much?

21   A.  Why do I have to go into how much I paid my lawyer?

22   Q.  Because it's a proper question.  Did you pay him?

23   A.  Yes, I had a retainer with him, and if he wants to give it

24   to you, you have to ask him.

25            MR. GERZOG:  Your Honor --

D1u1cib4                          Salamon - cross

1         THE COURT:  No, he's allowed to ask you.  I don't --

2    Q.  I want an answer from you.

3    A.  Yes, I paid him.  I paid actually two lawyers.

4    Q.  Okay.  How much?

5    A.  One lawyer I paid probably -- which went away -- like close

6    to 10,000; then I paid Mr. Shechtman a $25,000 check.

7    Q.  Okay.  This is when you had zero money?

8    A.  Zero money.

9    Q.  Where did you get the money to pay the lawyer?

10   A.  From my family.

11   Q.  And which members of your family?

12   A.  Oh, this is ridiculous.

13        MS. ECHENBERG:  Objection, your Honor.

14        THE COURT:  Sustained.

15   Q.  Did your father give you the money?

16        THE COURT:  Sustained.

17   Q.  Did you tell your son, who was 17 at the time, to threaten

18   Rafi Brodjik?

19   A.  No.

20   Q.  Did you tell him to speak reasonably to him and try to

21   reason with him and try to be as mature and adult as he could?

22   A.  I don't remember exact words, but I know -- I know I did

23   not tell him to threaten.  I told him, "This guy's bothering

24   me.  Please go speak to him, see what he wants."

25   Q.  Okay.  And did you tell him -- did you -- withdrawn.

1          Did you tell the agents that what he told -- did you

2    tell the agents that you told him to say, "I have nothing to

3    lose"?

4          MS. ECHENBERG:  Objection.

5          THE COURT:  Overruled.

6    A.  Excuse me?  What's the question?

7    Q.  Did you tell him to say, "I have nothing to lose"?

8    A.  No, I didn't tell him what to say.

9    Q.  So you didn't say that.

10   A.  No.

11   Q.  Okay.  Now did you tell the agents that's what you told him

12   to say?

13   A.  No.  I told the agents what he said to me after he came

14   back.

15   Q.  And was that what he said to you?

16         MS. ECHENBERG:  Objection.

17         MR. GERZOG:  No truth value, Judge.

18         THE COURT:  Excuse me.  The son cannot say what his

19   father told him to say in advance, after he came back.

20         MR. GERZOG:  Your Honor, what this witness just

21   testified is that he told the agents what the son reported to

22   him he had said after the meeting.

23         MS. ECHENBERG:  And your Honor, when I tried -- when I

24   tried to elicit it on direct, there was an objection and it was

25   sustained.

D1u1cib4                      Salamon - cross

1              THE COURT:  Okay.  Then sustained.

2    BY MR. GERZOG:

3    Q.  Now how is it that you say that Mr. Brodjik extorted you?

4    A.  You have seen e-mails.

5    Q.  Excuse me?

6    A.  Those e-mails going back and forth that he wanted money

7    from me.

8    Q.  How many e-mails -- well, withdrawn.

9              Is it -- sometimes he asked you for money; right?

10   A.  In the beginning he asked me, it's possible.  I don't

11   remember.  But the extortion was through the e-mails.

12   Q.  And what do you -- how do you define extortion?  When you

13   say he was committing extortion against you, what do you mean?

14   A.  By saying that he's going to call -- who's going to call

15   the government; by him calling my secretary saying the FBI is

16   on the way; by calling Tischler, not to rent me space.  That's

17   what I consider extortion.

18   Q.  Okay.  And you have e-mails for all of that?

19   A.  Excuse me?

20   Q.  There are e-mails that document all of that, all of that,

21   all of those things?

22   A.  He said about Tischler, what you saw, and the stuff about

23   how much money he's asking for me, so we can review again the

24   e-mails if you want.

25   Q.  That's from you.  You're the one who said, "You told

D1u1cib4                        Salamon - cross

1    Tischler not to rent;" right?  Not him.  You said that; right?

2                MS. ECHENBERG:  Objection.  If we want to look at the

3    e-mails, we can, but I think --

4                THE COURT:  Look, all this questioning without the

5    reference points at some point is really not eliciting

6    testimony, because your question is never evidence, it's only

7    his answer, and if the question --

8                MR. GERZOG:  I understand that.

9                THE COURT:  -- doesn't contain the reference point,

10   we're not moving along.

11   Q.  Did Rafi Brodjik ever try to send you an e-mail in which he

12   said, "I called 17 Battery and told them not to rent to you, to

13   you or to Tischler"?

14   A.  I can't recall saying 17 Battery, but I know he called

15   Tischler.

16   Q.  Okay.  Do you have an e-mail from Rafi Brodjik that says,

17   "I told Tischler not to rent -- not to work with you"?

18   A.  I have to check the e-mails going back and forth.

19   Q.  You don't remember.

20   A.  I have to see the e-mails.  I cannot reference ten e-mails

21   and see exactly what I said.  I have to see.

22   Q.  Sir, I'm asking you, as you sit there today, do you

23   remember?

24   A.  Do I remember what?

25   Q.  Whether Rafi Brodjik sent you an e-mail that said, "I

D1u1cib4                        Salamon - cross

```
 1   called Harold Tischler and told him not to work with you or
 2   told him not to help you lease space"?
 3            MS. ECHENBERG:  Objection.
 4            THE COURT:  You can answer that.
 5   A.  It said in the e-mail that I sent to him --
 6            THE COURT:  The question doesn't concern what you
 7   said.  The question is:  Did he, Refeal Brodjik, send you an
 8   e-mail?
 9            MR. GERZOG:  Correct, Judge.  Thank you.
10   Q.  And what's the answer?
11   A.  I don't remember him sending a separate e-mail saying that,
12   "I called Tischler not to rent to you."
13   Q.  So it didn't happen; right?
14            MS. ECHENBERG:  Objection.
15            THE COURT:  No.  That's not --
16   Q.  When you say you don't recall, does that mean you don't
17   remember or it didn't happen?
18            MS. ECHENBERG:  Objection.
19   A.  I would have to --
20            THE COURT:  Wait a second.  There is an issue about
21   whether there is an e-mail, and that's separate from whether
22   something happened.
23   Q.  Have you ever been to Lakewood, New Jersey?
24   A.  Lakewood, New Jersey?
25   Q.  Mm-hmm.
```

D1u1cib4                          Salamon – cross

1    A.  I can't recall that I was ever there.

2    Q.  Okay.  So you don't know what's at 1501 Pine Park Avenue,

3    do you?

4    A.  No.

5    Q.  You don't know what's at 2 -- I believe it's 225 Second

6    Street in Lakewood, New Jersey, do you?

7    A.  No.

8    Q.  225 Second Street in Lakewood, New Jersey; right?  You

9    don't know what's there.

10   A.  No.

11   Q.  Now you pled guilty to certain crimes; correct?

12   A.  Yes.

13   Q.  And the potential exposure for those crimes is up to 70

14   years; correct?

15   A.  70 years, yes.

16   Q.  But you don't really expect to get 70 years.  You've been

17   told that that's unusual; correct?

18              MS. ECHENBERG:  Objection.

19              THE COURT:  First, you're either asking him for what

20   his attorney told him, in which case you can't go into that;

21   and beyond that, the government hasn't told him, and certainly

22   no judge has told him.

23              MR. GERZOG:  How do we know the government hasn't told

24   him that, Judge?

25              THE COURT:  Because they don't.

D1u1cib4                          Salamon – cross

1          MR. GERZOG:  I object.  That's entirely inappropriate,

2     most respectfully.

3          THE COURT:  The cooperation agreement says

4     specifically that they don't make any recommendations on

5     sentence.

6          MR. GERZOG:  Correct.  I'm not asking if they're

7     making a recommendation.

8     BY MR. GERZOG:

9     Q.  Did anyone from the government tell you that it would be

10    very unlikely that you would get 70 years?

11    A.  No.  They never told me anything.

12    Q.  Do you think it's possible that you might get 70 years?

13    A.  If they go for the maximum, yes.

14    Q.  Obviously that's the maximum.  Do you think it's --

15    A.  I didn't discuss it.

16    Q.  Do you have an opinion?

17    A.  I have no opinion, I have no knowledge.  I'm doing what I'm

18    told and -- so I don't know what to believe.

19    Q.  If they sent you to jail for 70 years, that -- you would

20    probably die in jail; right?

21         MS. ECHENBERG:  Objection.

22    A.  That's a low blow.

23    Q.  You'd be 120, right, when your sentence was over; right?

24    A.  I would die in jail?

25    Q.  You'd be 120 years old in 70 years; right?

D1u1cib4                          Salamon - cross

1   A.   Maybe I'd be alive.  I know I have cancer, but god will

2   give me more life.

3   Q.   I'm not talking about your cancer, sir.  I'm talking about

4   70 years.

5   A.   I don't know what's going to happen in 70 years.

6   Q.   You don't want to go to jail for 70 years.

7   A.   No.

8   Q.   You don't want to go to jail for one year --

9   A.   No.

10  Q.   -- right?  Correct?

11  A.   Correct.

12  Q.   Okay.  And have you been told anything -- do you have any

13  understanding of the quality of medical care in prison?

14  A.   No, I haven't discussed.

15  Q.   Now you made a living, and a nice living, defrauding the

16  government; correct?

17  A.   Yes.

18  Q.   And it was pretty easy after you learned how to do it;

19  correct?

20  A.   I wouldn't say easy, but yes.

21  Q.   You did it at least a thousand times; right?

22  A.   Yes.

23  Q.   And the David law firm did it 5 or 7,000 times; right?

24  A.   I guess so, yes.

25  Q.   Now when you signed the work -- withdrawn.

D1u1cib4                        Salamon - cross

1           When you -- in 1999, when you signed the papers at

2    Earl David's office, your father got upset with you when he

3    found out about it; right?

4           MS. ECHENBERG:  Objection.  There's been no testimony

5    about signing anything in Earl David's office in 1999.

6    Q.  Well, Earl David's offices.

7           MS. ECHENBERG:  No.  In 1999, that's not his

8    testimony.

9           THE COURT:  He specifically has told us multiple times

10   he didn't meet Earl David until --

11   Q.  No.  I know you didn't meet Earl David, but were you in

12   Earl David's offices when you signed those --

13   A.  How would I be in Earl David's offices and not meet Earl

14   David?

15   Q.  I don't mean his personal office.  I mean the office suite.

16   A.  He only had one office.

17   Q.  Were you in his office suite; yes or no?

18   A.  When?

19   Q.  When you signed those work -- those work requests or

20   whatever they were.

21   A.  In what year?

22          THE COURT:  1999.

23   Q.  '99.

24   A.  No.

25   Q.  Where were you?

D1u1cib4                         Salamon - cross

1    A.  In my office, United Photocopy, 34 West 27th.

2    Q.  And your brother-in-law brought you the forms?

3    A.  My brother-in-law worked at that -- with me at that time,

4    at United Photocopy part time as a salesman.

5    Q.  And he brought you the forms?

6    A.  Correct.

7    Q.  Okay.  And your father was unhappy about it when he learned

8    about it; right?

9    A.  Yes.

10   Q.  Why?

11   A.  He just did not -- he's a Holocaust survivor, and if he

12   sees something from US Labor, what's going on, he did not

13   understand what it is.  I told him I signed for it, and he

14   wasn't -- he wasn't happy about it, and I told him I'm going to

15   stop it now.

16   Q.  Did you explain to him, "Dad, all I'm doing is trying to

17   get some technicians"?

18   A.  Yeah, but he said he's not interested.  He'd rather put

19   something in the paper.

20   Q.  Okay.  Did you consider that you -- did you ask your

21   father's permission to sign those papers, whatever they were?

22   A.  I told him about it.

23   Q.  Beforehand?

24   A.  I can't remember.  I -- I was in the service and sales, and

25   I was a 10 percent partner, so that --

D1u1cib4                          Salamon - cross

1   Q.  You told him about it?

2   A.  I can't remember if I told him before anything about it.

3   Q.  All right.  So is it your testimony that he knew about it

4   before he got the mail from the Department of Labor?

5           MS. ECHENBERG:  Objection.  He just said he didn't

6   know.

7           THE COURT:  Right.  Sustained.

8   Q.  All right.  Do you consider that you lied to your father

9   about that incident?

10  A.  Lying?

11  Q.  Yes.

12  A.  In what way was I lying?

13  Q.  I'm asking you:  Do you consider that you lied; yes or no?

14  A.  No.

15  Q.  Okay.  Did you ever lie to Earl David?

16  A.  Yes.

17  Q.  Did you ever lie to the other people at the Earl David law

18  office?

19  A.  It's possible.

20  Q.  Did you lie to the clients of the Earl David law office?

21  A.  Lie in what way?

22  Q.  Lie means say something that isn't true.  Do you not

23  understand that?

24  A.  It's possible.

25  Q.  Thank you.  Did you lie to your ex-wife?

D1u1cib4                          Salamon - cross

1           MS. ECHENBERG:  Objection.

2           THE COURT:  It's almost a given.

3   Q.  Could we assume -- all right.  If it's that easy, can we

4   assume you lied to your ex-wife?

5   A.  It's possible, yes.

6   Q.  And can we -- and you told us that you lied to women on

7   dating sites; right?

8   A.  I presented -- misrepresented myself.

9   Q.  You misrepresented yourself.  That's not a lie?

10  A.  Yes.

11  Q.  Yes, it is, or yes, it isn't?

12  A.  Yes, it's a lie.

13  Q.  Now after you got arrested and after you hired

14  Mr. Shechtman, there came a time when you decided to make a

15  proffer with the government; correct?

16  A.  Yes.

17  Q.  Do you recall when that first time was?

18  A.  I can't recall, sir.

19  Q.  Okay.  If I -- does it sound correct that the first time

20  you proffered for the government was on October 13th, 2009?

21  A.  I don't remember.

22  Q.  I'm going to show you what's been marked as Government's

23  Exhibit 3502-3, ask you to have a quick look at it.

24          Does that refresh your recollection as to when the

25  first time it was that you proffered?

D1u1cib4                          Salamon - cross

1    A.  Yes.  It says October 13th, 2009.

2    Q.  Was that when it was?

3    A.  Yes, probably.  Yes.

4    Q.  Okay.  And did you say anything about Mr. Brodjik at this

5    proffer?

6    A.  I don't know.  I have to go through the whole proffer to

7    see.

8    Q.  Go through the proffer.

9    A.  (Witness reviews exhibit.)  I can't go through this whole

10   thing right now.

11   Q.  You can't?  Why not?

12   A.  I don't know how many pages it is.

13   Q.  Three pages.

14   A.  Well, then I have to go through it right now.

15   Q.  You don't have time?  You have someplace to be?

16   A.  No.  I just don't know how proffer -- how the proffer is,

17   exactly how many pages.

18   Q.  Three pages.  It says from pages 1 to 3.  Do you see that

19   right there?

20   A.  Yeah.

21   Q.  Three pages.

22           THE COURT:  Can we, counsel, shorten this?  Is there

23   something in there about Mr. Brodjik or not?

24           MS. ECHENBERG:  I don't know that off the top of my

25   head, your Honor.

D1u1cib4                          Salamon - cross

1              MR. GERZOG:  Your Honor, would I ask him if there was

2       if there was?

3              THE COURT:  Well, I would hope not.

4              MR. GERZOG:  Right.

5              MS. ECHENBERG:  It's not jumping out at me right now,

6       your Honor.  I have a few pages here.  He just said three pages

7       but -- which it continued a few days later, but --

8       BY MR. GERZOG:

9       Q.  And then you made another proffer, which Ms. Echenberg just

10      said, to the government; correct?

11      A.  If it's in there, yes.

12      Q.  And that was on October 19th of '09; correct?

13      A.  If it's in there, yes.

14      Q.  Okay.  And then you didn't say anything about Rafi Brodjik

15      on that proffer either, did you?

16      A.  If it's not in there, I didn't say.

17      Q.  Then you made another proffer on December 11th, 2009;

18      correct?

19      A.  If it's in there, yes.

20      Q.  And you didn't say anything about Rafi Brodjik then either,

21      did you?

22      A.  If it doesn't say Rafi's name, no, I did not.

23      Q.  And then you made another proffer on March 9th, 2010, and

24      it doesn't say anything about Mr. Brodjik either; right?

25      A.  And again, if it's not there, then I didn't say it.

D1u1cib4                          Salamon - cross

1   Q.  In fact, you didn't say anything in any of your proffers

2   until March 26th, 2010, about Rafi --

3            MS. ECHENBERG:  Objection.

4            MR. GERZOG:  I haven't even finished the question.

5   Q.  You didn't say anything about Rafi Brodjik until

6   March 26th, 2010; is that correct?

7            MS. ECHENBERG:  I withdraw that, your Honor.

8   A.  I would have to go through, but if that's what it is, yes.

9   Q.  That's almost nine months after you were arrested; correct?

10  A.  Yes.

11           MR. GERZOG:  Would you please put up Exhibit 3605,

12  Government's Exhibit 3605.

13           And would you please highlight the text portion.

14  Q.  Can you read that, Mr. Salamon?

15  A.  Yeah.

16  Q.  And that purports to be an e-mail message from Mr. Brodjik

17  to you; correct?

18  A.  Yes.

19  Q.  And is that language consistent with the way Mr. Brodjik

20  writes English?

21  A.  No, not necessarily, no.

22  Q.  Yes or no?

23  A.  No.

24           MR. GERZOG:  You can take it down.  Thank you.

25  Q.  Do you recall making a proffer to the government on

D1u1cib4                          Salamon – cross

1   March 9th, 2010?

2   A.  If it's in there, if you have it, that's what it is, yeah.

3   Q.  And do you recall telling the government that you didn't

4   know how Earl David got money from New York?

5   A.  If I said it over there, yes.

6   Q.  Now you testified on direct that, if I remember correctly,

7   that Rafi Brodjik helped Earl David move to Canada.  Is that

8   what you testified?

9   A.  Yes.  It was from the e-mail that he sent, yes.

10  Q.  Did you ever tell that to the government before November of

11  2012?

12  A.  That what?

13  Q.  That Rafi Brodjik helped Earl David move to Canada.

14  A.  Maybe I did not.  I don't know.

15         MR. GERZOG:  Your Honor, if I could just have a moment

16  to consult with my colleague and my client.

17         THE COURT:  Okay.

18         (Pause)

19         MR. GERZOG:  I have no other questions, your Honor.

20         THE COURT:  Is there any redirect?

21         MS. ECHENBERG:  I'll be very brief.

22  REDIRECT EXAMINATION

23  BY MS. ECHENBERG:

24  Q.  Mr. Salamon, I'm going to direct you first to Ms. Cibik.

25  What did you see her doing in the office when you worked with

D1u1cib4                          Salamon - redirect

1    her?

2    A.   Speaking to clients, Turkish clients mostly.

3    Q.   Did you see her doing anything else?

4    A.   She was in the office speaking to clients.

5    Q.   And what, if anything, did Earl David tell you about what

6    her role was at the office?

7    A.   That she -- she takes care of Turkish clients and she did

8    extraordinary ability as well.

9    Q.   Extraordinary ability cases?

10   A.   Yes.

11   Q.   And you testified on direct that there were I believe three

12   instances where a sponsor complained, either directly to you or

13   through the Department of Labor, that they didn't want to

14   sponsor people; is that right?

15   A.   Correct.

16   Q.   And what did you do in those instances?

17   A.   I used to call Earl David to cease all applications and

18   delete everything from this file because I didn't want no

19   problems.

20   Q.   And when you say you didn't want any problems, what do you

21   mean?

22   A.   I didn't want they should go to the government and have

23   problems.  I mean, they'll go to the government and say, "You

24   know what, this guy is filing applications without our

25   authorization."

D1u1cib4                          Salamon – redirect

1    Q.  And why would that be a problem?

2    A.  They would come shut me down right away.

3    Q.  And do you know who the other witnesses in this case are?

4    A.  Not necessarily, no.

5    Q.  You testified about Rafi Brodjik collecting money for Earl

6    David in the office.  Do you remember that?

7    A.  Yes.

8    Q.  Can you describe for us how that worked.

9    A.  He would come at the end of the day, he would walk in late

10   at night, and he would go around asking everyone how much there

11   was, how much money it was, and then he used to deal with Lipa,

12   and Lipa would give him the money to transfer the money.  I

13   don't know how it was transmitted, but he transferred it over

14   to Canada.

15   Q.  And the money that you were making from this firm, who held

16   that money for you?

17   A.  What do you mean by who held the money?  Oh, Lipa

18   Teitelbaum.

19   Q.  So if he was collecting money from Lipa, was part of that

20   your money?

21   A.  Yes.

22   Q.  And would you have discussions with Lipa about what

23   Mr. Brodjik was collecting?

24   A.  Yes.

25   Q.  And what were those discussions?

D1u1cib4                    Salamon - redirect

1   A.   That he comes over and he told me he's not going to tell

2   him the full amounts, exact amount, and that's when Rafi

3   Brodjik got upset.

4           MS. ECHENBERG:   One moment, your Honor.

5           (Pause)

6           MS. ECHENBERG:   If we could bring up on the screen

7   Government Exhibit 3608 -- sorry -- 3031-8, please.

8           And if you could highlight -- enlarge the text on the

9   top, please.

10  Q.   Who is this e-mail from?

11  A.   Rafi Brodjik.

12  Q.   And who is it to?

13  A.   To me.

14  Q.   If you could read the third section down that starts with,

15  "So far."

16  A.   "So far you lost the fun with Alex and the office with

17  Tischler and ask Lipa who is the next phone call?"

18  Q.   What did you understand that to mean?

19  A.   That he spoke something to Lipa and he threatened Lipa that

20  he's going to call the government.

21  Q.   And what about, "So far you lost the office with Tischler,"

22  what did you understand that to mean?

23  A.   That he called -- he called Tischler to -- not to rent me

24  out an office.

25          MS. ECHENBERG:   Nothing further, your Honor.

1        MR. GERZOG:  I don't know who goes first.

2        THE COURT:  I don't know if anybody has a question.

3        MR. GERZOG:  I do.  Anyone else?

4        MR. DONALDSON:  I just have -- no.

5   RECROSS EXAMINATION

6   BY MR. GERZOG:

7   Q.  With respect to this exhibit, did you ever ask Lipa if Rafi

8   Brodjik threatened him?

9   A.  I can't remember.

10  Q.  Okay.  And do you know from your own knowledge what "lost

11  the fun with Alex" means?

12  A.  Yes.  I explained it yesterday.

13  Q.  And you're sure that's what it means?  You have no -- no

14  misunderstanding, that you know for sure what that means.

15  A.  Yes.

16  Q.  Okay.  And you know for sure what "the office with

17  Tischler" means; right?

18  A.  Yes.

19  Q.  And we should believe you because you're telling the truth;

20  right?

21  A.  Yes.

22  Q.  And you've defrauded the government for $2 million in the

23  past; correct?

24        MS. ECHENBERG:  Objection.

25        THE COURT:  Beyond the scope of redirect.

D1u1cib4

1          MR. GERZOG:  Withdrawn.

2          THE COURT:  Okay.  Thank you.

3          (Witness excused)

4          THE COURT:  While the government is changing

5    witnesses, I have the note from some juror, unidentified to me.

6    I've given it to counsel.  I can't answer the question.

7    Counsel may or may not be in a position to or may not want to.

8    So I just want you to know that they have the question on the

9    state of the record.

10          And let me also tell the jury that I am keenly aware

11    that this trial has taken longer than I promised, and this is

12    actually the first time in my judicial career, which spans over

13    30 years, that I've ever been as wrong about the length of a

14    trial, and I'm sorry.  I mean, obviously there was a day that

15    we missed because I just physically couldn't get here, and I

16    recognize that if the case goes into next week -- which it may

17    well, that's not unrealistic -- that we may lose some people

18    and, you know, I hope that we can avoid losing too many.  We

19    need to lose as few as possible, because if we lose too many,

20    we have to start the trial all over again.

21          So I'll be happy at the end of the day to speak to

22    you, to anybody who has a real problem, to tell me what it is.

23          The other thing is that tomorrow, we will be starting

24    summations.  We'll sit a whole day.  And let me tell you, the

25    fact that we sit the short day doesn't mean that we ever

D1u1cib4

1   accomplish less.  The reason we sit the shorter day is because

2   we don't spend all the time having lunch, having morning breaks

3   and afternoon breaks.  Those breaks add up to something

4   approaching two hours of lost time.  We only lose a half an

5   hour, and our transcripts are huge.  They're as big as

6   transcripts of judges that start in the morning and then go all

7   the way till the end of the day.  But I think I explained to

8   you at the beginning why I think it's to everybody's advantage

9   to start earlier and work in a concentrated way.  But as I

10  explained at the beginning, there are some times where we just

11  need hours.  And so we'll start tomorrow -- and on Friday there

12  is a limit to how far we can go in respect of religious

13  observances of some of the defendants.  I think we're limited

14  to about 2:30, I would say, on Friday.  That's a fair --

15            MR. GERZOG:  Yes, your Honor.

16            THE COURT:  Fair?  Okay.  So we'll go until 2:30 on

17  Friday.

18            Okay.  Do you have the witness?

19            MR. PASTORE:  United States calls Deidre Gordon.

20            THE CLERK:  Please remain standing and raise your

21  right hand.

22            (Witness sworn)

23            THE CLERK:  Please state and spell your full name for

24  the record.

25            THE WITNESS:  Deidre Gordon.  D-E-I-D-R-E,

D1u1cib4                          Gordon - direct

1    G-O-R-D-O-N.

2              MR. PASTORE:  May I proceed, your Honor?

3              THE COURT:  Yes.

4      DEIDRE GORDON,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. PASTORE:

9    Q.  Good afternoon.  How are you currently employed?

10   A.  I'm a special agent with the US Immigration and Customs

11   Enforcement.

12   Q.  Is that agency commonly referred to as ICE?

13   A.  Yes.

14   Q.  Are you assigned to a particular unit or squad within ICE?

15   A.  Yes.  I'm currently assigned to the Document and Benefit

16   Fraud Task Force.

17   Q.  How long have you been with that particular unit?

18   A.  I've been with the fraud unit since approximately 2004.

19   Q.  What does it mean to have a task force?

20   A.  That there are other federal and state local agencies

21   involved.

22   Q.  And you said you've been with the fraud unit since about

23   2004; is that right?

24   A.  That's correct.

25   Q.  What were you doing before that?

1    A.   Prior to that I was assigned to a violent gang unit and an

2    alien smuggling unit.

3    Q.   So how long have you been a special agent with ICE?

4    A.   21 years.

5    Q.   At some point were you assigned to an investigation of Earl

6    David & Associates?

7    A.   Yes.

8    Q.   What was your role in that investigation?

9    A.   Case agent.  One of the case agents.

10   Q.   Who was the other case agent?

11   A.   Special Agent Ryan Gibbs, from the Department of Labor's

12   Office of Labor Racketeering and Fraud Investigation.

13   Q.   And that's because of the task force investigation; is that

14   right?

15   A.   Correct.

16   Q.   Can you tell the jury in general what it means to be a case

17   agent on a case.

18   A.   Basically the case agent is responsible for overseeing the

19   investigation and coordinating with the US Attorney's Office.

20   Q.   Are you familiar with A files?

21   A.   Yes, I am.

22   Q.   How are you familiar with them and what are they?

23   A.   A files are files that are maintained by the US Citizenship

24   and Immigration Services.  They contain -- theoretically they

25   contain every application that's filed on behalf of an alien

D1u1cib4                          Gordon - direct

1    trying to adjust status.

2    Q.  Okay.  You say theoretically.  Are you familiar with

3    something called the T file?

4    A.  Yes.

5    Q.  What's that?

6    A.  T files are created when an application is filed and the

7    alien's primary A file is unavailable for some reason.

8    Q.  What are -- in your experience what are the circumstances

9    when an A file would be unavailable?

10   A.  An A file would be unavailable to CIS if it was in the

11   investigations unit with ICE or if it was in a litigation unit

12   with ICE or deportation unit.

13   Q.  And ultimately do you know what happens to the documents

14   that are in the T files?

15   A.  Yes.  Ultimately they're consolidated with the primary A

16   file.

17   Q.  Did you review A files and T files as part of your

18   investigation into the Earl David & Associates law firm?

19   A.  Yes, I did.

20   Q.  Approximately how many?

21   A.  Thousands.

22   Q.  Where did you review them?

23   A.  I reviewed them at the offices of CIS, which is at

24   26 Federal Plaza; I also traveled to the Vermont Service Center

25   of CIS and to the Texas Service Center of CIS.

D1u1cib4                        Gordon - direct

1    Q.  And based on your personal review, were you able to
2    determine approximately how many applications you reviewed that
3    were filed by Earl David & Associates?
4    A.  For my personal review I would estimate somewhere in the
5    vicinity of 5,000 applications.
6    Q.  How did you identify which -- which alien files to review?
7    A.   Initially, alien files that had applications filed through
8    the law offices of Earl David & Associates, and then began
9    focusing on A files that had applications relating to specific
10   sponsoring companies that had been identified as possibly
11   containing fraud.
12   Q.  So in preparation for trial against these four defendants,
13   did you conduct further analysis of certain alien files?
14   A.  Yes.
15   Q.  I'm going to wheel up to you what's been previously marked
16   as Government's 1301 through 1358.
17          Prior -- oh, and -- I'm sorry.  And I have a few of
18   the 1300s here on the podium.  Can you see them okay?
19   A.  Yes, I can.
20   Q.  Prior to trial did you have a chance to look through each
21   of these?
22   A.  Yes, I did.
23   Q.  In general, what are they?
24   A.  They're A files relating to one of the four defendants on
25   trial.

D1u1cib4                         Gordon - direct

1    Q.   Which of the four defendants, if you can remember?

2    A.   Harold Tischler and Nathan Schwartz.

3    Q.   And so how were -- how were these particular A files

4    identified by you?

5    A.   They contain applications that relate to a company

6    associated with Harold Tischler or Nathan Schwartz.

7    Q.   Now I'm going to hand you what's been marked for

8    identification as Government's 1304, Government's 1309,

9    Government's 1334, and Government's 1352.

10            Beginning with 1304, can you please tell the jury what

11    that is.

12    A.   Yes.  Government Exhibit 1304 is an A file for an alien by

13    the name of Fabian Arias.

14    Q.   Have particular documents been marked as government

15    exhibits within that file?

16    A.   Yes.

17    Q.   Are there Government's Exhibits 1304-1 and 1304-2?

18    A.   Yes.

19    Q.   In general, what is 1304-1?

20    A.   13094-1 is an original alien labor certification form, the

21    blue form.

22    Q.   And what is 1304-2?

23    A.   1304-2 is the I-140 that was filed with USCIS relating to

24    that same alien.

25            MR. PASTORE:  Government offers 1304-1 and 1304-2.

D1u1cib4                          Gordon - direct

1            MR. DONALDSON:  No objection.

2            THE COURT:  Received.

3            (Government's Exhibits 1304-1 and 1304-2 received in

4      evidence)

5            MR. PASTORE:  If we could publish 1304-1 on the

6      overhead, please.

7      Q.  And while that's being done, could you just take us

8      through -- is there a particular alien listed on this labor

9      certification?

10     A.  Yes.  Fabian Arias, A-R-I-A-S.

11     Q.  Is there a company associated -- well, now we can see it on

12     the screen.  So what is the company that's associated with it?

13     A.  387 Quincy Associates.

14     Q.  And what is the address that's associated with it?

15     A.  43-16 17th Avenue in Brooklyn, New York.

16     Q.  During this investigation did you have occasion to visit

17     43-16 17th Avenue in Brooklyn, New York?

18     A.  Yes, I did.

19     Q.  Handing you what's been marked for identification as

20     Government's 50, could you please tell us what that is.

21     A.  Yes.  It's three photographs of 43-16 17th Avenue in

22     Brooklyn.

23     Q.  And do they fairly and accurately depict that location as

24     it appeared when you visited it during the investigation?

25     A.  Structurally, yes.  I think the color may be different in

D1u1cib4                    Gordon – direct

1    these photos.

2    Q.  Looks like the color of the structure has been changed but

3    it's otherwise the same?

4    A.  Yes.

5            MR. PASTORE:  Government offers 50.

6            THE COURT:  Received.

7            (Government's Exhibit 50 received in evidence)

8            MR. PASTORE:  All right.  If we could publish that.

9    Q.  At any point did you encounter any individuals at 4316

10   17th Avenue?  Did you personally encounter anyone there?

11   A.  Did I personally?  No.

12   Q.  If we can move on to Government's Exhibit 1309.

13           Can you tell us what that is, please.

14   A.  Yes.  1309 is an A file relating to an alien Shahid Cheema,

15   C-H-E-E-M-A.

16   Q.  And again, are particular documents within that A file

17   marked as Government Exhibits 1309-1 through 1309-5?

18   A.  Yes.

19           MR. PASTORE:  Government offers 1309-1 through 1309-5.

20           THE COURT:  Received.

21           (Government's Exhibits 1309-1 through 1309-5 received

22   in evidence)

23   Q.  Focusing on 1309-1, what is that?

24   A.  1309-1 is an original alien labor certification for Shahid

25   Cheema.

D1u1cib4                        Gordon - direct

1   Q.  And what company is this associated with?

2   A.  Vintage Partners.

3          MR. PASTORE:  And if we could just zoom in, please, on

4   where it says the name of the company on the left.

5   Q.  So this is obviously different than 387 Quincy.  Now we're

6   dealing with Vintage Partners; is that right?

7   A.  Correct.

8   Q.  And the address here?

9   A.  4316 17th Avenue in Brooklyn, New York.

10  Q.  And again, sent care of?

11  A.  Harold Tischler.

12  Q.  If we could look at 1309-2, just tell the jury generally

13  what it is.

14  A.  It's the I-140 application filed with USCIS for Shahid

15  Cheema, with Vintage Partners as the sponsoring company.

16  Q.  And in general, directing your attention now to 1309-4 and

17  1309-5, can you tell us what each of these documents is.

18         MR. PASTORE:  If we could bring up 1309-4, please.

19  A.  1309-4 is a letter from USCIS, a decision letter.  It

20  should actually chronologically go in the other order, 4 and 5,

21  but 4 is a final decision from USCIS regarding the I-140

22  application for Shahid Cheema.

23  Q.  So this is actually dated later than 1309-5?

24  A.  Correct.

25  Q.  So let's do as you suggest and take a look at 1309-5 first.

D1u1cib4                    Gordon - direct

1    A.  1309-5 is a letter from USCIS dated February 17th 2010

2    requesting additional evidence in relation to Shahid Cheema's

3    application.

4    Q.  Are there any other documents that comprise Government's

5    1309-5?  And if so, can you please tell the jury what they are.

6    A.  Yes.  The request for evidence that I just described is

7    addressed to Vintage Partners, Harold Tischler, but it's cc'd

8    to Jed David Philwin, Esq.

9    Q.  Now you said it was addressed to Harold Tischler.  What

10   address?

11   A.  4316 17th Avenue in Brooklyn.

12   Q.  And you said a copy was sent to Jed Philwin?

13   A.  Yes.  Carbon copy to Jed Philwin.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D1ULCIB5                        Gordon - direct

1   BY MR. PASTORE:

2   Q.  Does it list an address?

3   A.  17 Battery Place, Suite 323, New York, New York.

4   Q.  Is there anything else in Government 1309-5?

5   A.  Yes.  It's the envelope from CIS addressed to Jed David

6   Philwin, Esq., with the return to sender address from the post

7   office.

8   Q.  Do I understand correctly that the envelope is addressed to

9   Jed David Philwin, but it's returned to sender back to CIS?

10  A.  Correct.

11  Q.  And you found that in the A file?

12  A.  Correct.

13  Q.  Now, based on your 21 years of experience, do you know

14  whether CIS maintains returned mail in alien files?

15  A.  They do.  I don't believe they always did, but they have

16  for at least as long as this investigation.

17  Q.  When you reviewed -- I'm sorry.  So you said the copy sent

18  to Jed David Philwin was returned to CIS as undeliverable?

19  A.  That's correct.

20  Q.  Was there any returned mail that had been sent to Harold

21  Tischler's address at 4316 17th Avenue?

22  A.  There's no indication of that in the A file, no.

23  Q.  In fact, when you reviewed Government's 1301 through 1358,

24  was there any returned mail to Harold Tischler?

25  A.  No, there was not.

D1ULCIB5                              Gordon - direct

1   Q.  Have you in your experience ever seen withdrawal letters

2   contained within an alien file?

3   A.  Yes, I have.

4   Q.  In looking through 1301 through 1358, those A files, did

5   you ever see any withdrawal files from Mr. Tischler?

6   A.  No, I did not.

7   Q.  Let's move on to Government's 1352, and if you could tell

8   us what it is and whether there are government exhibits marked.

9   A.  Yes.  Government Exhibit 1352 is an A file for Julio

10  Maldonado Contos.

11  Q.  And are Government's 1352-1 and 1352-2 marked within that A

12  file?

13  A.  Yes, they are.

14           MR. PASTORE:  Government offers 1352-1 and 1352-2.

15           MR. GREENFIELD:  No objection.

16           THE COURT:  Received.

17           (Government's Exhibits 1352-1, 1352-2 received in

18  evidence)

19           MR. PASTORE:  And if we could publish 1352-1.

20  Q.  And if you could tell us what 1352-1 is.

21  A.  1352-1 is an original labor certification for Julio Cesar

22  Maldonado Contos dated August 8, 2008.

23  Q.  What is that name of the company that's associated with

24  this labor certification?

25  A.  The name of the company is 5318 16th Avenue Enterprises,

D1ULCIB5                         Gordon - direct

1    LLC.

2    Q.  What's the address and is it sent care of someone?

3    A.  The address is 4316 17th Avenue in Brooklyn, New York, and

4    it's sent in care of Harold Tischler.

5    Q.  Now I want to direct your attention 5318 16th Avenue.  Have

6    you ever been to a location with that address?

7    A.  Yes, I have.

8    Q.  Handing you now what's been marked for identification as

9    Government's 51.

10          Do you recognize Government's 51?  If so, please tell

11   us what it is.

12   A.  I do.  It's a photo of the outside of 5318 16th Avenue in

13   Brooklyn.

14   Q.  And approximately how many photos is it -- not

15   approximately.  How many photos is it?

16   A.  Two.

17   Q.  And do both of those photos fairly and accurately depict

18   5318 16th Avenue as they appeared when you visited them?

19   A.  Structurally, yes.  I don't recognize the awning that's on

20   the first picture, the green line building consultants, I don't

21   recognize that.  The second photo is pretty much a photo of the

22   number on the door.  Yes, it appears to be the same.

23   Q.  So other than the signage being different, does this fairly

24   and accurately depict 5318 16th Avenue which you visited during

25   the investigation?

D1ULCIB5                           Gordon – direct

1    A.  Yes.

2               MR. PASTORE:  Government offers 51.

3               MR. GREENFIELD:  No objection.

4               THE COURT:  Received.

5               (Government's Exhibit 51 received in evidence)

6    Q.  You personally went to that address?

7    A.  Yes, I did.

8    Q.  Did you encounter anyone at that address?

9    A.  Yes, I did.

10   Q.  Who did you encounter?

11   A.  Harold Tischler.

12   Q.  What was the purpose of you traveling to that address?

13   A.  To locate Mr. Tischler to serve him with a subpoena.

14   Q.  What date did you -- approximately when did you serve

15   Harold Tischler with a subpoena at 5318 16th Avenue?

16   A.  In January 2009.

17   Q.  If I could direct your attention now to Government 1334,

18   please.  If you could tell us what it is and then if there are

19   Government Exhibits, tell us what those are.

20   A.  1334, Government Exhibit 1334 is an A file for an alien by

21   the name of Shlomo Ben Haim.  And it contains Government

22   Exhibits 1334-1 through 1334-6.

23              MR. PASTORE:  Government offers 1334-1 through 1334-6.

24              MR. GERZOG:  No objection.

25              THE COURT:  Received.

D1ULCIB5                          Gordon – direct

1              (Government's Exhibits 1334-1 through 1334-6 received

2       in evidence)

3       Q.  If we could go first to 1334-5, and if you could tell the

4       jury what that is, please.

5       A.  1334-5 is the original labor certification for an alien by

6       the name of Sigal Revivo.

7       Q.  And what company, if any, is listed on this and what is the

8       address for the company?

9       A.  Fix Anything Construction and Plumbing Incorporated.  The

10      address is 4316 17th Avenue in Brooklyn, New York.

11      Q.  And is it sent care of anyone?

12      A.  Care of Harold Tischler.

13      Q.  You mentioned this was Shlomo Ben Haim's A file, but then

14      you told us the labor cert has Sigal Revivo's name on it?

15      A.  That's correct.

16      Q.  In your review of the A file, did you find any information

17      or documents to explain why that might be?

18      A.  Yes.

19      Q.  What did you find and what is it marked?

20      A.  Government Exhibit 1334-6 is a letter from the law offices

21      of Jed David Philwin to USCIS indicating that Shlomo Ben Haim

22      was replacing Sigal Revivo based on the approved labor

23      certification.  It was a substitution of aliens, basically.

24      Q.  Is there another labor certification in Shlomo Ben Haim's A

25      file that's been marked?

D1ULCIB5                          Gordon - direct

1    A.  Yes, there is.

2    Q.  Is that 1334-3?

3    A.  Yes, it is.

4          MR. PASTORE:  And if we could please bring that up on

5    the screen.

6    Q.  What alien's name is this under?

7    A.  Shlomo Ben Haim.

8    Q.  And what company is this associated with?

9    A.  Olympia York Builders and Developers Incorporated.

10   Q.  And is it sent care of any individual?

11   A.  Yes, sent care of Nathan Schwartz.

12   Q.  What address?

13   A.  455 Route 306, Suite 119, in Monsey, New York.

14   Q.  Have you been to 455 Route 306 in Monsey, New York in

15   connection with this investigation?

16   A.  Yes, I have.

17         MR. PASTORE:  If we could please put up Government's

18   54 which is already in evidence.

19   Q.  Can you tell the jury what that is?

20   A.  That's a photo of the outside of 455 Route 306.

21         MR. PASTORE:  And if we could bring up what's already

22   been admitted as Government's 3004, and I'll approach and hand

23   it to the witness.

24   Q.  If you can just read that.

25   A.  I'm sorry, did you ask me to read that?

D1ULCIB5                         Gordon - direct

1    Q.  Yeah, to yourself, I'm sorry.  Should have been clearer.

2              In general, what is it?

3    A.  It appears to be an exchange between Harold Tischler and

4    Sam.

5    Q.  And do you see where it mentions Yona Abenson, do you see

6    that?

7    A.  Yes.

8    Q.  After you reviewed this chat, did you do any further

9    investigation as to whether an A file existed for Yona Abenson?

10   A.  I conducted a database check, yes.

11   Q.  I'm handing you what's been marked for identification as

12   Government Exhibit 3064-1.

13             Do you recognize that and, if so, please tell the jury

14   what it is.

15   A.  I do.  It's an I-140 and an I-485 application filed with

16   USCIS for an alien by the name of Yona Abenson.

17             MR. PASTORE:  Government offers 3064-1.

18             THE COURT:  Received.

19             (Government's Exhibit 3064-1 received in evidence)

20   Q.  You mentioned in your review of the alien files 1300

21   through 1358 that you didn't see any withdrawal letters and I

22   apologize, I don't think I defined what a withdrawal letter is.

23             So can you just tell the jury what is a withdrawal

24   letter?

25   A.  A withdrawal letter would be contained in an A file if

1    someone had put in an application to sponsor an alien -- it

2    doesn't need to be a company.  Even if a person wants to

3    sponsor another alien and then changes their mind, they would

4    notify USCIS, or if the alien themselves decided they wanted to

5    pursue getting status another way or wanted to go back to their

6    own country, didn't want to continue with the application, that

7    letter should be contained in the A file.

8    Q.  You mentioned that Mr. Tischler had several companies

9    associated with him.  Did you ever issue a subpoena to any of

10   those companies?

11   A.  Yes.

12   Q.  Approximately when was that?

13   A.  Around August of 2006.

14   Q.  I'm handing you what's already been admitted as

15   Government's 222.  Can you take a minute, take a look at that,

16   tell the jury what it is.

17        Okay.  Tell us what we're looking at on the first

18   page.

19   A.  I was going to say this is the first page that's on the

20   screen is the envelope that I received that contained documents

21   that were sent to me in response to a subpoena.

22        MR. PASTORE:  Okay.  And if we can rotate this so it's

23   right side up for the jury.

24   Q.  And if you could just direct your attention, Agent Gordon,

25   to where it says from.  It's a little faint on the screen, but

1    if you can make it out on the original that's in your hands,

2    can you tell us what the address is listed above the company is

3    listed?

4    A.   Yes.  In the from portion it says Vintage Partners, P.O.

5    Box 901301, Brooklyn, New York 11219.

6    Q.   Now, you mentioned earlier that you personally served a

7    subpoena on Harold Tischler in about January of 2009.  This

8    subpoena to Vintage Partners, was that served personally or was

9    it served some other way?

10   A.   It was served via mail.

11   Q.   What address or addresses was the subpoena sent to?

12   A.   The subpoena was sent to two addresses.  It was sent to

13   Vintage Partners both at 4316 17th Avenue and also to the P.O.

14   Box 190301, both in Brooklyn, New York.

15   Q.   So it was send to 4316 17th Avenue, and it was also mailed

16   to the P.O. box we've been discussing; is that right?

17   A.   That's correct.

18   Q.   What in general was the subpoena seeking, what information

19   was the subpoena seeking?

20   A.   In general the subpoena was requesting any and all

21   documents that would be maintained by a business, including W-2

22   forms, employee lists -- I forget the exact wording of the

23   subpoena.

24   Q.   Is there a copy of the subpoena that was included in the

25   response back to you?

1    A.  There is.

2    Q.  And does that have a rider associated with it that

3    indicates what documents were actually requested?

4    A.  Yes.

5    Q.  Why don't you tell the jury from looking at that what was

6    requested.

7    A.  Employee contact lists, payroll records, W-2s, certificates

8    of incorporation, proof of utilities payments, lease agreements

9    or locations where business is conducted, inspection

10   certificates, annual reports, organizational charts of

11   officers, directors, shareholders, members and managers,

12   invoices, sales receipts, and documents relating to the order

13   and receipt of merchandise and services.

14   Q.  Can you just separate out the subpoena and riders from the

15   documents in front of you leaving only the subpoena response,

16   can you just hold that up for the jury.

17   A.  This is the response.

18   Q.  That's the response?

19   A.  Yes.

20   Q.  Let's go through the response.  If we could go to the next

21   page on 222, please.  Okay.

22            This first document, what is it indicated as?

23   A.  I'm sorry?

24   Q.  The first document, what does it indicate that it is?

25   A.  A membership certificate for Vintage Partners.

D1ULCIB5                        Gordon - direct

1    Q.  Do you see where it says number on the top left?

2    A.  Yes.

3    Q.  What's listed there?

4    A.  Nothing.

5    Q.  Shares?

6    A.  Nothing.

7    Q.  This certifies that?

8    A.  It's blank.

9    Q.  Dated?

10   A.  It's blank.

11   Q.  Member and member?

12   A.  Blank.

13   Q.  Next page.  This cover sheet, what is it?  Just tell the

14   jury what it purports to be.

15   A.  The minutes of Vintage Partners New York, LLC.

16   Q.  Do you see how it says a limited liability company

17   organized under the laws of the State of New York?

18   A.  Yes.

19   Q.  If we can go to the next page, please.  Do you see where it

20   says the board of directors of Vintage Partners LLC, do you see

21   that?

22   A.  Yes.

23   Q.  Then it says holds its -- what's there?

24   A.  Nothing.  I'm sorry.

25   Q.  Meeting on?

1    A.   It's blank.

2    Q.   2000?

3    A.   It's blank.

4    Q.   At?

5    A.   Blank.

6    Q.   And then down at the bottom, the name field?

7    A.   The fields are left blank.

8    Q.   Next page, please.  Again, is there any information filled

9    in here?

10   A.   No.

11   Q.   Next page.  Any information filled in about the bank

12   account?

13   A.   No.

14   Q.   Next page.  Names of officers or issuance for services, are

15   those fields filled in?

16   A.   No.

17   Q.   Next page.  Same thing, more blank fields?

18   A.   Same thing, yes.

19   Q.   If we can scroll through the remainder of these minutes.

20            Okay.  If we could go back to page 12 for one second.

21   Meeting participant list.  Are there any participants listed

22   here?

23   A.   No, there are not.

24   Q.   Next page.  What are we looking at here?

25   A.   Copy of a phone bill for Linda and Harold Tischler, Vintage

1    Partners LLC.

2    Q.  What's the address on this phone bill?

3    A.  It's 4316 17th Avenue in Brooklyn.  Sorry, it's a copy of

4    the first page of a phone bill.

5    Q.  Next page, please.  Again, is this more sort of blank

6    forms?

7    A.  Yeah, I believe that's part of the minutes.

8    Q.  Next page, please.  Are you familiar with documents such as

9    these?

10    A.  Yes.

11    Q.  In general what are they?

12    A.  In general they're printed off the New York State Division

13    of Corporations website.  Just indicates date a company was

14    incorporated, process address, if it's still active.

15    Q.  And, again, Vintage Partners New York, LLC, do you see

16    where it says under DOS process, do you see where it says that?

17    A.  Yes.

18    Q.  And then a P.O. Box is listed.  What's that P.O. Box?

19    A.  190301 in Brooklyn, New York.

20    Q.  If we could look at the next page, please.  What is this?

21    A.  Next page appears to be a solicitation from Citibank for a

22    business card, excuse me, for a credit card, Citi business

23    credit card addressed to business owner, Vintage Partners New

24    York, LLC, Post Office Box 190301 in Brooklyn, New York.

25    Q.  Did you receive any W-2s?

1   A.  No.

2   Q.  Did you receive any employee lists?

3   A.  No.

4   Q.  Did you receive any information about any employees that

5   were working for Vintage?

6   A.  No.

7   Q.  Are there any other pages in this exhibit that we haven't

8   looked at?

9   A.  Yes, the cover letter.

10          MR. PASTORE:  If we could turn to the cover letter.

11   Page 1.

12   Q.  Is the cover letter what we've previously reviewed, did you

13   see it being discussed with another witness?

14   A.  Yes.

15   Q.  We'll move on.  Were you able to in connection with the

16   investigation obtain documents from the New York State

17   Department of Taxation and Finance?

18   A.  Yes.

19   Q.  How did you obtain those documents?

20   A.  I believe it was through a subpoena.

21          MR. PASTORE:  Your Honor, at this time the government

22   would like to read a stipulation into evidence.

23          Your Honor, it's stipulation S-5.  It's captioned with

24   this case name.  It says New York State Department of Taxation

25   and Finance and it says as follows:

1          "It is hereby stipulated and agreed by and between the

2     United States of America by Preet Bharara, United States

3     attorney for the Southern District, James Pastore and Janis

4     Echenberg, assistant United States attorneys, of counsel, and

5     the below named defendants by and through their attorneys, that

6     if called as a witness, a custodian of records of the New York

7     State Department of Taxation and Finance, which is abbreviated

8     NYSDTF, would testify that:

9          "1.  I am employed at the New York State Department of

10    Taxation and Finance as a custodian of records.  I am familiar

11    with the documents created and maintained by the NYSDTF, which

12    include recordkeeping procedures for the Department of

13    Withholding Tax Returns as well as certifications of

14    nonexistence of tax records.

15         "2.  A search was made on November 8, 2012, of NYSDTF

16    records for withholding tax returns for the tax years 2003

17    through the third quarter of 2002, inclusive for the --"

18              THE COURT:  '12.

19              MR. PASTORE:  Third quarter of 2012.

20              THE COURT:  You said two.

21              MR. PASTORE:  I said two.  I'm sorry, 2012.  I'm

22    sorry, that was incorrect.  Thank you.

23         "-- inclusive, for the following businesses:  Fix

24    Anything Construction and Plumbing, Inc., 387 Quincy

25    Associates, Vintage Partners, 5318 16th Avenue, LLC, Bliss 9

1    Limited, CFI Framing Developers, Olympia York Builders, The

2    Sharp Shopper, and no such returns were found.  A search was

3    also made on November 8, 2012, of NYSDTF records for

4    withholding tax returns for the tax years 2003 through third

5    quarter of 2012, inclusive, for the business Contour Framing,

6    Inc., and no such records were found for the tax years 2003,

7    2004, 2005, and 2007 through 2011 and the fourth quarter of tax

8    year 2006, as well as the first three quarters of 2012.  A

9    search was also made on November 8, 2012, of NYSDTF records for

10   withholding tax returns for the tax years 2003 through the

11   third quarter of 2012, inclusive, for the business Vintage

12   Builders and no such records were found for the tax years 2003,

13   2004, 2009, 2010, 2011, and the second, third, and fourth

14   quarters of 2008, as well as the first three quarters of 2012.

15            "The records marked as Government Exhibits 206 and 306

16   were found during the November 8, 2012 search.

17            "The NYSDTF records review during the November 8, 2012

18   search (a) were made by the NYSDTF if the ordinary course of

19   business; (b) were maintained in the files of the NYSDTF in the

20   ordinary course of its business; (c) were made as part of the

21   regular practice of the NYSDTF; and (d) set forth the

22   activities of the NYSDTF."

23            It is dated January 15.  It's signed by Ms. Echenberg

24   as well as counsel for each defendant.

25            And at this time the government offers S-5 together

1    with Government Exhibits 206 and 306.

2              THE COURT:  It's received.

3              (Government's Exhibits S-5, 206, 306 received in

4    evidence)

5    Q.  Agent Gordon, did you also obtain records regarding

6    Mr. Tischler's companies from the New York State Department of

7    Labor?

8    A.  Yes.

9              MR. PASTORE:  I'm reading what's been marked as

10   Government's S-7.  It has the caption of the case, stipulated,

11   New York State Department of Labor, and it reads as follows:

12             "It is hereby stipulated and agreed by and between the

13   United States of America by Preet Bharara, United States

14   attorney for the Southern District, James Pastore and Janis

15   Echenberg, assistant United States attorneys, of counsel, and

16   the below named defendants by and through their attorneys that:

17             "1.  If called as a witness, a custodian of records of

18   New York State Department of Labor would testify that

19   Government Exhibits 205 and 308 consist of records of the New

20   York State Department of Labor which were:

21             "A.  Made at or another the time of the occurrence of

22   the matters set forth in the records by, or from information

23   transmitted by, a person with knowledge of those matters;

24             "B.  Kept in the course of regularly conducted

25   business activity; and

1              "C.  Made by the regularly conducted business activity

2      as a regular practice."

3              Dated January 15, 2013, signed by Ms. Echenberg and

4      each of the defense counsel.

5              Government now offers S-7 and Government Exhibits 205

6      and 308.

7              MR. GREENFIELD:  No objection.

8              THE COURT:  Received.

9              (Government's Exhibits S-7, 205, 308 received in

10     evidence)

11             MR. PASTORE:  And if we could publish 205 by bringing

12     it up on the screen, please.  I'm also going to hand a copy to

13     the witness.

14     Q.  Agent Gordon, what are we looking at here?

15     A.  Records from the New York State Department of Labor related

16     to Vintage Builders and General Contractors, Inc.

17     Q.  And if we can go to the third page, please.

18             What is the address listed for Vintage Builders and

19     General Contractors?

20     A.  Post Office Box 190301 in Brooklyn, New York.

21     Q.  That's the same address of Vintage Partners that we

22     previously looked at?

23     A.  Yes.

24     Q.  Who are the owners listed for Vintage Builders and General

25     Contractors?

D1ULCIB5                         Gordon - direct

1    A.   Harold Tischler and Moses Weisz.

2    Q.   We've mentioned P.O. Box No. 190301 a few times.  Did you

3    ever get records associated with that P.O. Box?

4    A.   Yes.

5             MR. PASTORE:  Just to expedite matters, I'm going to

6    hand you what's been marked as Government Exhibit 204 and I'm

7    going to read stipulation marked Government's S-12.

8             This stipulation also has the caption of the case and

9    says United States Postal Service.  It reads as follows:

10            "It is hereby stipulated and agreed by and between the

11   United States of America by Preet Bharara, United States

12   attorney for the Southern District, James Pastore and Janis

13   Echenberg, assistant United States attorneys, of counsel, and

14   the below named defendants by and through their attorneys that:

15            "1.   If called as a witness, a custodian of records of

16   the United States Postal Service would testify that Government

17   Exhibit 204 consists of records of the United States Postal

18   Service which were:

19            "A.   Made at or another the time of the occurrence of

20   the matters set forth in the records by, or from information

21   transmitted by, a person with knowledge of those matters;

22            "B.   Kept in the course of regularly conducted

23   business activity; and

24            "C.   Made by the regularly conducted business activity

25   as a regular practice."

1          It's dated January 15, signed by Ms. Echenberg and

2     each of defense counsel.

3          Government now offers S-12 together with 204.

4          MR. GREENFIELD:  No objection.

5          THE COURT:  Received.

6          (Government's Exhibits S-12, 204 received in evidence)

7     Q.  And, Agent Gordon, if you could tell the jury what is

8     Government Exhibit 204?

9     A.  Government Exhibit 204 contains two application cards

10    related to a post office box.

11    Q.  What post office box?

12    A.  Post office box 301.

13    Q.  And is the first application dated?

14    A.  Yes.  First application is dated June 18, 2007.

15    Q.  Is that displayed on the screen right now that we're all

16    looking at?

17    A.  No.  That's actually the second application.

18    Q.  If we can go forward a few pages.

19    A.  Yes.  This is the application dated June 18, 2007.

20    Q.  You see field one.  Can you make out what the writing is in

21    field one where it says name to which box numbers is/are

22    assigned?

23    A.  Yes.  There are several listed.

24    Q.  Please tell the jury what they are.

25    A.  Vintage Builders, Fix Anything, Harold Tischler, Moses

1  Weisz, and then First Choice/FCP.

2  Q.  Section 4B, does that have an email address?

3  A.  Yes.

4  Q.  What is the email address?

5  A.  HARRYTHEMN@aol.com.

6  Q.  And the address in Section 5 is?

7  A.  4316 17th Avenue, Brooklyn, New York 11204.

8  Q.  If we could zoom out a little bit and I'll just ask you,

9  does this document contain any writing on the back of it?

10  A.  No, it does not.

11  Q.  Now let's go to the later dated application, please.  All

12  right.  Again focusing on field one, what information is listed

13  there?

14  A.  It says Tischler/Vintage Builders.

15  Q.  And then below that?

16  A.  Linda Tischler/Fix Anything.

17  Q.  Now, does this document have any companies, I'm sorry, any

18  information listed on the back?

19  A.  Yes, it does.

20  Q.  All right.  What is listed on the back?

21  A.  On the back it lists Vintage Builders, 5318 16th Avenue,

22  LLC, 387 Quincy Street Associate, Tischler family, Linda

23  Tischler, Harold Tischler, Fix Anything Construction.

24  Q.  And do you recognize 5318 16th Avenue LLC, 387 Quincy, Fix

25  Anything Construction, do you recognize those companies?

D1ULCIB5                          Gordon - direct

1   A.  Yes.

2   Q.  How do you recognize them?

3   A.  They're company names with which are associated numerous

4   immigration related applications.

5   Q.  Some of which we've reviewed in your testimony here today?

6   A.  Correct.

7   Q.  And Vintage Builders, how about that company?

8   A.  I've also reviewed A files that contain applications

9   listing Vintage Builders as the sponsoring company.

10  Q.  When we were discussing Vintage Partners, do you remember

11  the minutes said something about being a limited liability

12  corporation in New York State?

13  A.  Yes.

14  Q.  Did you ever obtain any records from the Department of

15  State, New York State Department of State relevant to

16  Mr. Tischler's companies?

17  A.  Yes.

18  Q.  What in general did you obtain?

19  A.  Certificates of incorporation and records indicating name

20  changes of several companies.

21          MR. PASTORE:  Once again, just to expedite, I'm going

22  to hand the witness what's been marked as Government Exhibits

23  215-A through 215-E.  I'm going to ask the witness to review

24  them while I read a stipulation into the record.

25          Stipulation is S-6.  Has the caption of the case and

1    it indicates New York State Department of State, Division of

2    Corporations, State Records, and Uniform Commercial code.  It

3    reads as follows:

4        "It is hereby stipulated and agreed by and between the

5    United States of America by Preet Bharara, United States

6    attorney for the Southern District, James Pastore and Janis

7    Echenberg, assistant United States attorneys, of counsel, and

8    the below named defendants by and through their attorneys that:

9        "1.  If called as a witness, a custodian of records

10   for the New York State Department of State, Division of

11   Corporations, State Records, and Uniform Commercial Code would

12   testify that Government Exhibits 215 and 309 consist of records

13   of the New York State Department of State which were:

14       "A.  Made at or another the time of the occurrence of

15   the matters set forth in the records by, or from information

16   transmitted by, a person with knowledge of those matters;

17       "B.  Kept in the course of regularly conducted

18   business activity; and

19       "C.  Made by the regularly conducted business activity

20   as a regular practice."

21       Dated January 15, 2013, signed by Ms. Echenberg as

22   well as counsel for each defendant.

23       Government now offers S-6, 215, and 309 into evidence.

24       MR. GREENFIELD:  No objection.

25       THE COURT:  Received.

1          (Government's Exhibits S-6, 215, 309 received in

2     evidence)

3     Q.  Starting with Government's 215-E, can you tell us what

4     company this relates to?

5     A.  215-E relates to Fix Anything Construction and Plumbing.

6     Q.  Does it list an address for Fix Anything?

7     A.  The third page shows Post Office Box 901301 in Brooklyn,

8     New York.

9     Q.  So do I understand correctly it's the first three

10    numbers -- the post office box we've been looking at was

11    190301; is that right?

12    A.  That's correct.

13    Q.  So the numbers, the first three numbers are inverted

14    essentially?

15    A.  Yes.

16    Q.  Government's 215-D, 387 Quincy Associates incorporation

17    document, do you see that?

18    A.  Yes.

19    Q.  Can you tell us what address, if any, is associated with

20    387 Quincy Associates in the Department of State records?

21    A.  4316 17th Avenue in Brooklyn, New York.

22    Q.  And if you could just direct us to what page that is,

23    please?

24    A.  I'm sorry, it's the third page.

25    Q.  Is that being displayed on the screen now?

D1ULCIB5                           Gordon - direct

A.   Yes.

Q.   Government's 215-A, can you tell us what company that

document is associated with and what address, if any?

A.   Vintage Partners New York, LLC.  And on the third page it

lists 190301 Brooklyn, New York as the address.

Q.   So that's the post office box that we reviewed records for?

A.   Correct.

Q.   215-C, please.

A.   Relates to 5318 16th Avenue Enterprises, LLC.  And page 3

lists 5318 16th Avenue in Brooklyn, New York, as the address

for service of process.

Q.   And, finally, Government's 215-B, what company does that

relate to?

A.   Millennium Developers and General Contractors Incorporated.

Q.   So any of the A files that we've discussed so far relate to

that company?

A.   No.

Q.   Is there an address associated with this company?

A.   Yes.  5318 16th Avenue in Brooklyn, New York.

Q.   And what page is that on?

A.   Page 3.

Q.   Is there a name also associated with Millennium Developers

Incorporated?

A.   Yes, Harold Tischler.

Q.   In connection with your testimony today, did you review

1    Department of Labor records and call notes?

2    A.  Yes.

3         MR. PASTORE:  If we could please bring up on the

4    screen side by side, on the left-hand side, Government's

5    107-20-A, side by side with Government's 107-20.

6    Q.  If we could focus first on the left-hand side, tell the

7    jury in general what this document is.

8    A.  It's entitled case note.  It's a record maintained by the

9    Department of Labor with respect to alien labor certifications,

10   specifically I believe this relates to trying to confirm

11   sponsorship of an alien.

12   Q.  Okay.  And is there anything that associates the document

13   on the left, the case note, with the document on the right?

14   A.  Yes, the address of the company, of the sponsoring company.

15   Q.  Okay.  And besides that, if we could zoom out on the left,

16   please.

17        Where it says case number, do you see that?

18   A.  Yes.  The case number that's listed here would correspond

19   to the case number on an alien labor certification.

20   Q.  Okay.  If we could now on the right side go to the second

21   page.

22        Does that case number in the case note appear anywhere

23   on this document?

24   A.  There is a case number on the right of this document and

25   also a case number on the top of the document to the left.

D1ULCIB5                              Gordon - direct

1   They appear to be the same.  To be honest with you, they're

2   very small.

3   Q.  We can zoom them in.  Is what is being displayed on the

4   screen --

5   A.  Yes, they are the same.

6   Q.  They're the same.  All right.

7            So if we can now on the right, 107-20, if you could

8   tell us whether you were able to determine what company, what

9   address and what phone number was associated with 107-20.

10           MR. PASTORE:  If we can please zoom out and go to the

11   actual labor certification.

12   Q.  Do you see where it says employer's name?

13   A.  Yes.

14   Q.  What's listed there?

15   A.  5318 16th Avenue Enterprises LLC.

16   Q.  And the address?

17   A.  4316 17th Avenue in Brooklyn, New York.

18   Q.  If you can go down now to the next field, D, employer

19   contact info, whose name is listed there?

20   A.  Harold Tischler.

21   Q.  And is there a phone number listed?  Is there a phone

22   number listed there?

23   A.  Yes.  (718)288-7844.

24   Q.  In the course of your investigation, did you do any

25   analysis of who was the subscriber for that phone number?

D1ULCIB5                         Gordon - direct

1    A.   Yes.

2    Q.   During this time period?

3    A.   Yes.

4    Q.   And when I say this time period, I mean May 14, 2008, which

5    is the date of the first call note.  Do you see that?

6    A.   Yes.

7    Q.   And were you able to in fact obtain subscriber and toll

8    records?

9    A.   Yes.

10              MR. PASTORE:  I'm reading what's been marked as

11   Government's S-17.  It has the caption of the case.  It's a

12   stipulation associated with Sprint Nextel Corporation and it

13   reads as follows:

14              "It is hereby stipulated and agreed by and between the

15   United States of America by Preet Bharara, United States

16   attorney for the Southern District, James Pastore and Janis

17   Echenberg, assistant United States attorneys, of counsel, and

18   the below named defendants by and through their attorneys that:

19              "If called as a witness, a custodian of records of

20   Sprint Nextel Corporation would testify that Government

21   Exhibit 223 consists of subscriber information and toll records

22   for the cellular telephone assigned telephone number

23   (718)288-7844 for the period May 1, 2008, through May 1, 2009,

24   and that these records were:

25              "A.   Made at or near the time of the occurrence of the

D1ULCIB5                        Gordon - direct

1    matter set forth in the records by, or from information

2    transmitted by, a person with knowledge of those matters;

3            "B.  Kept in the course of regularly conducted

4    business activity, and

5            "C.  Made by the regularly conducted business activity

6    as a regular practice."

7            Dated January 25, 2013, signed by me and each of

8    defense counsel.

9            And government moves to admit S-17 together with

10   Government's 223.

11           MR. GREENFIELD:  No objection.

12           THE COURT:  Received.

13           (Government's Exhibits S-17, 223 received in evidence)

14           THE COURT:  Is it okay with the jury if we stay

15   another 15 or 20 minutes?  Okay.  Great.

16           MR. PASTORE:  For the record, I just handed the

17   witness what's been admitted as Government's 223.

18   Q.  And if you could tell the jury what Government's 223 is.

19   A.  Yes.  It's subscriber and toll records relating to

20   (718)288-7844 from May 1, 2008 to May 1, 2009.

21           MR. PASTORE:  If we could publish 223 on the screen.

22   Q.  Based on your review of this document, who was the phone

23   number (718)288-7844 assigned to on -- from May 1, 2008 through

24   2009?

25   A.  Harold Tischler.

1           MR. PASTORE:  And do we have the first page of the

2    223.

3           If I may, for the jury's benefit, I'm just going to

4    publish by displaying on the overhead.

5    Q.  Okay.  Can you see that on your screen okay, Agent Gordon?

6    A.  Yes.

7    Q.  And you see where it says date range 5/1/2008 to 5/1/2009?

8    A.  Yes.

9    Q.  Do you see the subject number is (718)288-7844?

10   A.  Yes.

11   Q.  Does that match the number that was in the labor file we

12   were just looking at?

13   A.  Yes.

14   Q.  And down below do you see where it says account billing

15   address?

16   A.  Yes.

17   Q.  And what does it say there?

18   A.  Harold Tischler, 4316 17th Avenue.

19   Q.  If we could go back to 107-20-A.  That is the call note we

20   were previously looking at.

21          And if you could, when it comes up on the screen,

22   please read the call note and the date for us.

23   A.  The first record is dated May 14 of 2008.  And the note

24   reads, spoke with Mr. Harold Tischler who confirmed

25   sponsorship.

1    Q.  Okay.  Did you examine the toll records for the phone

2    number that you got from Sprint to see if there was a

3    corresponding call to this call note on May 14?

4    A.  Yes.

5    Q.  Directing your attention to Government's 223-1.  What does

6    that indicate?

7    A.  It indicates that on May 14 at 8:47 a.m. there was a four

8    minute incoming phone call to (718)288-7844 from telephone

9    number (404)893-0101.

10   Q.  And what is (404)893-0101?

11   A.  It's the Department of Labor in Atlanta.

12   Q.  Now, if we can bring up, and if we can just for the jury's

13   benefit, can you direct us to the time in the toll records?

14   A.  8:47 a.m.

15   Q.  Is that now being displayed on the screen?

16   A.  Yes.

17   Q.  And so the first column, well, I guess it's the second

18   column next to 3108 where it says date 05/14.  Do you see that?

19   A.  Yes.

20   Q.  8:47 a.m., is that the entry we're looking at?

21   A.  Yes.

22   Q.  And then under phone number, you've got the Department of

23   Labor number there?

24   A.  Correct.

25   Q.  Call destination incoming?

1    A.   Yes.

2    Q.   And minutes used, is that how you determined it was a four

3    minute phone call?

4    A.   Yes.

5            MR. PASTORE:  Now if we could bring up side by side

6    Government's 107-21-A and 107-21, if we could just bring those

7    up side by side.

8    Q.   On the left-hand side of the screen, can you see that

9    Government Exhibit 107-21-A?

10   A.   Yes.

11   Q.   Are we dealing with a call note for 5318 16th Avenue

12   Enterprises?

13   A.   Yes.

14   Q.   And before you testified, did you have a chance to compare

15   the labor numbers, those A numbers, with the document on the

16   left and compare it to the document on the right?

17   A.   Yes, I did.

18   Q.   And what did you determine?

19   A.   That it relates to the number that's on the actual

20   application.  The number on the call note is the same as the

21   one on the application.

22   Q.   Okay.  And when you looked at the application, what was the

23   phone number that was listed as the contact information for the

24   employer?

25   A.   It was (718)288-7844.

D1ULCIB5                         Gordon - direct

1   Q.  And if we could just zoom out and look at the call note

2   dated May 16, 2008, what does it say there?

3   A.  No. 1, it says verified information with contact.  It's

4   dated May 16, 2008.

5   Q.  Did you examine Harold Tischler's phone records to see

6   whether there was a corresponding phone call?

7   A.  Yes.

8   Q.  Directing your attention to Government's 223-2.  What does

9   that indicate?

10  A.  It indicates that on May 16 at 4:10 p.m., there was a two

11  minute incoming phone call from the Department of Labor in

12  Atlanta.

13  Q.  Is that what's being displayed on the screen there where it

14  says 4:10 p.m., (404)893-0101?

15  A.  Yes.

16          MR. PASTORE:  Now if we could look at Government's

17  107-16-A side by side with 107-16.

18  Q.  And just to expedite matters, prior to testifying, did you

19  compare the call note with the associated actual labor file?

20  A.  Yes.

21  Q.  And what was the company?

22  A.  5318 16th Avenue Enterprises, LLC.

23  Q.  And what was the phone number listed for the contact

24  information?

25  A.  (718)288-7844.

 1    Q.  And if we can slide over and look at the call note dated

 2    June 25, 2008, what does it state there?

 3    A.  "Spoke with applicant Harold Tischler and he confirmed

 4    sponsorship for Louis Sodamaba.  This case has passed."

 5    Q.  Did you examine Mr. Tischler's phone records to see if

 6    there was a corresponding call from the Department of Labor?

 7    A.  Yes.

 8    Q.  Was there?

 9    A.  Yes.

10    Q.  Government's 223-3, can you tell us what that is?

11    A.  Yes.  It shows at 8:43 a.m. there was a four minute

12    incoming phone call from (404)893-0101.

13    Q.  Turning now to 107-8-A and Government's 107-8.  Can you

14    tell the jury again whether you compared 107-8-A with 107-8?

15    A.  Yes.

16    Q.  And, once again, were you able to determine that this case

17    note relates to the labor file marked 107-8?

18    A.  Yes.

19    Q.  Again, what company are we dealing with here?

20    A.  5318 16th Avenue Enterprises, LLC.

21    Q.  And, once again, what was the phone number associated with

22    the contact for 5318 Enterprises?

23    A.  (718)288-7844.

24    Q.  Looking at the call note dated July 28, 2008, can we just

25    bring that up on the screen and see what it says.  Can you read

1    that?

2    A.  Yes.

3    Q.  Okay.  Go ahead.

4    A.  "Spoke with applicant Harold Tischler."

5    Q.  Okay.  Go ahead and read that for the jury.

6    A.  "Spoke with applicant Harold Tischler and he confirmed

7    sponsorship for Ruslam Malateck.  This case has passed."

8    Q.  Did you examine Mr. Tischler's phone records for a

9    corresponding phone call from the Department of Labor?

10   A.  Yes.

11   Q.  Did you find one?

12   A.  Yes.  At 10:46 a.m., a three minute incoming phone call

13   from (404)893-0101.

14   Q.  And if we could bring up Government 223-4, what time did

15   you say that was at?

16   A.  10:46 a.m.  Line 866.

17   Q.  Line 866.  Is that what's displayed on your screen here?

18   A.  Yes.

19        MR. PASTORE:  I want to take two call notes together

20   next.  Government's 107-4-A and 107-6-A, and if we could just

21   bring those two document up side by side.

22   Q.  And I'm going to ask you same questions.  Prior to

23   testifying, did you have a chance to look at the associated

24   labor files?

25   A.  Yes.

D1ULCIB5                          Gordon - direct

1   Q.  And was the contact information, including the phone number
2   we've been discussing, the same?
3   A.  Yes.
4   Q.  Okay.  So if we could look at 107-4-A, what does that case
5   note indicate?
6   A.  "Spoke with Harold Tischler and he confirmed sponsorship
7   for Margot Suplaquecha.  What case has passed."
8   Q.  What is the date on that call note?
9   A.  August 29, 2008.
10  Q.  Now focusing on the right-hand side of the screen, case
11  note No. 1, what does it say?
12  A.  "Spoke with Harold Tischler and he confirmed sponsorship
13  for Max Burmeo.  This case has passed."
14  Q.  Do you see where it says entered by on the left-hand side
15  of the screen?
16  A.  Yes.
17  Q.  There's a name there.  Can you make out that name?
18  A.  Quilinda Franklin Williams.
19  Q.  On the right-hand side of the screen, scroll over to the
20  right, please, where it says entered by for the case note that
21  you just read, is that the same name?
22  A.  Yes.
23  Q.  The date on both of these case notes is?
24  A.  August 29, 2008.
25          MR. PASTORE:  If you could bring up 223-5.

1   Q.  Did you examine Mr. Tischler's toll records and did you

2   fine a corresponding phone call for the Department of Labor for

3   that day?

4   A.  Yes.  Line 1416 shows at 3:21 p.m. there was a three minute

5   incoming phone call from the Department of Labor in Atlanta.

6   Q.  Is that now displayed on our screens?

7   A.  Yes.

8   Q.  Government's 107-3-A.  Okay.  And if you could just for

9   expediency's sake tell us if you examined associated labor

10  application, which was Government's 107-3, if so, what the

11  contact information showed?

12  A.  Yes.  The same business address, 5318 16th Avenue

13  Enterprises, and telephone number (718)288-7844.

14  Q.  And looking at the call note labeled two, can you read that

15  for the jury?

16  A.  Yes.  "Sponsorship confirmed and passed."

17  Q.  What's the date for this call note?

18  A.  December 4, 2008.

19  Q.  Did you examine Mr. Tischler's phone records?

20  A.  Yes.

21  Q.  Did you find a corresponding call from the Department of

22  Labor?

23  A.  Yes.

24  Q.  223-6.

25  A.  Line 802 shows on December 4 a four minute incoming phone

1    call at 2:20 p.m. from the Department of Labor in Atlanta.

2    Q.  Now, all of these companies, I'm sorry, all of these

3    applications that we've been talking about are 5318 16th Avenue

4    Enterprises; is that right?

5    A.  Correct.

6    Q.  Are you aware whether there were any other companies

7    associated with the phone number (718)288-7844?

8    A.  Yes, I believe there were.

9    Q.  Can we please bring up Government's 112-6.  Okay.  Can you

10   tell us what is 112-6?

11   A.  I'm sorry.

12   Q.  Can you go to the next page.  I'm sorry.

13   A.  It's a letter from the Department of Labor indicating that

14   an application has not been certified, addressed to BSD

15   Contracting Corporation, dated April 30, 2009.

16   Q.  April 30, 2009 you said?

17   A.  Yes.

18   Q.  And the company for this is BSD Contracting, care of Harold

19   Tischler, 5318 16th Avenue; is that right?

20   A.  Yes.

21   Q.  If we could go forward a couple pages to the employer

22   contact information, please.  Is that how you can tell that the

23   phone number is (718)288-7844?

24   A.  Yes.

25   Q.  And you said that this indicated, this document indicated

1    that it was not certified?

2    A.  That's correct.  The front of that letter says the

3    application was not certified.

4    Q.  Can we take a look at the associated call note, 112-6-A.

5            Okay.  Focusing in on call note four, what does that

6    say?

7    A.  It says, "Employer (Harold Tischler) stated that they are

8    no longer sponsoring the foreign worker.  Sponsorship fail."

9    Q.  What's the date on this?

10   A.  April 28, 2009.

11   Q.  Did you examine Mr. Tischler's phone records and did you

12   find a corresponding call?

13   A.  Yes.

14   Q.  Government's 223-11.  If you look at the entry for

15   10:08 a.m., can you tell us what that indicates?

16   A.  10:08 a.m. there's a phone call for 120 seconds from the

17   Department of Labor in Atlanta.

18   Q.  And what's the date of the phone call?

19   A.  April 28, 2009.

20   Q.  When did you personally serve Harold Tischler with a

21   subpoena in connection with this case?

22   A.  In January 2009.

23           MR. PASTORE:  Your Honor, I'm not sure if this is a

24   good stopping point or you'd like me to continue.

25           THE COURT:  Stop, five more minutes?

1           MR. PASTORE:  It sounds like five more minutes.

2    Q.  Aside from the phone number -- aside from the phone number

3    we've been discussing, (718)288-7844, were any other phone

4    numbers associated with Mr. Tischler during your investigation?

5    A.  Yes.

6           MR. PASTORE:  Taking a look at Government's 1110-15

7    side by side with 1110-15-A, you know what, let's go 1110-15.

8    Okay.

9    Q.  Now we're back in 2007, is that right, the date is

10   February 12, 2007?

11   A.  That's correct.

12   Q.  The company is?

13   A.  Vintage Partners.

14   Q.  And am I right it says care of Harold Tischler, 4316

15   17th Avenue?

16   A.  That's correct.

17   Q.  If we can go to the employer contact information associated

18   with this particular application, what is that phone number?

19   A.  (718)854-6622.

20   Q.  If we could go to the call note associated with this file

21   1110-15-A.

22          Okay.  And if you look January 24, if you could read

23   that entry, and then read the January 25, 2007 entry as well.

24   A.  January 24 entry reads "left message with Aisel to have

25   Mr. Tischler call me back."

1       The entry for January 25 says "verified with

2  Mr. Tischler that he is sponsoring the worker."

3  Q.  Did you ever obtain Mr. Tischler's bank records in

4  connection with this investigation?

5  A.  Yes.

6  Q.  How did you obtain them?

7  A.  Through a subpoena.

8       MR. PASTORE:  Government is reading stipulation marked

9  S-1, caption of the case, Citibank.

10      "It is hereby stipulated and agreed by and between the

11 United States of America by Preet Bharara, United States

12 attorney for the Southern District, James Pastore and Janis

13 Echenberg, assistant United States attorneys, of counsel, and

14 the below named defendants by and through their attorneys that:

15      "1.  If called as a witness, a custodian of records of

16 Citibank would testify that Government Exhibits 207, 207-1

17 through 207-19, 208, 208-1 through 208-8 and 209 through 214

18 consist of bank records of Citibank which were:

19      "A.  Made at or another the time of the occurrence the

20 matters set forth in the records by, or from information

21 transmitted by, a person with knowledge of those matters;

22      "B.  Kept in the course of regularly conducted

23 business activity, and

24      "C.  Made by the regularly conducted business activity

25 as a regular practice."

1    Dated January 15, 2013, signed by Ms. Echenberg and

2    each of the defense counsel.

3    The government offers the exhibits we just mentioned

4    as well as S-1.

5    MR. GREENFIELD:  No objection.

6    THE COURT:  Received.

7    (Government's Exhibits S-1, 207, 207-1 through 207-19,

8    208, 208-1 through 208-8 and 209 through 214 received in

9    evidence)

10   Q.  Agent Gordon, in general what bank records did you get that

11   were associated with Mr. Tischler?

12   A.  I'm sorry.  I'm not sure what you mean by in general.

13   Q.  Okay.  Sorry.  My effort to move quickly I asked too broad

14   of a question.

15   How many Citibank accounts did you review?

16   A.  Three.

17   (Continued on next page)

18

19

20

21

22

23

24

25

D1u1cib6                        Gordon - direct

1   BY MR. PASTORE:

2   Q.  If you could take a look at Government's 207, what account

3   is that?

4   A.  It's a Citibank account in the name of Fix Anything

5   Construction & Plumbing, Incorporated.

6   Q.  I'm sorry.  That's Government 207?

7   A.  Oh, I'm sorry.  No.  That's 207-1.  Government Exhibit 207

8   is the name of Vintage Partners NY, LLC.

9   Q.  Is there an address on the bank statement that's in front

10  of you?

11  A.  4316 17th Avenue, Brooklyn, New York.

12  Q.  Okay.  So the first account, Vintage Partners, is at

13  4316 17th Avenue?

14  A.  Correct.

15  Q.  Second account which you were describing, I think,

16  Government's Exhibit 207-1?

17  A.  Yes, is for Fix Anything Construction & Plumbing,

18  Incorporated.

19  Q.  Is there an address on the bank statement?

20  A.  Post Office Box 190301, Brooklyn, New York.

21  Q.  And the third account is for what company?  And if you look

22  at Government's 207-4.

23  A.  Vintage Builders & General Contractors, Inc.

24  Q.  And what is the address, if any, on the bank statement?

25  A.  Post Office Box 190301 in Brooklyn, New York.

D1u1cib6                        Gordon – direct

1    Q.  Directing your attention to Government's 207-17.

2              MR. PASTORE:  And if we could bring that up on the

3    screen, please.

4    Q.  What is this?

5    A.  It's a check drawn on the Vintage Builders & General

6    Contractors, Incorporated account.

7    Q.  So am I right that Vintage Builders is the one that's

8    associated with P.O. Box 190301?

9    A.  That's correct.

10   Q.  Who is the check made payable to?

11   A.  Verizon.

12   Q.  What is the phone number in the memo line?

13   A.  718-854-6622.

14   Q.  What's the date on this check?

15   A.  December 15th, 2006.

16             MR. PASTORE:  Government's 207-16, please.

17   Q.  Once again, we're looking at Vintage Builders; is that

18   right?

19   A.  Yes.

20   Q.  And who is this check made payable to?

21   A.  Verizon.

22   Q.  Is there a phone number in the memo line?

23   A.  718-854-6622.

24   Q.  The date on this check?

25   A.  January 15th, 2007.

D1u1cib6                        Gordon – direct

1           MR. PASTORE:  And finally, Government's 207.

2   Q.  And this is Vintage Partners, not Vintage Builders?

3   A.  Correct.

4   Q.  What is the Vintage Partners address again?  What is it

5   associated with?

6   A.  4316 17th Avenue, in Brooklyn, New York.

7   Q.  And this check dated February 15th, 2007, is there a

8   phone number in the memo line?

9   A.  718-854-6622.

10  Q.  Have you compared that phone number to the phone number

11  that appears for Vintage Partners in the labor file we were

12  just discussing?

13  A.  Yes.

14  Q.  How do they compare?

15  A.  It's the same.

16          THE COURT:  Perhaps we ought to stop here.

17          Let me remind the jury once again, please, not to

18  discuss the case.  It's really important that you keep an open

19  mind until all the evidence is in.

20          And I'd ask any juror who is going to have a really

21  serious problem staying here to the beginning of next week to

22  stay behind and let me know what it is, okay?

23          (Jury excused)

24          JUROR:  Stay here?

25          THE COURT:  Come on up and talk to me over here.

D1u1cib6

1             If counsel wants to join me, that's fine.

2             (Discussion held off the record at sidebar)

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1u1cib6

1            (In open court; jury not present)

2            THE COURT:  All right.  We are going to get to

3    summations tomorrow, so it only seems to be fair to counsel

4    that you're fully aware of what the charge is going to include,

5    or not, before we start.

6            So we have two options.  One, plowing through.

7    Honestly, I've given it a lot of thought, and whether you're

8    happy or not happy, I don't think it's going to be a very

9    extended discussion on a whole bunch of things.  There might be

10   a little more discussion on a few.  We can plow on right now or

11   I can give you a chance to get something to eat and come back.

12           MR. BRILL:  I'd rather do it now, Judge.

13           MR. GREENFIELD:  Can I step out for two minutes?

14           THE COURT:  All right.  Why don't we take a few-minute

15   break and then just plow through.  Okay.

16           (Recess)

17           MR. GERZOG:  Your Honor, is it okay with the court if

18   Mr. Brodjik is excused for this?

19           THE COURT:  Yes.

20           MR. DONALDSON:  Your Honor, is it okay if Ms. Cibik

21   leaves too?

22           THE COURT:  She is welcome to leave.  She is not

23   required to stay.

24           All right.  I think we can use the Brodjik comments as

25   a good beginning framework.  And if I miss one sequentially,

D1u1cib6

1    tell me.

2            I think the first one was on the particular

3    investigative techniques; is that correct?

4            MR. DONALDSON:  Yes.

5            THE COURT:  Okay.  And I decline to change the charge

6    as written.

7            The next is consciousness of guilt from false

8    exculpatory statements and consciousness of guilt in flight, I

9    concur that that doesn't belong in the charge at this time,

10    given the evidence as it came in.

11            On the section on witnesses and credibility, I am not

12    going to add the language.  If counsel continues to read the

13    following section on the testimony of cooperating witnesses and

14    etc., I think it will be clear that the language at the

15    beginning of that section is introductory and I have the

16    concept later on.

17            MR. PASTORE:  Judge, I'm sorry.  I just lost where we

18    are.  Are we on page 19, "On the other hand, if the witness has

19    shown knowingly"?

20            THE COURT:  Right.  Which I have on the next page, or

21    two pages later.

22            MR. PASTORE:  So we're striking that?

23            THE COURT:  Right.  I'm not adding it.

24            MR. PASTORE:  Not adding it.

25            THE COURT:  Not adding it, okay?  I will add the

D1u1cib6

1    request for an additional witnesses employed by the government,

2    which, actually, it's from Sand.

3              On the existence of conspiracy --

4              MR. GUTMAN:  Actually, I'm sorry, your Honor.  There

5    was one --

6              THE COURT:  Did I miss one?  Yes?

7              MR. GUTMAN:  I think testimony of cooperating

8    witnesses.

9              THE COURT:  Oh, I have where you are.  On 19?

10             MR. GUTMAN:  Yes.

11             THE COURT:  Yes, that's okay.  I'm adding that.

12             MR. PASTORE:  That's as well as other crimes?

13             THE COURT:  Yes.  That's it exactly.  I'm sorry.  Part

14   of it is, I'm working off of one copy and one other set of

15   notes so --

16             It's very helpful in some ways, but I would use next

17   time footnotes instead of end notes because --

18             MR. GUTMAN:  I wasn't sure which would be more

19   disruptive.

20             THE COURT:  I think it's very creative, and I like it.

21   It's good.  It could be even better.  That's all I'm saying.

22             Okay.  So 22, the addition is in.  That's on the

23   government witnesses.

24             Okay.  On page 30 I think is the next location, I'm

25   not going to add that.  This is not a contractual meeting of

D1u1cib6

1      the minds, you know, civil concept.

2              Please help me out.  What's the next --

3              MR. PASTORE:  37 is the next page, false statement.

4              THE COURT:  Right.  I'm not going to add this.  I find

5      the addition totally confusing.

6              MR. GUTMAN:  Your Honor, can I be heard on that

7      briefly?

8              THE COURT:  Sure.

9              MR. GUTMAN:  I think very specifically to this case,

10     there are in fact statements where -- where the argument would

11     be that -- not to seek questions -- if we're talking about the

12     same thing.

13             THE COURT:  Yes, we're talking about the same thing.

14             MR. GUTMAN:  Our argument would not necessarily be the

15     question was ambiguous.  It's that the statement has multiple

16     possible meanings.  For example, if the --

17             THE COURT:  It would be very helpful if you could

18     perhaps give me an exhibit to put this argument into your

19     reality that I have to deal with, okay?

20             MR. GUTMAN:  I don't have it with me, but it's --

21     well, actually --

22             THE COURT:  I'm asking you for like a real life

23     example.

24             MR. GUTMAN:  If you focus on -- this is really Count

25     Four more than Count Three.

D1u1cib6

1          THE COURT:  I appreciate that.

2          MR. GUTMAN:  The application for naturalization.

3          THE COURT:  Right.

4          MR. GUTMAN:  One of the statements is, "Where were you

5    employed in the last number of years?"  The definition of the

6    word "employed" could mean different things.  You could work at

7    a location or you could work for someone at a location and not

8    be employed by them.  I don't think there's been evidence about

9    W-2s and that kind of thing.  So --

10         THE COURT:  I don't think this needs to be upgraded to

11   W-2s.

12         MR. GUTMAN:  The point is, it's definitely one where

13   it could be a literal truth.

14         THE COURT:  What's the literal truth?  If I recall, he

15   omitted any connection with the David law firm; correct?

16         MR. PASTORE:  That's correct, your Honor.  And his

17   taxes will show that he didn't report any income from Gift

18   Packaging, that is, that he reported he was self-employed as a

19   computer repair person.  So your Honor is exactly right.  It's

20   the omission of the mention of the law firm.

21         MR. GUTMAN:  Well, again, I mean, actually, that may

22   or may not be the best example.  Another one is, you know, is

23   your -- does your wife have a -- has she been granted permanent

24   residence?  And that certainly is literally true.  So it's not

25   about the ambiguity of --

D1u1cib6

<pre>
 1                THE COURT:  If the question was:  Was your wife
 2     granted permanent residence?
 3                MR. PASTORE:  I honestly don't remember that question.
 4                MR. GUTMAN:  Well, that's one of the questions on the
 5     form.
 6                THE COURT:  And what did he answer?
 7                MR. GUTMAN:  Yes.
 8                THE COURT:  And are you saying --
 9                MR. GUTMAN:  Well, I'm not sure what the government
10     thinks, but in terms of --
11                THE COURT:  The government looks so puzzled that I
12     don't think it has very much to say about this at all.
13                MR. PASTORE:  She fraudulently got a green card.
14     That's literally true.  She fraudulently got a green card.
15     That's not a false statement.  She did get a green card.  Yeah.
16                THE COURT:  Okay.  Let's try another example.
17                MR. GUTMAN:  I'm sorry, your Honor.  I'm sorry.  Do
18     you have the application?
19                MR. GERZOG:  They're going to focus, Judge, on:  "Have
20     you committed any crimes?"  Which is a bizarre -- to me is a
21     bizarre question, because --
22                THE COURT:  Well, if I were rewriting the form, I
23     don't think I'd exactly put it that way.  I mean, I just
24     thought it was interesting, having nothing to do with this
25     case, my comment, nothing to do with this case.  This is a form
</pre>

D1u1cib6

1      of self-reporting on things that one would not necessarily

2      have --

3                  MR. GERZOG:  I wonder how many people have said yes in

4      that box, have checked yes to that question, is the bottom

5      line.

6                  THE COURT:  Well, but the question isn't:  "Have you

7      committed a crime?"  Isn't it --

8                  MR. GERZOG:  "Have you committed a crime for which you

9      were not arrested?"

10                 MR. GUTMAN:  And if you pleaded not guilty, you're

11     entitled to the presumption of innocence.

12                 MR. GERZOG:  They can't consider that a false

13     statement unless they convict him of one or more of the other

14     charges in this case.

15                 MR. GUTMAN:  Or even if they did, it's what in his

16     mind.  If he believes he's not guilty, a determination, you

17     know -- Jeffrey Skilling was convicted of a crime and the

18     Supreme Court said that's not a crime.  So it's a very

19     sophisticated question.

20                 THE COURT:  Well, or not.  Perhaps the whole point is,

21     it's not a sophisticated question.  It isn't a Skilling type

22     question.  It's a very fundamental question.  Are you actively,

23     day in, day out, engaged in a scam?

24                 MR. PASTORE:  And it's a little academic, but on

25     February 17th, 2009, before he submitted the application,

D1u1cib6

1    Mr. Brodjik came in and admitted his guilt to the United States

2    Attorney's Office.

3           THE COURT:  I guess that's a pretty good answer to

4    that.

5           MR. GUTMAN:  I don't think that is.  First of all, I

6    don't know if he admitted his guilt.  He admitted -- there's

7    nowhere in the proffer where it says, "I am guilty.  I have

8    committed a crime under Section so-and-so of the United States

9    Code."

10          THE COURT:  But we all know that to be guilty of a

11   crime, you don't even have to know that there's a section which

12   makes --

13          MR. GUTMAN:  But the point is, the statement is

14   subject to interpretation.  There is an interpretation, or we

15   would -- we'd like to argue that there is certainly a

16   reasonable interpretation in which that is not a false

17   statement.  I mean, this may be our Rule 29 argument and we're

18   getting ahead of ourselves, but for the government to rely on

19   that question -- and this does go back to why we would like to

20   know what the particular statement the government is relying

21   on, because they're going to have to, at the end of the case,

22   say why this should go to the jury.  We don't think that issue

23   should go to the jury.  It's a -- it's a question that's not

24   capable of a true or false answer or that at least is --

25          THE COURT:  Of course it is.  I have stolen from a

D1u1cib6

1    bank.  I've not yet been caught.  Have I committed a crime for

2    which I have not yet been arrested?  Why is that incapable of

3    being answered?  I murdered someone.  I've not been caught.

4            MR. GUTMAN:  That might be different.  This is not --

5    this is not the same kind of crime, and what -- what the

6    definition of what makes --

7            THE COURT:  What is ambiguous?  Assuming that the

8    defendants did what the government's testimony says they did,

9    what is the ambiguity about whether those activities are

10   clearly fraudulent?  And since they involve fraud against the

11   government of the United States, what is the ambiguity as to

12   whether they're criminal?

13           MR. GUTMAN:  First of all, who's to say that the jury

14   accepts the entire government case?

15           THE COURT:  Assuming arguendo.  You're arguing that

16   it's a question that can't be answered.  And you're saying that

17   this crime is so unique that a person committing it could not

18   know or reasonably be expected to know that what he is doing is

19   a crime.  Assuming -- maintaining my neutral position -- that

20   the government's evidence is accepted and that these are the

21   activities that he engaged in.

22           MR. GERZOG:  That's what I said at the beginning,

23   Judge.  In order to find him guilty of checking that no box,

24   they have to find him guilty of the crimes.

25           THE COURT:  No.

D1u1cib6

1          MR. GERZOG:  Well, then what, they can --

2          THE COURT:  I mean, that would work for every other

3    hypothetical I gave you.  It would work with a bank robber and

4    the murderer and everyone else.

5          MR. GERZOG:  So they can find him guilty of that crime

6    on speculation that he was guilty, on what?  What do they --

7    he's -- they're not going to be able to get in that he admitted

8    that he was guilty, and what are they supposed to look at,

9    whether he in fact committed the crime, and that's --

10         THE COURT:  Whether a person who did what he did would

11   reasonably have understood that it was a crime.

12         MR. GERZOG:  But when you say when "a person who did

13   what he did," they first have to determine if he did what he

14   did.

15         THE COURT:  Well --

16         MR. GUTMAN:  What if they find that he did some of

17   what the government alleges but not all of what the government

18   alleges?

19         THE COURT:  What does it matter?  In other words, this

20   is the big issue.  There are ways of having Count Four decided

21   after Count One, and after Counts Two, Three -- what is it,

22   however it works -- Five and Six?  You know, that you can do

23   that when you have a felon in possession case.  You can have

24   the jury determine whether he is a felon, and then you bring

25   him back and you charge him again and they ask whether he had a

D1u1cib6

gun when he committed that felony.  There is a way.  If this is
really your argument.  Which, by the way, this is not the time
to have raised it.  This is an argument that should have been
raised months ago, months ago.  Whether you were in the case or
not, it should have been raised.  Because this is a really
academic --

           MR. GERZOG:  Don't buy yourself a 2255.

           THE COURT:  Well, no.  I mean, I don't think we're
past a point of no return.  I'm just saying that this is the
type of argument that should be the subject of a legal brief
and not pop up in the context of a charge conference without
any academic support.  That's the point.

           MR. GUTMAN:  And it was in our charge request before
trial, but --

           THE COURT:  What charge request?

           MR. GUTMAN:  We submitted pretrial charge requests.

           THE COURT:  Okay.  I don't remember.  I'm sorry.

           MR. GUTMAN:  But your Honor, I do think it's not
academic.  I mean, it may be academic, but it's real --

           THE COURT:  Then if it's a real problem, we can handle
it just the way I said.

           MR. GUTMAN:  Well, possibly, but I think the language
we requested that just basically says, if either the statement
or the question is ambiguous -- I mean, I'm not wedded to our
language, but just not to limit it to the question.  If the

D1u1cib6

1    statement in the defendant's mind could have more than one

2    meaning.  And when we're talking about, "Did you commit a

3    crime," I mean, a crime requires --

4             THE COURT:  What is the ambiguity?  I thought it was a

5    crime or I thought it was okay?

6             MR. GUTMAN:  I didn't know whether, in my particular

7    state of mind, which I know, and I didn't have a conscious

8    intent to defraud the immigration service, I didn't think I was

9    committing a crime, I thought I was helping out, you know, a

10   person I worked for, I didn't think it had anything to do --

11   nothing that I intended had to do with defrauding the

12   immigration.

13            THE COURT:  But that is totally an argument without

14   any evidence whatsoever, because your client has chosen -- I'm

15   not saying inappropriately -- not to take the stand.

16            MR. GUTMAN:  But the statement -- the jury's being

17   asked to find the statement is false and knowingly false, and

18   the law is, if it's -- if there is a version of the statement,

19   a reasonable version of what the statement could have meant to

20   the person who said it that is literally true, he can't be

21   guilty of this crime, and our only point is that to focus

22   exclusively on was it a good enough question or was there

23   ambiguity to the question leaves out the possibility that the

24   jury's fine with the question but sees some possible

25   interpretation of the statement where it's literally true.

D1u1cib6

1          MR. PASTORE:  Judge, if I may, I mean, this may help.

2     On February 17th, 2009, Refeal Brodjik told the government,

3     "Approximately one month after starting work for David, it

4     became clear to Brodjik that David and other individuals in the

5     law office were committing immigration fraud."  So to the

6     extent that counsel is going to argue that there was no

7     intent --

8          MR. GUTMAN:  Did he say he joined the conspiracy?

9          MR. PASTORE:  He then goes on to explain what he did

10    to further the conspiracy, including collecting money from Sam

11    Salamon -- collecting money from Sam Salamon and Lipa

12    Teitelbaum, among others, which is another -- which is another

13    issue that we may have to discuss, because in cross-examining,

14    Mr. Gerzog -- I wrote it down somewhere -- but Mr. Gerzog said,

15    you know, "You never gave money -- you don't remember giving

16    money to Rafi Brodjik; right?"  And I think he said, "And

17    that's because you didn't do it."  And then he said, "You never

18    gave money to Rafi Brodjik."  And that seemed just flatly

19    inconsistent with what Rafi Brodjik told the government.

20         MR. GERZOG:  That's what he testified to on direct.

21    Meaning that's not true or what Mr. Brodjik said is not true?

22         MR. PASTORE:  Again, this is sort of -- understanding

23    what your Honor has instructed us, this seems to be not an

24    issue of perception or what did you see, which, you know,

25    Mr. Donaldson's cross, as I noted, skillfully avoided that.

D1u1cib6

```
 1    This is just flat out, "You never gave money to Rafi and you

 2    didn't do it."  So there's a lot of arguments here that are

 3    just flatly inconsistent with what Mr. Brodjik has admitted to

 4    in proffers with the government, and it's quite clear that he

 5    knew that he was engaged in, as he said it, immigration fraud.

 6              MR. GERZOG:  What does one say when the witness says

 7    something contrary, when the witness says, "I never gave a

 8    penny to Rafi Brodjik"?  Am I then not allowed to just

 9    underscore that?  I mean, I didn't -- I didn't ask it for the

10    first time.  He said on direct, "I didn't give a penny to Rafi

11    Brodjik."

12              MR. PASTORE:  My recollection is that he couldn't say,

13    sitting here, remember giving it to Rafi directly, that he

14    believes he gave it to Lipa.

15              MR. GERZOG:  No, absolutely.  He said -- he was very

16    proud of the fact that he never gave in to the extortion, or

17    what he perceived as extortion.

18              MR. PASTORE:  No, no.

19              MS. ECHENBERG:  This is something entirely different.

20              THE COURT:  No, that's separate.

21              MR. PASTORE:  Yeah.

22              MR. GERZOG:  And that he had this thing going with

23    Earl David that, you know, Rafi had no right to collect from

24    him and Rafi had no connection to him and so forth.  And he

25    made a big point of the fact that, you know, maybe Lipa
```

D1u1cib6

1    Teitelbaum did but he didn't.

2          MS. ECHENBERG:  It's not that maybe Lipa Teitelbaum

3    did.  He provided money to Earl David, as Earl David was

4    requiring, through Lipa Teitelbaum.  Lipa Teitelbaum gave money

5    to Rafi on both their behalf.  That's what the testimony

6    reflects.

7          MR. GUTMAN:  Does the government want to introduce

8    Rafi's statement to prove that their witness was not correct?

9          MR. GERZOG:  It's ridiculous to say that Sam Salamon

10   was saying, "Yes, I did give money to Rafi Brodjik, just, I

11   handed it to Lipa first and then he handed it to Rafi."  That's

12   not what he's saying.  That's clearly not what he was saying.

13         THE COURT:  Look, well, my notes say that he didn't

14   see Lipa Teitelbaum hand the money to Rafi Brodjik.  Sam

15   Salamon didn't give it to Brodjik, but the money was from Lipa

16   Teitelbaum and Sam Salamon, that Teitelbaum gave him the money,

17   although he never saw him do it, and that if he hadn't paid

18   Earl David through Brodjik, that David would have stopped

19   supporting his efforts in working for him.  That seemed pretty

20   clear to me.  Do you have some other interpretation of it?

21         MR. GERZOG:  Yes.  I have the interpretation that Sam

22   Salamon was saying, you know, "I declare myself free and

23   independent of Earl David.  If Lipa Teitelbaum wants to pay

24   him, go ahead.  And Lipa told me that he was going -- Lipa told

25   me, Sam, that he was going to cheat Earl out of some of the

D1u1cib6

1      money and I said, 'Be my guest.'"

2             THE COURT:  Oh, yeah, I think that there was

3      underreporting.  I agree with you.  But no way was that

4      testimony to be understood that Sam Salamon didn't understand

5      that he owed a tithe to Earl David.

6             MR. PASTORE:  And Mr. Gerzog's argument and your

7      Honor's interpretations hit the nail on the head.  We believe

8      that Mr. Gerzog, as he's now indicating, argued through his

9      cross-examination that Salamon never gave money in any form to

10     Rafi Brodjik, and that's what he wanted the jury to take away.

11     We believe the take-away is consistent with what your Honor

12     said, that he gave the money to Lipa and he understood that was

13     being given to Brodjik.

14            MR. GERZOG:  My cross-examination was very clear.

15     There was not a hand-to-hand between Salamon and Brodjik, which

16     Salamon said there was not.

17            THE COURT:  But it went on.  I mean, I'll either find

18     it on the transcript or I'll see it in the physical transcript

19     later.  But I think that the problem with your language is that

20     the words, "the statement was false under any reasonable

21     interpretation of the question or the statement" is just

22     garbled and the government's is simply clearer because it says,

23     if the question is subject to different interpretations, then

24     it is the government's responsibility to prove that the

25     defendant's answer was false under any reasonable

D1u1cib6

1    interpretation.

2              MR. GUTMAN:  Well, I'll give the government credit

3    for --

4              THE COURT:  If you want to give it more thought,

5    that's fine.

6              MR. GUTMAN:  I would try to word it better, but I

7    think -- I think it's easier because it doesn't fully state the

8    applicable law.

9              THE COURT:  But the point is that an answer to a

10   question is in the context of the question and the answer is

11   either truthfully responsive or it's deliberately not so.  And

12   if the question can be understood more than one way, then there

13   are other variations on possible answers.  The government's

14   proposed charge accounts for that.

15             MR. GUTMAN:  Your Honor, if I could, I'll submit a --

16             THE COURT:  Sure.

17             MR. GUTMAN:  -- hopefully clearer alternative.

18             THE COURT:  Sure.

19             MR. GERZOG:  And not to undercut what I'm sure will be

20   a brilliant submission by Mr. Gutman, but I would ask your

21   Honor to, if you rule against Mr. Gutman on whatever it is he

22   submits, to go to the separating the count and going to that

23   count second.

24             THE COURT:  Well, the only problem with that creative

25   suggestion is that I don't believe that for the answer to be

D1u1cib6

 1    false, the defendant has to, in their own mind, have gone

 2    beyond a reasonable doubt analysis.  And actually, the reason

 3    for the splits in the other case, I now remember, is because

 4    you don't want to tell the jury that the defendant is a felon,

 5    even though you have the evidence in the current case that they

 6    used a gun in commission of the crime.  So I take back my

 7    suggestion.  It's actually not applicable.

 8         MR. PASTORE:  And, Judge, if I may, it's been

 9    suggested that the jury couldn't possibly find him not guilty

10    on the immigration fraud but guilty for answering falsely that

11    he wasn't engaged in a crime.  I don't think that's true.  For

12    one example, the jury could say, oh, well, it appears he

13    engaged in money laundering, he was putting money into this

14    Code of the Heart and transmitting it to Earl David across

15    borders, you know, and wasn't reporting it, so he did money

16    laundering, I don't think he actually did it in the immigration

17    applications, so we're going to find him not guilty on

18    immigration stuff, but he knew that their money was being

19    laundered in a way and it was being disguised --

20         MR. GERZOG:  So now we're saying the jury can come up

21    with any -- the jury doesn't know what money laundering is.

22         THE COURT:  Well, no one's going to actually come to

23    that.  I mean, there's not going to be an argument --

24         MR. GERZOG:  I understand.

25         THE COURT:  But also, I mean, I don't know whether,

D1u1cib6

1    there, for example, are going to be tax returns of Mr. Brodjik.

2          MR. GERZOG:  Right.  Perfect example.  So maybe he

3    committed income tax evasion.  They can -- they can find --

4    look at the income tax things and say, huh, this doesn't seem

5    right to me.  That's a crime.

6          MR. GUTMAN:  But that's actually just the point is,

7    there are civil tax frauds and there are criminal tax frauds.

8    A lot of attorneys and a lot of judges debate where the line is

9    drawn between one and the other.  Mr. Gerzog and I were

10   involved in a case where a violation of the Clean Air Act was

11   treated as a crime.  Usually it's treated as a civil penalty, a

12   civil violation, where you get a penalty.  If someone -- if,

13   theoretically, a prosecutor could interpret something as a

14   crime, that doesn't mean that's the only way to interpret it.

15   Our laws are complicated.  Someone who is a layman may not know

16   where the line is between improper, you know, you could be

17   deported for this, you could be sanctioned for it in some way,

18   and it's a crime that you could go to jail for, and I -- the

19   point of the jury charge is to give the jury all the options

20   that are there, not to foreclose a way of thinking about the

21   evidence that is consistent with the law, even if it's not

22   consistent with the government's theory of what the evidence

23   shows.

24         MR. GERZOG:  There was evidence adduced that

25   Mr. Brodjik allegedly extorted money from Mr. Salamon.  I

D1u1cib6

1    guarantee you, Mr. Brodjik does not believe and has never

2    believed that he extorted money from Mr. Salamon.  The jury may

3    think, based on what Mr. Salamon said, that he did.  Is that

4    enough to make that answer false?

5         THE COURT:  Well, I mean, maybe it's helpful to learn

6    what the various false statements are that the government is

7    going to argue are false in his application, because this may

8    be one of six.

9         MR. PASTORE:  I apologize.  I think our paralegal just

10   took our trial cart out.  But Government's 410 is the relevant

11   exhibit, I believe it's on the third page, and there is a list

12   there of employment, and it lists that from January 1st, 2006

13   till August 31st, 2007, that he was employed, self-employed,

14   40 McNamara Road at Gift Packaging.  The next entry is for 2007

15   to sometime in 2008.  It lists that he was a bus driver at

16   Monsey Trails.  That also appears to be false, not -- his tax

17   returns don't report that in 2007.

18        MR. GERZOG:  No, but Judge, there's been absolutely no

19   evidence about Monsey Trails.  They're going to argue that

20   because he wrote on his tax return computer repairman that that

21   makes his answer as some bus driver false?

22        MR. PASTORE:  Yes.  He lied.  He lied about his

23   employment.  He has federal -- he has federal income taxes that

24   report that he was --

25        MR. GERZOG:  We don't even know if that's considered

D1u1cib6

1       material.

2               MR. PASTORE:  Yes, we do.  There was testimony

3       directly about that.  Ms. Echenberg specifically asked about

4       that as her last question on direct, and I believe it's --

5               MR. GERZOG:  No, no.  That's not what I mean.  I mean,

6       if you write on the IRS report -- we have one juror who said

7       she's an actress.  I never heard of her.  She probably isn't in

8       a lot of movies.  But if she likes to put on her tax return

9       that she's an actress because it makes her feel good, is she

10      lying, if in fact most of her income comes from something else?

11              THE COURT:  That isn't a good analysis.

12              MR. GERZOG:  I mean, if he puts computer repairman and

13      in fact he does do some computer repair work, which we haven't

14      heard anything about one way or another, and in fact he drives

15      a bus, which we haven't heard anything about one way or

16      another, that's false?

17              THE COURT:  You'll all argue about it.

18              MR. PASTORE:  So that's one set of false statements.

19              The next set of false statements is the question we've

20      been discussing:  "Have you committed a crime?"  And of course

21      he engaged, day after day, in this immigration fraud, failed to

22      disclose that on his application.

23              And then on question 23 and 24, they relate to false

24      information provided to immigration authorities, and of course

25      there was false information.  He aided and abetted providing

D1u1cib6

```
1    false information.  He went to Earl David and got a green card

2    based on his wife's phony application, which he knew -- there's

3    been extensive testimony that he knew the application that was

4    being submitted was false.

5            There's also a question -- and I'm not entirely sure

6    if it's on the 485 or instead on the 410, I believe it may be

7    on the 410 -- about whether you were detained at any time by US

8    Customs law enforcement, and of course there's an e-mail that

9    says, "I was placed under investigation for an hour when I

10   drove to Toronto and took your car for you," so that would be

11   another false statement.  In defendant's own words, he was

12   detained for more than an hour for I think what he called crap.

13           MR. GERZOG:  That doesn't say --

14           MR. PASTORE:  Again, false --

15           MR. GERZOG:  -- I was detained at the border.  I

16   wouldn't consider that.  I don't think he was detained in terms

17   of search --

18           THE COURT:  It's your opportunity to argue that.

19           MR. GERZOG:  But it can't be the law that when they --

20   when you cross the border, that they don't just immediately

21   wave you through, that that then appears that you have to

22   answer yes to:  "Have you ever been detained or in custody?"

23           MR. PASTORE:  Yeah.  If we look at the e-mail, his

24   words are, I believe, "under investigation for an hour."

25           MR. GUTMAN:  Yeah, but if this were a seizure case,
```

D1u1cib6

1    the government would be arguing the defendant wasn't under

2    arrest, he wasn't detained.  These are not such -- it's not so

3    clear-cut.

4            But I think this is going back to the original request

5    for a specification of the statement, and I appreciate that it

6    may or may not be reversible error.  Whether it is or it isn't,

7    the problem in this case is that in the absence of a

8    specification, which the government appears ready to give to

9    your Honor, but if we don't also give that to the jury, we're

10   leaving open the possibility that a guilty verdict could mean

11   that some juror picked, you know, the word extortion, for

12   example, or picked something out of the air and is using that

13   instead of something that the court agrees to be a reasonable

14   basis for a finding of guilt on this count.  And again, I think

15   that pragmatically, if there's not some sort of defining of

16   what the government's allegations are and what we're defending

17   against and what the verdict can be based on, it creates a host

18   of problems.

19           MR. GERZOG:  Quite frankly, I think the government is

20   overreaching.  They have a theory, the theory is that he

21   committed immigration fraud, the theory is that he lied on the

22   application when he said he didn't commit immigration fraud,

23   and that's what we're concerned about.

24           MR. PASTORE:  No.

25           MR. GERZOG:  It can't be that he -- that the failure

D1u1cib6

1    to acknowledge that's being questioned, we don't even know what

2    happened at the border.  He said he was investigated for an

3    hour.  Maybe it was a lie.  Maybe he was trying to make Earl

4    David feel bad about it.  We don't know anything about whether

5    he was investigated or not, or what it means, or what he

6    thought it meant.

7              MR. PASTORE:  Judge, these are all perfectly

8    reasonable arguments to present to the jury.

9              THE COURT:  Sure.  Now if you want to give me some

10   other language.

11             MR. GUTMAN:  I will.  Thank you, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1ULCIB7

1          THE COURT:  Is the next 42?

2          MR. PASTORE:  I have insertion of specific unlawful

3     objective.

4          THE COURT:  I'm not doing that.

5          42, I'll change the word automatically to in and of

6     itself.

7          On 43, I'm not adding specific unlawful objective.

8          I am going to give a conscious avoidance charge.

9          MR. GERZOG:  Your Honor, are you going to specify

10    that's with respect only to the two gentlemen behind us so that

11    even the government doesn't argue that Ms. Cibik or

12    Mr. Brodjik -- I believe the government's position, as I heard

13    it the other day, was that neither Ms. Cibik nor Mr. Brodjik

14    could be found guilty under a conscious avoidance theory.

15         MR. PASTORE:  No.

16         THE COURT:  That's not correct.  You can have

17    intentional crime and a conscious avoidance charge at the same

18    time.

19         MR. GUTMAN:  What's the evidence?

20         MR. GERZOG:  What evidence is there that Mr. Brodjik

21    consciously avoided anything?  They say he was as much a part

22    of the fraud as anybody and he was wrapped up and dancing

23    around and bragging about it and so forth.  What evidence is

24    there that he consciously avoided anything?

25         MR. PASTORE:  Judge, I can lay it out again.  The

D1ULCIB7

particular concern with Mr. Brodjik was that he was collecting
fraud proceeds, he was collecting money from the law firm.  We
allege that he was doing that knowingly that they were fraud
proceeds.  I think it's entirely appropriate.  There could be
an argument that he didn't know what was going on, that he
simply stuck his head in the sand and was transmitting the
money to Earl David for some reason that he didn't bother to
confirm.  In other words, he didn't bother to confirm where the
money was coming from.

       MR. GERZOG:  And if I argue that --

       MR. PASTORE:  That's what we said yesterday.  I'm
sorry, I'm just not finished.  That would be the argument with
respect to him.

       And the argument with respect to Ms. Cibik was
specifically that in her case she has said to the government on
several occasions, and this is where the false exculpatory
comes from that I agree at this point -- although she was
suspicious about these sponsors, she never really knew and was
just using these sponsors on the applications and she had her
suspicions but never bothered to confirm them.

       So with respect to both Ms. Cibik and Mr. Brodjik, I
believe there is a basis, as I said yesterday, for the
conscious avoidance charge.

       MR. GUTMAN:  But the government's argument is that he
must have known argument.  It's not there was a high

D1ULCIB7

probability and he put his head in the sand.  And the case law

is very clear.  There has to be some evidence that he decided

not to know.

    If somebody is handed a brown paper bag and is given

$20,000 to take it to somebody in another part of town and he

doesn't look inside the bag, that's conscious avoidance.

That's a decision to avoid learning something when you have

good reason to think there's something suspicious going on.

    That's not the evidence here.  The evidence here, if

the government is right, he had to know.  There's not a single

thing in the evidence about him refusing to look at something

that somebody tried to show him or it's just not here.  It's

not here.  There's a basic foundation.

    THE COURT:  Just to respond.  *United States v.*

*Svoboda*, 347 F.3d 471 at 480 (2d Cir. 2003).  Once a defendant

denies knowledge of the unlawful conduct, the Second Circuit in

*Svoboda* made clear that the second prerequisite for conscious

avoidance charge is easily met because "the same evidence that

will raise an inference that the defendant had actual knowledge

of the illegal conduct ordinarily will raise the inference that

the defendant was subjectively aware of a high probability of

the existence of illegal conduct."

    MR. GERZOG:  Am I not precluded from arguing that

knowledge because of the statements because I don't want the

statements to come in?  I can say they haven't proven beyond a

D1ULCIB7

1    reasonable doubt that he knew.  But I can't say that he didn't

2    know.

3            MR. DONALDSON:  Right.  That was my question.  My

4    question is, to jump on his back, kind of jumped over it, but

5    if we don't argue, not arguing knowledge.

6            THE COURT:  What are you going to argue, guys?

7            MR. GERZOG:  Which guys, us?  We're going to argue

8    they haven't proved beyond a reasonable doubt that he knew.

9            MR. GUTMAN:  Or intent.  There's also an intent

10   argument.  You can know what's -- just as your charge tells the

11   jury, knowledge of a conspiracy doesn't make you a member of

12   the conspiracy.

13           MR. PASTORE:  That sure sounds like conscious

14   avoidance to me, Judge.

15           THE COURT:  Yeah.

16           MR. GUTMAN:  It's not all conscious avoidance.

17   Conscious avoidance is a very specific different concept.  It's

18   not any time the government hasn't proven my intent I avoid.

19   It's really, conscious avoidance is not a catchall so that the

20   government can make up for, you know, an absence of proof on

21   the subject of intent.  And it's not about intent.  It's only

22   about knowledge.

23           MR. PASTORE:  Judge, I think, again, this lays bare

24   exactly, he knew but didn't intend.  This exactly what we're

25   concerned about.

D1ULCIB7

1          MR. GUTMAN:  They're concerned but that doesn't make

2     it the law.

3          THE COURT:  I don't think you're right on the law and

4     I think conscious avoidance is appropriate.

5          On the acts and statements of coconspirators, I think

6     the objection is really not well taken because our instruction

7     clearly tells the jurors if you find beyond a reasonable doubt

8     that one or more of the defendants was a member of the

9     conspiracy charged in Count One of the indictment, then any

10    acts committed in furtherance of the conspiracy by a member of

11    the same conspiracy may be considered.

12         On the issue of false statements, beyond what we've

13    been talking about, I gave you some language, I think, that I

14    wrote on the unanimity issue.

15         MR. PASTORE:  Government has no objection.

16         MR. GUTMAN:  Without waiving our previous request, we

17    have no objection.

18         THE COURT:  All right.  I think we dealt with the

19    obedience to authority issue yesterday.

20         I guess maybe going back to the Brodjik objections,

21    there was a request to take out certain language on page 56 in

22    terms of failure to act.  I'm not taking that out.

23         MR. PASTORE:  Judge, I think there was also a request

24    for deletion on page 55.

25         THE COURT:  Another helpful suggestion, next time,

D1ULCIB7

1    bold.

2          MR. PASTORE:  To the bottom of the page, knowingly

3    associate himself or herself in some way.  I believe the

4    defendants are requesting that "in some way" be struck.

5          MR. GUTMAN:  Your Honor, on the failure to act, I just

6    ask what's the government's theory.

7          THE COURT:  The failure to tell the truth.  It's the

8    inverse of lying.  I'm not going to take out "in some way."

9          MR. GUTMAN:  This is relating to the conspiracy.  This

10   is talking about participation.

11         THE COURT:  Wait a second.  What are we talking about?

12         MR. GUTMAN:  On page 57.

13         THE COURT:  All right.

14         MR. GUTMAN:  Actually, it's aiding and abetting.

15         MR. PASTORE:  Fifty-six.

16         THE COURT:  It's aiding and abetting.

17         MR. PASTORE:  It's the substantive offense.

18         MR. GUTMAN:  I'm not sure what the substantive offense

19   in which there's a failure, where there's an allegation of an

20   omission.

21         THE COURT:  It seems to me that the law requires

22   truthfulness.  The failure to be truthful is the flip side of

23   an action taken voluntarily and intentionally.

24         MR. GUTMAN:  I mean it gets into a whole range of

25   other things that I don't think are relevant to this case.  But

D1ULCIB7

1    I think there's a whole fiduciary -- in the absence of a duty

2    to say something, an omission isn't fraudulent.  And I just

3    don't think that's the allegation here.  I don't think there's

4    any evidence that that relates to, so it just seems like

5    something that will confuse the jury.

6            If the government can't articulate a specific omission

7    other than, you know -- I haven't heard an articulation of an

8    omission that they're going to argue to the jury.

9            MR. PASTORE:  Your Honor I think hit the nail on the

10   head, the failed to tell the truth.  They certified under

11   penalty of perjury.

12           THE COURT:  I think this is making a mountain out of a

13   mole hill.

14           MR. PASTORE:  Frankly, on this one, the government

15   takes no position.  We think the Court's instruction is right.

16           THE COURT:  If you don't care, I don't need to care,

17   all right.  We can take it out.  We don't need to have an issue

18   about something that is not important, you know, to the

19   prosecution.  I really do think it's --

20           MR. PASTORE:  I'm sorry, your Honor, I may have spoken

21   too soon.

22           THE COURT:  Because if you go on, a bad purpose other

23   than to disobey or disregard the law and it seems to me

24   disregard relates to the failure to do something the law

25   requires to be done, I would just leave it.  I think it's fine.

D1ULCIB7

1           There's the request to argue good faith.

2           MR. PASTORE:  Sorry.  Just on 57, I think we're all in

3    agreement that the aiding and abetting for Count Four is going

4    to be removed which was bracketed in defendant Brodjik's

5    comments.

6           THE COURT:  Okay.  I'm sorry.  Did we not pull that?

7    Sorry, what page?

8           MR. PASTORE:  57, subsection C, Count Four, the

9    indictment charges the defendant with making false statements

10   in a naturalization proceeding on his own behalf.

11          THE COURT:  Sorry.  We just missed that.  Sorry.  Bold

12   would really help.

13          There's a request that I charge good faith.  In the

14   Second Circuit there is no requirement to charge good faith and

15   this is consistent with the majority of circuits.  Unless there

16   is a theory of defense with a basis in the record, and I don't

17   know what the basis in this record would be for a good faith

18   defense on behalf of Mr. Brodjik.

19          MR. GUTMAN:  Can we wait to articulate that until we

20   hear what the false statements are?

21          THE COURT:  I think that you can't sort of have good

22   faith in the air, right?  So as of now, there's no good faith

23   defense charge.

24          I think that as far as the various typos and other

25   things, if you help us proofread, we'd appreciate it, and we'll

D1ULCIB7

1    include all that.

2            Let me just make sure that we covered everything in

3    Ms. Cibik's objections and I think we have.

4            MR. DONALDSON:  Yes, we have.

5            THE COURT:  All right.  Anything else?

6            MR. BRILL:  Scheduling tomorrow, Judge.  Nine to?

7            THE COURT:  Probably to same, to 1:15.  Go until like

8    two.  Give them lunch.  Come back.

9            MR. DONALDSON:  You said?

10           THE COURT:  Nine to 11:15.  Sorry.  Do the morning

11   break.  Come back for another session just like we do.  Feed

12   them around 2 o'clock, 2:15.  And then pick up and go as far

13   as, as long as we last.

14           MR. PASTORE:  Are we starting 9 a.m. interrupting

15   Deidre Gordon's testimony to put on the civilian witnesses?

16           THE COURT:  Let's ask.  There are two questions.

17           Are there civilian witnesses?

18           MR. GREENFIELD:  Yes.

19           THE COURT:  How many?

20           MR. GREENFIELD:  Four.

21           MR. PASTORE:  Could we have their complete names?  All

22   we got --

23           MR. GREENFIELD:  I'm going to give you that.

24           THE COURT:  Just give it to him before he leaves the

25   room.  I don't need to hear.

D1ULCIB7

1          How much more of Ms. Gordon's testimony?  That's a

2    question not --

3          MR. PASTORE:  Accusation.

4          THE COURT:  -- twisting knife.

5          MR. PASTORE:  I'm already about a third of the way

6    through.  I honestly didn't see what time I started today, but

7    I'm about a third of the way through.  So I would anticipate

8    probably slightly more than an hour.  Did I go for an hour ten

9    today?  I think it's --

10          MR. GERZOG:  Two more hours.

11          THE COURT:  Brett will probably know.

12          THE LAW CLERK:  About an hour ten.

13          MR. PASTORE:  An hour ten.  So I think I'll probably

14    have about that tomorrow.  I'm going to look again tonight.  I

15    was streamlining certain things, so I'm going to do that a

16    little bit more and see, obviously, subject to objections, if

17    we can continue to streamline things.

18          THE COURT:  Okay.  So.

19          MR. GREENFIELD:  So we are going to start with my

20    witnesses tomorrow.

21          THE COURT:  All right.

22          MR. DONALDSON:  There was some --

23          THE COURT:  Is that okay?

24          MR. BRILL:  Fine, Judge.

25          MR. PASTORE:  And my understanding is none of the

D1ULCIB7

1    defendants are testifying, at least at this time, and no other

2    defense cases, just for scheduling purposes.

3              MR. GERZOG:  Correct.

4              MR. BRILL:  One concern I have for tomorrow, Judge,

5    the government has a number of exhibits that I've stipulated to

6    them as business records but not necessarily as to their

7    relevance.  And, of course, as the government gets up to read

8    the stipulations, I'm scrambling to look at the exhibit numbers

9    before they come into evidence to make sure that's not one of

10   the ones that we had that issue with, so.

11             THE COURT:  Why don't you do that tonight.

12             MR. BRILL:  It's because I don't know at what point

13   during their direct.

14             MR. PASTORE:  Why don't we do it now.

15             THE COURT:  Do it now.  You're here.  If this is

16   really a problem, you can check it out now.

17             I mean these are all connected to stipulations, right?

18             MR. BRILL:  Right.  Maybe I wasn't being clear.  I

19   know what the exhibits are.  I know what the issue is.  I just

20   don't know of course at what point during the direct the issue

21   will come up.

22             THE COURT:  Tell me what it is.  You know it's coming

23   in tomorrow.

24             MR. BRILL:  Right.

25             THE COURT:  Because it's part of the stipulation.  So

D1ULCIB7

1    is there a generic issue?

2              MR. BRILL:  There are relevancy issues because they

3    have, for example, City Car Van call log which includes a call

4    to Arnold Goldenberg, who is a person who's not involved in

5    this case.  The government is now going to attempt to say that

6    call was made to Mr. Schwartz's phone, I believe, based upon a

7    toll record.

8              MR. PASTORE:  And subscriber records showing the phone

9    was subscribed in Mr. Schwartz's.

10             THE COURT:  Right, that it really was to his phone.

11   You're not debating that.  It was to his phone.

12             MR. BRILL:  The phone in the City Car application was

13   Mr. Schwartz's phone.

14             THE COURT:  Okay.

15             MR. BRILL:  That may be.  But the fact that the

16   call -- the government is essentially saying that it's the

17   truth that the call logs are accurate reflections of what

18   actually was done by the Department of Labor such that when the

19   exhibits we saw today suggest that Mr. Tischler was in fact

20   called and did in fact speak to them, there will be evidence

21   tomorrow Mr. Schwartz was allegedly called and did in fact

22   speak to them.  They're going to say that's not actually what

23   happened.  And when Mr. Goldenberg was called, it was not

24   Mr. Goldenberg who spoke.

25             THE COURT:  The government is looking very puzzled.

D1ULCIB7

1    So I don't think they know what you're talking about.

2              MR. BRILL:  The call log says Department of Labor

3    representative called Arnold Goldenberg.

4              MS. ECHENBERG:  Your Honor, there's some call logs

5    that reflect Arnold Goldenberg.  We don't know who that is

6    either.  We know the Department of Labor called a number

7    associated with Nathan Schwartz on that day and there's a call

8    log that says they spoke to Arnold Goldenberger and it passed

9    because those particular applications -- we don't know -- why

10   are in the name of Arnold Goldenberger instead of Nathan

11   Schwartz.  It's his company and his phone.  We will argue that

12   perhaps he was using an alias at that time, among other things

13   they did, to keep the Department of Labor from getting too

14   suspicious about the overuse of companies and particular

15   people.

16             MR. BRILL:  Of course, the government doesn't actually

17   know that call matches up to that file.  What they do know is

18   on that date, a call was placed to Nathan Schwartz from a

19   number in Atlanta.  But we know for a fact there are dozens of

20   people working for the Department of Labor as contract

21   employees in Atlanta and this could have been an entirely

22   different call because the call logs don't contain the phone

23   numbers that were actually called.  The government is asking

24   to --

25             THE COURT:  That's an argument you'll be making to the

D1ULCIB7

1    jury.

2              MR. BRILL:  Sure, but I think there's a relevance

3    issue.

4              THE COURT:  I don't think -- not a good enough one.

5              MR. BRILL:  That's fine, Judge.  There are a number of

6    other minor things like that which --

7              THE COURT:  Let's go through them because really we

8    need to move this along.

9              MR. BRILL:  Understand.

10             THE COURT:  And so tell me what these issues are.

11             MR. BRILL:  They have phone subscriber information

12   from allegedly from a company Bliss 9, which is related to my

13   client, as well as City Car and Van.  These are numbers in no

14   other way I've seen are connected to my client.

15             THE COURT:  But they're connected to his phone number.

16             MR. BRILL:  No, a phone number I don't know anything

17   about.

18             MS. ECHENBERG:  So the phone number is reflected in

19   those applications under employer contact for certain of the

20   companies.

21             And then the Bliss 9 number, if I'm correct, the one

22   we're talking about, is registered to the address 455 306.

23             MR. BRILL:  Except for the fact it's registered to a

24   different box at 455 306, a box that has never been connected

25   to my client.  And we know there are dozens of boxes in that

D1ULCIB7

1    location.

2              MR. PASTORE:  I should add, Bliss 9, the corporation,

3    is registered, associated with his client.

4              THE COURT:  So you have a phone number, a call to a

5    phone number.

6              MR. BRILL:  I don't know we have a call to that phone

7    number.  I think we have a phone record, a subscriber record to

8    a corporation name to a mailbox in Monsey that shares part of

9    the same mailing address with my client's mailbox.

10             THE COURT:  But the company that has the other mailbox

11   at the same location is a company registered by your client?

12   In other words, the New York State registration has --

13             MR. BRILL:  Years and years before.

14             THE COURT:  Doesn't matter.  It's Nathan Schwartz

15   registered that Bliss company.

16             MR. BRILL:  Yes.

17             THE COURT:  And now is -- and there's a phone number

18   associated with --

19             MR. BRILL:  The Bliss company.

20             THE COURT:  -- the Bliss company, and there is a phone

21   call.

22             MR. BRILL:  I haven't seen the phone call.

23             THE COURT:  There is a log.

24             MR. BRILL:  No, just the phone record, just the phone

25   subscriber information, as far as I know.  I haven't seen

D1ULCIB7

1    anything else.

2              MS. ECHENBERG:  The phone number is listed.  You know,

3    on the 9089 form, it lists employer contact information.  So

4    that phone number is listed as the employer contact information

5    for Bliss 9, Nathan Schwartz is the employer contact.

6              I think I misspoke.  The incorporation documents for

7    Bliss 9 don't specify Nathan Schwartz, but Sam Salamon

8    testified that Bliss 9 was a company associated with Nathan

9    Schwartz.

10             MR. BRILL:  Actually, he testified it was a company

11   called Bliss 39.

12             MS. ECHENBERG:  That's accurate.

13             And when you look at the phone number that's listed in

14   employer contact for Bliss 9, Nathan Schwartz, when you get the

15   subscriber records for that phone, it lists Bliss 9, 455 Route

16   306.  And, yes, it's a different mailbox, but we're talking

17   about a small mailbox location.  So these are all arguments

18   that can certainly be made.

19             THE COURT:  I'd say there's sufficient evidence for --

20   support for the evidence to come in.

21             MR. BRILL:  And the second one is very similar but it

22   has to do with the City Car Van rental with Mr. Goldenberg.

23   The government I'm sure will argue that because Mr. Schwartz

24   had some tangential relationship to that business at some point

25   that somehow that also has a nexus to him.  Again, it's that

D1ULCIB7

```
 1  same separate mailbox, Box 129 instead of Box 119.  Doesn't
 2  have his name associated with it.  But, again, I'm sure his
 3  name is on this false labor application.  Or, actually, no,
 4  it's not Arnold Goldenberg's name on that false labor
 5  application.
 6           THE COURT:  Okay.  So you've got Goldenberg's name.
 7  What's the company?  The company is the car service?
 8           MR. BRILL:  City Car Van rental, something like that.
 9           THE COURT:  What's the address?
10           MR. BRILL:  Box 129 instead of Box 119.
11           THE COURT:  So the same place?
12           MR. BRILL:  Right.
13           THE COURT:  What about the contact information?
14           MR. BRILL:  Arnold Goldenberg.
15           THE COURT:  What about the phone number?
16           MR. BRILL:  It's a phone number that comes back to
17  City Car and Van Rental.
18           MR. PASTORE:  No.  It comes back to (845)721-7455,
19  which is the phone number that appears that Nathan Schwartz put
20  on the kitchen receipts, among other places, and it also
21  appears on Government -- so that's 3002.  It also appears on
22  Government's 304, which was the record Mr. Srugo introduced as
23  a business record when the mailbox was opened at 46 Main St.
24           MR. BRILL:  We're not disputing the 7455 is
25  Mr. Schwartz's phone number.
```

D1ULCIB7

1              THE COURT:  That ties it to him.  That's enough.

2              MR. BRILL:  I think there was one other but I forgot.

3              THE COURT:  If it's about of the same order, probably

4      get the same ruling.  Okay.

5              MR. GUTMAN:  I just have a procedural question.  Will

6      the Court make our submission on the charge part of the docket

7      or do we need to file it?

8              THE COURT:  You certainly can file it.  Absolutely.

9              MR. GUTMAN:  Thank you.

10             THE COURT:  There are no secret proceedings here.

11             MR. GERZOG:  Finally, Judge, about the jurors.

12     Obviously the woman is going to Florida.  She's gone.

13             THE COURT:  Effectively she's gone.

14             MR. GUTMAN:  The woman who has to take her child.

15             THE COURT:  She may or may not.

16             MR. GUTMAN:  What did the man say?

17             THE COURT:  He just said that if we were still sitting

18     next Wednesday, he couldn't sit past 2:15.  Sort of like a

19     nonissue.  So we're hanging in by our thumbnails, as they say.

20     That's sort of the way I've been feeling for a while.  You too,

21     I suspect.

22             (Adjourned to January 31, 2013 at 9 a.m.)

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   ROBERT SALAMON

 4   Cross By Mr. Brill . . . . . . . . . . . . .1588

 5   Cross By Mr. Greenfield . . . . . . . . . .1616

 6   Cross By Mr. Gerzog . . . . . . . . . . . .1674

 7   Redirect By Ms. Echenberg . . . . . . . . .1731

 8   Recross By Mr. Gerzog . . . . . . . . . . .1735

 9   DEIDRE GORDON

10   Direct By Mr. Pastore . . . . . . . . . . .1738

11                    GOVERNMENT EXHIBITS

12   Exhibit No.                          Received

13    1304-1 and 1304-2  . . . . . . . . . . . .1743

14    1309-1 through 1309-5  . . . . . . . . . .1744

15    1352-1, 1352-2 . . . . . . . . . . . . . .1748

16    1334-1 through 1334-6  . . . . . . . . . .1751

17    S-5, 206, 306  . . . . . . . . . . . . . .1763

18    S-7, 205, 308  . . . . . . . . . . . . . .1764

19    S-12, 204  . . . . . . . . . . . . . . . .1766

20    S-6, 215, 309  . . . . . . . . . . . . . .1770

21    S-17, 223  . . . . . . . . . . . . . . . .1775

22    S-1, 207, 207-1 through 207-19, 208,  . . .1788

23          208-1 through 208-8 and 209

24          through 214

25    50  . . . . . . . . . . . . . . . . 1744
</pre>

```
 1    51     . . . . . . . . . . . . . 1750

 2    3064-1    . . . . . . . . . . . . 1753

 3                    DEFENDANT EXHIBITS

 4   Exhibit No.                        Received

 5    HT-11   . . . . . . . . . . . . 1669

 6    HT-8    . . . . . . . . . . . . 1667

 7    HT6    . . . . . . . . . . . . 1653

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```